**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE ART MUSEUM, INC., a Delaware corporation, | : : : |
| Plaintiff, | : C.A. No. |
| v. | : Jury Demand : |
| ANN BEHA ARCHITECTS, INC., f/k/a ANN BEHA ASSOCIATES, INC., a Massachusetts corporation, and OVE ARUP & PARTNERS MASSACHUSETTS, INC., a Massachusetts corporation, | : : : : : : |
| Defendants. | : : |

**COMPLAINT**

Plaintiff Delaware Art Museum, Inc. ("Delaware Art Museum" or "Museum"), by and

through its undersigned counsel, brings this action against Defendants Ann Beha Architects, Inc.,

formerly known as Ann Beha Associates, Inc. ("ABA"), and Ove Arup & Partners

Massachusetts, Inc. ("Arup") and hereby alleges, upon knowledge as to the Museum and upon

information and belief as to all others, as follows:

**PRELIMINARY STATEMENT**

1.      In 1998 and 1999, the Delaware Art Museum's Board of Trustees developed a

long-range Strategic Building and Site-Development Plan (the "Master Plan").  Part of the

Master Plan included renovations and expansions (the "Project") to the Museum's existing

facility at 2301 Kentmere Parkway, Wilmington, Delaware (the "Facility").  Chief of the

Museum's concerns was that the Project would be completed on time and within budget.

2.      Typical of nonprofit corporations, the Delaware Art Museum's Board of Trustees was made up of community volunteers who shared a common enthusiasm for the community and the mission of the Museum.  The Museum's Board members had little, if any, experience in large-scale construction.  Certainly no one on the Museum's Board of Trustees had any experience on a multimillion dollar museum renovation equivalent to the Project's scale. Therefore, the Museum sought qualified professionals to guide it through the Project.

3.      This action arises from the failure of architectural and engineering professionals engaged by the Delaware Art Museum to discharge their obligations to the Museum in connection with the Project.  The Museum retained the architect to act as the Museum's representative throughout the Project, and the Museum properly relied on the expertise that the architect, and its engineers, supposedly brought to the Project.  Because the architect, and its engineers, did not perform their services in a timely and competent manner, the Museum was severely damaged – not only economically, by incurring substantial expenses necessary to correct and overcome these professionals' errors, omissions and delays, but also institutionally, by damage to its reputation, fund-raising and other aspects of its mission.  This suit seeks to recover those damages.

## THE PARTIES

4.      The Delaware Art Museum is a Delaware nonprofit corporation with its principal place of business in Wilmington, Delaware.  The Museum operates the Facility.

5.      Defendant Ann Beha Architects, Inc. is a Massachusetts corporation with its headquarters and principal place of business located in Boston, Massachusetts.

2

6.     Defendant Ove Arup & Partners Massachusetts, Inc. is a Massachusetts corporation with its headquarters and principal place of business located in Cambridge, Massachusetts.

## JURISDICTION

7.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and the action is between citizens of different states.

## VENUE

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the Museum's claims occurred in Delaware, the Project was undertaken in Delaware, and ABA and Arup made frequent visits to Delaware as part of their work on the Project.

## SUBSTANTIVE ALLEGATIONS

### HISTORY OF THE DELAWARE ART MUSEUM

9.     The Delaware Art Museum was founded in 1912 as the Wilmington Society of Fine Arts (the "Society").  The Society's goals were to promote the knowledge and enjoyment of the fine arts in the State of Delaware.  The Society would meet these goals by establishing schools and other methods of instruction, publishing books and other materials, establishing galleries of paintings and sculpture, and any other methods that the Society's members would determine that would further the promotion and the cultivation of the fine arts.

10.     Soon after the Society had been incorporated, the trustees of the Howard Pyle Fund deeded the Howard Pyle Collection to it.  In the 1930s, the Bancroft family generously offered the estate of Samuel Bancroft, Jr. as a site for a new museum, and in 1938 the first building of the Facility (the "1938 Building") was constructed.  In return for the gift of the

3

Samuel Bancroft, Jr. estate, the Delaware Art Museum agreed to dedicate a wing to display Samuel Bancroft, Jr.'s collection of English Pre-Raphaelite paintings.

11.     In 1957, the Facility was expanded with the addition of the H. Fletcher Brown Wing (the "Education Wing"). The Education Wing included classrooms and studio space.

12.     Before the Project, the last major construction was in 1987, when another wing was added to the Facility. This second wing (the "1987 Wing") increased gallery space by 50% and provided a new temporary exhibition gallery, but the 1987 Wing's construction was on a much smaller scale than the Project. The Project required greater sophistication and coordination between staffing and design, and posed additional complications than the construction for the 1987 Wing. The Project, in effect, was to build a new museum; the 1987 Wing was just an addition.

13.     During the past 83 years, the Delaware Art Museum gathered the works of British and American artists, including Andrew Wyeth, Howard Pyle, Dante Gabriel Rossetti, Ford Madox Brown, John Everett Millais, Edward Burne-Jones, William Holman Hunt, John Sloan and his circle, Benjamin West, Thomas Sully, Winslow Homer, Frederic Church, George Inness, John Twatchman, J. Alden Weir, Childe Hassam, Edward Hopper, Isabel Bishop, Robert Colescott, Scott Burton and Al Held. The Facility currently houses approximately 11,000 objects from the Museum's collection.

14.     Past exhibitions at the Facility included: Punto de Partida / Mexico Now: Point of Departure; Wondrous Strange: Pyle, Wyeth, Wyeth & Wyeth; Myth, Magic & Mystery: One Hundred Years of American Children's Book Illustration; Visions of Love and Life: Pre-Raphaelite Art from the Birmingham Collection, England; and Lasting Legacies: Howard Pyle and Norman Rockwell.

15.    Today, the Delaware Art Museum is dedicated to developing awareness, understanding and appreciation of the visual arts and their impact on culture, and to enriching lives by collecting, preserving, exhibiting and interpreting the visual arts for a diverse audience.

## THE DELAWARE ART MUSEUM NEEDED TO EXPAND

16.    In 1998 and 1999, to further the Museum's goals, its Board of Trustees developed the Master Plan. The Master Plan identified the following 10 long-range goals for improving the Facility:

i.    increase the amount of permanent collections on view;

ii.    increase the number, quality and variety of gallery spaces for permanent collections and temporary exhibits;

iii.    improve the physical relationship between the permanent collection galleries and the temporary exhibit spaces;

iv.    enhance the education and studio spaces;

v.    improve the collection and exhibition support spaces, as well as meet future administrative needs;

vi.    open the original front door of the 1938 Building;

vii.    improve the lobby for access to different areas of the building, and develop the lobby as an area conducive to public events and income-related activities;

viii.    integrate the building with the site by providing appropriate spaces for art in the landscape;

ix.    use the existing reservoir as a site asset and link it to the visitor experience; and

x.      separate public entry from service and improve vehicular access to the

Facility.

17.      One of the Master Plan's most important goals was to expand exhibition space. Before the Project, the Delaware Art Museum could display only 5% of its total collection in the Facility at any given time; many peer art institutions strive to display at least 15% of their collections at any given time. Under the Master Plan, the Museum would increase its display capacity to 15% of its total collection.

18.      The Delaware Art Museum's old facilities had limited ability to host temporary exhibits; because of space and other constraints, temporary exhibition space had to be closed for 12 weeks out of the year to install and reinstall exhibits. More importantly, the space was inadequate for many traveling shows that the Museum was eager to host. Improved facilities would reduce the amount of time that space in the Facility was not put to productive use, and give visitors access to a broader range of traveling exhibitions.

19.      The Delaware Art Museum also wanted to expand the Facility's gallery size and develop areas for hosting large gatherings as additional revenue sources. The Master Plan included the goal of developing new kitchen facilities to cater such events.

20.      Thus, the Master Plan encapsulated the Museum's goals of increasing revenue, improving visitors' experiences at the Facility, and providing additional means for the Museum to further its goals of educating and adding to Delaware's cultural vibrancy.

21.      The Museum undertook the Project in order to bring the Master Plan to fruition. Apart from having to correct for unforeseen costs, conditions or errors and omissions encountered during the Project, the Museum did not materially deviate from the Master Plan during the course of the Project.

6

## TO HELP ACHIEVE ITS GOALS,
## THE DELAWARE ART MUSEUM ENGAGES ABA

22.    In connection with the Master Plan, the Delaware Art Museum sent a request for proposal for architectural services ("RFP") to various architects. The RFPs included excerpts from the Master Plan. After receiving and reviewing responses to the RFPs, the Museum selected ABA as the architect for the Project.

23.    From the beginning of ABA's involvement in the Project, ABA was well aware of the Delaware Art Museum's long-term goals.

24.    In a February 8, 2001 fax (the "February 8 Fax"), ABA recognized that an important part of its role in the Project was to help the Museum "clarify long-range needs for upgrading and expansion of Museum facilities in order to achieve the objectives identified in the Museum's Strategic Plan . . . [and to] explore options for serving the long-range needs. . . ."

25.    ABA was also specifically aware of the role that the Project would play in the Museum's fund-raising activities. In the February 8 Fax, ABA acknowledged that one of its goals was the development of "a clear design vision for the project . . . which can be communicated to Museum Trustees, *potential funding sources* and the community" (emphasis added).

26.    ABA was also aware of the Delaware Art Museum's need for the Project to finish within budget. In the February 8 Fax, ABA recognized that it needed to "provide design and technical information which leads to *reliable budgets, schedules and phasing for planning and fund-raising*" (emphasis added).

27.    The Museum believed that the Project also required an architect with local architecture expertise (the "Local Architect"). The Local Architect would have been primarily responsible for reviewing documents to ensure they complied with local building codes,

7

coordinating review and approval of the documents with regulatory authorities, answering questions regarding the Project and obtaining warranty inspections during the Project. The Local Architect also would have reviewed ABA's design documents for completeness and accuracy.

28.     ABA refused to hire a Local Architect as a consultant. ABA told the Delaware Art Museum that it would have to pay for the Local Architect separately. Given the Museum's limited budget and the Board of Trustees' concerns that pressing for a Local Architect would result in increased acrimony between the Museum and ABA, the Museum relied on ABA's assurances that ABA could handle all local issues, including promptly obtaining any necessary permits and complying with local ordinances. As the Project progressed, however, ABA's performance demonstrated that it had no basis for making those assurances. For example, ABA was unable to obtain timely permit applications from local regulatory authorities, and disputes arose as to code requirements with which ABA was not familiar.

29.     On March 22, 2001, the Delaware Art Museum entered into a written agreement with ABA (the "Agreement") that formalized the terms and conditions of ABA's performance on the Project. A copy of the Agreement is attached hereto as Exhibit A, and the terms and conditions set forth in the Agreement are incorporated herein by reference.

30.     Pursuant to paragraph 1.1.3.5 of the Agreement, ABA stated it would retain Arup as a consultant to ABA and as ABA's project engineer for the Project. Arup was to provide structural, mechanical, electrical, plumbing and fire protection engineering services to ABA to the same extent that ABA was to provide those services to the Delaware Art Museum under the Agreement. Arup failed to meet that obligation by, among other things, producing drawings that resulted in incorrect clearance heights for ceilings, structural steel with insufficient support,

8

mechanical rooms that are inaccessible to maintenance personnel, and other material flaws and inefficiencies.

31.     ABA's agreement with Arup identified the Delaware Art Museum as ABA's client, and provided that Arup would provide information and services to ABA for the renovation and expansion of the Museum.

32.     Throughout the Project, representatives from ABA and Arup traveled to the Facility and other locations in Delaware for meetings with Museum representatives regarding their work on the Project, or to perform on-site investigations or supervision for the Project.

33.     In paragraph 1.2.3.2 of the Agreement, ABA agreed to perform its work "as expeditiously as is consistent with professional skill and care and the orderly progress of the Project."

34.     Paragraph 1.4.2.1 of the Agreement required ABA and Arup to "perform the services under this Agreement with the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time."

35.     Paragraph 1.2.3.6 required ABA to "review laws, codes, and regulations applicable to [ABA's] services.  [ABA] shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project."

36.     Further, ABA agreed, among other things, to:

a.     provide the Delaware Art Museum with a schedule for the performance of ABA's services (the "Schedule") (Agreement at ¶ 1.2.3.2);

b.     manage and administer the Project (Agreement at ¶ 2.1.1);

c.     coordinate the services provided by ABA and its consultants, including Arup (Agreement at ¶ 2.1.4);

     d.     consult with and advise the Delaware Art Museum throughout the Project (Agreement, *passim*);

     e.     provide normal structural, mechanical and electrical engineering services, in addition to designing the fire protection, landscape, architecture, civil engineering, general lighting and room acoustics (Agreement at ¶ 2.4.1);

     f.     provide Schematic Design Documents based on the agreed upon schedule and budget for the Project (Agreement at ¶ 2.4.2.1);

     g.     provide Design Development Documents that would "illustrate and describe the refinement of the design of the Project, establish[] the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts," such documents to "include specifications identifying major materials and systems and establish in general their quality levels" (Agreement at ¶ 2.4.3.1);

     h.     provide Construction Documents, based on approved Design Development Documents and an updated budget for the Project, that would set forth "in detail the requirements for construction of the Project," and "establish in detail the quality levels of materials and systems required for the Project" (Agreement at ¶ 2.4.4.1);

     i.     assist the Delaware Art Museum in "bid validation or proposal evaluation and determination of the successful bid or proposal, if any" (Agreement at ¶ 2.5.3); and

     j.     "visit the site at intervals appropriate to the stage of the Contractor's operations" so that ABA would "become generally familiar with and [] keep the [Museum] informed about the progress and quality of the portion of the Work completed, . . . endeavor to guard the [Museum] against defects and deficiencies in the Work, and . . .

determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents" (Agreement at ¶ 2.6.2.1).

37.    ABA also agreed to "be responsible for [ABA's] negligent acts or omissions," including delays within ABA's reasonable control. (Agreement at ¶ 2.6.2.2) For example, one matter that was within ABA's reasonable control was the quality of its design documents – ABA was specifically responsible for insuring that there were no errors, omissions or inconsistencies in those documents. ABA's reasonable control also extended to ABA's ability to provide those documents within the Project's deadlines. ABA was late in providing design documents, and those documents were filled with errors, omissions and inconsistencies.

38.    The Agreement contained a mediation clause "as a condition precedent to the institution of legal or equitable proceedings" by either the Delaware Art Museum or ABA. (Agreement at ¶ 1.3.4.1) ABA agreed to mediate "in the place where the Project is located" (i.e., Delaware) unless ABA and the Delaware Art Museum agreed to hold the mediation at another location. (Agreement at ¶ 1.3.4.3)

39.    While ABA could authorize minor changes without the Delaware Art Museum's consent, ABA could do so only if the changes did not involve an adjustment in the contract sum or an extension to the Schedule. (Agreement at ¶ 2.6.5)

40.    The Schedule included allowances for the Delaware Art Museum's review and approval of documents prepared by ABA, performance by the Museum's consultants and the approval of submissions by authorities with jurisdiction over the Project. (Agreement at ¶ 1.2.3.2) The Schedule established a construction start date of approximately June 1, 2002 and projected that construction on the Project would take 15 months. (Agreement at ¶ 1.1.2.6) The

11

Schedule limited the total construction period, including the post-construction period, to no greater than 17 months. (Agreement at ¶ 1.1.2.8) Paragraph 1.2.3.2 of the Agreement provided that ABA could exceed these time limits only for "reasonable cause." ABA also agreed to perform its services consistent with the Schedule. (Agreement at ¶ 1.2.3.2)

41.    Overall, ABA agreed to perform and coordinate the above-mentioned services, as well as other services, with others working on the Project throughout the following Project phases:  Schematic Design, Design Development, Construction Document, Bidding/Negotiation, and Construction Administration.

42.    Under the Agreement, the Delaware Art Museum was to pay ABA $2,494,700.00 for its services on the Project in increments for each Project phase, as follows:

| | | |
|---|---|---|
| a. | Schematic Design | 17% |
| b. | Design Development | 23% |
| c. | Construction Document | 30% |
| d. | Bidding/Negotiation | 5% |
| e. | Construction Administration | 25% |

43.    Attachment A to the Agreement provided the following time periods for the completion of each phase of the Project:

| Phase | Time Period |
|---|---|
| Schematic Design | 24 to 28 weeks (168 to 196 days) |
| Design Development | 20 weeks (140 days) |
| Construction Document | 24 weeks (168 days) |
| Bidding/Negotiation | 8 weeks (56 days) |
| Construction Administration | 52 weeks (364 days) |

44.     The work on some of the Project phases would have overlapped.  For example, completed Construction Documents could be issued to contractors for bids while ABA finished preparing other Construction Documents.

45.     It was critical for ABA to meet the deadline for completing the Construction Documents so that bid packages could be issued.  The later ABA finished the Construction Documents for a particular Project item, the later the bid package for such item could be issued.

46.     Eventually, the construction start date was pushed back to approximately September 30, 2002.  ABA, and everyone else working on the Project, knew that it was necessary to meet the Schedule's milestones in order for the Museum to achieve its original occupancy date of January 12, 2004.

47.     In fact, however, the occupancy date had to be pushed back many times due to frequent delays in the Project.  Eventually, the occupancy date was pushed back to on or about December 31, 2004.

48.     Once the December 31, 2004 occupancy date was established, the Delaware Art Museum made a commitment to its constituencies that the Facility would be open no later than March 2005.  The Museum's entire focus was on fulfilling this commitment.

49.     The Delaware Art Museum's success depends importantly on funds, commitment and support from its donors.  If the Facility did not open as promised, that delay would signal problems with the Project, causing donor concern and disappointment.

50.     Meeting the December 31, 2004 occupancy date was also critical because the Museum had contracted to host a high profile exhibit of works of the world renowned artist Georgia O'Keefe as the Facility's opening event in March 2005.  The Museum arranged for this

exhibit well in advance of the scheduled opening of the Facility. The Museum faced substantial financial consequences if it had to cancel the O'Keefe exhibit.

51.    While ABA was still preparing the design documents, the Museum informed ABA by letter on or about July 9, 2001 of the Museum's budgetary constraints. In the letter, the Museum stated the obvious proposition that ABA should conform the "program to the realities of budget. . . ."

52.    The Museum reiterated the need for the Project to remain within budget in a letter dated November 14, 2002, in which the Museum restated its "expectation that it remains [ABA's] obligation as we move from a GMP [defined below] estimate to a 100% Construction Document design that the plans delivered allow us to build our project for $18 million, as agreed." The Museum also brought to ABA's attention the Museum's concern that Ms. Ann Beha was not participating in the Project in the "lead position" of ABA's design team (as ABA had represented she would), and that her participation had decreased through the design process. Ann Beha's lack of attention and participation contributed to ABA's errors and omissions.

53.    ABA also staffed a senior architect, Peter Sugar, and a junior architect, Peter Zumidzinas, on the Project. However, Peter Sugar's attention was divided between the Project and his work on the Portland Art Museum. Because Ann Beha and Peter Sugar did not put sufficient time into the Project, ABA delegated the preparation of many drawings or designs to Peter Zumidzinas until he became overworked. However, Peter Zumidzinas was not sufficiently experienced to work on some of these drawings or designs, and he lacked the authority needed to approve all of them. ABA's delegation of tasks to a junior architect contributed to ABA's errors and omissions.

54.     The urgency of the Project was reflected in Section 8.2.1 of AIA document A201, which the Agreement references.  (Agreement at ¶ 1.1.5)  Section 8.2.1 provides that the "[t]ime limits stated in the Contract Documents are of the essence of the Contract."  (A201 at § 8.2.1)

55.     In short, ABA, which participated in preparing the Schedule, was well aware of the significance of completing the Project by the opening date, ABA's need to perform in accordance with the Schedule and ABA's need to provide Construction Documents that would enable the Project to be completed within budget.

56.     As a financing vehicle for the Project, the Museum issued a tax-exempt revenue bond backed by a letter of credit from Allied Irish Banks, p.l.c. ("Allied Irish").

## THE DELAWARE ART MUSEUM ENGAGES A CONSTRUCTION MANAGER FOR THE PROJECT

57.     On October 26, 2000, the Delaware Art Museum entered into a contract with Barclay White Incorporated, which was subsequently assigned, with the Museum's consent, to Barclay White Skanska, Inc. and its successor, Skanska USA Building Inc. (collectively, "BWS").  Under this contract, BWS was to act as the construction manager for the Project.  As part of BWS's contract with the Museum, BWS was to develop with the Museum a guaranteed maximum price ("GMP"), which would be the sum of:  (1) those costs BWS necessarily incurred in performance of the construction required for the Project, and (2) BWS's fee.

## ABA'S WORK ON THE PROJECT

58.     ABA started its work on the Project shortly after the Museum and ABA entered into the Agreement.  By September 18, 2001, ABA had billed the Museum $442,000.00 for ABA's work on the Project.  ABA claimed to have completed about 80% of its work on the Schematic Design phase by September 18, 2001.

59.    ABA failed to perform its obligations within the Schedule, and ABA's performance fell far behind in critical areas. Furthermore, even though ABA took months and, in some cases, years to provide Construction Documents to the Museum, ABA's Construction Documents contained numerous errors, omissions and inconsistencies requiring additional time to resolve. These delays resulted in additional costs to the Museum that were not covered by the GMP.

60.    On or about October 30, 2001, the Museum drafted a memo to ABA that highlighted the need for ABA's design to "be distinguished, beautiful, elegant, efficient *and within budget.* It must be rigorous, balancing artfulness and clever use of space. It cannot ignore the hierarchy of needs stated by the staff and board" (emphasis added).

61.    On or about November 2, 2001, BWS sent a letter to ABA in which BWS communicated its expectation that ABA would complete the Design Development phase and begin the Construction Document phase by mid-March 2002. As this letter shows, ABA had to complete the Design Development phase before BWS could provide a "design development estimate." BWS also reiterated the need for BWS and ABA "to establish a milestone schedule which will include meeting dates for design discussions and reviews."

62.    In February 2002, ABA acknowledged in a memorandum to the Museum that delays could "cost sizeable $$$ and may even result in killing the [P]roject."

63.    Stephen T. Bruni, the Museum's executive director, sent ABA a letter on or about April 2, 2002, in which he communicated the Museum's reliance on ABA, especially given that the demands placed on the Museum's staff went "well beyond [their] expectations, budget and . . . expertise." This letter also reiterated the Museum's continuing concerns over Ann Beha's limited work on the Project and ABA's general inattentiveness to the Museum's needs.

64.     On or about April 3, 2002, Dr. Mark A. Fortunato, chair of the Museum's Design/Construction Review Committee, sent an additional letter to ABA expressing again the Museum's concerns that ABA's communication and performance to date had been "less than optimal."

### ABA Produced Construction Documents That Were Both Late And Filled With Errors

65.     Although construction was scheduled to start in June 2002, ABA had not even completed the Construction Documents by that point. As its June 17, 2002 invoice to the Museum shows, ABA had not even completed the Design Development documents by that point, and claimed to have completed only 25% of the Construction Documents – this notwithstanding that on May 1, 2002, ABA had proposed milestones of June 17, 2002 for "50% CD [Construction Document] PRINTING" and September 16, 2002 for "100% CD/FINAL PERMIT SET."

66.     During a meeting with the Museum at the Riverfront in Wilmington, Delaware in August 2002, ABA committed to releasing 100% completed Construction Documents ("100% CDs") no later than September 23, 2002. To the Museum's detriment, ABA did not meet its commitment; in fact, ABA took more than a year and a half before issuing a set of documents that were 100% complete.

67.     In reliance on ABA's representations, including its commitment to deliver completed Construction Documents by September 23, 2002, the Delaware Art Museum relocated its operations from the Facility to temporary facilities along the Riverfront in Wilmington, Delaware. The Museum also asked BWS to proceed with construction-related tasks.

68.     Based on the commitment and design documents that ABA provided, the Museum negotiated with BWS a GMP of $19,649,176.00. This GMP included a contingency amount of

$1,649,176.00 to cover unforeseen expenses (the "Contingency"). The Contingency was intended to cover weather inefficiencies and changes in construction means and methods as necessary to deliver the Project as designed and specified in the GMP Set (defined below), but the Contingency was not intended to cover costs attributable to changes in scope of work, concealed conditions and variances from the allowances in BWS's GMP Report.

69.      BWS developed the GMP from Construction Documents that ABA represented were approximately 75% complete (the "GMP Set"). ABA issued the GMP Set on August 23, 2002. However, Construction Technology Corporation ("CTC") advised Allied Irish on January 13, 2003 that the GMP Set was "not sufficiently complete or coordinated to support a positive recommendation." CTC found that "many details and schedules are missing, incomplete, or not coordinated properly [in the GMP Set] to construct the work." Indeed, contrary to ABA's representations, far from being 75% complete, ABA's GMP Set was closer to 50% complete.

70.      Due to the delays, errors and omissions in ABA and Arup's performance on the Project, the Delaware Art Museum incurred substantial costs in excess of the GMP. The GMP, as amended, eventually exceeded $22,500,000.00, which consumed all of the Contingency and increased the GMP, and therefore the cost to the Museum, by more than $2,850,824.00.

71.      Even though the GMP Set was based on incomplete Construction Documents, the Delaware Art Museum was induced to believe that the Contingency offered reasonable protection should the 100% CDs have added additional costs. That the costs of the Project eventually greatly exceeded the GMP (even with the Contingency) resulted from delays, errors, omissions and inconsistencies by ABA and Arup, all of which were contractual violations and negligent conduct by ABA and Arup.

72.     Not only did ABA fail to deliver the 100% CDs by the promised September 23, 2002 delivery date, it missed a second deadline of October 11, 2002 as well.  The Schedule was then revised to call for construction to commence in November 2002.

73.     By September 2002, it became apparent that ABA was not bubbling (or highlighting) changes in documents that were making their way into the 100% CDs – an issue that would come to damage the Project further, despite ABA's assurances that the "missing details would be complete with the issuance of the Construction Set."

74.     On October 18, 2002, ABA asked BWS "what was critical on the project schedule."  BWS's reply was simple and clear-cut:  "all of the design documents" that ABA had promised to release in September 2002.  In particular, ABA's delay in releasing the documents for structural steel was "causing serious delays."  Because ABA and Arup had failed to obtain state licensure to allow them to seal those documents before permits could be granted, ABA and BWS agreed to issue the structural drawings for bids without seals on the condition that "the same set of documents would be sealed without further change."  The structural drawings were released on October 22, 2002, subject to possible addenda.

75.     On October 21, 2002, BWS informed ABA of a day-to-day delay condition until ABA released the 100% CDs.

### ABA Issues A "Permit Set" That Is Full Of Errors

76.     Starting on or about November 13, 2002, ABA issued a permit set (the "Permit Set") of Construction Documents in partial releases.  Even this limited release was incomplete. ABA had to issue addenda to correct errors and omissions in the Permit Set through approximately May 19, 2003, almost eight months late.

19

77.    ABA ignored BWS's repeated requests to comply with professional standards by highlighting or bubbling ABA's corrections to the Permit Set and other Construction Documents. ABA's failure to highlight or bubble properly caused confusion and delay, as BWS and the subcontractors were required to determine the changes in the various sets of Construction Documents on their own.  Properly bubbled changes would have enabled BWS and the subcontractors to price any of the changed work and to commence that work more quickly.

78.    Finally, in December 2003, ABA's Sherry Frim agreed that ABA would reissue and highlight all changes in Construction Documents issued since the release of the GMP Set. Neither ABA nor Sherry Frim gave any reason why ABA could not manually highlight or bubble corrections to the Permit Set or other Construction Documents prior to December 2003.

79.    ABA did not deliver what it claimed to be the 100% CDs until on or about May 30, 2003, a full eight months late.

80.    The Delaware Art Museum continually complained to ABA that it had not provided the 100% CDs.  In a February 11, 2003 memorandum (the "February 11 Memorandum"), the Museum informed ABA that the Construction Documents remained "significantly short of 100%" and that BWS had to "'fill in details' that should be coming from ABA.  Details of this issue have been regularly communicated to ABA so this should not be news to anyone."

81.    The Museum also informed ABA in the February 11 Memorandum of the multitude of problems encountered as a result of ABA's inadequate performance to that date. First, the Museum reiterated the concerns, first raised by the copper contractor, that the treatment ABA selected for the Facility's copper skin would be "problematic."  Even though the Museum had frequently asked ABA to investigate this issue, ABA did not do so.  The Museum stated in

the February 11 Memorandum: "What if 'the expert' is right and [ABA] is wrong? Do we start over on the skin? Will DAM [*i.e.*, the Museum] be responsible for a change order? The ramifications are both numerous and scary."

82.     Peter Sugar, ABA's executive in charge of the Project, said that he had found "someone" who could install the Facility's copper skin at approximately $25 per square foot. However, as the Project progressed, the Museum discovered that the cheapest installation price for the copper skin was at least $50 per square foot. Further, Sugar did not supply the Museum with the contact information for the individual Sugar claimed could install the Facility's copper skin at $25 per square foot – nor was BWS able to find anyone who could install the copper skin at that price. On information and belief, no such person existed. By the time the Museum discovered that it would cost at least twice as much to install the copper skin, abandoning the copper skin would have materially diminished the quality of the completed Facility. Because the Museum had to install the copper skin at a cost far greater than what ABA specified, the Museum had to cut costs from other areas in the Project and absorb additional costs stemming from ABA's misrepresentations as to the cost to install.

83.     The February 11 Memorandum also highlighted: the "defiance" ABA gave the Museum relating to the design of the Facility's fire suppression system; that "issues surrounding the brick veneer on the north face of the Homsey building" had not been addressed; and that ABA had simply shrugged off six-figure costs related to making sure the Project complied with fire regulations, even though BWS had suggested a seemingly practical alternative. Indeed, ABA's apparent inability to concede any issue caused "a lot of problems" and substantial additional costs for the Museum.

84.    As of March 7, 2003, the Construction Documents continued to be revised. The initial Construction Documents had been used for base bids, which meant that subsequent changes to the documents had to be priced separately. Mechanical and electrical bidding had to be suspended to enable ABA to complete the applicable Construction Documents. Another consequence of the repeated changes to the Construction Documents was that minor electrical and plumbing work that was needed to allow concrete work to progress had to be treated as change orders, at further substantial cost to the Museum. Even the structural drawings in the Construction Documents had to be revised to conform with the revisions.

85.    In spite of all of the above problems, the Museum was led to believe on March 7, 2003 that the Project remained within budget.

86.    Prior to March 17, 2003, BWS reiterated the need for ABA "to reissue the structural drawings to reflect all current design dimensions." BWS also told ABA that reissuing the structural drawings was an urgent matter, since BWS had caught numerous layout errors and the subcontractors were confused and needed questions answered.

87.    While weather during the winter of 2002-2003 caused problems, if ABA had produced the 100% CDs by the September 2002 deadline, BWS and the subcontractors could have adjusted the Schedule so that some tasks, such as fabrication, could take place during those winter months and increased costs could have been reduced or eliminated. However, because of ABA's delays, errors and omissions, BWS and the subcontractors had to delay those tasks until ABA completed the 100% CDs, all to the substantial damage of the Museum.

88.    Between the release of the Permit Set and June 3, 2003, ABA issued approximately 25 Addenda, 257 Sketches and 153 responses to Requests for Information

("RFIs"). Most of these corrections were a result of changes necessitated by ABA and Arup's errors, omissions and inconsistencies in the Permit Set.

89.    The above changes included repeated changes to critical path work – that is, work on the Project that needed to be completed before other work could commence. Delays in critical path work caused delays to other trades or work and thereby compounded the delay costs of the Project.

90.    For example, between January 27, 2003 and May 19, 2003, ABA issued Addendum 6, which had to be revised five additional times, just for structural changes. ABA issued Addendum 6 and its revisions in response to RFIs. Addendum 6 and its revisions curtailed completion of the shop drawings needed for the fabrication of structural steel. These structural changes also caused changes in virtually all other trades. Also, numerous design changes were made on 8-1/2" x 11" sketches that were not issued as addenda. The final addendum identifying structural changes was issued approximately 253 calendar days later than when the 100% CDs were due.

91.    ABA was required to issue Addendum 10 for mechanical work on February 21, 2003, and Addendum 10 for electrical work on March 3, 2003. RFIs throughout the bidding process demonstrated that subcontractors could not offer bids based on the grossly inadequate information in the original mechanical and electrical documents. Finally, ABA admitted that the original drawings were not biddable and that Addendum 10 was intended to complete these designs. ABA's issuance of Addendum 10 was 150 calendar days later than the mechanical and electrical documents, as part of the 100% CDs, were due.

92.    ABA also was required to issue Addendum 12 for lighting fixtures on March 10, 2003. RFIs throughout the bidding process demonstrated that subcontractors could not offer bids

based on inadequate information in the original lighting fixture documents. ABA admitted that the original lighting fixture documents were not biddable and that Addendum 12 was intended to complete these designs. ABA's issuance of Addendum 12 in March 2003 was 168 calendar days later than the lighting fixture documents, as part of the 100% CDs, were due. Arup was not responsible for the lighting fixture documents.

93.    ABA issued its response to RFI 064 in Addendum 6R5 on May 19, 2003. Addendum 6R5 altered what had been defects and conflicts in the original design for new steel ties into the existing wall of the 1938 Building. However, by the time ABA issued Addendum 6R5, work had already commenced based on the original design. The redesign, demolition, additional concrete work and refabrication of structural steel necessitated by Addendum 6R5 delayed work for approximately 120 calendar days.

94.    ABA issued its response to RFI 080 on March 31, 2003, to correct errors in the Construction Documents. Originally, ABA had designed the floor drains and drain piping in the 1987 Wing so that they were higher than the finished floor elevations. ABA's response to RFI 080 was meant to correct these errors, and required costly rerouting of piping and the addition of a sump pump and electrical work.

95.    BWS sent additional RFIs to ABA seeking clarification on: missing dimensions in the Construction Documents; whether changes to the Construction Documents were properly highlighted or bubbled; inconsistencies in the Construction Documents; and materials to be used on the Project. RFIs also show that ABA issued Construction Documents that did not conform to industry standards and referred to Construction Documents that had not yet been issued. These errors and omissions caused costly delays in fabrication of materials and other work on the Project.

96.    Further, ABA failed to provide complete structural steel drawings with necessary dimensions and angles by the promised February 28, 2003 deadline; the documents were not provided until on or about May 29, 2003.

97.    ABA was informed of certain code violations in the Construction Documents prior to February 28, 2003. Moreover, on or about April 4, 2003, the Wilmington Fire Chief and Wilmington Assistant Fire Marshall informed ABA that the city would not grant permits until ABA resolved certain code violations in the Construction Documents involving egress requirements. On April 29, 2003, the Wilmington Fire Marshall's office sent BWS a letter in which it informed BWS that in addition to correcting the egress violations, ABA also had to correct additional violations subsequently noted. It took ABA until May 29, 2003 to resolve those code violations.

98.    One of the effects of ABA's inability to obtain the appropriate permits was that site cut, fill and building excavation which were initially planned to be performed in a single phase by one contractor now had to be split into several phases and between multiple subcontractors.

### ABA Claims To Issue "100% Complete Construction Documents"

99.    On or about May 30, 2003, ABA claimed to issue 100% CDs (the "Deficient CDs"). However, the Deficient CDs conflicted with sketches that ABA had recently issued. This conflict caused confusion and added further delay before BWS and the subcontractors could implement the Deficient CDs. Even though ABA did not issue the Deficient CDs prior to May 30, 2003, ABA nonetheless billed the Museum for 100% CDs in October 2002 (ABA would eventually reduce its October bill to 97% in spite of the fact that the CDs were nowhere near 97% complete).

100.    In fact, as late as May 21, 2003, the Museum informed ABA that it had failed to provide "a single Construction Document" and that BWS "has been working from a combination of 'cut and paste' Permit and GMP documents and hand sketches that have been less than ideal in moving the project forward."

101.    BWS also asked ABA if the Deficient CDs superseded the previously issued responses to RFIs.  ABA's response was "not in all cases."  Instead of correcting the confusion that it had created, ABA simply instructed BWS and the subcontractors to submit new RFIs to obtain ABA's ruling on whether the previously issued responses to RFIs governed over the Deficient CDs.  ABA's piecemeal approach to correcting a problem that it had created through its own errors and omissions added further delay and costs to the Project.

102.    ABA once again incorrectly bubbled the Deficient CDs, adding further errors to previous omissions.  As before, this incorrect bubbling caused further confusion, delay and costs, as BWS and the subcontractors had to decipher the changes in the Deficient CDs from previously issued documents.

103.    The Deficient CDs also contained mechanical, plumbing, fire protection and electrical drawings that were based on architectural backgrounds that did not agree with more up-to-date architectural drawings.  All of these drawings pertained to critical path work, and BWS informed ABA on or about June 13, 2003 through RFI 159 of ABA's need to revise the drawings "ASAP" since they covered work that was critical to the Schedule.  Yet ABA had failed to make those revisions as late as December 19, 2003.

104.    The Museum discovered that the clearance heights from finished floors to ceilings in the Deficient CDs did not conform to the design criteria that the Museum had provided to ABA, requiring ABA to redesign the Deficient CDs.  ABA and Arup designed these rooms such

that ductwork or drain pipes, when installed, would fall below the ceiling threshold established in the design criteria. By way of example, the room for the Sloan Gallery in the Facility always had a clearance height of 14 feet but, as a result of the above errors, this room lost approximately 7 inches; another room went from an 18-foot clearance to a 14-foot clearance; and the post-World War II Gallery went from having a clearance of 14 feet to 10 feet, 8 inches. Correction of these errors required that virtually the entire Project be redesigned. The Museum was concerned about maintaining proper clearance heights because having lower heights would limit the amount or type of artwork that could be displayed.

105.    BWS had to continue to question structural documents even after ABA made changes to those drawings. ABA compounded its errors because its initial redesign, and the several that followed, "did not take into account conditions that were clearly observable by the design professionals as all demolition in that area was complete."

106.    ABA and Arup also had to redesign the Deficient CDs because equipment and systems could not possibly fit within the space that ABA and Arup allotted for them in the Deficient CDs. To correct these errors in the Deficient CDs, ABA and Arup needed to reroute piping, ductwork and conduit. The Deficient CDs also required structural and architectural changes. The time needed to make the above corrections to the flawed Deficient CDs delayed the Project by months.

107.    The Museum faced additional costs because the designs of the mechanical and HVAC systems contained errors. BWS did not address these errors until after the bid process for these systems was well under way and, in some cases, complete, because it was understood that ABA would correct these errors in the Deficient CDs. In part because the Museum was not

27

aware of these errors until the later stages of the bidding process, the Museum had to incur
additional costs to resolve these errors.

108.    As of August 15, 2003, the projected costs for the Project were still within the
GMP; however, $516,419.00 out of the Contingency had already been consumed. Continuing
design revisions also delayed subcontract purchases and hampered critical path work.

109.    Once ABA finally released the Deficient CDs, the changes in the Deficient CDs
caused the Contingency to be depleted at an even greater rate. For example, by September 10,
2003, while only 25% of the Project was complete, work on the Project had already consumed
almost 100% of the Contingency.

110.    Between June 3, 2003 and April 15, 2004, ABA issued approximately 18
significant changes in design, 176 Sketches and 255 Responses to RFIs to correct errors and
omissions in the Deficient CDs. Until these corrections were issued, construction of the
associated work was placed on hold. Once ABA provided the corrections, it was necessary to
obtain contractor pricing for changes, and to analyze, negotiate, approve and issue subcontract
change orders, before the subcontractors could continue their work. Many of these corrections
were a result of changes necessitated by ABA's errors and omissions in the Deficient CDs.

111.    During this time period, and as was its custom throughout the Project, ABA
sought to blame others for its own errors, omissions and deficiencies. In a September 29, 2003
e-mail, ABA told Arup that "[t]he drawings provided by Arup were simply not complete in their
coordination with the rest of the architectural details. . . . This has resulted in late corrections
after being brought to our attention at the site, with consequent delays and increased costs!"
ABA's accusatory email violated its own earlier insistence that everyone on the Project should

strive to avoid the appearance of creating a paper trail. That same day, BWS prepared an invoice that showed that all but $12,005.00 of the Contingency had been consumed.

112.    On October 21, 2003, ABA issued a response to RFI 328. It was determined that additional structural support was needed behind the infill areas in basement walls along the west side of the 1938 Building. Adding this additional structural support delayed waterproofing and backfill in this area by 49 calendar days.

113.    By October 24, 2003, BWS had already exceeded the GMP, and was beginning to forecast that it could grow to over $21,000,000.00.

114.    During the period from June 3, 2003 to April 15, 2004, revised specifications for waterproofing and roofing were submitted to roofers for additional bidding. A contract for waterproofing and roofing had been awarded on or after February 14, 2003. Following the award of this contract, conflicts were discovered that required redesign of the roof pitch to avoid reducing the size of clerestory windows. ABA denied requests to approve and release schematics for roof areas that did not need to be redesigned. The revised specifications and ABA's refusal to release completed schematics added further delay and costs to the Project.

115.    The Deficient CDs also contained inconsistencies that had to be resolved before work could progress on the Project. In one instance, ABA was late in providing electrical drawings that needed to be reviewed by the electrical inspector so that the fire protection drawings could be prepared for inspection. RFIs showed that the fire pump contained in the design documents might have violated Delaware code.

### ABA Promises To Release A Conformed Set

116.    On or about October 23, 2003, ABA told the Museum and BWS that ABA would have to reissue all design documents as a conformed set (the "Conformed Set"). ABA promised

29

to release the Conformed Set on or about November 6, 2003. ABA had to issue the Conformed Set to address all confirmed changes to the Project that had occurred since the Deficient CDs.

117.    The Conformed Set was intended to: integrate and coordinate the scope of work requirements provided for under the Museum's budget; integrate and coordinate installations as directed by the Museum; reflect design and finish reviews conducted by the Museum and ABA; consolidate previously issued information; and correct errors and omissions in the Deficient CDs.

118.    ABA developed the term "Conformed Set" as a replacement for the term "100% CDs" that was in common use in the industry. But ABA had already failed to deliver by the September 2002 deadline the *complete* set of design documents that had previously been defined as the 100% CDs. Thus, ABA failed to provide the Delaware Art Museum by September 2002 anything resembling 100% CDs. ABA used the term "Conformed Set" to describe what were in fact the 100% CDs – which (now termed the Conformed Set) ABA would eventually issue over a year and a half late.

119.    The Conformed Set, which would include finalized designs, was a necessary addition to the Construction Documents, and was required to correct and clarify Construction Documents that ABA and Arup had previously prepared and issued.

120.    ABA assured the Museum and BWS that the Conformed Set would completely define the Project and totally supersede all previously issued documents, including all sketches and responses to RFIs. ABA also assured the Museum and BWS that all changes in the Conformed Set would be bubbled. ABA needed to live up to these assurances so that BWS and the subcontractors would not have to file additional change orders upon discovery of unidentified changes in the Conformed Set.

30

121.    ABA initially delayed release of the Conformed Set to November 10, 2003. ABA was unable to meet that goal. And in a rehash of the events surrounding the Deficient CDs, ABA failed to bubble or highlight changes to drawings in the Conformed Set that ABA provided to the Delaware Art Museum. Further, clearance heights in the galleries remained an issue.

122.    On or about November 13, 2003, BWS received a partial release of architectural drawings issued with areas marked "Hold." Then, on or about November 20, 2003, ABA noted that it issued those drawings in advance of development of the associated engineering drawings. ABA and Arup had made no attempt to assure those documents would not be in conflict with other Construction Documents.

123.    On November 20, 2003, BWS informed ABA that there were several drawings that were going to be in the Conformed Set that ABA had prepared without coordinating those drawings with engineering drawings that Arup was still developing. Because of these omissions, BWS needed to return the drawings with mark-ups to ABA for further development and coordination with Arup's engineering drawings.

124.    Due to the problems that continued to plague the Project, the Delaware Art Museum hired CTC, at additional cost, to be the Delaware Art Museum's representative. CTC's role in the Project included defending the existing GMP, and reviewing and approving all change orders necessitated by the corrections to the Construction Documents.

125.    By November 25, 2003, it became clear that changes to the Construction Documents and delays had contributed to at least $1,600,000.00 in cost overruns in the Project. The need for numerous change orders played a significant part of those cost overruns.

126.    On or about December 12, 2003, ABA reported that it could not issue the Conformed Set by December 15, 2003.

127.    On February 11, 2004, ABA admitted that Schedule impacts may have been associated with document releases and submittal reviews. On that same day, ABA denied that the Museum's review of pending change orders was responsible for any Schedule impacts.

128.    Release of the Conformed Set was ultimately delayed for several months until, on or about February 26, 2004, ABA reported that it intended to release the Conformed Set the following week – a new deadline that, again, it did not meet. Instead, ABA reported, on or about March 3, 2004, that it would print the Conformed Set and present it to the Museum by March 12, 2004 for review and comment. In mid-March 2004, ABA gave the Conformed Set to the Museum.

129.    From October 2003 until March 2004, ABA's responses to questions from BWS and subcontractors on previously issued Construction Documents were generally that such questions would be addressed in the Conformed Set.

130.    Substantial work was delayed while BWS and the subcontractors waited for receipt of the Conformed Set. For example, the Conformed Set would have included design documents for ductwork that required shop drawings, fabrication and installation before other construction could begin. Ductwork was a substantial critical path and needed to be completed before other work on the Facility could proceed. ABA's delay in releasing the Conformed Set delayed this critical path.

131.    By February 4, 2004, it became clear that the finish date would be no sooner than October 28, 2004, approximately 275 calendar days later than the previous estimate for completion. Meanwhile, the GMP continued to rise.

32

132.    By letter dated February 16, 2004, ABA misrepresented that its performance under the base Agreement was complete, although it had yet to release the 100% CDs (as the Conformed Set).

133.    As of March 2, 2004, the GMP had grown to $21,626,509.00, which included a $1,353,164.00 contingency.  However, at that time there was also approximately $1,740,042.00 in pending change orders.  And, as of March 2, 2004, it was clear that construction on the Project would continue through the rest of November 2004, and that the Facility would not be able to open until early 2005.

134.    On March 4, 2004, BWS encapsulated in PCO 257 what everyone on the Project understood was now the case:  the Delaware Art Museum "could not have reasonably anticipated the volume and extent of design errors and resultant changes that have occurred since October 21, 2002 . . . ."  The Conformed Set, which at that point was to issue by mid-March 2004, was the same set of documents that the Museum and BWS had expected to receive from ABA by October 11, 2002.  Furthermore, the many design changes produced conflicts between the different Construction Documents, requiring ABA to reissue the Construction Documents several times in an attempt to correct and resolve errors, omissions, conflicts and inconsistencies. In short, ABA's continuing performance under the Agreement included massive errors, inconsistencies and omissions which violated the standard of care that ABA assumed under the Agreement and was required to perform under the common law and by statute.

135.    On or about March 30, 2004, the Museum informed ABA that it needed to modify over 60 drawings in the Conformed Set to correct errors and conflicts with other documents before ABA could release the Conformed Set to BWS.  The Museum informed ABA that "it was the understanding that [the Conformed Set] would take the place of all previously released

33

documents in there [sic] entirety, and that all documents other that [sic] the Conformed [Set] may be discarded upon receipt of the Conformed [Set]! . . . Common problems throughout the [Conformed Set] include: Title Blocks not showing proper revisions associated with the indicated drawing. Areas that have been changed will note to refer to RFI rather than showing the change. Numerous sketches are missing, Details are missing, Inconsistencies from Architectural, to Electrical, to Mechanical, to Line Safety, Etc. . . . occur throughout the [Conformed Set]!" Furthermore, even though ABA knew about the confusion and delay that improper bubbling caused, the Museum informed ABA of no fewer than fifteen items in the Conformed Set that either still needed to be bubbled or were incorrectly bubbled. Under duress, the Museum gave ABA until on or about April 19, 2004 to make all necessary corrections and to issue the Conformed Set.

136.    By April 8, 2004, the delays caused by ABA's errors and omissions impacted the Delaware Art Museum "financially, operationally, and most important, publicly." The Museum had to cancel some exhibits and reschedule others.

137.    As of April 8, 2004, time was of the utmost importance. The Project needed to be completed so that the Museum could return to the Facility by December 2004 in preparation for receiving artwork by Georgia O'Keefe on January 17, 2005. The O'Keefe Exhibit was to be part of the Facility's reopening to the public on March 5, 2005.

138.    ABA released the Conformed Set on or about April 15, 2004 to BWS and the subcontractors. Remarkably, however, ABA issued the Conformed Set without making any attempt to correct the errors and omissions in the Conformed Set that the Museum had previously identified. ABA, therefore, knew that the Conformed Set was incomplete when ABA gave the Conformed Set to BWS. Because the Museum needed to meet its obligations –

including hosting the O'Keefe Exhibit, meeting the Museum's fund-raising goals, and ensuring that the Project continued apace – the Conformed Set had to be released. The Museum was also concerned that, if the Project came to a halt, BWS and the subcontractors would leave the Project and never return. ABA released the Conformed Set approximately 521 calendar days later than the date ABA was to deliver the 100% CDs – for which the Conformed Set was supposed to be the functional replacement.

139.    Implementing the Conformed Set required the re-coordination of mechanical, electrical and plumbing ("MEP") trades, understanding the new schedule for material deliveries and generating new schedules for all aspects of work on the Project.

140.    The Conformed Set did not resolve outstanding errors in the Construction Documents. In fact, the Conformed Set contained additional errors that ABA needed to correct through several major releases that continued through March 31, 2005.

141.    Also, as of October 13, 2004, the Conformed Set had added approximately $2,000,000.00 in cost of work and other change orders related to the Conformed Set. Extra attention was also needed to resolve and track cost and schedule impacts related to almost daily changes that were required as a result of ABA and Arup's errors and omissions in the Conformed Set.

142.    From April 15, 2004 through March 31, 2005, ABA had to issue approximately 5 Addenda, 161 Sketches and 205 Responses to RFIs. Many of these corrections were necessitated by ABA and Arup's errors, omissions and inconsistencies in the Conformed Set.

143.    To summarize, ABA routinely failed to meet deadlines for issuing Construction Documents; ABA's most substantial and serious delay, but far from the only one, was that it took

an extra year and a half to release the Conformed Set, which ABA had agreed to release (as the final set of 100% CDs) in September 2002.

### ARUP'S WORK ON THE PROJECT

144.    In addition to the above errors and omissions, other acts by Arup contributed to the Project's delays and additional costs.

145.    For example, Arup's failure to obtain licensure to practice engineering in Delaware delayed when public authorities could issue the necessary permits for the Project. Without complete state licensure, public authorities would not grant the necessary permits for the documents that Arup drafted – with the result that Arup needed third-party engineers to review and seal design documents.

146.    Furlow Associates, an engineering firm that Arup retained to review the documents that Arup produced, cited several engineering errors and omissions in Arup's design that required correction before Furlow Associates would sign and seal Arup's drawings.

147.    O'Donnell Naccarato MacIntosh, another engineering firm that Arup retained to review the structural documents, cited errors and omissions in Arup's design that required correction before O'Donnell Naccarato MacIntosh would sign and seal Arup's drawings.

148.    As a result of Arup's errors, issuance of the sealed Permit Set was delayed from October 11, 2002 to approximately December 10, 2002.

149.    As a result of the delay in releasing the Permit Set, it took until January 30, 2003, or 77 days after it was scheduled to be granted, until the appropriate governmental body issued a foundation permit so that foundation work on the Project could commence.

150.    In addition to Arup's failure to obtain complete state licensure, ABA failed to perform the customary review of the design documents with Licenses and Inspections of the City

of Wilmington and the Wilmington Fire Marshall prior to issuing the Permit Set. Initially, the

Wilmington Fire Marshall refused to grant the appropriate building permits because of ABA's

failure to perform the customary review with the fire marshall and the errors present in the

Permit Set. It took until April 17, 2003, or 120 days after it was scheduled to be granted, before

the Wilmington Fire Marshall's concerns were alleviated and the appropriate building permits

were issued.

151.     Arup misrepresented the design status to the Delaware Art Museum and BWS.

152.     On or about September 26, 2002, Arup submitted an invoice (the "Arup Invoice")

to ABA in which Arup misrepresented that it had completed 100% of the design.

153.     On or about November 15, 2002, ABA submitted an invoice to the Museum

stating that Arup's work was 100% complete during the month of October 2002.

154.     However, on or about February 13, 2003, ABA sent the Museum a letter stating

that the Arup Invoice should be reduced to approximately 97% and a release date for the 100%

CDs had to be delayed pending the resolution of items identified in the February 13, 2003 letter.

155.     Despite Arup's inadequate performance to this point, ABA represented on

October 9, 2003 that ABA and all design professionals gave Arup's representative full authority

to review and approve all coordination drawings when ABA was not present in the field.

156.     Arup also failed to promptly respond to RFIs to such an extent that even ABA had

to caution Arup over its lack of diligence.

157.     Further, Arup and ABA were responsible for ensuring that ductwork, when

installed, would not be below desired ceiling heights. As the Museum and BWS discovered

instances in which the ductwork extended below the desired ceiling heights, Arup was

responsible for responding to RFIs seeking clarification or changes to the Construction

Documents. BWS and the subcontractors had to suspend work on the ductwork until Arup and ABA revised the Construction Documents.

158.    Arup exacerbated the delays by releasing drawings that contained vague and guarded comments. Before work could proceed on those drawings, Arup needed to re-review and clarify those comments.

159.    At a staff coordination meeting held in 2004, Arup admitted that it had failed to properly coordinate engineering documents for the Project. Arup's original principal on the Project, Caroline Fitzgerald, literally disappeared from the Project after going on vacation. Once Ms. Fitzgerald left the Project, Arup failed to staff an engineer as a principal who had sufficient experience to coordinate different engineering specialties. At the staff coordination meeting mentioned above, an Arup engineer, Ed Dalton, stated that Arup had failed to coordinate documents properly for the Project.

160.    Ultimately, on March 11, 2004, ABA reported that all design issues with respect to Arup's work would have to be addressed in the Conformed Set.

161.    Drawings prepared by Quality Sheetmetal, a subcontractor to the mechanical contractor, Degli Obizzi, were submitted to ABA and Arup as sheet metal layout drawings for their review and approval prior to issue of the Conformed Set. These drawings were intended as submittals, but were copied and modified by ABA and Arup. ABA and Arup then issued these modified drawings as part of the Conformed Set. However, ABA and Arup failed to identify the changes they made to these drawings prior to releasing them as part of the Conformed Set. It took four months before the complications resulting from ABA and Arup's unidentified design changes were resolved.

162.    In another instance, Arup sent sketches on the plaza steel at the north face of the 1938 Building.  Arup sent these sketches directly to BWS.  When BWS submitted an RFI to ABA regarding these sketches, ABA told BWS that it should not proceed with work based on those designs pending an on-site review.

<u>**ADDITIONAL ERRORS IN ABA AND ARUP'S DESIGN DOCUMENTS**</u>

163.    The Construction Documents that ABA and Arup issued to the Delaware Art Museum, BWS and the subcontractors were replete with errors.  The following are examples of some of the further errors that ABA and Arup made during the Project:

a.    The design of the sprinkler/fire action system in the Deficient CDs would have caused major false alarm problems.  Those false alarms would have resulted in the sprinklers going off when not needed.  The most likely source of the problem was that engineers at Arup did not understand the Museum's requirements, and, therefore, designed a system that did not meet the Museum's needs.

b.    Stairs in the East Court needed to be redesigned because they were flexing – one person walking on the stairs would cause them to vibrate.  These stairs were designed to have a glass railing.  The flexing would have cracked the glass railing.

c.    There were no architectural designs for attachments to the steel runners in the elevator shaft.  The elevator contractor modified the system to correct this omission, which was done at additional cost to the Delaware Art Museum.

d.    As designed, mechanical systems were inaccessible to maintenance personnel.  The mechanical contractor, BWS and Museum staff provided Arup with proposed solutions, some of which involved relocations that required additional engineering to assure that intended performance was not compromised.

39

e.    Steel supports in the East Gallery needed to be reinforced by adding angled joints, additional steel and changing the rod tensioning. Arup had stated that the supports were sufficient, but testing proved Arup wrong.

f.    Structural loads were not calculated properly, requiring installation of angular supports to correct these errors, resulting in lost space and additional cost.

g.    Steel crimped in the Education Wing, caused by insufficient structural support, and caused the concrete floor to lower and to expose a gap between the floor and the wall.

h.    Designs for the elevator shaft adjacent to the Trustees' Room did not include a fire-rated wall or fire-rated glass near the elevator shaft. Correcting for these omissions alone increased the costs of the Project by approximately $190,000.00.

i.    Storage racks were meant to bear 250 pounds. The Construction Documents failed to reflect this requirement and the storage racks that were eventually installed could not bear the required weight. The storage areas should have been designed to allow artwork to be hung from the ceiling. Instead, the structure was actually designed such that the storage area's ceiling could not bear the weight of materials being hung from it in addition to the weight placed on it from the floors above. Ultimately, the Museum had to use a floor-mounted storage system at substantial additional expense.

j.    Changes in structural design were frequent and substantial. ABA issued many of those design changes on 8-1/2" x 11" sketches that lacked architectural background that would permit design professionals to verify fit prior to issue.

k.    Following the removal of the building in front of the north façade of the 1938 Building, the appearance of previously made modifications was unacceptable.

40

Correcting for this entailed addition of brick veneer, and took several months due to the need to prepare trial designs and estimates and to select the brick.

l.    The structural engineer observed in the field that the structural steel supporting the 1987 Wing could not bear the weight of the structure. The structure needed to be heavily modified at additional cost.

m.    Interior pipes were designed so that they were exposed outside of walls instead of being concealed behind walls. These design errors were aesthetically unacceptable and required the Delaware Art Museum to either: (1) relocate the piping; (2) relocate the walls around the piping; (3) add chase walls; or (4) lower ceilings.

n.    The structural steel supporting the North Plaza showed bearing on the brick veneer, and correcting this problem required significant demolition and additional footings and piers.

o.    The rear of the 1938 Building was not a flat brick wall, as indicated in ABA's original designs. Instead, the rear of the 1938 Building had windows that were covered by brick. This condition was visible in pictures the Delaware Art Museum sent to ABA, and during ABA's on-site inspections of the 1938 Building. In spite of ABA's obvious errors and omissions with regard to the rear of the 1938 Building, ABA insisted that the Museum pay for any changes to the design documents. The Museum also had to pay approximately $175,000 in additional costs to correct for the errors and omissions in ABA's original designs.

p.    Art museums require special lighting. ABA designed the lighting in the storage areas with lighting that would have damaged artwork stored in those facilities.

41

Also, the lights were not shielded so that if a light bulb exploded, glass would rain down on and damage artwork.

q.      In an error that exemplifies ABA's incompetent performance, the Museum specifically stated that it did not want any windows installed on the exterior of the Facility that appeared green in color.  ABA nonetheless included green windows in the Construction Documents.

### Design Errors Continue To Be Discovered To This Day

164.    Recently, the Museum discovered that the Construction Documents provided for windows that did not filter out ultraviolet light.  Because ultraviolet light damages the artwork on display in the Facility, the windows that were installed pursuant to the Construction Documents needed to be coated at additional cost to the Museum.  ABA was or should have been aware of the Museum's special needs, and failed to accommodate them.

### THE CONSEQUENCES OF ABA AND ARUP'S ERRORS AND DELAYS ON THE PROJECT

165.    Before work could proceed on any design change, subcontractors needed to revise their pricing for the changes to the Construction Documents.  The errors and omissions in the Construction Documents complicated and delayed responses from these subcontractors for pricing of the changes to the Construction Documents.  The errors and omissions in the Construction Documents also complicated and extended the time needed for the Museum's review and approval of the changes to the Construction Documents.

166.    Design changes were incorporated into the Construction Documents via change orders.  In many instances, the bid process and the awarding of contracts had taken place by the time these design changes were made.  These design changes were made at a premium cost because of the lack of competitive bid pricing for the subject work.

167.    Each time an error or omission was encountered, BWS had to suspend work, inform ABA, await design corrections, obtain pricing from subcontractors and submit the changes to the Museum for approval before work could proceed.  In many instances (such as changes in structural steel and ductwork), the Museum's approval was not the last step in the process.  In those instances, it was necessary to submit revised shop drawings and obtain approvals from the design professionals before fabrication, delivery and installation could begin. This process caused very substantial delays that, in turn, impacted and delayed work performed by other trades.

168.    The Museum could not anticipate the magnitude of the cost impact for design changes to the Construction Documents.  The Museum had to mitigate this unexpected cost impact by redesigning or changing the specifications for the Project.

169.    Design changes delayed approval for critical path work.  Other trades could not commence their work until the critical path work was completed.

170.    Additional work, such as repairs or replacement work, was also required for many change orders due to the timing of their issuance.  This additional work resulted in higher costs.

171.    In some instances (such as ductwork in the Main Gallery, Penthouse Mechanical Room, Education Wing Mechanical Room, Education Wing and Studio), correcting the Construction Documents proved to be dysfunctional.  The corrections often required redesign, some of which was never fully completed.  These corrections created substantial delays and out-of-sequence work.

172.    Errors in the structural designs delayed when BWS and the subcontractors could enclose and waterproof portions of the Facility.  In some cases, the failure to enclose and waterproof portions of the Facility exposed already completed portions of the Project to the

elements. This exposure damaged already completed portions of the Project, requiring those portions to be replaced at additional cost.

173.    Late changes in structural design delayed and added to the cost of completion of underpinning, foundations, steel columns and beams, metal decking and placement of slabs. These delays added to the costs of the Project.

174.    Inter-discipline design review was not possible because some Construction Documents were issued on 8-1/2" x 11" sketches without correct background showing related work. As a result, repeated redesign, including on-site changes by the design professionals, was necessary to resolve conflicts in the Construction Documents.

175.    The release of major MEP addenda shown on outdated architectural backgrounds created substantial confusion. MEP work was placed on hold as the design professionals redesigned MEP systems and reissued documents.

176.    The Construction Documents included duct risers that passed through doors and conflicted with the structure; these errors were obvious on the face of the Construction Documents, and ABA, in accordance with its professional obligation, was required to – but did not – correct these errors prior to releasing those Construction Documents.

177.    For any changes to the ductwork design, it was necessary to obtain contractor pricing, receive the Museum's approval, prepare and submit fabrication drawings for review and approval, then fabricate, deliver and install the ductwork. Because ductwork was a critical path, the above tasks needed to be completed in advance of work that had to be performed by other trades. Ductwork needed to be redesigned several times to resolve conflicts with structural steel. ABA and Arup finally eliminated return air systems to partially resolve spatial conflicts, and other errors had to be corrected by lowering ceiling heights.

178.    Correction of design omissions, such as elevator pits and the associated equipment, piping, electrical and general construction work, continued through completion of the Project.  These perpetual changes created substantial delays and out-of-sequence work.

179.    Even on relatively minor matters such as the composition of the wood lattice ceilings, ABA's performance caused confusion and delay.  ABA had informed the Delaware Art Museum that it could use birch with a clear lacquer finish instead of a white painted poplar as originally designed for the wood lattice.  ABA then simply changed the specifications to make the wood lattice birch with a clear lacquer.  ABA's actions and misrepresentations caused further delay and confusion once the supplier informed the Museum and BWS that the new materials would be more costly, and the Museum and BWS needed to resolve this issue created by ABA's misstatements and unilateral actions.

180.    The errors and omissions in documents and drawings submitted by ABA and Arup resulted in continuous design changes.  These design changes delayed the progress of work on the Project because BWS and the subcontractors continuously had to adjust to and figure out the additional and/or altered scope of the design documents.  The RFIs that BWS and the subcontractors frequently submitted in their attempts to understand the frequent design changes led to substantial Project delays.

181.    The delays in the Project caused by ABA and Arup caused BWS and the subcontractors substantial additional costs for overtime, extended work weeks and additional resources to reduce the extent of delay in opening the Facility.

182.    When ABA finally released Construction Documents, the Construction Documents contained substantial errors and omissions that caused holds and delays, which also resulted in out-of-sequence work.  ABA knew about the substantial errors and omissions when it

45

released the Construction Documents.  While those documents might have given the appearance of delivering design information on a given date, the resulting confusion among contractors attempting to resolve problems in those documents through RFIs and clarifications in pricing delayed progress more than if ABA and Arup withheld the issuance of the Construction Documents and expanded the time necessary to provide complete and accurate documents.

183.    Because the Construction Documents needed to be changed to correct ABA and Arup's errors and omissions, contractors charged the Museum for the work they performed as a result of these changes.  In some cases, the contractors had already completed work based on the original design documents, exposing the Museum to duplicative costs.

184.    The failure of ABA and Arup to meet their contractually imposed duties operated to the financial detriment of the Delaware Art Museum and jeopardized the Museum's ability to meet its organizational goals.

### Because Of The Delays And Errors In The Project, The Delaware Art Museum Needed Additional Financing, Lost Investment Opportunities, Had Difficulty Raising Funds And Paid Fines And Fees

185.    Before Allied Irish would issue a letter of credit for $25,000,000.00 to the Museum, the Museum needed to have a GMP.  Because ABA did not release the 100% CDs by September 23, 2002, as originally planned, Allied Irish did not issue the letter of credit.  Without the letter of credit, the Museum could not sell its bonds and lost income-generating opportunities that would have been realized by the short-term investment of bond capital.  The Museum also had to sell $300,000.00 in stock during a downturn in the market in order to pay several of ABA's invoices.

186.    In the summer of 2004, the Museum realized that it would not have sufficient bond money to pay the anticipated costs of construction because of changes to the Construction

Documents and delays in the Project. The cost overruns caused by these changes to the Construction Documents and delays required the Museum to obtain additional financing from BWS to complete the Project.

187.    Further, the Museum had a defined timetable when it would have to make interest payments on the bonds it issued. Because the Project's completion was delayed, the Museum was operational for less time before its first interest payment was due, and the Museum generated less income to meet its interest payments and the costs of its operations, placing the Museum on less sound financial footing.

188.    Because of the Project's delays, the Museum also found it more difficult to raise funds. The Museum had to delay fund-raising activities, including memberships that were tied to the re-opening of the Facility, until the Project neared completion. Delays in the Project caused by ABA and Arup's errors and omissions were also detrimental to the Museum's ability to raise additional funds, given the presence of many other nonprofit institutions in the Wilmington area that were not faced with the Museum's difficulties.

189.    In the fall of 2004, when the Museum considered terminating the Agreement with ABA due to ABA and Arup's delays, errors and omissions, ABA dissuaded the Museum from doing so. ABA communicated its belief that the Project would be completed in time for the Facility to host the O'Keefe Exhibit, but only if the Museum continued to retain ABA through the completion of the Project. ABA also stated that it was certain that replacing ABA would cause disruption and delay which would impact the timely completion of the Project.

190.    The Museum also incurred additional expenses from having to remain at the Wilmington Riverfront instead of returning to the Facility as anticipated.

191.    The Museum was trapped between Scylla and Charybdis:  continue to work with ABA and hope that the Project would be completed within the Schedule; or the virtual certainty that replacing ABA with another architect would cause a delay such that the Facility would not open in time for the Georgia O'Keefe Exhibit.  In reliance on ABA's statements, the Museum did not terminate the Agreement with ABA.

192.    Unfortunately, delays in the Project continued.  The Museum was unable to return to the Facility by December 28, 2004.  Ultimately, ABA did not even issue a certificate of substantial completion until on or about April 11, 2005,  and the Facility did not re-open to the general public until June 26, 2005.

193.    The Museum had a covenant with Allied Irish requiring it to occupy the Facility by December 2004.  Because the Facility was not completed by December 2004, the Museum was unable to occupy the Facility and breached the covenant.  As a result of that breach, the Museum had to pay fines, fees and other charges.

## ABA Did Not Fulfill Its Contractual Obligations

194.    While ABA and Arup were able to create a design (albeit, an inadequate one) for a renovated and expanded Facility, ABA and Arup did not properly perform the necessary tasks required of them in implementing this design within the deadlines called for in the Agreement and in a professional, competent manner.

195.    Many of the cost overruns the Museum incurred on the Project were the result of ABA and Arup's inadequate performance.

**Attempted Dispute Resolution**

196.    Before the Museum pursued claims against ABA for its failures in its performance, it made a good faith effort to mediate its dispute with ABA with a qualified mediator pursuant to paragraph 1.3.4.2 of the Agreement.

197.    The Museum mediated with ABA on November 3 and 4, 2005 in Wilmington, Delaware. The mediation process was ultimately unsuccessful and the parties were unable to reach an acceptable resolution. At this point, mediation has concluded and failed to resolve the dispute between ABA, Arup and the Museum.

198.    As a result of the facts pleaded above, and in an effort to mitigate its damages, the Museum entered into a Liquidating Agreement with BWS dated March 17, 2006. Pursuant to the Liquidating Agreement, the Museum and BWS, among other things, acknowledged the Museum's liability to BWS for the damages it incurred as a result of the actions, inactions, errors and omissions of ABA and Arup, together with the manner in which the Museum will satisfy its liability to BWS for these damages.

**CONCLUSION**

199.    Because ABA and Arup failed to meet their contractual obligations and the standard of care imposed on professionals in their field, the Delaware Art Museum incurred significant costs in excess of what it had budgeted for the Project. Under the original GMP, at most it would have cost the Museum $19,649,176.00 to complete the Project. Ultimately, the Museum has had to raise $32,000,000.00 to cover the final costs of the Facility and its related furnishings, fixtures and equipment. Furthermore, the Museum lost additional income that would have come from admissions and facilities use during March, April and May of 2005 (when the Facility should have been open to the public), added admission income and

49

sponsorship revenues brought on by the Georgia O'Keefe exhibition and goodwill of the community. This lost income is estimated to exceed $1,000,000.00. The Museum and its constituencies should not be responsible for raising the $13,350,824.00 difference; rather, ABA and Arup – the architect and engineer who were responsible for the errors, omissions and delays that caused the Project to go over budget – should bear that burden.

### FIRST CAUSE OF ACTION
### ABA's Breach Of Contract

200.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

201.    The Agreement between the Delaware Art Museum and ABA was a valid contract.

202.    The Delaware Art Museum substantially performed all of its obligations and conditions precedent under the Agreement.

203.    As set forth above, the Agreement required ABA to, among other things, deliver Construction Documents in a timely and complete fashion; be responsible for the coordination, completeness, accuracy and competent preparation of all Construction Documents and ensure that they set forth in detail the requirements for the construction of the Project; ensure that the Construction Documents complied with all applicable codes, ordinances, regulations, laws and statutes; and act promptly to revise its documents to ensure that the construction cost of the Project did not exceed the Project's budget.

204.    While ABA may have been able to produce a concept of the Facility, it was wholly unable to prepare and draft the documents needed to take the Project from the concept form to actual construction and completion in a timely manner.

50

205.    As detailed above, ABA breached the Agreement and failed to perform in accordance with the professional standards of care it fixed for itself therein by, among other things, providing late and deficient Construction Documents.

206.    Furthermore, upon information and belief, ABA breached the Agreement by not having or committing sufficient personnel, resources or materials and/or having the knowledge necessary to prepare the working documents needed to accomplish the construction of the Project as it represented it could.

207.    As a result of ABA's breaches of the Agreement, the Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims.

## SECOND CAUSE OF ACTION
## Breach Of The Implied Covenant Of Good Faith And Fair Dealing

208.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

209.    The Agreement contained an implied covenant requiring ABA to act in good faith and not deprive the Delaware Art Museum of the benefits of its bargain.

210.    ABA understood that it needed to produce design documents in a timely manner that were free of errors. ABA missed almost every deadline to produce design documents. Even worse, when ABA produced design documents, the design documents were filled with errors, omissions and inconsistencies which delayed progress on the Project, as the Delaware Art Museum, BWS and the subcontractors had to seek additional documents or comments from ABA. By not fulfilling its obligations to provide correct and timely design documents, ABA performed its obligations under the Agreement in bad faith. The Museum justifiably relied on ABA to perform its obligations under the Agreement.

51

211.    The Delaware Art Museum hired ABA for its purported expertise. ABA even dissuaded the Museum from hiring a Local Architect after ABA assured the Museum that ABA was up to the task of producing correct and timely design documents and guiding the Museum through the Project. By failing to take steps to ensure that it provided correct and timely design documents, ABA breached its implied covenant of good faith and fair dealing.

212.    The Delaware Art Museum was proximately damaged by this breach because ABA's performance under the Agreement delayed the Project and added significant costs to its completion. As a result, the Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims because of ABA's breach of ABA's implied covenant of good faith and fair dealing.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation Against ABA

213.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

214.    As an architect, ABA is in the business of supplying information.

215.    As a result of its contractual obligations and the payment it was entitled to under those agreements, ABA had a duty to provide accurate information to the Delaware Art Museum.

216.    ABA supplied false information by providing Construction Documents that were replete with errors. The Museum used the false information that ABA provided to the Museum in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

217.    ABA failed to exercise reasonable care in obtaining or communicating the information to the Delaware Art Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

52

218. The Delaware Art Museum suffered pecuniary loss when the Museum justifiably relied upon the false information supplied by ABA for the Museum's use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

219. ABA knew that the Delaware Art Museum intended to rely upon the false information provided by ABA for the Museum's benefit and guidance, and in the Museum's transactions with third parties, including BWS, subcontractors and licensing authorities.

220. The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims on account of ABA's misrepresentations.

### FOURTH CAUSE OF ACTION
### Negligent Misrepresentation Against Arup

221. The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

222. As an engineer and design professional, Arup is in the business of supplying information.

223. As a result of its contractual obligations and the payment it was entitled to under those agreements, Arup had a duty to provide accurate information to ABA and, indirectly, to the Museum.

224. Arup supplied false information by providing to ABA Construction Documents that were replete with errors. ABA used the false information that Arup provided to ABA in its business transactions with third parties, including the Delaware Art Museum, BWS, subcontractors and licensing authorities. The Museum, in turn, used the false information from Arup that ABA provided to the Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

53

225.    Arup failed to exercise reasonable care in obtaining or communicating the information to ABA, which was, in turn, communicated to the Delaware Art Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

226.    The Delaware Art Museum suffered pecuniary loss when the Museum justifiably relied upon the false information from Arup that ABA provided to the Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

227.    Arup knew that ABA was going to provide the false information that Arup produced to the Delaware Art Museum.  Arup knew that the Museum intended to rely upon the false information from Arup for the Museum's benefit and guidance, and in the Museum's transactions with third parties, including BWS, subcontractors and licensing authorities.

228.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims on account of Arup's misrepresentations.

### FIFTH CAUSE OF ACTION
### Common Law Fraud

229.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

230.    ABA falsely represented to the Delaware Art Museum that ABA was able to perform its obligations under the Agreement in accordance with the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time, and that ABA could perform its obligations in a timely manner.

231.    ABA falsely represented to the Delaware Art Museum that ABA would be able to meet its obligations under the Agreement without the assistance of a Local Architect, and that

ABA could perform its obligations in a timely manner, or do so without the assistance of a Local Architect.

232.    Upon information and belief, ABA was recklessly indifferent to the truth of its representations when ABA stated that it could meet the professional standards of care imposed by the Agreement, do so without the assistance of a Local Architect, and/or that ABA could perform its obligations in a timely manner.

233.    By stating that ABA could meet the professional standards of care imposed by the Agreement, do so without the assistance of a Local Architect, and/or that ABA could perform its obligations in a timely manner, ABA intended to induce the Delaware Art Museum to retain ABA for the Project, to induce the Museum to refrain from retaining a Local Architect for the Project and to induce the Museum to refrain from terminating the Agreement with ABA.

234.    The Delaware Art Museum acted in justifiable reliance upon the representations made by ABA.

235.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims as a result of the Museum's reliance on ABA's false representations.

### SIXTH CAUSE OF ACTION
### Consumer Fraud In Violation Of 6 DEL. C. § 2513

236.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

237.    ABA misrepresented material facts regarding its services when ABA represented to the Delaware Art Museum that in performing its services, ABA would do so with the characteristics of the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time, and/or that ABA could perform its obligations in

a timely manner. The misrepresentations were material because, if had the Museum known that ABA would not have provided its services in conformity with the care and skill ordinarily used by professional architects and engineers or that ABA could not perform its obligations in a timely manner, then the Museum would not have contracted with ABA.

238.    ABA misrepresented material facts regarding its services when ABA represented to the Delaware Art Museum that in performing its services, ABA and the Museum would not need a Local Architect for the Project. The misrepresentations were material because, had the Museum known that ABA would in fact have needed a Local Architect, the Museum would have engaged a Local Architect.

239.    Upon information and belief, ABA misrepresented material facts regarding its services when ABA represented to the Delaware Art Museum that the Museum would have a greater chance of completing the Project on schedule with ABA's services and that the Museum should not terminate the Agreement with ABA. These misrepresentations were material because, had the Museum known that ABA would be unable to complete the Project on time, the Museum would have terminated the Agreement.

240.    ABA made these misrepresentations intending that the Delaware Art Museum would rely upon them in making its decisions with regard to ABA's services.

241.    In doing so, ABA could reasonably foresee that the Delaware Art Museum's reliance upon ABA's unprofessional performance would expose the Museum to additional costs resulting from delays, errors and omissions in ABA's production and release of the design documents for the Project.

242.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims as a result of the Museum's reliance on ABA's false representations.

## REQUEST FOR RELIEF

WHEREFORE, the Delaware Art Museum requests that the Court enter an order awarding to it:

A.    damages against ABA and Arup in an amount greatly in excess of $75,000.00, to be determined at trial;

B.    punitive damages for ABA's fraudulent conduct;

C.    prejudgment interest;

D.    costs and expenses related to this proceeding, including reasonable attorneys' fees; and

E.    such other and further relief as the Court deems just and proper.

DATED: August 3, 2006

Respectfully,

Thomas J. Allingham II (#476)
Richard S. Horvath, Jr. (#4558)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000
Attorneys for Plaintiff Delaware Art
   Museum, Inc.

Of Counsel:
B. Christopher Lee
Walter S. Zimolong III
Jacoby Donner, P.C.
1515 Market Street, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 563-2400

Bruce D. Meller
Peckar & Abramson, P.C.
70 Grand Avenue
River Edge, New Jersey 07661
(201) 343-3434

Rodman Ward, Jr. (#652)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

# Exhibit A



# Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services

### AIA Document B141 - 1997
### 1997 Edition - Electronic Format

---

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

Copyright 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987, ©1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

---

## TABLE OF ARTICLES

1.1 INITIAL INFORMATION

1.2 RESPONSIBILITIES OF THE PARTIES

1.3 TERMS AND CONDITIONS

1.4 SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS

1.5 COMPENSATION

**AGREEMENT** made as of the <u>22</u> day of <u>March</u> in the year <u>2001</u>
*(In words, indicate day, month and year)*

**BETWEEN** the Architect's client identified as the Owner:
*(Name, address and other information)*

<u>Delaware Art Museum</u>
<u>2301 Kentmore Parkway</u>
<u>Wilmington, DE 19806</u>

and the Architect:
*(Name, address and other information)*

<u>Ann Beha Architects Inc.</u>
<u>33 Kingston Street</u>
<u>Boston, MA 02111</u>

RECEIVED

JUL 0 2 2001

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #1

DAM04058

For the following Project:
*(Include detailed description of Project)*
_____ Renovation and expansion of the Delaware Art Museum.

The Owner and Architect agree as follows.

## ARTICLE 1.1    INITIAL INFORMATION
**1.1.1**    This Agreement is based on the following information and assumptions.
*(Note the disposition for the following items by inserting the requested information or a statement such as "not applicable," "unknown at time of execution" or "to be determined later by mutual agreement.")*

**1.1.2    PROJECT PARAMETERS**
**1.1.2.1**  The objective or use is:
*(Identify or describe, if appropriate, proposed use or goals.)*
_____ Expanded and renovated museum and museum park.

**1.1.2.2**  The physical parameters are:
*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports about the site.)*
_____ The current property of the Delaware Art Museum, and an acquisition of up to two parks: the Homsey site and the north Catholic Charities site.

**1.1.2.3**  The Owner's Program is:
*(Identify documentation or state the manner in which the program will be developed.)*
_____ Consistent with a revised Master Plan program: site and landscape design including work associated with the Reservoir, parking, offices, galleries, facilities for special exhibitions, education, art storage, library, cafe, museum shop, loading dock, auditorium, mechanical, electric, and lighting systems, fire protection and related code compliance, and general support facilities for a building expansion of up to 40,000, and a renovation of 60,000 gsf..

**1.1.2.4**  The legal parameters are:
*(Identify pertinent legal information, including, if appropriate, land surveys and legal descriptions and restrictions of the site.)*
_____ Property as presented on site surveys provided by the Delaware Art Museum.

**1.1.2.5**  The financial parameters are as follows.

    .1    ~~Amount of the Owner's overall budget for the Project, including the Architect's compensation, is:~~

    .2    Amount of the Owner's budget for the Cost of the Work, excluding the Architect's compensation, is: an amount to be set after Schematic Design, approximately $18-26M.

**1.1.2.6**  The time parameters are:
*(Identify, if appropriate, milestone dates, durations or fast track scheduling.)*
_____ Construction start: Approximately 1 June 2002
_____ Construction duration: 15 months

**1.1.2.7**  The proposed procurement or delivery method for the Project is:
*(Identify method such as competitive bid, negotiated contract, or construction management.)*
_____ Negotiated contract with Construction Manager..

**1.1.2.8**  Other parameters are:
*(Identify special characteristics or needs of the Project such as energy, environmental or historic preservation requirements.)*
_____ Total construction period not to exceed 17 months, including post construction period.

**1.1.3    PROJECT TEAM**
**1.1.3.1**  The Owner's Designated Representative is:
*(List name, address and other information.)*
_____ Stephen T. Bruni, Executive Director.

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #2

DAM04059

**1.1.3.2** The persons or entities, in addition to the Owner's Designated Representative, who are required to review the Architect's submittals to the Owner are:
*(List name, address and other information.)*

|  |  |
|---|---|
| Lyle V. Frederick, Senior Vice President | Tel. 267-470-1000 ext. 207 |
| Barclay White Skanska Inc. | |
| 518 Township Line Road, Suite 100 | |
| Blue Bell, PA 19422 | |
| | |
| Principal in Charge: W. Wayne Dunlop, Executive Vice President | Tel. 267-470-1000 ext. 202 |

**1.1.3.3** The Owner's other consultants and contractors are:
*(List discipline and, if known, identify them by name and address.)*

**1.1.3.4** The Architect's Designated Representative is:
*(List name, address and other information.)*

|  |  |
|---|---|
| Peter C. Sugar AIA | Tel. 617-338-3000 ext. 169 |
| Ann Beha Architects | |
| 33 Kingston Street | |
| Boston, MA 02111 | |
| Principal In Charge: Ann M. Beha FAIA | Tel. 617-338-3000 ext. 133 |

**1.1.3.5** The consultants retained ~~at the Architect's expense~~ by the Architect include ~~are~~:
*(List discipline and, if known, identify them by name and address.)*

Project Engineers: Arup Partners
Landscape and Architecture: Michael Van Valkenburgh Associates
Acoustics: Acentech, Inc.
Civil Engineer: Vandemark & Lynch, Inc.
Lighting Designer: TBD

**1.1.4** Other important initial information is:

**1.1.5** When the services under this Agreement include contract administration services, the General Conditions of the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement, or as follows:

**1.1.6** The information contained in this Article 1.1 may be reasonably relied upon by the Owner and Architect in determining the Architect's compensation. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Paragraph 1.3.3.

## ARTICLE 1.2    RESPONSIBILITIES OF THE PARTIES

**1.2.1** The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

### 1.2.2    OWNER

**1.2.2.1** Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

**1.2.2.2** The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality. and a potential change in services, where applicable.

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #3

**1.2.2.3** The Owner's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

**1.2.2.4** The Owner shall furnish the services of consultants other than those designated in Paragraph 1.1.3 or authorize the Architect to furnish them as a Change in Services when such services are requested by the Architect and are reasonably required by the scope of the Project. The Owner shall cause all consultants retained by the Owner to coordinate their services and work with that of the Architect.

**1.2.2.5** Unless otherwise provided in this Agreement, the Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials. The Architect shall be entitled to rely upon such tests, inspections and reports provided by the Owner.

**1.2.2.6** The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests, and such legal interpretations as the Architect may reasonably request with respect to applicable laws, construction contract issues, and similar subjects relative to the Project which involve legal questions beyond the normal expertise of Architects.

**1.2.2.7** The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

## 1.2.3    ARCHITECT

**1.2.3.1** The services performed by the Architect, Architect's employees and Architect's consultants shall be enumerated in Article 1.4.

**1.2.3.2** The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which initially shall be consistent with the time periods established in Subparagraph 1.1.2.6 and which shall be adjusted, if necessary, as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

**1.2.3.3** The Architect's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

**1.2.3.4** The Architect shall maintain the confidentiality of information specifically designated as confidential by the Owner, unless withholding such information would violate the law, create the risk of significant harm to the public or prevent the Architect from establishing a claim or defense in an adjudicatory proceeding. The Architect shall require of the Architect's consultants similar agreements to maintain the confidentiality of information specifically designated as confidential by the Owner.

**1.2.3.5** Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

**1.2.3.6** The Architect shall review laws, codes, and regulations applicable to the Architect's services. The Architect shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project.

**1.2.3.7** The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

DAM04061

Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

## ARTICLE 1.3    TERMS AND CONDITIONS
### 1.3.1    COST OF THE WORK
**1.3.1.1**  The Cost of the Work shall be the total cost or, to the extent the Project is not completed, the estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**1.3.1.2**  The Cost of the Work shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, including the costs of management or supervision of construction or installation provided by a separate construction manager or contractor, plus a reasonable allowance for their overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work.

**1.3.1.3**  The Cost of the Work does not include the compensation of the Architect and the Architect's consultants, the costs of the land, rights-of-way and financing or other costs that are the responsibility of the Owner but does include any payments to a Contractor under a shared savings or incentives clause in the Contract for Construction or Construction Management Agreement, and shall not be reduced by any liquidated or other damages payable by a Contractor or Construction Manager to the Owner on account of delay or default.

### 1.3.2    INSTRUMENTS OF SERVICE
**1.3.2.1**  Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

**1.3.2.2**  Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent with this Agreement. Any termination of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project, provided that the Architect shall not be responsible, nor liable for any such changes, corrections, or additions.

**1.3.2.3**  Except for the licenses granted in Subparagraph 1.3.2.2, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect. However, the Owner shall be permitted to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work by license granted in Subparagraph 1.3.2.2. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants. The Owner shall not use the Instruments of Service for future additions or alterations to this Project or for other projects, unless the Owner obtains the prior written agreement of the Architect and the Architect's consultants. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

**1.3.2.4**  Prior to the The Architect and its consultants may provide providing to the Owner any with their Instruments of Service in an electronic format. or the Owner providing to the Architect any electronic data for incorporation into the Instruments of

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #5

~~Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement.~~ The Owner acknowledges that the information and data delivered to the Owner in electronic or machine readable copies of the Drawings, Specifications and other documents prepared by the Architect (the "Documents") may vary from that contained on physical copies of the Documents. Variances may be due to the use of different software, hardware, or output devices by the Owner or others from those used by the Architect in originally preparing and printing the Documents. Variances may also be the result of the manner in which software used to convert the Documents from the system or format employed by the Architect to that of the Owner or others translates the information and data contained on the Documents. Variances may also be the result of undocumented changes or modifications made to the electronic or machine readable documents, whether inadvertently or otherwise, and whether made by the Owner or others. The Architect, therefore, reserves the right to retain the electronic or machine readable media upon which the Documents were originally prepared, and to retain physical copies of the Document delivered to the Owner in electronic or machine readable form, which physical copies shall govern in the event of any inconsistency or discrepancy between the two.

In consideration of the Architect's willingness to deliver electronic or machine-readable copies of the Documents for the Owner's use as described above, and of the risks to the Architect of inconsistencies, discrepancies, or undocumented changes or modifications to the Documents, the Owner agrees to assume all risks associated with the use and modification, by the Owner or others, of electronic or machine readable copies of the Documents and, to the fullest extent permitted by law, to release, hold harmless, and to indemnify the Architect, and to defend the Architect using counsel satisfactory to the Architect, from and against all claims, liabilities, losses, damages, judgements, awards, and costs including, but not limited to, court costs and attorney's fees, directly caused by variances between the physical copies of the Documents and electronic or machine readable copies of the Documents, or modification by the Owner or others of electronic or machine readable copies of the Documents. Providing electronic copies of issued documents upon request shall not constitute a Change in Services.

**1.3.3    CHANGE IN SERVICES**
**1.3.3.1**  Change in Services of the Architect, including services required of the Architect's consultants, may be accomplished after execution of this Agreement, without invalidating the Agreement, if mutually agreed in writing, if required by circumstances beyond the Architect's control, or if the Architect's services are affected as described in Subparagraph 1.3.3.2. In the absence of mutual agreement in writing, the Architect shall notify the Owner prior to providing such services. If the Owner deems that all or a part of such Change in Services is not required, the Owner shall give prompt written notice to the Architect, and the Architect shall have no obligation to provide those services; provided, however, that the Owner hereby agrees to authorize and confirm any Change in Services which the Architect is required to perform or provide pursuant to any law or regulation issued by a government authority having jurisdiction over the Project. Except for a change due to the fault of the Architect, Change in Services of the Architect shall entitle the Architect to an adjustment in compensation pursuant to Paragraph 1.5.2, and to any Reimbursable Expenses described in Subparagraph 1.3.9.2 and Paragraph 1.5.5.

**1.3.3.2**  If any of the following circumstances affect the Architect's services for the Project, the Architect shall be entitled to an appropriate adjustment in the Architect's schedule and compensation.

    **.1**  change in the instructions or approvals given by the Owner that necessitate revisions in Instruments of Service;

    **.2**  enactment or revision of codes, laws or regulations or official interpretations which necessitate changes to previously prepared Instruments of Service;

    **.3**  decisions of the Owner not rendered in a timely manner;

    **.4**  significant change in the Project including, but not limited to significant changes of those referred to in Subparagraph 1.2.2.2, ~~size, quality, complexity,~~ and changes in the Owner's schedule or budget, or procurement method; or increases in the budget for landscape, site parking, or systems components, or addition of new program elements.

    **.5**  failure of performance on the part of the Owner or the Owner's consultants or contractors;

    **.6**  preparation for and attendance at a public hearing, a dispute resolution proceeding or a legal proceeding except

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

DAM04063

where the Architect is party thereto;

.7    change in the information contained in Article 1.1.

### 1.3.4    MEDIATION

**1.3.4.1** Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to ~~arbitration or~~ the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation ~~or by arbitration.~~, or the institution of legal or equitable proceedings.

**1.3.4.2** The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. ~~The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.~~  The Owner and the Architect further agree to include a similar mediation provision in all agreements with their respective independent Contractors and Consultants, thereby providing for mediation as the primary method for dispute resolution between the parties to those agreements.

**1.3.4.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### 1.3.5    ~~ARBITRATION~~

**1.3.5.1** ~~Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Paragraph 1.3.4.~~

**1.3.5.2** ~~Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.~~

**1.3.5.3** ~~A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.~~

**1.3.5.4** ~~No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.~~

**1.3.5.5** ~~The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.~~

### 1.3.6    ~~CLAIMS FOR CONSEQUENTIAL DAMAGES~~

~~The Architect and the Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Paragraph 1.3.8.~~

---

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #7

**1.3.7  MISCELLANEOUS PROVISIONS**

**1.3.7.1**  This Agreement shall be governed by the law of the State of Delaware ~~principal place of business of the Architect~~, unless otherwise provided in Paragraph 1.4.2.

**1.3.7.2**  Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**1.3.7.3**  Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

**1.3.7.4**  To the extent damages are covered by property insurance during construction, the Owner and the Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner or the  Architect, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

**1.3.7.5**  Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect. The Owner agrees that it will include in its agreement with any Contractor and/or Construction Manager the following clause: The Owner and the Architect have acknowledged that nothing in the Architect's engagement implies any undertaking by the Architect for the benefit of or which may be enforced by the Contractor, its Subcontractors, or the surety of any of them; it being understood that the Architect's obligations are to the Owner and that, in performing such obligations, the Architect may increase the burdens and expense of the Contractor, its Subcontractors or the surety of any of them. Neither the Contractor, any Subcontractor, nor the surety of any of them shall bring civil suit or other legal action against the Architect arising out of or in connection with the Project.

**1.3.7.6**  ~~Unless otherwise provided in this Agreement~~, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site. In the event the  Architect or any other party encounters asbestos or hazardous or toxic materials at the job site, or should it become known in any way that such materials may be present at the job site or any adjacent areas that may affect the performance of the Architect's services, the Architect may, at its option and without liability for consequential or any other damages, suspend performance of service on the project until the Owner retains appropriate specialist consultant(s) or contractor(s) ("Independent Consultants") to identify, abate and/or remove the asbestos or hazardous or toxic material, and warrant that the job site is in full compliance with acceptable laws and regulations.     The Architect may reasonably rely upon the designs, instructions and specifications provided by Independent Consultants pursuant to this Subparagraph 1.3.7.6.  The Architect agrees to use its best efforts to coordinate its services with services provided by Independent Consultants, and to promptly notify the Owner of any conflicts or problems arising out of the coordination of its services with the services of Independent Consultants.  The Owner agrees to release, indemnify, defend and hold harmless the  Architect, its consultants, and their respective officers, agents and employees of and from all costs, claims, damages and liability arising out of the services provided by Independent Consultants pursuant to this Subparagraph 1.3.7.6.

**1.3.7.7** The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.    The Architect shall be entitled to publish this project in reputable professional journals with the Owner's consent, such consent not to be withheld unreasonably.

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed  photocopying violates U.S. copyright laws and  will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted  below.

DAM04065

**1.3.7.8**  If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

**1.3.7.9**  The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

## 1.3.8  TERMINATION OR SUSPENSION

**1.3.8.1**  If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to suspension of services, the Architect shall give seven days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

**1.3.8.2**  If the Project is suspended by the Owner ~~for more than 30 consecutive days,~~ the Architect shall be compensated for services performed and expenses incurred prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

**1.3.8.3**  If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice which shall be deemed a termination not the fault of the Architect. If the Project is abandoned in accordance with this subparagraph and is thereafter revived, the Owner shall engage again the Architect under the then current AIA Owner-Architect form of agreement, with terms and conditions no less favorable to the Architect than those set forth herein.

**1.3.8.4**  This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**1.3.8.5**  This Agreement may be terminated by the Owner upon not less than ~~seven~~ twenty-eight calendar days' written notice to the Architect for the Owner's convenience and without cause.

**1.3.8.6**  In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Subparagraph 1.3.8.7.

**1.3.8.7**  Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount for the Architect's anticipated profit on the value of the services not performed by the Architect.    Termination expenses shall be negotiated between the Architect and the Owner to mutual satisfaction of both parties.

## 1.3.9  PAYMENTS TO THE ARCHITECT

**1.3.9.1**  Payments on account of services rendered and for Reimbursable Expenses incurred shall be made monthly upon presentation of the Architect's statement of services. No deductions shall be made from the Architect's compensation on account ~~of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work~~ of changes in the Work or other costs incurred by the Owner other than those for which the Architect has been adjudged to be liable.

---

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed  photocopying violates U.S. copyright laws and  will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted  below.

DAM04066

**1.3.9.2** Reimbursable Expenses are in addition to compensation for the Architect's services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:

.1   transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;

.2   fees paid for securing approval of authorities having jurisdiction over the Project;

.3   reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;

.4   expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;

.5   renderings, models and mock-ups requested by the Owner;

.6   expense of professional liability insurance dedicated exclusively to this Project or the expense of additional insurance coverage or limits requested by the Owner in excess of that normally carried by the Architect and the Architect's consultants;

.7   reimbursable expenses as designated in Paragraph 1.5.5;

.8   other similar direct Project-related expenditures.

**1.3.9.3** Records of Reimbursable Expenses, of expenses pertaining to a Change in Services, and of services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

**1.3.9.4** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

## ARTICLE 1.4    SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS

**1.4.1    Enumeration of Parts of the Agreement.** This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

**1.4.1.1** Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997.

**1.4.1.2** Standard Form of Architect's Services: Design and Contract Administration, AIA Document B141-1997, or as follows:
*(List other documents, if any, delineating Architect's scope of services.)*

**1.4.1.3** Other documents as follows:
*(List other documents, if any, forming part of the Agreement.)*

Attachments:
A: Task List, 22 March 2001
B: Compensation and Other Miscellaneous Issues, 10 April 2001
C: Phase I Schedule
D: Certificate of Insurance

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #10

DAM04067

**1.4.2    Special Terms and Conditions.** Special terms and conditions that modify this Agreement are as follows:

1.4.2.1    Ann Beha Architects (ABA) and their consultants will perform the services under this Agreement with the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time. The evaluation and repair of existing buildings require that certain assumptions be made concerning existing conditions. Some of the assumptions cannot be verified without great expense, or destroying otherwise serviceable or historically significant portions of the building. Because our conclusions therefore must be made on such information as is available to us from our examinations of the existing building, our observations of exposed and accessible surfaces and available documentation, and because hidden or unseen conditions may vary from those encountered in the investigation, ABA and their consultants shall not be responsible for the result of any damage or claim which is directly or indirectly the result of an error or defect which could not be determined by reasonable observation.

1.4.2.2    The Owner and the Architect are aware of the risks, rewards and benefits of the project and the Architect's total fee for services. The risks have been allocated such that the owner agrees that to the fullest extent permitted by law, the Architect's total liability to the Owner for any and all injuries, claims, losses, expenses or damage arising out of this agreement from any cause or causes, shall not exceed the total amount of the Architect's available insurance coverage as described in the Architect's Certificate of Insurance (Attachment D). Such causes include but are not limited to the Architect's negligence, errors, omissions, strict liability, breach of contract or breach of warranty. The Architect agrees to maintain such coverage through the period of the Architect's contract obligations.

1.4.2.3    "Subject to limitations contained in 1.4.2.2 above, the Architect and its officers, agents, consultants, subcontractors and employees (collectively "Architect" shall protect and indemnify the Owner, Project Manager, and their respective officers, agents, and employees collectively "Indemnitees" from and against all claims, liabilities, costs, and expenses (including attorney fees) for any personal injury or property damage (including loss of use) to the extent caused by the Architect's negligent errors or omissions in connection with the Project ."

1.4.2.3.1    Architect shall purchase at its sole expense the following  insurance from responsible underwriters licensed in the State of Massachusetts and approved by Owner. Such insurance policies shall contain adequate limits of liability, but in no event less than the following limits:

1.4.2.3.2    Worker's Compensation Insurance

|  | |
|---|---|
| a. Worker's Compensation | Statutory Limits |
| b. Employer's Liability | $500,000 Each Accident |
|  | $500,000 Disease - Each Employee |
|  | $500,000 Disease - Policy Limit |

The policy shall be endorsed to include a waiver of subrogation in favor of Owner and Project Manager.

1.4.2.3.2    Commercial General Liability

|  | |
|---|---|
| Bodily Injury/Property Damage | $1,000,000 Combined Single Limit |
| (Occurrence Basis) | per occurrence and in aggregate |

The policy shall be endorsed to include Owner and Project Manager as additional insureds, contain a waiver of subrogation in favor of Owner and  Project Manager, and state that the policy is primary to that carried by Owner  and Project Manager.

1.4.2.3.3    Comprehensive Automobile Liability

|  | |
|---|---|
| Bodily Injury/Property Damage | $1,000,000 Combined Single Limit |
| (Occurrence Basis) | per person and in aggregate |

The policy shall cover all owned, hired and non-owned automobiles. The policy shall be endorsed to name Owner and Project Manager as additional insureds, contain a waiver of subrogation in favor of Owner and Project Manager, and state that the policy is primary to that of the Owner or Project Manager.

1.4.2.3.4    Professional Liability Insurance

|  | |
|---|---|
| Per Claims Made and Aggregate Limits | $3M |

The policy shall be maintained to protect Architect, Owner and Project Manager from liability arising out of errors and omissions in the Architect's performance of professional services under this contract. The insurance shall be endorsed to cover the indemnification provision of the Agreement.

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed  photocopying violates U.S. copyright laws and  will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997

User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #11

1.4.2.3.5    The following rider shall be endorsed on all the insurance policies:

The Insurance Company agrees that the Certificate holder shall be provided with thirty (30) day written notice of cancellation or material change in the policy terms and conditions.

Notice of claim given by the Architect of Project Manager shall be deemed to be sufficient notice under the policy(ies).

1.4.2.3.6    At the time the Agreement is executed, Architect shall submit evidence to Owner that Architect and its consultants have all required insurance which is in full force and effect. The insurance carriers and policy coverages shall be subject to Owner's approval.

1.4.2.3.7    Architect shall require similar insurance and indemnification provisions in its consultant's contracts.

## ARTICLE 1.5    COMPENSATION

**1.5.1**    For the Architect's services as described under Article 1.4, compensation shall be computed as follows:

Payment Schedule:

| | |
|---|---|
| Sch.D. | 17% |
| D.D. | 23% |
| C.D. | 30% |
| B/N | 5% |
| C.A. | 25% |

See also Attachment 'B'

**1.5.2**    If the services of the Architect are changed as described in Subparagraph 1.3.3.1, the Architect's compensation shall be adjusted. Such adjustment shall be calculated as described below or, if no method of adjustment is indicated in this Paragraph 1.5.2, in an equitable manner. on the basis of hourly rates, to be adjusted annually, 1 January of each year.
*(Insert basis of compensation, including rates and multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply.)*

| | |
|---|---|
| Principal | $200-$225/hour |
| Senior Architect | $175/hour |
| Architect | $125/hour |
| Sr. Designer/Technical Staff | $85-$95/hour |
| Technical Staff | $85/hour |
| Project Assistant | $65/hour |
| Administrative | $65/hour |

**1.5.3**    For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of ten percent added to the cost of the Consultant's fee : ( 1.1 ) times the amounts billed to the Architect for such services., or the compensation may be the cost of the Architect's services and the cost of the Consultant's services.

**1.5.4**    For Reimbursable Expenses as described in Subparagraph 1.3.9.2, and any other items included in Paragraph 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of one hundred ten percent of the direct cost: ( 1.10 ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

**1.5.5**    Other Reimbursable Expenses, if any, are as follows:
Expense of additional computer-aided design and drafting equipment time when used in connection with the Project at the request and prior authorization of the Owner, expense of photographic services and photographic reproductions, and expenses of measured drawings of existing conditions.

**1.5.6**    The rates and multiples for services of the Architect and the Architect's consultants as set forth in this Agreement shall be adjusted in accordance with their normal salary review practices.

**1.5.7**    An initial payment of zero Dollars ($ 0.00 ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997

DAM04069

shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

**1.5.8**    Payments are due and payable <u>thirty</u> ( <u>30</u> ) days from the date of the Architect's invoice. Amounts unpaid <u>forty-five</u> ( <u>45</u>) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*
<u>Prime Commercial Lending Rate published by Fleet Boston, plus two percentage points.</u>

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**1.5.9**    If the services covered by this Agreement have not been completed within <u>thirty-two</u> ( <u>32</u> ) months of the date hereof, through no fault of the Architect, ~~extension of~~ the Architect's services beyond that time shall be compensated as provided in Paragraph 1.5.2.

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*

STEPHEN T. BRUNI
EXEC. DIRECTOR
*(Printed name and title)*

ARCHITECT *(Signature)*

<u>Ann M. Beha FAIA</u>
<u>President</u>
*(Printed name and title)*

AIA DOCUMENT B141-STANDARD FORM AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997
User Document: DAMB141.DOC -- 6/20/2001. AIA License Number 104824, which expires on 12/4/2001 -- Page #13

DAM04070



# Standard Form of Architect's Services:
# Design and Contract Administration

### AIA Document B141 - 1997
### 1997 Edition - Electronic Format

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

Copyright 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987, ©1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

**TABLE OF ARTICLES**

2.1 PROJECT ADMINISTRATION SERVICES

2.2 SUPPORTING SERVICES

2.3 EVALUATION AND PLANNING SERVICES

2.4 DESIGN SERVICES

2.5 CONSTRUCTION PROCUREMENT SERVICES

2.6 CONTRACT ADMINISTRATION SERVICES

2.7 FACILITY OPERATION SERVICES

2.8 SCHEDULE OF SERVICES

2.9 MODIFICATIONS

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

## ARTICLE 2.1    PROJECT ADMINISTRATION SERVICES

**2.1.1**    The Architect shall manage the Architect's services and administer the Project. The Architect shall consult with the Owner, research applicable design criteria, attend Project meetings, communicate with members of the Project team and shall prepare reports of all project meetings attended by the Architect and distribute these reports to the Owner. If the Consultants of the Architect attend a meeting with the Owner, they will prepare a report of the meeting and distribute it to the Architect and Owner. issue progress reports. The Architect shall coordinate the services provided by the Architect and the Architect's consultants with those services provided by the Owner and the Owner's consultants.

**2.1.2**    When Project requirements have been sufficiently identified, the Architect shall prepare, and periodically on a monthly basis update, a Project schedule that shall identify milestone dates for decisions required of the Owner, design services furnished by the Architect, completion of documentation provided by the Architect, commencement of construction and Substantial Completion of the Work.

**2.1.3**    The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program, budget and aesthetics in developing the design for the Project.

**2.1.4**    Upon request of the Owner, the Architect shall make a presentation to explain the design of the Project to representatives of the Owner.

**2.1.5**    The Architect shall submit design documents to the Owner at intervals appropriate to the design process for purposes of evaluation and approval by the Owner. The Architect shall be entitled to rely on approvals received from the Owner in the further development of the design.

**2.1.6**    The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

### 2.1.7    EVALUATION OF BUDGET AND COST OF THE WORK

**2.1.7.1** When the Project requirements have been sufficiently identified, the Owner Architect shall prepare a preliminary estimate of the Cost of the Work. This estimate may be based on current area, volume or similar conceptual estimating techniques. As the design process progresses through the end of the preparation of the Construction Documents, the Owner Architect shall update and refine the preliminary estimate of the Cost of the Work. The Architect shall advise the Owner of any known adjustments to previous estimates of the Cost of the Work indicated by changes in Project requirements or general market conditions. If at any time the Owner's Architect's estimate of the Cost of the Work exceeds the Owner's budget, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality or budget, and the Owner shall cooperate with the Architect in making such adjustments.

**2.1.7.2** Evaluations of the Owner's budget for the Project, the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work prepared by the Architect represent the Architect's judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Project or from any estimate of the Cost of the Work or evaluation prepared or agreed to by the Architect.

**2.1.7.3** In advising on preparing estimates of the Cost of the Work, the Architect shall be permitted to advise on include contingencies for design, bidding and price escalation; to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents; to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget for the Cost of the Work. If an increase in the Contract Sum occurring after execution of the Contract between the Owner and the Contractor causes the budget for the Cost of the Work to be exceeded, that budget shall be increased accordingly.

**2.1.7.4** If bidding or negotiation has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

construction industry.

**2.1.7.5** If the budget for the Cost of the Work is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1 give written approval of an increase in the budget for the Cost of the Work;

.2 authorize rebidding or renegotiating of the Project within a reasonable time;

.3 terminate in accordance with Subparagraph 1.3.8.5; or

.4 cooperate in revising the Project scope and quality as required to reduce the Cost of the Work.

**2.1.7.6** If the Owner chooses to proceed under Clause 2.1.7.5.4, the Architect, ~~without additional compensation,~~ shall modify the documents for which the Architect is responsible under this Agreement as necessary to comply with the budget for the Cost of the Work.  Such modifications shall be considered an additional service, except to the extent that cost overruns were the result of unauthorized added scope over and above previously agreed-upon estimates.  The modification of such documents shall be the limit of the Architect's responsibility under this Paragraph 2.1.7. ~~The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not construction is commenced.~~

## ARTICLE 2.2    SUPPORTING SERVICES
**2.2.1**    Unless specifically designated in Paragraph 2.8.3, the services in this Article 2.2 shall be provided by the Owner or the Owner's consultants and contractors.

**2.2.1.1** The Owner shall furnish a program setting forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, special equipment, systems and site requirements.  The Architect shall assist the Owner through its request for specific information.

**2.2.1.2** The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

**2.2.1.3**  The Owner shall furnish services of geotechnical engineers which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.

## ARTICLE 2.3    EVALUATION AND PLANNING SERVICES
**2.3.1**    The Architect shall provide a preliminary evaluation of the information furnished by the Owner under this Agreement, including the Owner's program and schedule requirements and budget for the Cost of the Work, each in terms of the other. The Architect shall review such information to ascertain that it is consistent with the requirements of the Project and shall notify the Owner of any other information or consultant services that may be reasonably needed for the Project.

**2.3.2**    The Architect shall provide a preliminary evaluation of the Owner's site for the Project based on the information provided by the Owner of site conditions, and the Owner's program, schedule and budget for the Cost of the Work.

**2.3.3**    The Architect shall review the Owner's proposed method of contracting for construction services and shall notify the Owner of anticipated impacts that such method may have on the Owner's program, financial and time requirements, and the

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

scope of the Project.

## ARTICLE 2.4    DESIGN SERVICES
**2.4.1**    The Architect's design services shall include normal structural, mechanical and electrical engineering services., and fire protection, landscape architecture, civil engineering, general lighting, and room acoustics. The services shall exclude geotechnical testing, surveying, construction testing, exhibit design, audio-visual design, telecommunications, and FFE selection.

### 2.4.2    SCHEMATIC DESIGN DOCUMENTS
**2.4.2.1** The Architect shall provide Schematic Design Documents based on the mutually agreed-upon program, schedule, and budget for the Cost of the Work. The documents shall establish the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents shall include a conceptual site plan, if appropriate, and preliminary building plans, sections and elevations. At the Architect's option, the Schematic Design Documents may include study models, perspective sketches, electronic modeling or combinations of these media. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

### 2.4.3    DESIGN DEVELOPMENT DOCUMENTS
**2.4.3.1** The Architect shall provide Design Development Documents based on the approved Schematic Design Documents and updated budget for the Cost of the Work. The Design Development Documents shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts. The Design Development Documents shall include specifications that identify major materials and systems and establish in general their quality levels.

### 2.4.4    CONSTRUCTION DOCUMENTS
**2.4.4.1** The Architect shall provide Construction Documents based on the approved Design Development Documents and updated budget for the Cost of the Work. The Construction Documents shall set forth in detail the requirements for construction of the Project. The Construction Documents shall include Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.

**2.4.4.2** During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of: (1) bidding and procurement information which describes the time, place and conditions of bidding; bidding or proposal forms; and the form of agreement between the Owner and the Contractor; and (2) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect also shall compile the Project Manual that includes the Conditions of the Contract for Construction and Specifications and may include bidding requirements and sample forms. The Construction Manager shall assist the Architect by providing some of the requirements and required sample forms as appropriate.

## ARTICLE 2.5    CONSTRUCTION PROCUREMENT SERVICES
**2.5.1**    The Architect shall assist the Owner in obtaining either competitive bids or negotiated proposals and shall assist the Owner in awarding and preparing contracts for construction.

**2.5.2**    The Architect shall assist the Owner in establishing a list of prospective bidders or contractors.

**2.5.3**    The Architect shall assist the Owner in bid validation or proposal evaluation and determination of the successful bid or proposal, if any. If requested by the Owner, the Architect shall notify all prospective bidders or contractors of the bid or proposal results.

### 2.5.4    COMPETITIVE BIDDING
**2.5.4.1**    ~~Bidding Documents shall consist of bidding requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.~~

**2.5.4.2**    ~~If requested by the Owner, the Architect shall arrange for procuring the reproduction of Bidding Documents for distribution to prospective bidders. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for~~

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997

DAM04074

~~such expenses.~~

**2.5.4.3** ~~If requested by the Owner, the Architect shall distribute the Bidding Documents to prospective bidders and request their return upon completion of the bidding process. The Architect shall maintain a log of distribution and retrieval, and the amounts of deposits, if any, received from and returned to prospective bidders.~~

**2.5.4.4** The Architect shall consider requests for substitutions, if permitted by the Bidding Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective bidders.

**2.5.4.5** ~~The Architect shall participate in or, at the Owner's direction, shall organize and conduct a pre-bid conference for prospective bidders.~~

**2.5.4.6** The Architect shall prepare responses to questions from prospective bidders and provide clarifications and interpretations of the Bidding Documents to all prospective bidders in the form of addenda.

**2.5.4.7** ~~The Architect shall participate in or, at the Owner's direction, shall organize and conduct the opening of the bids. The Architect shall subsequently document and distribute the bidding results, as directed by the Owner.~~

## 2.5.5    NEGOTIATED PROPOSALS
**2.5.5.1** Proposal Documents shall consist of proposal requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

**2.5.5.2** If requested by the Owner, the Architect shall arrange for procuring the reproduction of Proposal Documents for distribution to prospective contractors. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

**2.5.5.3** If requested by the Owner, the Architect shall organize and participate in selection interviews with prospective .

**2.5.5.4** The Architect shall consider requests for substitutions, if permitted by the Proposal Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective contractors.

**2.5.5.5** If requested by the Owner, the Architect shall assist the Owner during negotiations with prospective contractors. The Architect shall subsequently prepare a summary report of the negotiation results, as directed by the Owner.

## ARTICLE 2.6   CONTRACT ADMINISTRATION SERVICES
### 2.6.1    GENERAL ADMINISTRATION
**2.6.1.1** The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. Modifications made to the General Conditions, when adopted as part of the Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect.

**2.6.1.2** The Architect's responsibility to provide the Contract Administration Services under this Agreement commences with the award of the initial Contract for Construction and terminates at the issuance to the Owner of the final Certificate for Payment. However, the Architect shall be entitled to a Change in Services in accordance with Paragraph 2.8.2 when Contract Administration Services extend 60 days after the date of Substantial Completion of the Work.

**2.6.1.3** The Architect shall be a representative of and shall advise and consult with the Owner during the provision of the Contract Administration Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

**2.6.1.4** Duties, responsibilities and limitations of authority of the Architect under this Article 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect ~~with consent of the Contractor, which consent will not be unreasonably withheld.~~

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

DAM04075

**2.6.1.5** The Architect shall review properly prepared, timely requests by the Contractor for additional information about the Contract Documents. A properly prepared request for additional information about the Contract Documents shall be in a form prepared or approved by the Architect and shall include a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested.

**2.6.1.6** If deemed appropriate by the Architect, the Architect shall on the Owner's behalf prepare, reproduce and distribute supplemental Drawings and Specifications in response to requests for information by the Contractor.

**2.6.1.7** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

**2.6.1.8** Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for the results of interpretations or decisions so rendered in good faith.

**2.6.1.9** The Architect shall render initial decisions on claims, disputes or other matters in question between the Owner and Contractor as provided in the Contract Documents. However, the Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

## 2.6.2    EVALUATIONS OF THE WORK

**2.6.2.1** The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 2.8, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**2.6.2.2** The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. ~~However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents.~~ However, the Architect's professional activities and presence at the site notwithstanding, the Architect shall not be responsible for the Contractor's schedule or failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work. The Architect is not responsible for delays caused by factors beyond the Architect's reasonable control, including but not limited to delays because of strikes, lockouts, work slowdowns or stoppages, accidents, acts of God, failure of any governmental or other regulatory authority to act in a timely manner, failure of the Owner to furnish timely information or approve or disapprove of the Architect's services or work product promptly, or delays caused by faulty performance by the Owner or by Contractors on any level. When such delays beyond the Architect's reasonable control occur, the Owner agrees the Architect is not responsible for damages, nor shall the Architect be deemed in default of this Agreement.

**2.6.2.3** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**2.6.2.4** Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

**2.6.2.5** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

DAM04076

Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

### 2.6.3    CERTIFICATION OF PAYMENTS TO CONTRACTOR

**2.6.3.1** The Architect shall review and certify the amounts due the Contractor and shall issue Certificates for Payment in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Paragraph 2.6.2 and on the data comprising the Contractor's Application for Payment, that ~~that the Work has progressed to the point indicated and that,~~ to the best of the Architect's knowledge, information and belief, the Work has progressed to the point indicated and that the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject (1) to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) to results of subsequent tests and inspections, (3) to correction of minor deviations from the Contract Documents prior to completion, and (4) to specific qualifications expressed by the Architect.

**2.6.3.2**  The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.6.3.3** ~~The~~ Architect shall maintain a record of the Contractor's Applications for Payment.

### 2.6.4    SUBMITTALS

**2.6.4.1** The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with ~~such~~ reasonable promptness ~~as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors,~~ while allowing sufficient time in the Architect's professional judgment to permit adequate review. In preparing the Schedule of Submittals, the Contractor shall allow a reasonable time for normal checking and processing of each submittal or resubmittal. For most submittals of normal complexity, allow not less than ten working days for processing by the Architect, and an additional five working days for each of the Architect's consultants from whom review will be required. Start of processing period shall be the first full working day after receipt by the Architect of the submittal. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval or review of any safety precautions, or unless otherwise explicitly stated in writing by the Architect, of construction means, methods, techniques sequences or procedures. ~~of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures.~~ The Architect shall not be responsible for any deviations from the Construction Documents not brought to the attention of the Architect by the Contractor. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**2.6.4.2** The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

**2.6.4.3**  If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify necessary ~~appropriate~~ performance and design criteria that such services must satisfy. The Architect shall be responsible for the adequacy of such performance and design criteria and for the coordination of any design undertaken by the design professional retained by the Contractor in response to such performance and design criteria with the overall design of the Project. The Architect shall not be responsible for the actual design undertaken by the design professional retained by the Contractor or for its adequacy, accuracy or completeness. Shop Drawings and other submittals related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval, signature and appropriate professional seal and professional

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

DAM04077

registration number, when submitted to the Architect. Such professional's signature and professional seal shall constitute such professional's undertaking, and The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

**2.6.5    CHANGES IN THE WORK**

**2.6.5.1** The Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents. The Architect may authorize minor changes in the Work not involving an adjustment in Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents. If necessary, the Architect shall prepare, reproduce and distribute Drawings and Specifications to describe Work to be added, deleted or modified, as provided in Paragraph 2.8.2.

**2.6.5.2** The Architect shall review properly prepared, timely requests by the Owner or Contractor for changes in the Work, including adjustments to the Contract Sum or Contract Time. A properly prepared request for a change in the Work shall be accompanied by sufficient supporting data and information to permit the Architect to make a reasonable determination without extensive investigation or preparation of additional drawings or specifications. If the Architect determines that requested changes in the Work are not materially different from the requirements of the Contract Documents, the Architect may issue an order for a minor change in the Work or recommend to the Owner that the requested change be denied.

**2.6.5.3** If the Architect determines that implementation of the requested changes would result in a material change to the Contract that may cause an adjustment in the Contract Time or Contract Sum, the Architect shall make a recommendation to the Owner, who may authorize further investigation of such change. Upon such authorization, and based upon information furnished by the Contractor, if any, the Architect shall estimate the additional cost and time that might result from such change, including any additional costs attributable to a Change in Services of the Architect. With the Owner's approval, the Architect shall incorporate those estimates into a Change Order or other appropriate documentation for the Owner's execution or negotiation with the Contractor.

**2.6.5.4** The Architect shall maintain records relative to changes in the Work.

**2.6.6    PROJECT COMPLETION**

**2.6.6.1** The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.

**2.6.6.2** The Architect's inspection shall be conducted with the Owner's Designated Representative to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.

**2.6.6.3** When the Work is found to be substantially complete, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including any amounts needed to pay for final completion or correction of the Work.

**2.6.6.4** The Architect shall receive from the Contractor and forward to the Owner: (1) consent of surety or sureties, if any, to reduction in or partial release of retainage or the making of final payment and (2) affidavits, receipts, releases and waivers of liens or bonds indemnifying the Owner against liens.

**ARTICLE 2.7    FACILITY OPERATION SERVICES**

**2.7.1**    The Architect shall meet with the Owner or the Owner's Designated Representative promptly after Substantial Completion to review the need for facility operation services.

**2.7.2**    Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall conduct a meeting with the Owner and the Owner's Designated Representative to review the facility operations and performance and to make appropriate recommendations to the Owner.

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B141-1997

DAM04078

**ARTICLE 2.8    SCHEDULE OF SERVICES**

**2.8.1**    ~~Design and~~ Contract Administration Services beyond the following limits shall be provided by the Architect as a Change in Services in accordance with Paragraph 1.3.3:

.1    up to two ( 2 ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor.

.2    up to sixty    ( 60 ) visits to the site by the Architect, and up to thirty (30) total visits to the site by the following consultants: Structural, Mechanical, Plumbing, Electrical, Fire Protection, Landscape Architect, Acoustician, Lighting Consultant, and Plumbing, over the duration of the Project during construction. For the purposes of this article, a visit is defined as a visit by a single design professional, and not the number of personnel.

.3    up to two ( 2 ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents.

.4    up to two ( 2 ) inspections for any portion of the Work to determine final completion.

**2.8.2**    The following Design and Contract Administration Services shall be provided by the Architect as a Change in Services in accordance with Paragraph 1.3.3:

.1    review of a Contractor's submittal out of sequence from the submittal schedule agreed to by the Architect;

.2    responses to the Contractor's requests for information where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;

.3    Change Orders and Construction Change Directives requiring evaluation of proposals, including the preparation or revision of Instruments of Service;

.4    providing consultation concerning replacement of Work resulting from fire or other cause during construction;

.5    evaluation of an extensive number of claims submitted by the Owner's consultants, the Contractor or others in connection with the Work;

.6    evaluation of substitutions proposed by the Owner's consultants or contractors and making subsequent revisions to Instruments of Service resulting therefrom;

.7    preparation of design and documentation for alternate bid or proposal requests proposed by the Owner; or

.8    Contract Administration Services provided 60 days after the date of Substantial Completion of the Work._____

Insert A:    .9    providing coordination of construction performed by separate contractors or by the Owner's own forces and _____ coordination of services required in connection with construction performed and equipment supplied by the Owner, or

Insert B:    .10  providing services in connection with the work of separate consultants retained by the Owner, except as noted below.

**2.8.3**    The Architect shall furnish or provide the following services only if specifically designated:

| Services | Responsibility<br>*(Architect, Owner or Not Provided)* | Location of Service<br>Description |
|---|---|---|

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997

| | | |
|---|---|---|
| .1 | Programming | A |
| .2 | Land Survey Services | O |
| .3 | Geotechnical Services | O |
| .4 | Space Schematics/Flow Diagrams | A |
| .5 | Existing Facilities Surveys | A (general) |
| .6 | Economic Feasibility Survey | NP |
| .7 | Site Analysis and Selection | NP |
| .8 | Environmental Studies and Reports | NP |
| .9 | Owner Supplied Data Coordination | A (supply layouts) |
| .10 | Schedule Development and Monitoring | A (Design Schedule) |
| .11 | Civil Design | A |
| .12 | Landscape Design | ~~O~~A |
| .13 | Interior Design | A (except F,F,E) |
| .14 | ~~Special Bidding or~~ Negotiation | A |
| .15 | Value Analysis | A+O |
| .16 | Detailed Cost Estimating | O |
| .17 | On-Site Project Representation | ~~O~~NP |
| .18 | Construction Management | NP |
| .19 | Start-up Assistance | NP |
| .20 | Record Drawings | NP |
| .21 | Post-Contract Evaluation | ~~N~~A (evaluation at 6 months and at final warranty) |
| .22 | Tenant-Related Services | NP |
| .23 | Gallery Lighting | A |
| .24 | Coordination of Audio-Visual | A |
| .25 | FFE services | NP |
| .26 | Public presentations or regulatory reviews (4 meetings max) | A |
| .27 | Variances or Special Permit services | NP |
| .28 | Custom Building and Site Signage | NP |
| .29 | Graphic Design/Site Signage | NP |
| .30 | Hazardous Materials Analysis | O |
| .31 | Interactive Displays/Technology | NP |
| .32 | Security System Design | O |
| .33 | As Built Drawings | NP |
| .34 | Computer Design/Selection | O |
| .35 | Exhibit Design | NP |
| .36 | Collection Storage Systems Design | NP |
| .37 | Electrical/Lighting within Cases/Exhibit Systems | NP |
| .38 | Audio Visual Design | NP (coord. only) |
| .39 | Kitchen Equipment Design/Selection | NP |
| | NP= Not Provided | |
| | A=Architect | |
| | O=Owner | |
| | F,F,E=Furniture, Fixtures, and Equipment | |

Description of Services.
*(Insert descriptions of the services designated.)*

## ARTICLE 2.9   MODIFICATIONS

**2.9.1**   Modifications to this Standard Form of Architect's Services: Design and Contract Administration, if any, are as follows:

By its execution, this Standard Form of Architect's Services: Design and Contract Administration and modifications hereto are incorporated into the Standard Form of Agreement Between the Owner and Architect, AIA Document B141-1997, that was

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997

DAM04080

entered into by the parties as of the date:

OWNER (Signature)

STEPHEN T. BRUNI
EXEC. DIRECTOR
(Printed name and title)

ARCHITECT (Signature)

Ann M. Beha, FAIA, President
(Printed name and title)

AIA DOCUMENT B141-STANDARD FORM SERVICES - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the viiolatorto legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B141-1997

DAM04081

# AnnBehaArchitects

33 Kingston Street
Boston, MA 02111
617.338.3000 T
617.482.9097 F

"Attachment A"

**Outline of Work Tasks**
**6 March 2001**
**The Delaware Art Museum**
Wilmington, Delaware
**Revised 22 March 2001**

## DESIGN VERIFICATION (4 weeks)

**Museum's Activities**

1. Provide survey of the site including all topographic, boundary and utility information, with specific and additional details that may be required for the Project site.

2. Identify Museum's Building Committee review procedures, participants and time of reviews (this phase and all subsequent phases).

3. Select and provide timely services of all Museum's consultants: exhibition and exhibition lighting, hazardous materials, telecommunications, testing services, geotechnical and cost consultants (this phase and all subsequent phases).

4. Confirm project schedule goals and inform Architect of any changes in a timely manner.

5. Attend all design workshops and coordinate Museum's responses.

6. Confirm budget and space program at each phase.

7. Provide representation throughout the project and a Project Coordinator.

8. Provide timely legal interpretations, zoning and any other legal issues, if required.

9. Maintain all updates Museum's policies, legal requirements, and insurances.

10. Identify Museum's phasing requirements, and review and update project schedule.

11. Identify community review process.

**Owner's Activities**

## PROGRAM VERIFICATION/ SCHEMATIC DESIGN (SD)

### (24-28 Weeks)

**1.0 Workshops/Presentations**
    As a guideline, agendas to include the following:

Workshop #1: Space Needs Verification
Workshop #2: Confirm building program; report on existing conditions

DAM04082

Workshop #3:  General site and building concepts
Workshop #4:  Listening session with neighborhood
Workshop #5:  Final site and building concepts
Workshop #6:  Presentation of concepts to Trustees
Workshop #7:  Exhibits and lighting concepts
Workshop #8:  Systems concepts
Workshop #9:  Budgets and schedule
Workshop #10:  Presentation to Trustees of final concept, budget, schedule
Workshop #11:  Community/neighborhood presentation of final concept

## 2.0 Evaluation of Existing Facilities

2.1  Review available drawings to confirm layout of existing spaces.  Prepare a single set of base floor plans and typical sections for use by the design team as needed for concept plans.

2.2  Identify spaces, such as the original galleries, which are of principal importance and should be preserved.

2.3  Visually assess and provide general descriptions of existing conditions in the Museum building, including:  exterior building envelope;  interior finishes;  and structural systems.

2.4  Verify current known conditions of the plumbing, fire protection, HVAC and electrical systems.

2.5  Generally, review local site and zoning issues to identify potential sites for expansion, as well as building code issues associated with proposed uses.

2.6  Review urban context, including city planning initiatives, regional institutions, competing attractions.

2.7  Identify review agencies and procedures for integration with project schedule.

2.8  Issue a summary report outlining system descriptions, conditions, major code issues and general recommendations.

## 3.0 Space Needs

3.1  Review previous studies.

3.2  Meet with staff and trustees to review, confirm and expand upon space needs identified in the Strategic Plan.

3.3  Identify requirements for the various spaces, including:  size;  location and proximity to entrances or other activities;  finishes;  and critical needs for equipment which will impact space size or systems, such as computers, shelving or climate control.

3.4  Prepare a table summarizing space requirements.

3.5  Review and finalize requirements with Museum.

## 4.0 Alternative Concept Plans

ABA will provide options to serve an 18M budget and options for a 26M solution.

4.1  Develop up to six (6) concept design studies in diagram form for accommodating the various space needs in the existing building or additions, with associated design concepts for landscape features, site circulation and parking.  Options will consider existing property plus adjacent property available for purchase by the Museum.

4.2  Meet with staff and trustees to review options and select preferred alternative.

4.3  Develop preferred alternative into plans, sections, and massing models.

4.4  Develop concept designs for building systems (HVAC, plumbing, electrical and fire protection).

4.5  Meet  with staff to review exhibit and lighting concepts.

4.6  Meet  with staff to review building systems concepts and options.

4.7  Review preliminary concept budgets and phasing options developed by Construction Manager.

DAM04083

### 5.0 Schematic Design

5.1  Architectural Deliverables:

- Floor plans of all floors showing room names and roof plan.
- Sketches showing schematic design for building exteriors including elevation studies, selected interior spaces, service areas.
- Schematic building sections
- Updated program and square footage and occupancy totals based on final Schematic Design.
- Outline specifications defining repairs, renovations and characteristics of new work.

- Working model
- Progress representations and design studies and other progress representations of the design image, design quality and interior components.

5.2  **Landscape and site plan** including: vehicular and pedestrian circulation; parking and delivery; landscaping and plantings; site lighting and furnishings; and locations for site features such as sculpture or program areas.

5.3  **Structural:** Prepare schematic level information and sketches indicating proposed structural framing systems, including modifications required for existing building.

5.4  **HVAC, Plumbing, Electrical, Fire Protection:** Prepare schematic design documents for the proposed changes to the plumbing, fire protection, HVAC and electrical systems. Coordinate requirements for security upgrades with Museum staff and vendors. Schematic Documents will consist of the following:

- Summary system descriptions of proposed modifications
- Outline specifications
- Design criteria
- One-line Concept system diagrams
- Preliminary engineering calculations
- Identification of MEP equipment and distribution (i.e. shafts) space allocation.

5.5  Review Schematic Design construction cost estimates prepared by Construction Manager.

5.6  Review and comment on the Project Schedule, phasing and packaging strategies prepared by the Construction Manager.

5.7  Preliminary review with regulatory agencies (building code, historic district) (one meeting each with key agencies).

5.8  Prepare and distribute all meeting notes of design meetings.

5.9  Prepare Schematic Design Report, to include executive summary, key features, site and floor plans, renderings and budget information.

**End of Schematic Design**

### 6.0 DESIGN DEVELOPMENT (DD) PHASE (20 Weeks)

DAM04084

**6.1 Museum's Activities**

- Confirm final approved SD option (one option) as a basis for Design Development.
- Attend DD workshops.
- Review and approve DD architectural information package.
- Review and approve DD Museum's consultants information.
- Confirm requirements of all FF&E items.
- Review and approve DD estimate and updated schedule.


**6.2 Architect's Activities**

- Prepare site and landscape drawings which include:
    - Removals
    - Layout plan including layout of all parking areas
    - Location and general types of proposed plan and surface materials
    - Location of site features, including lighting, paths, etc.
- Prepare architectural floor plans which include:
    - Major plan dimensions
    - Wall and ceiling systems indicated
    - Room names and numbers updated
    - Large scale plans blocked out for key areas
    - General material indications
    - Demolition of existing areas/structure
    - Roof plan, including location of roof drains, downspouts, etc.
    - Exterior window and wall systems, including all components and repairs required to existing systems.
    - Preliminary partition types/schedule.
    - Preliminary finish schedule.
    - Interior color and finish selections color boards illustrating finishes and colors (final selections will be identified after completion of Construction Documents.)
    - Proposed special interior design features.
    - Preliminary door schedule.
    - Structural drawings including:
        - -Typical floor framing
        - -Preliminary beam, joist and column layouts and schedules with    approximate depths/sizes.
- Mechanical, Electrical, Plumbing and Fire Protection drawings including:

DAM04085

- Proposed equipment rooms with preliminary layouts and locations
- Ductwork and piping: one-line diagrams indicated on plans including preliminary sizes of registers, diffusers, plenums, etc.
- Standpipes and riser locations/as required
- Roof drains, downspouts and floor drains
- Plumbing fixtures with preliminary selections
- Lighting: reflected ceiling plans of all areas, with typical lighting 'cuts'.
- Partial riser diagrams and schedules
- Standard details
- Updated renderings, models, and design studies for client review and distribution

- Draft final specification.
- Updated construction cost estimate.
- Prepare and distribute all meeting notes.
- Continue code review. Meet with local building officials and prepare architectural documentation for review with the Access Board, Building Department, Historical Review, and other regulatory agencies as applicable.
- Review and update the Project Schedule.
- Obtain Museum's approval of DD package and written authorization to proceed to next phase.
- As determined by the Owner, provide documents to General Contractors for GMP pricing and Contractor selection.
- Meet with Museum Building Committee (we assume three meetings with the Committee and Museum Staff; one meeting with the Trustees. We are carrying four trips to Wilmington).

## CONSTRUCTION DOCUMENT (CD) PHASE (24 weeks)

### Museum's Activities

1. Review and approve Construction Document architectural package.
2. Review and approve Museum's Consultants information.
3. Review of CD estimate, and approve.
4. Review and advise Architect on General and Supplementary Conditions sections for Project Manual.

### Architect's Activities

1. Complete site drawings including, as appropriate:
    - Site layout plans with final dimensioned walks, paths, ramps, parking and other details
    - Topographic and grading plan
    - Site lighting plan
    - Details
    - Notes, legends and symbols

---

DAM04086

2.  Complete landscape drawings including, as appropriate:

    - Location of all proposed landscaping
    - Plant materials and sizes
    - Details

3.  Complete architectural drawings including, as appropriate:

    - All floor plans including roof
    - Exterior building elevations and sections
    - Stairs and elevators
    - Enlarged plans of key areas
    - Doors and windows including schedules and details
    - Enlarged exterior wall sections and details
    - Reflected ceiling plans
    - Interior finishes, finish schedules and partition types based on final finish selections including general color schedule
    - Interior elevations
    - Miscellaneous details

4.  Complete structural drawings including, as appropriate:

    - Foundation plans and details
    - Floor and roof framing plans and details
    - Column and beam schedules
    - Structural details

5.  Complete mechanical drawings including, as appropriate:

    - Plumbing plans
    - Plumbing floor and roof plans, including roof drains, down spouts, floor drains
    - Plumbing fixture schedules
    - Sprinkler floor plans
    - HVAC floor plans including all duct runs, register and diffuser locations
    - Equipment room details and layouts
    - Riser diagrams
    - Miscellaneous details, large scale layouts as required
    - Schedules, symbols, legends, notes

6.  Complete electrical drawings including, as appropriate:

    - Electrical site plan, including site lighting
    - Floor, roof and reflected ceiling plans showing light and power device layouts
    - Riser diagrams

DAM04087

- Panel schedules
- Miscellaneous details, large scale layouts as required
- Schedules, symbols, legends, notes

7. Review, coordinate and insert submittals from Museum's consultants (computers, data and telecommunications, etc.) as applicable

8. Complete Project Manual (specifications including general and supplementary general conditions, etc.)

9. Provide and review construction cost update.

10. Prepare and distribute all meeting notes for design meetings.

11. Obtain Museum's approval of early-release packages and final Construction Documents (if GMP contract).

12. Meet with Building Committee (we are carrying two meetings with the Building Committee, one with Trustees, and two with Delaware Museum of Art Staff, for a total three trips to Wilmington).

## BIDDING or NEGOTIATION (B/N) PHASE   (8 weeks)

### Museum's Activities

1. Attend pre-bid conference.

2. Review bid results, and select General Contractor.

3. Prepare and execute contract with General Contractor.

### Architect's Activities

1. Print and distribute bid documents.

2. Respond to questions from bidders.

3. Prepare clarification of interpretation of bid documents.

4. Conduct pre-bid conference.

5. Assist Owner in review of bidding results.

6. Review Owner/GC construction contract with Owner.

## CONSTRUCTION ADMINISTRATION (CA) PHASE  (52 weeks)

### Museum's Activities

1. Provide Owner representation at all scheduled job meetings.

2. Provide all necessary services for the coordination of Owner-supplied items (i.e. tel/data networks, etc.) for the General Contractor and Architect.

3. Coordinate move-in of furniture, equipment, collections.

### Architect's Activities

1. Provide on-site CA activities in accordance with AIA B141 Agreement.

DAM04088

2. Attend on-site project meetings during construction period as established in Project Schedule; review construction schedule as prepared by General Contractor (GC); review construction meeting notes prepared by GC. ABA is carrying weekly site representation.

3. Prepare and distribute site visit reports and meeting notes related to design issues.

4. Review shop drawings, samples and other submittals of materials, finishes, products or equipment.

5. Review and approve GC's Applications for Payment.

6. Review GC's RFI's (if not answerable by GC after careful review of documents provided).

7. Provide correspondence as required to maintain GC's schedule.

8. Review test reports.

9. Prepare bulletins (Items of Change) and Change Orders documenting changes in the project. Review all change costs and comment as appropriate.

10. Prepare punch lists after notification by GC of substantial completion.

11. Prepare and issue Certificate of Substantial Completion.

12. Review submittal by GC of all operation and maintenance manuals of systems, equipment, etc. as required by Project Manual.

13. Provide follow-up review at six months and one year to review warranty items.

14. Meet with Building Committee monthly to update on progress.

15. We assume a twelve month construction schedule and are carrying a fee for no more than fifty-two job progress meetings in Wilmington.

# AnnBehaArchitects

33 Kingston Street
Boston, MA 02111
617.338.3000 T
617.482.9097 F

Attachment "B"

**Compensation and Other Miscellaneous Issues**
**10 April 2001**
**The Delaware Art Museum**
Wilmington, Delaware

(based on previous correspondence between Owner and Architect, specifically letters of 15 February, 21 February and 6 March, 2001)

<u>Compensation</u> – based on a schedule of Construction Costs as follows:

|  |  |
|---|---|
| $18M | a fee of 13.00% |
| $20M | a fee of 12.90% |
| $22M | a fee of 12.75% |
| $24M | a fee of 12.60% |
| $26M | a fee of 12.50% |

The first phase of the work will be Program Verification/Schematic Design. As the construction cost has as yet not been established, ABA will prepare conceptual designs for two levels of cost: approximately $18M and approximately $26M. The fee for this phase of the work will be 17% of the total fee for $26M: $552,500. For all future phases, the fee will be 83% of the balance of the fee based on the applicable percentage level determined by the project construction budget.

Some key areas of interest among the donors may be more developed and treated as focal points in the larger ($26M) scheme:

- The Pyle Collection
- The Sloan Collection
- The Pre-Raphaelite Collection
- The Site and Gardens
- The Museum Library

<u>Miscellaneous Issues:</u>

1. Data and telephone outlets: DAM will provide the location requirements and ABA will provide the conduiting.

2. Building signage: ABA will provide any electrical engineering required; however graphic design is excluded from the scope of ABA's work.

3. Security system: its design is excluded from ABA's scope of work. ABA will provide the required power for the system as well as coordination with the design. DAM's consultant shall prepare the

DAM04090

construction documents for its system, including all conduiting and layout and shall provide timely information for coordination to the ABA team as appropriate.

4. Change Orders: ABA shall provide documentation and all required sketches and drawings as appropriate for all changes relating to the building and systems design, except as noted elsewhere.

5. ABA will provide Construction Documents for site design, including grading and site utilities, based on a detailed existing conditions survey to be provided by DAM.

6. Gallery lighting: ABA's fee includes the fees of a gallery lighting consultant.

7. Civil Engineering: the services of this consultant are included in ABA's fees to the extent that the work, as it relates to grading, building utilities, site landscape and parking, is within the project area. Groundwater compliance and non-observable site conditions which may require remediation are to be treated as an additional service. ABA hopes to engage the services of a Wilmington area civil engineer.

8. Geotechnical and Traffic Engineering: these are outside ABA's scope of work.

9. Existing conditions within the Museum: ABA will be provided with accurate CAD-based drawings by DAM. ABA will review all observable conditions relating to its scope of work. Measurement of existing conditions, destructive testing, or conversion of existing documents to CAD will be treated as an additional service.

10. Meetings with Code officials and others: ABA is carrying two meetings during SD and up to three meetings during DD with code officials. Preparation of materials for variances and special permits are considered an additional service as previously agreed. ABA will draw down on the fundraising allowance for any neighborhood meetings.

11. Renderings: all renderings are to be treated as a reimbursable expense.

12. Coordination and Site Representation: ABA may, but is not obliged to, retain the services of a Wilmington area architectural firm to provide coordinating and site representation services for ABA. If these services are a substitute for ABA services, the architect will be compensated by ABA. If the services are required by DAM, the Owner will pay for the services.

13. Trustee Meetings: Ann Beha will attend, to the best of her abilities, meetings with the Trustees and meetings which are central to the presentation of design concepts. Meeting times will be established cooperatively to the mutual convenience of all parties.

14. ABA's fee includes two meetings with Mr. Paley during the first phase of the work. ABA expects to address the Reservoir as part of its design approach. The providing of technical documentation or technical support for artist installations on this project are considered an additional service.

DAM04091

# Delaware Art Museum   Program/Schematic Design   Attachment C   22 March 2001

## Schedule (March - September 2001)

**Ann Beha Architects**

Gantt chart schedule. Months: March, April, May, June, July, August, September (2001), divided by weeks.

TASKS:
1. WORKSHOPS (DAM)
2. EVALUATION
3. SPACE NEEDS
4. ALTERNATIVE CONCEPTS
5. SCHEMATIC DESIGN
6. PRICING REVIEWS
7. CLIENT REVIEW PERIODS
8. FULL TRUSTEE PRESENTATIONS
9. DESIGN TEAM REVIEWS (BOSTON)

■  *ABA/Committee Workshop*

F:\ABA\Projects\Delaware.940\Contracts\DAM Schedule.p65

DAM04092

ATTACHMENT D

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY)
05/15/2001

| PRODUCER (617)720-6333          (617)723-7475 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

B. R. Alexander & Co., Inc.
50 Congress Street
Suite 530
Boston, MA 02109

**INSURERS AFFORDING COVERAGE**

| INSURED Ann Beha Architect,Inc.<br>Attn: Katherine Shannon<br>33 Kingston Street<br>Boston, MA 02111 | | |
|---|---|---|
| | INSURER A: | Utica Mutual Insurance Company |
| | INSURER B: | The Hartford |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE  X OCCUR | CPP1611006 | 11/01/2000 | 11/01/2001 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 50,000 |
| | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | **GEN'L AGGREGATE LIMIT APPLIES PER:**<br>☐ POLICY ☐ PROJECT ☐ LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | PRODUCTS - COMP/OP AGG | $ Excluded |
| A | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | CPP1611006 | 11/01/2000 | 11/01/2001 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| A | **EXCESS LIABILITY**<br>X OCCUR  ☐ CLAIMS MADE<br>☐ DEDUCTIBLE<br>☐ RETENTION  $ | CULP1607884 | 11/01/2000 | 11/01/2001 | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | AGGREGATE | $ 2,000,000 |
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | W1900186 | 11/01/2000 | 11/01/2001 | X WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| B | **OTHER** Professional Liability | NPC010904806 | 05/20/2000 | 05/20/2002 | $3,000,000 Per Claim<br>$3,000,000 Aggregate | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER: | CANCELLATION |
|---|---|---|
| | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE<br>Patricia Corman |

ACORD 25-S (7/97)                                                © ACORD CORPORATION 1988

DAM04093

✎ JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Delaware Art Museum, Inc.

**DEFENDANTS**

Ann Beha Architects, Inc., f/k/a Ann Beha Associates, Inc., and Ove Arup & Partners Massachusetts, Inc.

**(b)** County of Residence of First Listed Plaintiff  New Castle County, DE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  N/A
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address and Telephone Number)
Attn: Thomas J. Allingham II, Esq.
Attn: Richard S. Horvath, Jr., Esq.
One Rodney Square, P.O. Box 636
Wilmington, DE  19899-0636
Tel: (302) 651-3000

Attorneys (If Known)

see Attachment

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business In This State | ☒4 | ☐4 |
| Citizen of Another State | ☐2 | ☒2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Breach of Contract, Professional Negligence and Fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**
In excess of $75,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE _____    DOCKET NUMBER _____

DATE
8-3-06

SIGNATURE OF ATTORNEY OF RECORD
_Rick M_

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

American LegalNet, Inc. | www.USCourtForms.com

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ___0 6 - 4 8 1___

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___2.___ COPIES OF AO FORM 85.

___8/4/06___
(Date forms issued)

___Ronald E. Witt Jr___
(Signature of Party or their Representative)

___Ronald E. Witman Jr.___
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action