UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DELAWARE ART MUSEUM,  §
A Delaware corporation,  §
 §
Plaintiff,  §  C.A. No.: 06-481
 §
v.  §  JURY TRIAL DEMANDED
 §
ANN BEHA ARCHITECTS INC., f/k/a  §
ANN BEHA ASSOCIATES, INC., a  §
Massachusetts corporation, and OVE ARUP &  §
PARTNERS MASSACHUSETTS, INC.,  §
A Massachusetts corporation,  §
 §
Defendants.  §

**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
PURSUANT TO FED. R.. CIV. P. 12(b) TO
DISMISS THE COMPLAINT AGAINST ARUP**

BAILEY & ASSOCIATES, P.A.


/s/ James F. Bailey, Jr.
JAMES F. BAILEY, JR.
Delaware Bar I.D. #336
Three Mill Road, Suite 306A
Wilmington, DE  19806
(302) 658-5686
*Attorney for Defendant*
*Ove Arup & Partners Massachusetts, Inc.*

Michael J. Vardaro, Esquire
Zetlin & DeChiara LLP
900 Merchants Concourse
Westbury NY  11590
(516) 832-1000

Dated: October 24, 2006

1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF FACTS ......................................................................... 2

ARGUMENT ........................................................................................... 4

       POINT I.       PLAINTIFF'S COMPLAINT AGAINST ARUP MUST BE DISMISSED AS IT IS BARRED AS A MATTER OF LAW BY THE ECONOMIC LOSS DOCTRINE.................................... 4

       POINT II.      PLAINTIFF'S CAUSE OF ACTION AGAINST ARUP FOR NEGLIGENT MISREPRESENTATION IS BARRED BY THE ECONOMIC LOSS DOCTRINE AS IT DOES NOT FALL WITHIN THE NARROW EXCEPTION OF PERMITTED CLAIMS ................................................................ 8

CONCLUSION ........................................................................ 12

i

## **TABLE OF AUTHORITIES**

**Cases**

Carello v. Price Waterhouse Coopers, LLP, 2002 WL 1454111, at *7 (Del. Super. Ct.
    July 3, 2002)............................................................................................................. 10

Christiana Marine Service Corporatrion v. Texaco Fuel and Marine Marketing, Inc., 2002
    WL 133560, *5-6 (Del. Super. Ct. June 13, 2002) ............................................ 4,8,11

Danforth v. Acorn Architecture Structrures, Inc. 608 A.2d 1194, 1195-98 (Del. 1992) ... 4,6,8

Delmarva Power & Light v. Meter-Treater Inc., 218 F. Supp.2d 564, 568-69 (D.
    Del.2002) ...................................................................................................................... 4

Millsboro Fire Company v. Construction Management Service, Inc., 2006 WL
    1867705, at *1-3 (June 7, 2006) .................................................................... 4,8,9,11

Outdoor Technologies Inc. v. All First Financial Inc., 2000 WL 141275, at *5 (Del. Super
    Ct. January 24, 2000) .................................................................................................. 10

Ruger v. Funk, 1996 WL 110072, at *10 (Del. Super. Ct. January 22, 1996). ........................... 10

The Crowell Corporation v. Topkis Construction Company, 280 A.2d 730, 731-32 (Del.
    Super. Ct. 1971) ................................................................................................... 4,5,6,7

### Preliminary Statement

Defendant Ove Arup & Partners Massachusetts, Inc. ("Arup") respectfully submits this memorandum of law in support of its motion, pursuant to FED. R. CIV. P. 12(b)(6), to dismiss the Complaint and the claim asserted by Plaintiff, the Delaware Art Museum, Inc. ("DAM"), against Arup. DAM's lone cause of action against Arup seeks economic damages for negligent misrepresentation. Accordingly, Arup requests that this Court dismiss DAM's Complaint because, as a matter of law, DAM's claim of negligent misrepresentation against Arup is barred by the economic loss doctrine.

**Statement of Facts**

DAM operates a museum in Wilmington Delaware. (A copy of the Complaint is annexed to the Affidavit of Michael J. Vardaro ("Vardaro Aff.") as Exhibit A, ¶ 1, 4). In 1998 and 1999, DAM developed a plan that included, *inter alia*, the renovation of its facility and an expansion of its exhibition space (the "Project"). (Vardaro Aff., Exh. A, ¶¶ 16-20). In March of 2001, DAM retained ABA as the architect for the Project. (Vardaro Aff., Exh. A, ¶¶ 22, 29). According to Complaint, DAM and ABA executed a written contract that specified ABA's responsibilities for the Project. (Vardaro Aff., Exh. A, ¶¶ 29-30).

Pursuant to the contract between DAM and ABA, ABA retained Arup to serve as ABA's consultant on the Project. (Vardaro Aff., Exh. A, ¶ 30). The Complaint alleges that Arup was retained as an engineer "to provide structural, mechanical, electrical plumbing and fire protection engineering services to ABA". (Vardaro Aff., Exh. A, ¶ 30).

DAM commenced the instant action by filing a Summons and Complaint on or about August 3, 2006. (Vardaro Aff., Exh. A). DAM's Complaint alleges six causes of action. Five of the six causes of action are asserted solely against ABA. (Vardaro Aff., Exh. A, pp. 50-55). DAM's causes of action against ABA include: (1) breach of contract, (2) breach of implied covenants, (3) negligent misrepresentation, (4) common law fraud, and (5) consumer fraud. The only cause of action directed at Arup is the fourth, which alleges negligent misrepresentation. (Vardaro Aff., Exh. A, p. 53).

In DAM's cause of action for negligent misrepresentation against Arup, DAM alleges that Arup supplied false information to ABA and that subsequently, ABA provided that information to DAM. (Vardaro Aff., Exh. A, ¶ 224). DAM claims that as a result, it "suffered pecuniary loss" for "delay costs, construction premiums, remedial work and contractor and subcontractor claims." (Vardaro Aff., Exh. A, ¶¶ 226, 228).

**Argument**

**POINT I**

**PLAINTIFF'S COMPLAINT AGAINST ARUP MUST BE DISMISSED AS IT IS BARRED AS A MATTER OF LAW BY THE ECONOMIC LOSS DOCTRINE**

The economic loss doctrine bars the negligent misrepresentation claim asserted by DAM against Arup. It is well-settled law in Delaware that the economic loss doctrine precludes recovery under tort law in cases where a plaintiff's only damages are economic in nature and are not the result of a personal injury or damage to property. See Delmarva Power & Light v. Meter-Treater Inc., 218 F. Supp.2d 564, 568-69 (D. Del. 2002) (discussing Danforth v. Acorn Architecture Structures, Inc., 608 A.2d 1194, 1195-98 (Del. 1992)); see also Christiana Marine Service Corporation v. Texaco Fuel and Marine Marketing, Inc., 2002 WL 133560, *5-6 (Del. Super. Ct. June 13, 2002) (a copy of the decision is annexed to the Vardaro Aff. as Exh. B); The Crowell Corporation v. Topkis Construction Company, 280 A.2d 730, 731-32 (Del. Super. Ct. 1971).

The economic loss doctrine applies to any cause of action in tort that stems from a commercial transaction. See Christiana, 2002 WL 1335360 at *5. Moreover, the rule precludes a claim in tort regardless of whether the parties were in contractual privity at the time of the alleged conduct or omission. See Danforth, 608 A.2d at 1200 (holding that "the existence of privity of contract is not an exception to the application of the economic loss doctrine in Delaware"); Crowell, 280 A.2d at 730-31 (applying economic loss rule to owner's claim against a subcontractor with whom the owner shared no contractual privity); Millsboro Fire Company v. Construction Management Service, Inc., 2006 WL 1867705, at *1-3 (June 7, 2006) (finding that the

4

economic loss doctrine precluded property owner's claim against its architect, with whom it shared contractual privity, and architect's engineering consultant, who was not in privity with the owner) (a copy of the decision is annexed to the Vardaro Aff. as Exh. C).

In <u>Crowell</u>, plaintiff hired a general contractor to undertake work on a multipurpose building owned by the plaintiff. 280 A.2d at 730-31. The general contractor then hired various subcontractors for various portions of the work. <u>Id.</u> at 730. Plaintiff sued the subcontractors for negligence claiming the subcontractors' work was of a poor quality and created defects in the building. <u>Id.</u> at 730-31. Plaintiff sought damages based on its cost to repair the alleged defects.

The subcontractors moved for summary judgment, and argued that plaintiff's claims were barred by the economic loss doctrine since plaintiff's alleged damages were exclusively pecuniary as there were no claimed personal injuries or property damage. <u>Id.</u> at 731. Defendants asserted that plaintiff's proper claim was for breach of contract against the general contractor whom plaintiff had hired. <u>Id.</u>

The court distinguished the facts of <u>Crowell</u> with instances where defective construction or manufacture causes injury to a person or an event that results in property damage. <u>Id.</u> In such cases, the court explained that subcontractors may very well be liable to a property owner or victim. <u>Id.</u> As the court pointed out, however, the facts in <u>Crowell</u> were completely different:

> [t]here is a third category of situations where tort liability has generally been held not to exist. In this category are cases where no accident, collapse or explosion has yet taken place and damages are sought because of the pecuniary losses suffered on account of the negligent workmanship. . . . Where, however, there is no accident

> or tangible damage, and the only loss is a pecuniary one, through loss of use of the chattel or the cost of repairing it, the Courts have adhered to the rule * * * that purely economic interests are not entitled to protection against mere negligence, and so have denied recovery."

Id. (quoting Prosser, Law of Torts, 3rd Ed. 1964).

The Delaware Supreme Court addressed this same issue in Danforth v. Acorn Architecture Structures, Inc., supra. In Danforth, plaintiff hired an architect to design a prefabricated home and supply the materials necessary for its construction. Id. at 1194. Plaintiff then hired a contractor to build the home using the materials and designs that the architect provided. Id. Approximately eight years later, plaintiff discovered condensation on the interior walls of his home and claimed that it was because the architect's specifications regarding the residence's insulation were incorrect. Id. Plaintiff filed suit against the architect sounding in negligence. Id.

In affirming the trial court's grant of summary judgment to the architect, the Delaware Supreme Court made it clear that the economic loss rule was firmly rooted in Delaware law and endorsed the legal conclusions of Crowell, describing it as the "seminal Delaware case" on the economic loss doctrine. Id. at 1198-1200. The Delaware Supreme Court agreed that summary judgment was appropriate because plaintiff's damages were purely economic and its claim sounded in tort. Id.

Similarly, the economic loss doctrine applies to the instant matter and bars DAM's cause of action against Arup for negligent misrepresentation. DAM's only claimed damages in this matter are strictly pecuniary. Plaintiff has made no allegation of any personal injury, nor does plaintiff claim any property damage. Therefore, even if each of plaintiff's claims are true, the economic doctrine claim bars plaintiff's action in tort against Arup. Plaintiff's claim is one for pecuniary damage

only and the law is clear that "purely economic interests are not entitled to protection against mere negligence" Crowell, 280 A.2d at 731. Accordingly, DAM's attempt to recover pecuniary damages for alleged negligence is barred by the economic loss doctrine.

**POINT II**

**PLAINTIFF'S CAUSE OF ACTION AGAINST ARUP FOR NEGLIGENT MISREPRESENTATION IS BARRED BY THE ECONOMIC LOSS DOCTRINE AS IT DOES NOT FALL WITHIN THE NARROW EXCEPTION OF PERMITTED CLAIMS**

Delaware has adopted Section 552 of the Restatement (Second) of Torts, which provides a narrow exception to the economic loss rule for certain negligent misrepresentation claims. Although DAM's cause of action against Arup is for negligent misrepresentation, it does not fall within the limited exception to the economic loss doctrine and DAM's claim is indeed barred.

The Delaware courts hold that in order to fit within the narrow exception and sustain a negligent misrepresentation claim, a plaintiff must demonstrate the existence of two elements: (1) the defendant provided the information in question to the plaintiff, with the expectation that the plaintiff would use that information in business transactions with third-parties, and (2) the "defendant must be in the business of supplying information." See Millsboro, supra, 2006 WL 1867705, at *2; Christiana, supra, 2002 WL 1335360, at *6; Danforth v. Acorn Structures, Inc., 1991 WL 215658, *4 (Del. Super. Ct. August 27, 1991), aff'd, Danforth, 608 A.2d 1194. This narrow exception is applied by Delaware courts in very limited circumstances. See Millsboro, 2006 WL 1867705, at *3; Christiana, 2002 WL 1335360 at *6.

DAM alleges at paragraph 222 of its Complaint that "[a]s an engineer and design professional, Arup is in the business of supplying information." Obviously, this conclusory allegation was included in the Complaint in a desperate attempt to comply with the requirements of the narrow exception allowing claims for negligent

misrepresentation for pecuniary losses.  However, DAM's attempt to impose its own legal conclusion on this Court is unavailing.  This assertion should be disregarded as it is not factual and merely attempts to usurp this Court's role in determining issues of law.  Delaware courts have unequivocally held that engineers are not in the business of supplying information.  DAM's complaint is clear, Arup is alleged to be an engineer.  Therefore, as a matter of law, Arup is not in the business of supplying information as defined under Delaware law.

In <u>Millsboro</u>, the plaintiff was a fire company that hired a construction management firm to renovate and build an addition to plaintiff's firehouse.  2006 WL 1867705, at *1.  Plaintiff also hired an architectural firm to design the renovation and construction and to administer the construction contract.  <u>Id.</u>  That architectural firm then, in turn, hired an engineering firm to assist in the design of the project's electrical, plumbing, heating, ventilation and air conditioning systems.  <u>Id.</u>  Plaintiff filed suit against the construction management firm, claiming defects in the heating, ventilation and air conditioning systems.  <u>Id.</u>  The construction management firm then commenced a lawsuit against several parties, including the architect and the engineer.  <u>Id.</u> at *2.  The construction manager asserted a claim against the engineer for negligent misrepresentation with respect to the design drawings and other information that it had provided regarding the heating, ventilation and air conditioning system.  <u>Id.</u>

The engineering firm moved for summary judgment and argued that the economic loss doctrine barred the third-party defendant's negligent misrepresentation claim since it was not in the business of supplying information.  <u>Id.</u>  The court agreed.  In deciding the motion, the <u>Millsboro</u> court utilized the rubric stated above, namely that the construction manager had to demonstrate that the engineer provided the erroneous information to the construction manager with the expectation that the construction

manager would use that information in business transactions with third-parties, and that the engineer was in the business of supplying information. Id. at 2. The salient question before the court was whether the engineering firm was "in the business of supplying information."

The court carefully analyzed the difference between those professions whose primary function is to provide information, and those professions where the exchange of information was incidental to a much larger function. Id. Thus, under Delaware law, only surveyors and members of professions "expressly in the business of supplying information" fall within the exception to economic loss rule. Id. These have included accountants, financial advisors, and title searchers. Id. (citing Carello v. Price Waterhouse Coopers, LLP, 2002 WL 1454111, at *7 (Del. Super. Ct. July 3, 2002); Outdoor Technologies Inc. v. All First Financial Inc., 2000 WL 141275, at *5 (Del. Super. Ct. January 24, 2000); Ruger v. Funk, 1996 WL 110072, at *10 (Del. Super. Ct. January 22, 1996).

The court correctly recognized that a design professional's primary function is not disseminating information. As the phrase "design professional" aptly implies, the primary role of an engineer is to design structures and systems for buildings and improvements. The dissemination of that information is only a byproduct of the professional's primary role in the project as a designer. As the Millsboro court appropriately explained:

> [the architect and engineers] did not engage in the business of supplying information. The information is more aptly categorized as information incidentally supplied to [the construction manager] as part of the construction, renovation and addition to the Fire Hall. Viewing the facts in the light most favorable to the non-moving parties, the provision of plans and design drawings used to construct the project do not constitute

> the business of supplying information. [The architect and engineers] are not in business falling within Delaware's narrow exception and strict construction [of] the Economic Loss Doctrine.

Id. See also, Christiana, supra, 2002 WL 1335360, at *6-7.


The Court's holding could not have been clearer – an engineer is not subject to the narrow exception to the economic loss doctrine. Just as in Millsboro, the inevitable dissemination of Arup's design is clearly incidental to the firm's role as a designer. As a matter of law, engineers are not in business of supplying information. Consequently, just as the court in Millsboro found that the claim for negligent misrepresentation was barred by the economic loss doctrine, so to should this Court find that DAM's claim for negligent misrepresentation against Arup should be dismissed.

**Conclusion**

For all of the foregoing reasons, Defendant Arup respectfully requests that this Court issue an order, dismissing Plaintiff's Complaint in its entirety as against Arup and for such other and further relief as this Court deems just and proper.

Dated: October 20, 2006

Respectfully submitted,

BAILEY & ASSOCIATES, P.A.

By:_____
     James F. Bailey, Jr., Esq.
3 Mill Road, Suite 306A
Wilmington, Delaware 19806
(302) 658-8051
*Attorneys for Defendant*
*Ove Arup & Partners Massachusetts*

ZETLIN & DE CHIARA LLP

By:_____
     Michael J. Vardaro, Esq.
900 Merchants Concourse
Westbury, New York  11590
(516) 832-1000
*Attorneys for Defendant*
*Ove Arup & Partners Massachusetts*

12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE ART MUSEUM, | § | |
| A Delaware corporation, | § | |
| | § | |
| Plaintiff, | § | C.A. No.: 06-481 |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| ANN BEHA ARCHITECTS INC., f/k/a | § | |
| ANN BEHA ASSOCIATES, INC., a | § | |
| Massachusetts corporation, and OVE ARUP & | § | |
| PARTNERS MASSACHUSETTS, INC., | § | |
| A Massachusetts corporation, | § | |
| | § | |
| Defendants. | § | |

**MOTION OF DEFENDANT OVE ARUP & PARTNERS MASSACHUSETTS, INC.
TO DISMISS THE COMPLAINT PURSUANT TO FED. R.. CIV. P. 12(b)**

Defendant Ove Arup & Partners Massachusetts, Inc. "(Arup)" hereby moves to dismiss the

Complaint pursuant to Fed. R. Civ. P. 12(b) for the reasons contained within the attached Memorandum

of Law, the contents of which are incorporated herein by reference.

Respectfully submitted,

BAILEY & ASSOCIATES, P.A.

/s/ James F. Bailey, Jr.
JAMES F. BAILEY, JR.
Delaware Bar I.D. #336
Three Mill Road, Suite 306A
Wilmington, DE 19806
(302) 658-5686
*Attorney for Defendant*
*Ove Arup & Partners Massachusetts, Inc.*

Michael J. Vardaro, Esquire
Zetlin & DeChiara LLP
900 Merchants Concourse
Westbury NY 11590
(516) 832-1000

Dated: October 24, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE ART MUSEUM, | § | |
| A Delaware corporation, | § | |
| | § | |
| Plaintiff, | § | C.A. No.: 06-481 |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| ANN BEHA ARCHITECTS INC., f/k/a | § | |
| ANN BEHA ASSOCIATES, INC., a | § | |
| Massachusetts corporation, and OVE ARUP & | § | |
| PARTNERS MASSACHUSETTS, INC., | § | |
| A Massachusetts corporation, | § | |
| | § | |
| Defendants. | § | |

**AFFIDAVIT IN SUPPORT OF MOTION TO DISMISS**

| | |
|---|---|
| STATE OF NEW YORK | § |
| SS. | § |
| COUNTY OF NASSAU | § |

**MICHAEL J. VARDARO**, being duly sworn, deposes and says:

1.      I am associated with the law firm of Zetlin & De Chiara LLP, attorneys for Ove Arup & Partners Massachusetts, Inc. ("ARUP") in the above captioned action.  I am fully familiar with the facts and circumstances set forth herein and submit this affidavit in support of ARUP's motion to dismiss Plaintiff's Complaint.

2.      Annexed hereto as Exhibit A is a true and accurate copy of the Complaint filed on or about August 4, 2006.

3.      Annexed hereto as Exhibit B is a true and accurate copy of the decision <u>Christiana Marine Service Corporation v. Texaco Fuel and Marine Marketing, Inc.</u>, 2002 WL 1335360 (June 13, 2002).

4.      Annexed hereto as Exhibit C is a true and accurate copy of the decision <u>Millsboro Fire Company v. Construction Management Service, Inc.</u>, 2006 WL 1867705 (June 7, 2006).

5.    For the reasons set forth in the accompanying Memorandum of Law, ARUP respectfully requests that this Court dismiss the Complaint against it.

Dated: Westbury, New York
      October 20, 2006

Michael J. Vardaro

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

DELAWARE ART MUSEUM, INC., a
Delaware corporation,

               Plaintiff,

      v.

ANN BEHA ARCHITECTS, INC., f/k/a
ANN BEHA ASSOCIATES, INC., a
Massachusetts corporation, and OVE ARUP
& PARTNERS MASSACHUSETTS, INC.,
a Massachusetts corporation,

               Defendants.

:  C.A. No.   06 - . 4 8 1

:  Jury Demand



## COMPLAINT

Plaintiff Delaware Art Museum, Inc. ("Delaware Art Museum" or "Museum"), by and

through its undersigned counsel, brings this action against Defendants Ann Beha Architects, Inc.,

formerly known as Ann Beha Associates, Inc. ("ABA"), and Ove Arup & Partners

Massachusetts, Inc. ("Arup") and hereby alleges, upon knowledge as to the Museum and upon

information and belief as to all others, as follows:

## PRELIMINARY STATEMENT

1.    In 1998 and 1999, the Delaware Art Museum's Board of Trustees developed a

long-range Strategic Building and Site-Development Plan (the "Master Plan"). Part of the

Master Plan included renovations and expansions (the "Project") to the Museum's existing

facility at 2301 Kentmere Parkway, Wilmington, Delaware (the "Facility"). Chief of the

Museum's concerns was that the Project would be completed on time and within budget.

2.      Typical of nonprofit corporations, the Delaware Art Museum's Board of Trustees was made up of community volunteers who shared a common enthusiasm for the community and the mission of the Museum. The Museum's Board members had little, if any, experience in large-scale construction. Certainly no one on the Museum's Board of Trustees had any experience on a multimillion dollar museum renovation equivalent to the Project's scale. Therefore, the Museum sought qualified professionals to guide it through the Project.

3.      This action arises from the failure of architectural and engineering professionals engaged by the Delaware Art Museum to discharge their obligations to the Museum in connection with the Project. The Museum retained the architect to act as the Museum's representative throughout the Project, and the Museum properly relied on the expertise that the architect, and its engineers, supposedly brought to the Project. Because the architect, and its engineers, did not perform their services in a timely and competent manner, the Museum was severely damaged – not only economically, by incurring substantial expenses necessary to correct and overcome these professionals' errors, omissions and delays, but also institutionally, by damage to its reputation, fund-raising and other aspects of its mission. This suit seeks to recover those damages.

## THE PARTIES

4.      The Delaware Art Museum is a Delaware nonprofit corporation with its principal place of business in Wilmington, Delaware. The Museum operates the Facility.

5.      Defendant Ann Beha Architects, Inc. is a Massachusetts corporation with its headquarters and principal place of business located in Boston, Massachusetts.

2

6.    Defendant Ove Arup & Partners Massachusetts, Inc. is a Massachusetts corporation with its headquarters and principal place of business located in Cambridge, Massachusetts.

## JURISDICTION

7.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and the action is between citizens of different states.

## VENUE

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the Museum's claims occurred in Delaware, the Project was undertaken in Delaware, and ABA and Arup made frequent visits to Delaware as part of their work on the Project.

## SUBSTANTIVE ALLEGATIONS

### HISTORY OF THE DELAWARE ART MUSEUM

9.    The Delaware Art Museum was founded in 1912 as the Wilmington Society of Fine Arts (the "Society"). The Society's goals were to promote the knowledge and enjoyment of the fine arts in the State of Delaware. The Society would meet these goals by establishing schools and other methods of instruction, publishing books and other materials, establishing galleries of paintings and sculpture, and any other methods that the Society's members would determine that would further the promotion and the cultivation of the fine arts.

10.    Soon after the Society had been incorporated, the trustees of the Howard Pyle Fund deeded the Howard Pyle Collection to it. In the 1930s, the Bancroft family generously offered the estate of Samuel Bancroft, Jr. as a site for a new museum, and in 1938 the first building of the Facility (the "1938 Building") was constructed. In return for the gift of the

3

Samuel Bancroft, Jr. estate, the Delaware Art Museum agreed to dedicate a wing to display Samuel Bancroft, Jr.'s collection of English Pre-Raphaelite paintings.

11.     In 1957, the Facility was expanded with the addition of the H. Fletcher Brown Wing (the "Education Wing"). The Education Wing included classrooms and studio space.

12.     Before the Project, the last major construction was in 1987, when another wing was added to the Facility. This second wing (the "1987 Wing") increased gallery space by 50% and provided a new temporary exhibition gallery, but the 1987 Wing's construction was on a much smaller scale than the Project. The Project required greater sophistication and coordination between staffing and design, and posed additional complications than the construction for the 1987 Wing. The Project, in effect, was to build a new museum; the 1987 Wing was just an addition.

13.     During the past 83 years, the Delaware Art Museum gathered the works of British and American artists, including Andrew Wyeth, Howard Pyle, Dante Gabriel Rossetti, Ford Madox Brown, John Everett Millais, Edward Burne-Jones, William Holman Hunt, John Sloan and his circle, Benjamin West, Thomas Sully, Winslow Homer, Frederic Church, George Inness, John Twatchman, J. Alden Weir, Childe Hassam, Edward Hopper, Isabel Bishop, Robert Colescott, Scott Burton and Al Held. The Facility currently houses approximately 11,000 objects from the Museum's collection.

14.     Past exhibitions at the Facility included:  Punto de Partida / Mexico Now: Point of Departure; Wondrous Strange: Pyle, Wyeth, Wyeth & Wyeth; Myth, Magic & Mystery: One Hundred Years of American Children's Book Illustration; Visions of Love and Life: Pre-Raphaelite Art from the Birmingham Collection, England; and Lasting Legacies: Howard Pyle and Norman Rockwell.

4

15.    Today, the Delaware Art Museum is dedicated to developing awareness, understanding and appreciation of the visual arts and their impact on culture, and to enriching lives by collecting, preserving, exhibiting and interpreting the visual arts for a diverse audience.

## THE DELAWARE ART MUSEUM NEEDED TO EXPAND

16.    In 1998 and 1999, to further the Museum's goals, its Board of Trustees developed the Master Plan. The Master Plan identified the following 10 long-range goals for improving the Facility:

i.    increase the amount of permanent collections on view;

ii.    increase the number, quality and variety of gallery spaces for permanent collections and temporary exhibits;

iii.    improve the physical relationship between the permanent collection galleries and the temporary exhibit spaces;

iv.    enhance the education and studio spaces;

v.    improve the collection and exhibition support spaces, as well as meet future administrative needs;

vi.    open the original front door of the 1938 Building;

vii.    improve the lobby for access to different areas of the building, and develop the lobby as an area conducive to public events and income-related activities;

viii.    integrate the building with the site by providing appropriate spaces for art in the landscape;

ix.    use the existing reservoir as a site asset and link it to the visitor experience; and

        x.      separate public entry from service and improve vehicular access to the Facility.

17.    One of the Master Plan's most important goals was to expand exhibition space. Before the Project, the Delaware Art Museum could display only 5% of its total collection in the Facility at any given time; many peer art institutions strive to display at least 15% of their collections at any given time. Under the Master Plan, the Museum would increase its display capacity to 15% of its total collection.

18.    The Delaware Art Museum's old facilities had limited ability to host temporary exhibits; because of space and other constraints, temporary exhibition space had to be closed for 12 weeks out of the year to install and reinstall exhibits. More importantly, the space was inadequate for many traveling shows that the Museum was eager to host. Improved facilities would reduce the amount of time that space in the Facility was not put to productive use, and give visitors access to a broader range of traveling exhibitions.

19.    The Delaware Art Museum also wanted to expand the Facility's gallery size and develop areas for hosting large gatherings as additional revenue sources. The Master Plan included the goal of developing new kitchen facilities to cater such events.

20.    Thus, the Master Plan encapsulated the Museum's goals of increasing revenue, improving visitors' experiences at the Facility, and providing additional means for the Museum to further its goals of educating and adding to Delaware's cultural vibrancy.

21.    The Museum undertook the Project in order to bring the Master Plan to fruition. Apart from having to correct for unforeseen costs, conditions or errors and omissions encountered during the Project, the Museum did not materially deviate from the Master Plan during the course of the Project.

## TO HELP ACHIEVE ITS GOALS,
## THE DELAWARE ART MUSEUM ENGAGES ABA

22.     In connection with the Master Plan, the Delaware Art Museum sent a request for proposal for architectural services ("RFP") to various architects. The RFPs included excerpts from the Master Plan. After receiving and reviewing responses to the RFPs, the Museum selected ABA as the architect for the Project.

23.     From the beginning of ABA's involvement in the Project, ABA was well aware of the Delaware Art Museum's long-term goals.

24.     In a February 8, 2001 fax (the "February 8 Fax"), ABA recognized that an important part of its role in the Project was to help the Museum "clarify long-range needs for upgrading and expansion of Museum facilities in order to achieve the objectives identified in the Museum's Strategic Plan . . . [and to] explore options for serving the long-range needs. . . ."

25.     ABA was also specifically aware of the role that the Project would play in the Museum's fund-raising activities. In the February 8 Fax, ABA acknowledged that one of its goals was the development of "a clear design vision for the project . . . which can be communicated to Museum Trustees, *potential funding sources* and the community" (emphasis added).

26.     ABA was also aware of the Delaware Art Museum's need for the Project to finish within budget. In the February 8 Fax, ABA recognized that it needed to "provide design and technical information which leads to *reliable budgets, schedules and phasing for planning and fund-raising*" (emphasis added).

27.     The Museum believed that the Project also required an architect with local architecture expertise (the "Local Architect"). The Local Architect would have been primarily responsible for reviewing documents to ensure they complied with local building codes,

coordinating review and approval of the documents with regulatory authorities, answering questions regarding the Project and obtaining warranty inspections during the Project. The Local Architect also would have reviewed ABA's design documents for completeness and accuracy.

28.    ABA refused to hire a Local Architect as a consultant. ABA told the Delaware Art Museum that it would have to pay for the Local Architect separately. Given the Museum's limited budget and the Board of Trustees' concerns that pressing for a Local Architect would result in increased acrimony between the Museum and ABA, the Museum relied on ABA's assurances that ABA could handle all local issues, including promptly obtaining any necessary permits and complying with local ordinances. As the Project progressed, however, ABA's performance demonstrated that it had no basis for making those assurances. For example, ABA was unable to obtain timely permit applications from local regulatory authorities, and disputes arose as to code requirements with which ABA was not familiar.

29.    On March 22, 2001, the Delaware Art Museum entered into a written agreement with ABA (the "Agreement") that formalized the terms and conditions of ABA's performance on the Project. A copy of the Agreement is attached hereto as Exhibit A, and the terms and conditions set forth in the Agreement are incorporated herein by reference.

30.    Pursuant to paragraph 1.1.3.5 of the Agreement, ABA stated it would retain Arup as a consultant to ABA and as ABA's project engineer for the Project. Arup was to provide structural, mechanical, electrical, plumbing and fire protection engineering services to ABA to the same extent that ABA was to provide those services to the Delaware Art Museum under the Agreement. Arup failed to meet that obligation by, among other things, producing drawings that resulted in incorrect clearance heights for ceilings, structural steel with insufficient support,

mechanical rooms that are inaccessible to maintenance personnel, and other material flaws and inefficiencies.

31.    ABA's agreement with Arup identified the Delaware Art Museum as ABA's client, and provided that Arup would provide information and services to ABA for the renovation and expansion of the Museum.

32.    Throughout the Project, representatives from ABA and Arup traveled to the Facility and other locations in Delaware for meetings with Museum representatives regarding their work on the Project, or to perform on-site investigations or supervision for the Project.

33.    In paragraph 1.2.3.2 of the Agreement, ABA agreed to perform its work "as expeditiously as is consistent with professional skill and care and the orderly progress of the Project."

34.    Paragraph 1.4.2.1 of the Agreement required ABA and Arup to "perform the services under this Agreement with the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time."

35.    Paragraph 1.2.3.6 required ABA to "review laws, codes, and regulations applicable to [ABA's] services.  [ABA] shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project."

36.    Further, ABA agreed, among other things, to:

    a.    provide the Delaware Art Museum with a schedule for the performance of ABA's services (the "Schedule") (Agreement at ¶ 1.2.3.2);

    b.    manage and administer the Project (Agreement at ¶ 2.1.1);

    c.    coordinate the services provided by ABA and its consultants, including Arup (Agreement at ¶ 2.1.4);

9

d.     consult with and advise the Delaware Art Museum throughout the Project (Agreement, *passim*);

e.     provide normal structural, mechanical and electrical engineering services, in addition to designing the fire protection, landscape, architecture, civil engineering, general lighting and room acoustics (Agreement at ¶ 2.4.1);

f.     provide Schematic Design Documents based on the agreed upon schedule and budget for the Project (Agreement at ¶ 2.4.2.1);

g.     provide Design Development Documents that would "illustrate and describe the refinement of the design of the Project, establish[] the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts," such documents to "include specifications identifying major materials and systems and establish in general their quality levels" (Agreement at ¶ 2.4.3.1);

h.     provide Construction Documents, based on approved Design Development Documents and an updated budget for the Project, that would set forth "in detail the requirements for construction of the Project," and "establish in detail the quality levels of materials and systems required for the Project" (Agreement at ¶ 2.4.4.1);

i.     assist the Delaware Art Museum in "bid validation or proposal evaluation and determination of the successful bid or proposal, if any" (Agreement at ¶ 2.5.3); and

j.     "visit the site at intervals appropriate to the stage of the Contractor's operations" so that ABA would "become generally familiar with and [] keep the [Museum] informed about the progress and quality of the portion of the Work completed, . . . endeavor to guard the [Museum] against defects and deficiencies in the Work, and . . .

10

determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents" (Agreement at ¶ 2.6.2.1).

37.    ABA also agreed to "be responsible for [ABA's] negligent acts or omissions," including delays within ABA's reasonable control. (Agreement at ¶ 2.6.2.2)  For example, one matter that was within ABA's reasonable control was the quality of its design documents – ABA was specifically responsible for insuring that there were no errors, omissions or inconsistencies in those documents.  ABA's reasonable control also extended to ABA's ability to provide those documents within the Project's deadlines.  ABA was late in providing design documents, and those documents were filled with errors, omissions and inconsistencies.

38.    The Agreement contained a mediation clause "as a condition precedent to the institution of legal or equitable proceedings" by either the Delaware Art Museum or ABA. (Agreement at ¶ 1.3.4.1)  ABA agreed to mediate "in the place where the Project is located" (i.e., Delaware) unless ABA and the Delaware Art Museum agreed to hold the mediation at another location.  (Agreement at ¶ 1.3.4.3)

39.    While ABA could authorize minor changes without the Delaware Art Museum's consent, ABA could do so only if the changes did not involve an adjustment in the contract sum or an extension to the Schedule.  (Agreement at ¶ 2.6.5)

40.    The Schedule included allowances for the Delaware Art Museum's review and approval of documents prepared by ABA, performance by the Museum's consultants and the approval of submissions by authorities with jurisdiction over the Project.  (Agreement at ¶ 1.2.3.2)  The Schedule established a construction start date of approximately June 1, 2002 and projected that construction on the Project would take 15 months.  (Agreement at ¶ 1.1.2.6)  The

Schedule limited the total construction period, including the post-construction period, to no greater than 17 months. (Agreement at ¶ 1.1.2.8)  Paragraph 1.2.3.2 of the Agreement provided that ABA could exceed these time limits only for "reasonable cause."  ABA also agreed to perform its services consistent with the Schedule. (Agreement at ¶ 1.2.3.2)

41.    Overall, ABA agreed to perform and coordinate the above-mentioned services, as well as other services, with others working on the Project throughout the following Project phases:  Schematic Design, Design Development, Construction Document, Bidding/Negotiation, and Construction Administration.

42.    Under the Agreement, the Delaware Art Museum was to pay ABA $2,494,700.00 for its services on the Project in increments for each Project phase, as follows:

| | | |
|---|---|---|
| a. | Schematic Design | 17% |
| b. | Design Development | 23% |
| c. | Construction Document | 30% |
| d. | Bidding/Negotiation | 5% |
| e. | Construction Administration | 25% |

43.    Attachment A to the Agreement provided the following time periods for the completion of each phase of the Project:

| Phase | Time Period |
|---|---|
| Schematic Design | 24 to 28 weeks (168 to 196 days) |
| Design Development | 20 weeks (140 days) |
| Construction Document | 24 weeks (168 days) |
| Bidding/Negotiation | 8 weeks (56 days) |
| Construction Administration | 52 weeks (364 days) |

44.     The work on some of the Project phases would have overlapped. For example, completed Construction Documents could be issued to contractors for bids while ABA finished preparing other Construction Documents.

45.     It was critical for ABA to meet the deadline for completing the Construction Documents so that bid packages could be issued. The later ABA finished the Construction Documents for a particular Project item, the later the bid package for such item could be issued.

46.     Eventually, the construction start date was pushed back to approximately September 30, 2002. ABA, and everyone else working on the Project, knew that it was necessary to meet the Schedule's milestones in order for the Museum to achieve its original occupancy date of January 12, 2004.

47.     In fact, however, the occupancy date had to be pushed back many times due to frequent delays in the Project. Eventually, the occupancy date was pushed back to on or about December 31, 2004.

48.     Once the December 31, 2004 occupancy date was established, the Delaware Art Museum made a commitment to its constituencies that the Facility would be open no later than March 2005. The Museum's entire focus was on fulfilling this commitment.

49.     The Delaware Art Museum's success depends importantly on funds, commitment and support from its donors. If the Facility did not open as promised, that delay would signal problems with the Project, causing donor concern and disappointment.

50.     Meeting the December 31, 2004 occupancy date was also critical because the Museum had contracted to host a high profile exhibit of works of the world renowned artist Georgia O'Keefe as the Facility's opening event in March 2005. The Museum arranged for this

exhibit well in advance of the scheduled opening of the Facility. The Museum faced substantial financial consequences if it had to cancel the O'Keefe exhibit.

51.     While ABA was still preparing the design documents, the Museum informed ABA by letter on or about July 9, 2001 of the Museum's budgetary constraints. In the letter, the Museum stated the obvious proposition that ABA should conform the "program to the realities of budget. . . ."

52.     The Museum reiterated the need for the Project to remain within budget in a letter dated November 14, 2002, in which the Museum restated its "expectation that it remains [ABA's] obligation as we move from a GMP [defined below] estimate to a 100% Construction Document design that the plans delivered allow us to build our project for $18 million, as agreed." The Museum also brought to ABA's attention the Museum's concern that Ms. Ann Beha was not participating in the Project in the "lead position" of ABA's design team (as ABA had represented she would), and that her participation had decreased through the design process. Ann Beha's lack of attention and participation contributed to ABA's errors and omissions.

53.     ABA also staffed a senior architect, Peter Sugar, and a junior architect, Peter Zumidzinas, on the Project. However, Peter Sugar's attention was divided between the Project and his work on the Portland Art Museum. Because Ann Beha and Peter Sugar did not put sufficient time into the Project, ABA delegated the preparation of many drawings or designs to Peter Zumidzinas until he became overworked. However, Peter Zumidzinas was not sufficiently experienced to work on some of these drawings or designs, and he lacked the authority needed to approve all of them. ABA's delegation of tasks to a junior architect contributed to ABA's errors and omissions.

54.    The urgency of the Project was reflected in Section 8.2.1 of AIA document A201, which the Agreement references. (Agreement at ¶ 1.1.5) Section 8.2.1 provides that the "[t]ime limits stated in the Contract Documents are of the essence of the Contract." (A201 at § 8.2.1)

55.    In short, ABA, which participated in preparing the Schedule, was well aware of the significance of completing the Project by the opening date, ABA's need to perform in accordance with the Schedule and ABA's need to provide Construction Documents that would enable the Project to be completed within budget.

56.    As a financing vehicle for the Project, the Museum issued a tax-exempt revenue bond backed by a letter of credit from Allied Irish Banks, p.l.c. ("Allied Irish").

## THE DELAWARE ART MUSEUM ENGAGES A CONSTRUCTION MANAGER FOR THE PROJECT

57.    On October 26, 2000, the Delaware Art Museum entered into a contract with Barclay White Incorporated, which was subsequently assigned, with the Museum's consent, to Barclay White Skanska, Inc. and its successor, Skanska USA Building Inc. (collectively, "BWS"). Under this contract, BWS was to act as the construction manager for the Project. As part of BWS's contract with the Museum, BWS was to develop with the Museum a guaranteed maximum price ("GMP"), which would be the sum of: (1) those costs BWS necessarily incurred in performance of the construction required for the Project, and (2) BWS's fee.

## ABA'S WORK ON THE PROJECT

58.    ABA started its work on the Project shortly after the Museum and ABA entered into the Agreement. By September 18, 2001, ABA had billed the Museum $442,000.00 for ABA's work on the Project. ABA claimed to have completed about 80% of its work on the Schematic Design phase by September 18, 2001.

59.    ABA failed to perform its obligations within the Schedule, and ABA's performance fell far behind in critical areas. Furthermore, even though ABA took months and, in some cases, years to provide Construction Documents to the Museum, ABA's Construction Documents contained numerous errors, omissions and inconsistencies requiring additional time to resolve. These delays resulted in additional costs to the Museum that were not covered by the GMP.

60.    On or about October 30, 2001, the Museum drafted a memo to ABA that highlighted the need for ABA's design to "be distinguished, beautiful, elegant, efficient *and within budget*. It must be rigorous, balancing artfulness and clever use of space. It cannot ignore the hierarchy of needs stated by the staff and board" (emphasis added).

61.    On or about November 2, 2001, BWS sent a letter to ABA in which BWS communicated its expectation that ABA would complete the Design Development phase and begin the Construction Document phase by mid-March 2002. As this letter shows, ABA had to complete the Design Development phase before BWS could provide a "design development estimate." BWS also reiterated the need for BWS and ABA "to establish a milestone schedule which will include meeting dates for design discussions and reviews."

62.    In February 2002, ABA acknowledged in a memorandum to the Museum that delays could "cost sizeable $$$ and may even result in killing the [P]roject."

63.    Stephen T. Bruni, the Museum's executive director, sent ABA a letter on or about April 2, 2002, in which he communicated the Museum's reliance on ABA, especially given that the demands placed on the Museum's staff went "well beyond [their] expectations, budget and . . . expertise." This letter also reiterated the Museum's continuing concerns over Ann Beha's limited work on the Project and ABA's general inattentiveness to the Museum's needs.

16

64.    On or about April 3, 2002, Dr. Mark A. Fortunato, chair of the Museum's Design/Construction Review Committee, sent an additional letter to ABA expressing again the Museum's concerns that ABA's communication and performance to date had been "less than optimal."

## ABA Produced Construction Documents That Were Both Late And Filled With Errors

65.    Although construction was scheduled to start in June 2002, ABA had not even completed the Construction Documents by that point. As its June 17, 2002 invoice to the Museum shows, ABA had not even completed the Design Development documents by that point, and claimed to have completed only 25% of the Construction Documents – this notwithstanding that on May 1, 2002, ABA had proposed milestones of June 17, 2002 for "50% CD [Construction Document] PRINTING" and September 16, 2002 for "100% CD/FINAL PERMIT SET."

66.    During a meeting with the Museum at the Riverfront in Wilmington, Delaware in August 2002, ABA committed to releasing 100% completed Construction Documents ("100% CDs") no later than September 23, 2002. To the Museum's detriment, ABA did not meet its commitment; in fact, ABA took more than a year and a half before issuing a set of documents that were 100% complete.

67.    In reliance on ABA's representations, including its commitment to deliver completed Construction Documents by September 23, 2002, the Delaware Art Museum relocated its operations from the Facility to temporary facilities along the Riverfront in Wilmington, Delaware. The Museum also asked BWS to proceed with construction-related tasks.

68.    Based on the commitment and design documents that ABA provided, the Museum negotiated with BWS a GMP of $19,649,176.00. This GMP included a contingency amount of

$1,649,176.00 to cover unforeseen expenses (the "Contingency"). The Contingency was intended to cover weather inefficiencies and changes in construction means and methods as necessary to deliver the Project as designed and specified in the GMP Set (defined below), but the Contingency was not intended to cover costs attributable to changes in scope of work, concealed conditions and variances from the allowances in BWS's GMP Report.

69.    BWS developed the GMP from Construction Documents that ABA represented were approximately 75% complete (the "GMP Set"). ABA issued the GMP Set on August 23, 2002. However, Construction Technology Corporation ("CTC") advised Allied Irish on January 13, 2003 that the GMP Set was "not sufficiently complete or coordinated to support a positive recommendation." CTC found that "many details and schedules are missing, incomplete, or not coordinated properly [in the GMP Set] to construct the work." Indeed, contrary to ABA's representations, far from being 75% complete, ABA's GMP Set was closer to 50% complete.

70.    Due to the delays, errors and omissions in ABA and Arup's performance on the Project, the Delaware Art Museum incurred substantial costs in excess of the GMP. The GMP, as amended, eventually exceeded $22,500,000.00, which consumed all of the Contingency and increased the GMP, and therefore the cost to the Museum, by more than $2,850,824.00.

71.    Even though the GMP Set was based on incomplete Construction Documents, the Delaware Art Museum was induced to believe that the Contingency offered reasonable protection should the 100% CDs have added additional costs. That the costs of the Project eventually greatly exceeded the GMP (even with the Contingency) resulted from delays, errors, omissions and inconsistencies by ABA and Arup, all of which were contractual violations and negligent conduct by ABA and Arup.

72.     Not only did ABA fail to deliver the 100% CDs by the promised September 23, 2002 delivery date, it missed a second deadline of October 11, 2002 as well. The Schedule was then revised to call for construction to commence in November 2002.

73.     By September 2002, it became apparent that ABA was not bubbling (or highlighting) changes in documents that were making their way into the 100% CDs – an issue that would come to damage the Project further, despite ABA's assurances that the "missing details would be complete with the issuance of the Construction Set."

74.     On October 18, 2002, ABA asked BWS "what was critical on the project schedule." BWS's reply was simple and clear-cut: "all of the design documents" that ABA had promised to release in September 2002. In particular, ABA's delay in releasing the documents for structural steel was "causing serious delays." Because ABA and Arup had failed to obtain state licensure to allow them to seal those documents before permits could be granted, ABA and BWS agreed to issue the structural drawings for bids without seals on the condition that "the same set of documents would be sealed without further change." The structural drawings were released on October 22, 2002, subject to possible addenda.

75.     On October 21, 2002, BWS informed ABA of a day-to-day delay condition until ABA released the 100% CDs.

### ABA Issues A "Permit Set" That Is Full Of Errors

76.     Starting on or about November 13, 2002, ABA issued a permit set (the "Permit Set") of Construction Documents in partial releases. Even this limited release was incomplete. ABA had to issue addenda to correct errors and omissions in the Permit Set through approximately May 19, 2003, almost eight months late.

77.    ABA ignored BWS's repeated requests to comply with professional standards by highlighting or bubbling ABA's corrections to the Permit Set and other Construction Documents. ABA's failure to highlight or bubble properly caused confusion and delay, as BWS and the subcontractors were required to determine the changes in the various sets of Construction Documents on their own. Properly bubbled changes would have enabled BWS and the subcontractors to price any of the changed work and to commence that work more quickly.

78.    Finally, in December 2003, ABA's Sherry Frim agreed that ABA would reissue and highlight all changes in Construction Documents issued since the release of the GMP Set. Neither ABA nor Sherry Frim gave any reason why ABA could not manually highlight or bubble corrections to the Permit Set or other Construction Documents prior to December 2003.

79.    ABA did not deliver what it claimed to be the 100% CDs until on or about May 30, 2003, a full eight months late.

80.    The Delaware Art Museum continually complained to ABA that it had not provided the 100% CDs. In a February 11, 2003 memorandum (the "February 11 Memorandum"), the Museum informed ABA that the Construction Documents remained "significantly short of 100%" and that BWS had to "'fill in details' that should be coming from ABA. Details of this issue have been regularly communicated to ABA so this should not be news to anyone."

81.    The Museum also informed ABA in the February 11 Memorandum of the multitude of problems encountered as a result of ABA's inadequate performance to that date. First, the Museum reiterated the concerns, first raised by the copper contractor, that the treatment ABA selected for the Facility's copper skin would be "problematic." Even though the Museum had frequently asked ABA to investigate this issue, ABA did not do so. The Museum stated in

the February 11 Memorandum: "What if 'the expert' is right and [ABA] is wrong? Do we start over on the skin? Will DAM [*i.e.*, the Museum] be responsible for a change order? The ramifications are both numerous and scary."

82.     Peter Sugar, ABA's executive in charge of the Project, said that he had found "someone" who could install the Facility's copper skin at approximately $25 per square foot. However, as the Project progressed, the Museum discovered that the cheapest installation price for the copper skin was at least $50 per square foot. Further, Sugar did not supply the Museum with the contact information for the individual Sugar claimed could install the Facility's copper skin at $25 per square foot – nor was BWS able to find anyone who could install the copper skin at that price. On information and belief, no such person existed. By the time the Museum discovered that it would cost at least twice as much to install the copper skin, abandoning the copper skin would have materially diminished the quality of the completed Facility. Because the Museum had to install the copper skin at a cost far greater than what ABA specified, the Museum had to cut costs from other areas in the Project and absorb additional costs stemming from ABA's misrepresentations as to the cost to install.

83.     The February 11 Memorandum also highlighted: the "defiance" ABA gave the Museum relating to the design of the Facility's fire suppression system; that "issues surrounding the brick veneer on the north face of the Homsey building" had not been addressed; and that ABA had simply shrugged off six-figure costs related to making sure the Project complied with fire regulations, even though BWS had suggested a seemingly practical alternative. Indeed, ABA's apparent inability to concede any issue caused "a lot of problems" and substantial additional costs for the Museum.

84.     As of March 7, 2003, the Construction Documents continued to be revised. The initial Construction Documents had been used for base bids, which meant that subsequent changes to the documents had to be priced separately. Mechanical and electrical bidding had to be suspended to enable ABA to complete the applicable Construction Documents. Another consequence of the repeated changes to the Construction Documents was that minor electrical and plumbing work that was needed to allow concrete work to progress had to be treated as change orders, at further substantial cost to the Museum. Even the structural drawings in the Construction Documents had to be revised to conform with the revisions.

85.     In spite of all of the above problems, the Museum was led to believe on March 7, 2003 that the Project remained within budget.

86.     Prior to March 17, 2003, BWS reiterated the need for ABA "to reissue the structural drawings to reflect all current design dimensions." BWS also told ABA that reissuing the structural drawings was an urgent matter, since BWS had caught numerous layout errors and the subcontractors were confused and needed questions answered.

87.     While weather during the winter of 2002-2003 caused problems, if ABA had produced the 100% CDs by the September 2002 deadline, BWS and the subcontractors could have adjusted the Schedule so that some tasks, such as fabrication, could take place during those winter months and increased costs could have been reduced or eliminated. However, because of ABA's delays, errors and omissions, BWS and the subcontractors had to delay those tasks until ABA completed the 100% CDs, all to the substantial damage of the Museum.

88.     Between the release of the Permit Set and June 3, 2003, ABA issued approximately 25 Addenda, 257 Sketches and 153 responses to Requests for Information

("RFIs"). Most of these corrections were a result of changes necessitated by ABA and Arup's errors, omissions and inconsistencies in the Permit Set.

89.    The above changes included repeated changes to critical path work – that is, work on the Project that needed to be completed before other work could commence. Delays in critical path work caused delays to other trades or work and thereby compounded the delay costs of the Project.

90.    For example, between January 27, 2003 and May 19, 2003, ABA issued Addendum 6, which had to be revised five additional times, just for structural changes. ABA issued Addendum 6 and its revisions in response to RFIs. Addendum 6 and its revisions curtailed completion of the shop drawings needed for the fabrication of structural steel. These structural changes also caused changes in virtually all other trades. Also, numerous design changes were made on 8-1/2" x 11" sketches that were not issued as addenda. The final addendum identifying structural changes was issued approximately 253 calendar days later than when the 100% CDs were due.

91.    ABA was required to issue Addendum 10 for mechanical work on February 21, 2003, and Addendum 10 for electrical work on March 3, 2003. RFIs throughout the bidding process demonstrated that subcontractors could not offer bids based on the grossly inadequate information in the original mechanical and electrical documents. Finally, ABA admitted that the original drawings were not biddable and that Addendum 10 was intended to complete these designs. ABA's issuance of Addendum 10 was 150 calendar days later than the mechanical and electrical documents, as part of the 100% CDs, were due.

92.    ABA also was required to issue Addendum 12 for lighting fixtures on March 10, 2003. RFIs throughout the bidding process demonstrated that subcontractors could not offer bids

based on inadequate information in the original lighting fixture documents. ABA admitted that the original lighting fixture documents were not biddable and that Addendum 12 was intended to complete these designs. ABA's issuance of Addendum 12 in March 2003 was 168 calendar days later than the lighting fixture documents, as part of the 100% CDs, were due. Arup was not responsible for the lighting fixture documents.

93.    ABA issued its response to RFI 064 in Addendum 6R5 on May 19, 2003. Addendum 6R5 altered what had been defects and conflicts in the original design for new steel ties into the existing wall of the 1938 Building. However, by the time ABA issued Addendum 6R5, work had already commenced based on the original design. The redesign, demolition, additional concrete work and refabrication of structural steel necessitated by Addendum 6R5 delayed work for approximately 120 calendar days.

94.    ABA issued its response to RFI 080 on March 31, 2003, to correct errors in the Construction Documents. Originally, ABA had designed the floor drains and drain piping in the 1987 Wing so that they were higher than the finished floor elevations. ABA's response to RFI 080 was meant to correct these errors, and required costly rerouting of piping and the addition of a sump pump and electrical work.

95.    BWS sent additional RFIs to ABA seeking clarification on: missing dimensions in the Construction Documents; whether changes to the Construction Documents were properly highlighted or bubbled; inconsistencies in the Construction Documents; and materials to be used on the Project. RFIs also show that ABA issued Construction Documents that did not conform to industry standards and referred to Construction Documents that had not yet been issued. These errors and omissions caused costly delays in fabrication of materials and other work on the Project.

96.   Further, ABA failed to provide complete structural steel drawings with necessary dimensions and angles by the promised February 28, 2003 deadline; the documents were not provided until on or about May 29, 2003.

97.   ABA was informed of certain code violations in the Construction Documents prior to February 28, 2003.  Moreover, on or about April 4, 2003, the Wilmington Fire Chief and Wilmington Assistant Fire Marshall informed ABA that the city would not grant permits until ABA resolved certain code violations in the Construction Documents involving egress requirements.  On April 29, 2003, the Wilmington Fire Marshall's office sent BWS a letter in which it informed BWS that in addition to correcting the egress violations, ABA also had to correct additional violations subsequently noted.  It took ABA until May 29, 2003 to resolve those code violations.

98.   One of the effects of ABA's inability to obtain the appropriate permits was that site cut, fill and building excavation which were initially planned to be performed in a single phase by one contractor now had to be split into several phases and between multiple subcontractors.

## ABA Claims To Issue "100% Complete Construction Documents"

99.   On or about May 30, 2003, ABA claimed to issue 100% CDs (the "Deficient CDs").  However, the Deficient CDs conflicted with sketches that ABA had recently issued. This conflict caused confusion and added further delay before BWS and the subcontractors could implement the Deficient CDs.  Even though ABA did not issue the Deficient CDs prior to May 30, 2003, ABA nonetheless billed the Museum for 100% CDs  in October 2002 (ABA would eventually reduce its October bill to 97% in spite of the fact that the CDs were nowhere near 97% complete).

100.    In fact, as late as May 21, 2003, the Museum informed ABA that it had failed to provide "a single Construction Document" and that BWS "has been working from a combination of 'cut and paste' Permit and GMP documents and hand sketches that have been less than ideal in moving the project forward."

101.    BWS also asked ABA if the Deficient CDs superseded the previously issued responses to RFIs. ABA's response was "not in all cases." Instead of correcting the confusion that it had created, ABA simply instructed BWS and the subcontractors to submit new RFIs to obtain ABA's ruling on whether the previously issued responses to RFIs governed over the Deficient CDs. ABA's piecemeal approach to correcting a problem that it had created through its own errors and omissions added further delay and costs to the Project.

102.    ABA once again incorrectly bubbled the Deficient CDs, adding further errors to previous omissions. As before, this incorrect bubbling caused further confusion, delay and costs, as BWS and the subcontractors had to decipher the changes in the Deficient CDs from previously issued documents.

103.    The Deficient CDs also contained mechanical, plumbing, fire protection and electrical drawings that were based on architectural backgrounds that did not agree with more up-to-date architectural drawings. All of these drawings pertained to critical path work, and BWS informed ABA on or about June 13, 2003 through RFI 159 of ABA's need to revise the drawings "ASAP" since they covered work that was critical to the Schedule. Yet ABA had failed to make those revisions as late as December 19, 2003.

104.    The Museum discovered that the clearance heights from finished floors to ceilings in the Deficient CDs did not conform to the design criteria that the Museum had provided to ABA, requiring ABA to redesign the Deficient CDs. ABA and Arup designed these rooms such

that ductwork or drain pipes, when installed, would fall below the ceiling threshold established in the design criteria. By way of example, the room for the Sloan Gallery in the Facility always had a clearance height of 14 feet but, as a result of the above errors, this room lost approximately 7 inches; another room went from an 18-foot clearance to a 14-foot clearance; and the post-World War II Gallery went from having a clearance of 14 feet to 10 feet, 8 inches. Correction of these errors required that virtually the entire Project be redesigned. The Museum was concerned about maintaining proper clearance heights because having lower heights would limit the amount or type of artwork that could be displayed.

105.    BWS had to continue to question structural documents even after ABA made changes to those drawings. ABA compounded its errors because its initial redesign, and the several that followed, "did not take into account conditions that were clearly observable by the design professionals as all demolition in that area was complete."

106.    ABA and Arup also had to redesign the Deficient CDs because equipment and systems could not possibly fit within the space that ABA and Arup allotted for them in the Deficient CDs. To correct these errors in the Deficient CDs, ABA and Arup needed to reroute piping, ductwork and conduit. The Deficient CDs also required structural and architectural changes. The time needed to make the above corrections to the flawed Deficient CDs delayed the Project by months.

107.    The Museum faced additional costs because the designs of the mechanical and HVAC systems contained errors. BWS did not address these errors until after the bid process for these systems was well under way and, in some cases, complete, because it was understood that ABA would correct these errors in the Deficient CDs. In part because the Museum was not

27

aware of these errors until the later stages of the bidding process, the Museum had to incur additional costs to resolve these errors.

108.    As of August 15, 2003, the projected costs for the Project were still within the GMP; however, $516,419.00 out of the Contingency had already been consumed. Continuing design revisions also delayed subcontract purchases and hampered critical path work.

109.    Once ABA finally released the Deficient CDs, the changes in the Deficient CDs caused the Contingency to be depleted at an even greater rate. For example, by September 10, 2003, while only 25% of the Project was complete, work on the Project had already consumed almost 100% of the Contingency.

110.    Between June 3, 2003 and April 15, 2004, ABA issued approximately 18 significant changes in design, 176 Sketches and 255 Responses to RFIs to correct errors and omissions in the Deficient CDs. Until these corrections were issued, construction of the associated work was placed on hold. Once ABA provided the corrections, it was necessary to obtain contractor pricing for changes, and to analyze, negotiate, approve and issue subcontract change orders, before the subcontractors could continue their work. Many of these corrections were a result of changes necessitated by ABA's errors and omissions in the Deficient CDs.

111.    During this time period, and as was its custom throughout the Project, ABA sought to blame others for its own errors, omissions and deficiencies. In a September 29, 2003 e-mail, ABA told Arup that "[t]he drawings provided by Arup were simply not complete in their coordination with the rest of the architectural details. . . . This has resulted in late corrections after being brought to our attention at the site, with consequent delays and increased costs!" ABA's accusatory email violated its own earlier insistence that everyone on the Project should

strive to avoid the appearance of creating a paper trail. That same day, BWS prepared an invoice that showed that all but $12,005.00 of the Contingency had been consumed.

112.    On October 21, 2003, ABA issued a response to RFI 328. It was determined that additional structural support was needed behind the infill areas in basement walls along the west side of the 1938 Building. Adding this additional structural support delayed waterproofing and backfill in this area by 49 calendar days.

113.    By October 24, 2003, BWS had already exceeded the GMP, and was beginning to forecast that it could grow to over $21,000,000.00.

114.    During the period from June 3, 2003 to April 15, 2004, revised specifications for waterproofing and roofing were submitted to roofers for additional bidding. A contract for waterproofing and roofing had been awarded on or after February 14, 2003. Following the award of this contract, conflicts were discovered that required redesign of the roof pitch to avoid reducing the size of clerestory windows. ABA denied requests to approve and release schematics for roof areas that did not need to be redesigned. The revised specifications and ABA's refusal to release completed schematics added further delay and costs to the Project.

115.    The Deficient CDs also contained inconsistencies that had to be resolved before work could progress on the Project. In one instance, ABA was late in providing electrical drawings that needed to be reviewed by the electrical inspector so that the fire protection drawings could be prepared for inspection. RFIs showed that the fire pump contained in the design documents might have violated Delaware code.

### ABA Promises To Release A Conformed Set

116.    On or about October 23, 2003, ABA told the Museum and BWS that ABA would have to reissue all design documents as a conformed set (the "Conformed Set"). ABA promised

29

to release the Conformed Set on or about November 6, 2003. ABA had to issue the Conformed Set to address all confirmed changes to the Project that had occurred since the Deficient CDs.

117.    The Conformed Set was intended to:  integrate and coordinate the scope of work requirements provided for under the Museum's budget; integrate and coordinate installations as directed by the Museum; reflect design and finish reviews conducted by the Museum and ABA; consolidate previously issued information; and correct errors and omissions in the Deficient CDs.

118.    ABA developed the term "Conformed Set" as a replacement for the term "100% CDs" that was in common use in the industry. But ABA had already failed to deliver by the September 2002 deadline the *complete* set of design documents that had previously been defined as the 100% CDs. Thus, ABA failed to provide the Delaware Art Museum by September 2002 anything resembling 100% CDs. ABA used the term "Conformed Set" to describe what were in fact the 100% CDs – which (now termed the Conformed Set) ABA would eventually issue over a year and a half late.

119.    The Conformed Set, which would include finalized designs, was a necessary addition to the Construction Documents, and was required to correct and clarify Construction Documents that ABA and Arup had previously prepared and issued.

120.    ABA assured the Museum and BWS that the Conformed Set would completely define the Project and totally supersede all previously issued documents, including all sketches and responses to RFIs. ABA also assured the Museum and BWS that all changes in the Conformed Set would be bubbled. ABA needed to live up to these assurances so that BWS and the subcontractors would not have to file additional change orders upon discovery of unidentified changes in the Conformed Set.

121.    ABA initially delayed release of the Conformed Set to November 10, 2003. ABA was unable to meet that goal. And in a rehash of the events surrounding the Deficient CDs, ABA failed to bubble or highlight changes to drawings in the Conformed Set that ABA provided to the Delaware Art Museum. Further, clearance heights in the galleries remained an issue.

122.    On or about November 13, 2003, BWS received a partial release of architectural drawings issued with areas marked "Hold." Then, on or about November 20, 2003, ABA noted that it issued those drawings in advance of development of the associated engineering drawings. ABA and Arup had made no attempt to assure those documents would not be in conflict with other Construction Documents.

123.    On November 20, 2003, BWS informed ABA that there were several drawings that were going to be in the Conformed Set that ABA had prepared without coordinating those drawings with engineering drawings that Arup was still developing. Because of these omissions, BWS needed to return the drawings with mark-ups to ABA for further development and coordination with Arup's engineering drawings.

124.    Due to the problems that continued to plague the Project, the Delaware Art Museum hired CTC, at additional cost, to be the Delaware Art Museum's representative. CTC's role in the Project included defending the existing GMP, and reviewing and approving all change orders necessitated by the corrections to the Construction Documents.

125.    By November 25, 2003, it became clear that changes to the Construction Documents and delays had contributed to at least $1,600,000.00 in cost overruns in the Project. The need for numerous change orders played a significant part of those cost overruns.

126.    On or about December 12, 2003, ABA reported that it could not issue the Conformed Set by December 15, 2003.

127.    On February 11, 2004, ABA admitted that Schedule impacts may have been associated with document releases and submittal reviews. On that same day, ABA denied that the Museum's review of pending change orders was responsible for any Schedule impacts.

128.    Release of the Conformed Set was ultimately delayed for several months until, on or about February 26, 2004, ABA reported that it intended to release the Conformed Set the following week – a new deadline that, again, it did not meet. Instead, ABA reported, on or about March 3, 2004, that it would print the Conformed Set and present it to the Museum by March 12, 2004 for review and comment. In mid-March 2004, ABA gave the Conformed Set to the Museum.

129.    From October 2003 until March 2004, ABA's responses to questions from BWS and subcontractors on previously issued Construction Documents were generally that such questions would be addressed in the Conformed Set.

130.    Substantial work was delayed while BWS and the subcontractors waited for receipt of the Conformed Set. For example, the Conformed Set would have included design documents for ductwork that required shop drawings, fabrication and installation before other construction could begin. Ductwork was a substantial critical path and needed to be completed before other work on the Facility could proceed. ABA's delay in releasing the Conformed Set delayed this critical path.

131.    By February 4, 2004, it became clear that the finish date would be no sooner than October 28, 2004, approximately 275 calendar days later than the previous estimate for completion. Meanwhile, the GMP continued to rise.

132.    By letter dated February 16, 2004, ABA misrepresented that its performance under the base Agreement was complete, although it had yet to release the 100% CDs (as the Conformed Set).

133.    As of March 2, 2004, the GMP had grown to $21,626,509.00, which included a $1,353,164.00 contingency.  However, at that time there was also approximately $1,740,042.00 in pending change orders.  And, as of March 2, 2004, it was clear that construction on the Project would continue through the rest of November 2004, and that the Facility would not be able to open until early 2005.

134.    On March 4, 2004, BWS encapsulated in PCO 257 what everyone on the Project understood was now the case:  the Delaware Art Museum "could not have reasonably anticipated the volume and extent of design errors and resultant changes that have occurred since October 21, 2002 . . . ."  The Conformed Set, which at that point was to issue by mid-March 2004, was the same set of documents that the Museum and BWS had expected to receive from ABA by October 11, 2002.  Furthermore, the many design changes produced conflicts between the different Construction Documents, requiring ABA to reissue the Construction Documents several times in an attempt to correct and resolve errors, omissions, conflicts and inconsistencies.  In short, ABA's continuing performance under the Agreement included massive errors, inconsistencies and omissions which violated the standard of care that ABA assumed under the Agreement and was required to perform under the common law and by statute.

135.    On or about March 30, 2004, the Museum informed ABA that it needed to modify over 60 drawings in the Conformed Set to correct errors and conflicts with other documents before ABA could release the Conformed Set to BWS.  The Museum informed ABA that "it was the understanding that [the Conformed Set] would take the place of all previously released

documents in there [sic] entirety, and that all documents other that [sic] the Conformed [Set] may be discarded upon receipt of the Conformed [Set]! . . . Common problems throughout the [Conformed Set] include: Title Blocks not showing proper revisions associated with the indicated drawing. Areas that have been changed will note to refer to RFI rather than showing the change. Numerous sketches are missing, Details are missing, Inconsistencies from Architectural, to Electrical, to Mechanical, to Line Safety, Etc. . . . occur throughout the [Conformed Set]!" Furthermore, even though ABA knew about the confusion and delay that improper bubbling caused, the Museum informed ABA of no fewer than fifteen items in the Conformed Set that either still needed to be bubbled or were incorrectly bubbled. Under duress, the Museum gave ABA until on or about April 19, 2004 to make all necessary corrections and to issue the Conformed Set.

136.    By April 8, 2004, the delays caused by ABA's errors and omissions impacted the Delaware Art Museum "financially, operationally, and most important, publicly." The Museum had to cancel some exhibits and reschedule others.

137.    As of April 8, 2004, time was of the utmost importance. The Project needed to be completed so that the Museum could return to the Facility by December 2004 in preparation for receiving artwork by Georgia O'Keefe on January 17, 2005. The O'Keefe Exhibit was to be part of the Facility's reopening to the public on March 5, 2005.

138.    ABA released the Conformed Set on or about April 15, 2004 to BWS and the subcontractors. Remarkably, however, ABA issued the Conformed Set without making any attempt to correct the errors and omissions in the Conformed Set that the Museum had previously identified. ABA, therefore, knew that the Conformed Set was incomplete when ABA gave the Conformed Set to BWS. Because the Museum needed to meet its obligations –

34

including hosting the O'Keefe Exhibit, meeting the Museum's fund-raising goals, and ensuring that the Project continued apace – the Conformed Set had to be released. The Museum was also concerned that, if the Project came to a halt, BWS and the subcontractors would leave the Project and never return. ABA released the Conformed Set approximately 521 calendar days later than the date ABA was to deliver the 100% CDs – for which the Conformed Set was supposed to be the functional replacement.

139.    Implementing the Conformed Set required the re-coordination of mechanical, electrical and plumbing ("MEP") trades, understanding the new schedule for material deliveries and generating new schedules for all aspects of work on the Project.

140.    The Conformed Set did not resolve outstanding errors in the Construction Documents. In fact, the Conformed Set contained additional errors that ABA needed to correct through several major releases that continued through March 31, 2005.

141.    Also, as of October 13, 2004, the Conformed Set had added approximately $2,000,000.00 in cost of work and other change orders related to the Conformed Set. Extra attention was also needed to resolve and track cost and schedule impacts related to almost daily changes that were required as a result of ABA and Arup's errors and omissions in the Conformed Set.

142.    From April 15, 2004 through March 31, 2005, ABA had to issue approximately 5 Addenda, 161 Sketches and 205 Responses to RFIs. Many of these corrections were necessitated by ABA and Arup's errors, omissions and inconsistencies in the Conformed Set.

143.    To summarize, ABA routinely failed to meet deadlines for issuing Construction Documents; ABA's most substantial and serious delay, but far from the only one, was that it took

an extra year and a half to release the Conformed Set, which ABA had agreed to release (as the final set of 100% CDs) in September 2002.

## ARUP'S WORK ON THE PROJECT

144.    In addition to the above errors and omissions, other acts by Arup contributed to the Project's delays and additional costs.

145.    For example, Arup's failure to obtain licensure to practice engineering in Delaware delayed when public authorities could issue the necessary permits for the Project. Without complete state licensure, public authorities would not grant the necessary permits for the documents that Arup drafted – with the result that Arup needed third-party engineers to review and seal design documents.

146.    Furlow Associates, an engineering firm that Arup retained to review the documents that Arup produced, cited several engineering errors and omissions in Arup's design that required correction before Furlow Associates would sign and seal Arup's drawings.

147.    O'Donnell Naccarato MacIntosh, another engineering firm that Arup retained to review the structural documents, cited errors and omissions in Arup's design that required correction before O'Donnell Naccarato MacIntosh would sign and seal Arup's drawings.

148.    As a result of Arup's errors, issuance of the sealed Permit Set was delayed from October 11, 2002 to approximately December 10, 2002.

149.    As a result of the delay in releasing the Permit Set, it took until January 30, 2003, or 77 days after it was scheduled to be granted, until the appropriate governmental body issued a foundation permit so that foundation work on the Project could commence.

150.    In addition to Arup's failure to obtain complete state licensure, ABA failed to perform the customary review of the design documents with Licenses and Inspections of the City

of Wilmington and the Wilmington Fire Marshall prior to issuing the Permit Set. Initially, the Wilmington Fire Marshall refused to grant the appropriate building permits because of ABA's failure to perform the customary review with the fire marshall and the errors present in the Permit Set. It took until April 17, 2003, or 120 days after it was scheduled to be granted, before the Wilmington Fire Marshall's concerns were alleviated and the appropriate building permits were issued.

151.    Arup misrepresented the design status to the Delaware Art Museum and BWS.

152.    On or about September 26, 2002, Arup submitted an invoice (the "Arup Invoice") to ABA in which Arup misrepresented that it had completed 100% of the design.

153.    On or about November 15, 2002, ABA submitted an invoice to the Museum stating that Arup's work was 100% complete during the month of October 2002.

154.    However, on or about February 13, 2003, ABA sent the Museum a letter stating that the Arup Invoice should be reduced to approximately 97% and a release date for the 100% CDs had to be delayed pending the resolution of items identified in the February 13, 2003 letter.

155.    Despite Arup's inadequate performance to this point, ABA represented on October 9, 2003 that ABA and all design professionals gave Arup's representative full authority to review and approve all coordination drawings when ABA was not present in the field.

156.    Arup also failed to promptly respond to RFIs to such an extent that even ABA had to caution Arup over its lack of diligence.

157.    Further, Arup and ABA were responsible for ensuring that ductwork, when installed, would not be below desired ceiling heights. As the Museum and BWS discovered instances in which the ductwork extended below the desired ceiling heights, Arup was responsible for responding to RFIs seeking clarification or changes to the Construction

Documents. BWS and the subcontractors had to suspend work on the ductwork until Arup and ABA revised the Construction Documents.

158.    Arup exacerbated the delays by releasing drawings that contained vague and guarded comments. Before work could proceed on those drawings, Arup needed to re-review and clarify those comments.

159.    At a staff coordination meeting held in 2004, Arup admitted that it had failed to properly coordinate engineering documents for the Project. Arup's original principal on the Project, Caroline Fitzgerald, literally disappeared from the Project after going on vacation. Once Ms. Fitzgerald left the Project, Arup failed to staff an engineer as a principal who had sufficient experience to coordinate different engineering specialties. At the staff coordination meeting mentioned above, an Arup engineer, Ed Dalton, stated that Arup had failed to coordinate documents properly for the Project.

160.    Ultimately, on March 11, 2004, ABA reported that all design issues with respect to Arup's work would have to be addressed in the Conformed Set.

161.    Drawings prepared by Quality Sheetmetal, a subcontractor to the mechanical contractor, Degli Obizzi, were submitted to ABA and Arup as sheet metal layout drawings for their review and approval prior to issue of the Conformed Set. These drawings were intended as submittals, but were copied and modified by ABA and Arup. ABA and Arup then issued these modified drawings as part of the Conformed Set. However, ABA and Arup failed to identify the changes they made to these drawings prior to releasing them as part of the Conformed Set. It took four months before the complications resulting from ABA and Arup's unidentified design changes were resolved.

162.    In another instance, Arup sent sketches on the plaza steel at the north face of the 1938 Building. Arup sent these sketches directly to BWS. When BWS submitted an RFI to ABA regarding these sketches, ABA told BWS that it should not proceed with work based on those designs pending an on-site review.

## ADDITIONAL ERRORS IN ABA AND ARUP'S DESIGN DOCUMENTS

163.    The Construction Documents that ABA and Arup issued to the Delaware Art Museum, BWS and the subcontractors were replete with errors. The following are examples of some of the further errors that ABA and Arup made during the Project:

a.    The design of the sprinkler/fire action system in the Deficient CDs would have caused major false alarm problems. Those false alarms would have resulted in the sprinklers going off when not needed. The most likely source of the problem was that engineers at Arup did not understand the Museum's requirements, and, therefore, designed a system that did not meet the Museum's needs.

b.    Stairs in the East Court needed to be redesigned because they were flexing – one person walking on the stairs would cause them to vibrate. These stairs were designed to have a glass railing. The flexing would have cracked the glass railing.

c.    There were no architectural designs for attachments to the steel runners in the elevator shaft. The elevator contractor modified the system to correct this omission, which was done at additional cost to the Delaware Art Museum.

d.    As designed, mechanical systems were inaccessible to maintenance personnel. The mechanical contractor, BWS and Museum staff provided Arup with proposed solutions, some of which involved relocations that required additional engineering to assure that intended performance was not compromised.

e.    Steel supports in the East Gallery needed to be reinforced by adding angled joints, additional steel and changing the rod tensioning. Arup had stated that the supports were sufficient, but testing proved Arup wrong.

f.    Structural loads were not calculated properly, requiring installation of angular supports to correct these errors, resulting in lost space and additional cost.

g.    Steel crimped in the Education Wing, caused by insufficient structural support, and caused the concrete floor to lower and to expose a gap between the floor and the wall.

h.    Designs for the elevator shaft adjacent to the Trustees' Room did not include a fire-rated wall or fire-rated glass near the elevator shaft. Correcting for these omissions alone increased the costs of the Project by approximately $190,000.00.

i.    Storage racks were meant to bear 250 pounds. The Construction Documents failed to reflect this requirement and the storage racks that were eventually installed could not bear the required weight. The storage areas should have been designed to allow artwork to be hung from the ceiling. Instead, the structure was actually designed such that the storage area's ceiling could not bear the weight of materials being hung from it in addition to the weight placed on it from the floors above. Ultimately, the Museum had to use a floor-mounted storage system at substantial additional expense.

j.    Changes in structural design were frequent and substantial. ABA issued many of those design changes on 8-1/2" x 11" sketches that lacked architectural background that would permit design professionals to verify fit prior to issue.

k.    Following the removal of the building in front of the north façade of the 1938 Building, the appearance of previously made modifications was unacceptable.

Correcting for this entailed addition of brick veneer, and took several months due to the need to prepare trial designs and estimates and to select the brick.

l.　　The structural engineer observed in the field that the structural steel supporting the 1987 Wing could not bear the weight of the structure. The structure needed to be heavily modified at additional cost.

m.　　Interior pipes were designed so that they were exposed outside of walls instead of being concealed behind walls. These design errors were aesthetically unacceptable and required the Delaware Art Museum to either: (1) relocate the piping; (2) relocate the walls around the piping; (3) add chase walls; or (4) lower ceilings.

n.　　The structural steel supporting the North Plaza showed bearing on the brick veneer, and correcting this problem required significant demolition and additional footings and piers.

o.　　The rear of the 1938 Building was not a flat brick wall, as indicated in ABA's original designs. Instead, the rear of the 1938 Building had windows that were covered by brick. This condition was visible in pictures the Delaware Art Museum sent to ABA, and during ABA's on-site inspections of the 1938 Building. In spite of ABA's obvious errors and omissions with regard to the rear of the 1938 Building, ABA insisted that the Museum pay for any changes to the design documents. The Museum also had to pay approximately $175,000 in additional costs to correct for the errors and omissions in ABA's original designs.

p.　　Art museums require special lighting. ABA designed the lighting in the storage areas with lighting that would have damaged artwork stored in those facilities.

Also, the lights were not shielded so that if a light bulb exploded, glass would rain down on and damage artwork.

q.    In an error that exemplifies ABA's incompetent performance, the Museum specifically stated that it did not want any windows installed on the exterior of the Facility that appeared green in color.  ABA nonetheless included green windows in the Construction Documents.

## Design Errors Continue To Be Discovered To This Day

164.    Recently, the Museum discovered that the Construction Documents provided for windows that did not filter out ultraviolet light.  Because ultraviolet light damages the artwork on display in the Facility, the windows that were installed pursuant to the Construction Documents needed to be coated at additional cost to the Museum.  ABA was or should have been aware of the Museum's special needs, and failed to accommodate them.

## THE CONSEQUENCES OF ABA AND ARUP'S ERRORS AND DELAYS ON THE PROJECT

165.    Before work could proceed on any design change, subcontractors needed to revise their pricing for the changes to the Construction Documents.  The errors and omissions in the Construction Documents complicated and delayed responses from these subcontractors for pricing of the changes to the Construction Documents.  The errors and omissions in the Construction Documents also complicated and extended the time needed for the Museum's review and approval of the changes to the Construction Documents.

166.    Design changes were incorporated into the Construction Documents via change orders.  In many instances, the bid process and the awarding of contracts had taken place by the time these design changes were made.  These design changes were made at a premium cost because of the lack of competitive bid pricing for the subject work.

167.    Each time an error or omission was encountered, BWS had to suspend work, inform ABA, await design corrections, obtain pricing from subcontractors and submit the changes to the Museum for approval before work could proceed.  In many instances (such as changes in structural steel and ductwork), the Museum's approval was not the last step in the process.  In those instances, it was necessary to submit revised shop drawings and obtain approvals from the design professionals before fabrication, delivery and installation could begin.  This process caused very substantial delays that, in turn, impacted and delayed work performed by other trades.

168.    The Museum could not anticipate the magnitude of the cost impact for design changes to the Construction Documents.  The Museum had to mitigate this unexpected cost impact by redesigning or changing the specifications for the Project.

169.    Design changes delayed approval for critical path work.  Other trades could not commence their work until the critical path work was completed.

170.    Additional work, such as repairs or replacement work, was also required for many change orders due to the timing of their issuance.  This additional work resulted in higher costs.

171.    In some instances (such as ductwork in the Main Gallery, Penthouse Mechanical Room, Education Wing Mechanical Room, Education Wing and Studio), correcting the Construction Documents proved to be dysfunctional.  The corrections often required redesign, some of which was never fully completed.  These corrections created substantial delays and out-of-sequence work.

172.    Errors in the structural designs delayed when BWS and the subcontractors could enclose and waterproof portions of the Facility.  In some cases, the failure to enclose and waterproof portions of the Facility exposed already completed portions of the Project to the

elements. This exposure damaged already completed portions of the Project, requiring those portions to be replaced at additional cost.

173.    Late changes in structural design delayed and added to the cost of completion of underpinning, foundations, steel columns and beams, metal decking and placement of slabs. These delays added to the costs of the Project.

174.    Inter-discipline design review was not possible because some Construction Documents were issued on 8-1/2" x 11" sketches without correct background showing related work. As a result, repeated redesign, including on-site changes by the design professionals, was necessary to resolve conflicts in the Construction Documents.

175.    The release of major MEP addenda shown on outdated architectural backgrounds created substantial confusion. MEP work was placed on hold as the design professionals redesigned MEP systems and reissued documents.

176.    The Construction Documents included duct risers that passed through doors and conflicted with the structure; these errors were obvious on the face of the Construction Documents, and ABA, in accordance with its professional obligation, was required to – but did not – correct these errors prior to releasing those Construction Documents.

177.    For any changes to the ductwork design, it was necessary to obtain contractor pricing, receive the Museum's approval, prepare and submit fabrication drawings for review and approval, then fabricate, deliver and install the ductwork. Because ductwork was a critical path, the above tasks needed to be completed in advance of work that had to be performed by other trades. Ductwork needed to be redesigned several times to resolve conflicts with structural steel. ABA and Arup finally eliminated return air systems to partially resolve spatial conflicts, and other errors had to be corrected by lowering ceiling heights.

178.    Correction of design omissions, such as elevator pits and the associated equipment, piping, electrical and general construction work, continued through completion of the Project. These perpetual changes created substantial delays and out-of-sequence work.

179.    Even on relatively minor matters such as the composition of the wood lattice ceilings, ABA's performance caused confusion and delay. ABA had informed the Delaware Art Museum that it could use birch with a clear lacquer finish instead of a white painted poplar as originally designed for the wood lattice. ABA then simply changed the specifications to make the wood lattice birch with a clear lacquer. ABA's actions and misrepresentations caused further delay and confusion once the supplier informed the Museum and BWS that the new materials would be more costly, and the Museum and BWS needed to resolve this issue created by ABA's misstatements and unilateral actions.

180.    The errors and omissions in documents and drawings submitted by ABA and Arup resulted in continuous design changes. These design changes delayed the progress of work on the Project because BWS and the subcontractors continuously had to adjust to and figure out the additional and/or altered scope of the design documents. The RFIs that BWS and the subcontractors frequently submitted in their attempts to understand the frequent design changes led to substantial Project delays.

181.    The delays in the Project caused by ABA and Arup caused BWS and the subcontractors substantial additional costs for overtime, extended work weeks and additional resources to reduce the extent of delay in opening the Facility.

182.    When ABA finally released Construction Documents, the Construction Documents contained substantial errors and omissions that caused holds and delays, which also resulted in out-of-sequence work. ABA knew about the substantial errors and omissions when it

released the Construction Documents. While those documents might have given the appearance of delivering design information on a given date, the resulting confusion among contractors attempting to resolve problems in those documents through RFIs and clarifications in pricing delayed progress more than if ABA and Arup withheld the issuance of the Construction Documents and expanded the time necessary to provide complete and accurate documents.

183.    Because the Construction Documents needed to be changed to correct ABA and Arup's errors and omissions, contractors charged the Museum for the work they performed as a result of these changes. In some cases, the contractors had already completed work based on the original design documents, exposing the Museum to duplicative costs.

184.    The failure of ABA and Arup to meet their contractually imposed duties operated to the financial detriment of the Delaware Art Museum and jeopardized the Museum's ability to meet its organizational goals.

**Because Of The Delays And Errors In The Project,**
**The Delaware Art Museum Needed Additional Financing,**
**Lost Investment Opportunities, Had Difficulty Raising Funds And Paid Fines And Fees**

185.    Before Allied Irish would issue a letter of credit for $25,000,000.00 to the Museum, the Museum needed to have a GMP. Because ABA did not release the 100% CDs by September 23, 2002, as originally planned, Allied Irish did not issue the letter of credit. Without the letter of credit, the Museum could not sell its bonds and lost income-generating opportunities that would have been realized by the short-term investment of bond capital. The Museum also had to sell $300,000.00 in stock during a downturn in the market in order to pay several of ABA's invoices.

186.    In the summer of 2004, the Museum realized that it would not have sufficient bond money to pay the anticipated costs of construction because of changes to the Construction

Documents and delays in the Project. The cost overruns caused by these changes to the Construction Documents and delays required the Museum to obtain additional financing from BWS to complete the Project.

187.    Further, the Museum had a defined timetable when it would have to make interest payments on the bonds it issued. Because the Project's completion was delayed, the Museum was operational for less time before its first interest payment was due, and the Museum generated less income to meet its interest payments and the costs of its operations, placing the Museum on less sound financial footing.

188.    Because of the Project's delays, the Museum also found it more difficult to raise funds. The Museum had to delay fund-raising activities, including memberships that were tied to the re-opening of the Facility, until the Project neared completion. Delays in the Project caused by ABA and Arup's errors and omissions were also detrimental to the Museum's ability to raise additional funds, given the presence of many other nonprofit institutions in the Wilmington area that were not faced with the Museum's difficulties.

189.    In the fall of 2004, when the Museum considered terminating the Agreement with ABA due to ABA and Arup's delays, errors and omissions, ABA dissuaded the Museum from doing so. ABA communicated its belief that the Project would be completed in time for the Facility to host the O'Keefe Exhibit, but only if the Museum continued to retain ABA through the completion of the Project. ABA also stated that it was certain that replacing ABA would cause disruption and delay which would impact the timely completion of the Project.

190.    The Museum also incurred additional expenses from having to remain at the Wilmington Riverfront instead of returning to the Facility as anticipated.

191.    The Museum was trapped between Scylla and Charybdis:  continue to work with ABA and hope that the Project would be completed within the Schedule; or the virtual certainty that replacing ABA with another architect would cause a delay such that the Facility would not open in time for the Georgia O'Keefe Exhibit.  In reliance on ABA's statements, the Museum did not terminate the Agreement with ABA.

192.    Unfortunately, delays in the Project continued.  The Museum was unable to return to the Facility by December 28, 2004.  Ultimately, ABA did not even issue a certificate of substantial completion until on or about April 11, 2005,  and the Facility did not re-open to the general public until June 26, 2005.

193.    The Museum had a covenant with Allied Irish requiring it to occupy the Facility by December 2004.  Because the Facility was not completed by December 2004, the Museum was unable to occupy the Facility and breached the covenant.  As a result of that breach, the Museum had to pay fines, fees and other charges.

## ABA Did Not Fulfill Its Contractual Obligations

194.    While ABA and Arup were able to create a design (albeit, an inadequate one) for a renovated and expanded Facility, ABA and Arup did not properly perform the necessary tasks required of them in implementing this design within the deadlines called for in the Agreement and in a professional, competent manner.

195.    Many of the cost overruns the Museum incurred on the Project were the result of ABA and Arup's inadequate performance.

### Attempted Dispute Resolution

196.    Before the Museum pursued claims against ABA for its failures in its performance, it made a good faith effort to mediate its dispute with ABA with a qualified mediator pursuant to paragraph 1.3.4.2 of the Agreement.

197.    The Museum mediated with ABA on November 3 and 4, 2005 in Wilmington, Delaware. The mediation process was ultimately unsuccessful and the parties were unable to reach an acceptable resolution. At this point, mediation has concluded and failed to resolve the dispute between ABA, Arup and the Museum.

198.    As a result of the facts pleaded above, and in an effort to mitigate its damages, the Museum entered into a Liquidating Agreement with BWS dated March 17, 2006. Pursuant to the Liquidating Agreement, the Museum and BWS, among other things, acknowledged the Museum's liability to BWS for the damages it incurred as a result of the actions, inactions, errors and omissions of ABA and Arup, together with the manner in which the Museum will satisfy its liability to BWS for these damages.

### CONCLUSION

199.    Because ABA and Arup failed to meet their contractual obligations and the standard of care imposed on professionals in their field, the Delaware Art Museum incurred significant costs in excess of what it had budgeted for the Project. Under the original GMP, at most it would have cost the Museum $19,649,176.00 to complete the Project. Ultimately, the Museum has had to raise $32,000,000.00 to cover the final costs of the Facility and its related furnishings, fixtures and equipment. Furthermore, the Museum lost additional income that would have come from admissions and facilities use during March, April and May of 2005 (when the Facility should have been open to the public), added admission income and

sponsorship revenues brought on by the Georgia O'Keefe exhibition and goodwill of the community. This lost income is estimated to exceed $1,000,000.00. The Museum and its constituencies should not be responsible for raising the $13,350,824.00 difference; rather, ABA and Arup – the architect and engineer who were responsible for the errors, omissions and delays that caused the Project to go over budget – should bear that burden.

## FIRST CAUSE OF ACTION
### ABA's Breach Of Contract

200.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

201.    The Agreement between the Delaware Art Museum and ABA was a valid contract.

202.    The Delaware Art Museum substantially performed all of its obligations and conditions precedent under the Agreement.

203.    As set forth above, the Agreement required ABA to, among other things, deliver Construction Documents in a timely and complete fashion; be responsible for the coordination, completeness, accuracy and competent preparation of all Construction Documents and ensure that they set forth in detail the requirements for the construction of the Project; ensure that the Construction Documents complied with all applicable codes, ordinances, regulations, laws and statutes; and act promptly to revise its documents to ensure that the construction cost of the Project did not exceed the Project's budget.

204.    While ABA may have been able to produce a concept of the Facility, it was wholly unable to prepare and draft the documents needed to take the Project from the concept form to actual construction and completion in a timely manner.

205.    As detailed above, ABA breached the Agreement and failed to perform in accordance with the professional standards of care it fixed for itself therein by, among other things, providing late and deficient Construction Documents.

206.    Furthermore, upon information and belief, ABA breached the Agreement by not having or committing sufficient personnel, resources or materials and/or having the knowledge necessary to prepare the working documents needed to accomplish the construction of the Project as it represented it could.

207.    As a result of ABA's breaches of the Agreement, the Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims.

## SECOND CAUSE OF ACTION
## Breach Of The Implied Covenant Of Good Faith And Fair Dealing

208.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

209.    The Agreement contained an implied covenant requiring ABA to act in good faith and not deprive the Delaware Art Museum of the benefits of its bargain.

210.    ABA understood that it needed to produce design documents in a timely manner that were free of errors. ABA missed almost every deadline to produce design documents. Even worse, when ABA produced design documents, the design documents were filled with errors, omissions and inconsistencies which delayed progress on the Project, as the Delaware Art Museum, BWS and the subcontractors had to seek additional documents or comments from ABA. By not fulfilling its obligations to provide correct and timely design documents, ABA performed its obligations under the Agreement in bad faith. The Museum justifiably relied on ABA to perform its obligations under the Agreement.

51

211.    The Delaware Art Museum hired ABA for its purported expertise.  ABA even dissuaded the Museum from hiring a Local Architect after ABA assured the Museum that ABA was up to the task of producing correct and timely design documents and guiding the Museum through the Project.  By failing to take steps to ensure that it provided correct and timely design documents, ABA breached its implied covenant of good faith and fair dealing.

212.    The Delaware Art Museum was proximately damaged by this breach because ABA's performance under the Agreement delayed the Project and added significant costs to its completion.  As a result, the Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims because of ABA's breach of ABA's implied covenant of good faith and fair dealing.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation Against ABA

213.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

214.    As an architect, ABA is in the business of supplying information.

215.    As a result of its contractual obligations and the payment it was entitled to under those agreements, ABA had a duty to provide accurate information to the Delaware Art Museum.

216.    ABA supplied false information by providing Construction Documents that were replete with errors.  The Museum used the false information that ABA provided to the Museum in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

217.    ABA failed to exercise reasonable care in obtaining or communicating the information to the Delaware Art Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

218.    The Delaware Art Museum suffered pecuniary loss when the Museum justifiably relied upon the false information supplied by ABA for the Museum's use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

219.    ABA knew that the Delaware Art Museum intended to rely upon the false information provided by ABA for the Museum's benefit and guidance, and in the Museum's transactions with third parties, including BWS, subcontractors and licensing authorities.

220.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims on account of ABA's misrepresentations.

### FOURTH CAUSE OF ACTION
### Negligent Misrepresentation Against Arup

221.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

222.    As an engineer and design professional, Arup is in the business of supplying information.

223.    As a result of its contractual obligations and the payment it was entitled to under those agreements, Arup had a duty to provide accurate information to ABA and, indirectly, to the Museum.

224.    Arup supplied false information by providing to ABA Construction Documents that were replete with errors.  ABA used the false information that Arup provided to ABA in its business transactions with third parties, including the Delaware Art Museum, BWS, subcontractors and licensing authorities.  The Museum, in turn, used the false information from Arup that ABA provided to the Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

225.    Arup failed to exercise reasonable care in obtaining or communicating the information to ABA, which was, in turn, communicated to the Delaware Art Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

226.    The Delaware Art Museum suffered pecuniary loss when the Museum justifiably relied upon the false information from Arup that ABA provided to the Museum for its use in its business transactions with third parties, including BWS, subcontractors and licensing authorities.

227.    Arup knew that ABA was going to provide the false information that Arup produced to the Delaware Art Museum. Arup knew that the Museum intended to rely upon the false information from Arup for the Museum's benefit and guidance, and in the Museum's transactions with third parties, including BWS, subcontractors and licensing authorities.

228.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims on account of Arup's misrepresentations.

### FIFTH CAUSE OF ACTION
### Common Law Fraud

229.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

230.    ABA falsely represented to the Delaware Art Museum that ABA was able to perform its obligations under the Agreement in accordance with the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time, and that ABA could perform its obligations in a timely manner.

231.    ABA falsely represented to the Delaware Art Museum that ABA would be able to meet its obligations under the Agreement without the assistance of a Local Architect, and that

54

ABA could perform its obligations in a timely manner, or do so without the assistance of a Local Architect.

232.    Upon information and belief, ABA was recklessly indifferent to the truth of its representations when ABA stated that it could meet the professional standards of care imposed by the Agreement, do so without the assistance of a Local Architect, and/or that ABA could perform its obligations in a timely manner.

233.    By stating that ABA could meet the professional standards of care imposed by the Agreement, do so without the assistance of a Local Architect, and/or that ABA could perform its obligations in a timely manner, ABA intended to induce the Delaware Art Museum to retain ABA for the Project, to induce the Museum to refrain from retaining a Local Architect for the Project and to induce the Museum to refrain from terminating the Agreement with ABA.

234.    The Delaware Art Museum acted in justifiable reliance upon the representations made by ABA.

235.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims as a result of the Museum's reliance on ABA's false representations.

### SIXTH CAUSE OF ACTION
### Consumer Fraud In Violation Of 6 DEL. C. § 2513

236.    The Delaware Art Museum repeats, realleges and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

237.    ABA misrepresented material facts regarding its services when ABA represented to the Delaware Art Museum that in performing its services, ABA would do so with the characteristics of the care and skill ordinarily used by professional architects and engineers practicing under similar conditions at the time, and/or that ABA could perform its obligations in

a timely manner. The misrepresentations were material because, if had the Museum known that ABA would not have provided its services in conformity with the care and skill ordinarily used by professional architects and engineers or that ABA could not perform its obligations in a timely manner, then the Museum would not have contracted with ABA.

238.    ABA misrepresented material facts regarding its services when ABA represented to the Delaware Art Museum that in performing its services, ABA and the Museum would not need a Local Architect for the Project. The misrepresentations were material because, had the Museum known that ABA would in fact have needed a Local Architect, the Museum would have engaged a Local Architect.

239.    Upon information and belief, ABA misrepresented material facts regarding its services when ABA represented to the Delaware Art Museum that the Museum would have a greater chance of completing the Project on schedule with ABA's services and that the Museum should not terminate the Agreement with ABA. These misrepresentations were material because, had the Museum known that ABA would be unable to complete the Project on time, the Museum would have terminated the Agreement.

240.    ABA made these misrepresentations intending that the Delaware Art Museum would rely upon them in making its decisions with regard to ABA's services.

241.    In doing so, ABA could reasonably foresee that the Delaware Art Museum's reliance upon ABA's unprofessional performance would expose the Museum to additional costs resulting from delays, errors and omissions in ABA's production and release of the design documents for the Project.

242.    The Delaware Art Museum incurred damages for delay costs, construction premiums, remedial work and contractor and subcontractor claims as a result of the Museum's reliance on ABA's false representations.

## **REQUEST FOR RELIEF**

WHEREFORE, the Delaware Art Museum requests that the Court enter an order

awarding to it:

A.    damages against ABA and Arup in an amount greatly in excess of

$75,000.00, to be determined at trial;

B.    punitive damages for ABA's fraudulent conduct;

C.    prejudgment interest;

D.    costs and expenses related to this proceeding, including reasonable

attorneys' fees; and

E.    such other and further relief as the Court deems just and proper.

DATED: August 3, 2006

Respectfully,

Thomas J. Allingham II (#476)
Richard S. Horvath, Jr. (#4558)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
Attorneys for Plaintiff Delaware Art
  Museum, Inc.

Of Counsel:
B. Christopher Lee
Walter S. Zimolong III
Jacoby Donner, P.C.
1515 Market Street, Suite 2000
Philadelphia, Pennsylvania  19103
(215) 563-2400

Bruce D. Meller
Peckar & Abramson, P.C.
70 Grand Avenue
River Edge, New Jersey  07661
(201) 343-3434

Rodman Ward, Jr. (#652)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

58

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

**H**
**Christiana** Marine Service Corp. v. **Texaco** Fuel and
Marine MarketingDel.Super.,2002.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
**CHRISTIANA** MARINE SERVICE
CORPORATION, Plaintiff,
v.
**TEXACO** FUEL AND MARINE MARKETING
INC. and **Texaco** Inc., Defendants.
No. Civ.A. 98C-02-217WCC.

Submitted Jan. 2, 2002.
Decided June 13, 2002.

On Defendant **Texaco** Fuel and Marine Marketing
Inc., and **Texaco** Inc.'s Motion for Summary
Judgment. Granted in part; denied in part.

John D. Balaguer, White & Williams LLP,
Wilmington, Delaware, for Plaintiff, **Christiana**
Marine.
James J. Maron & John P. Daniello, Maron &
Marvel, P.A., Wilmington, Delaware, for Defendants,
**Texaco** Inc.
Peter R. Kahana & Daniel M. Cohen, Berger &
Montague, P.C., Philadelphia, PA, for Defendant,
**Texaco** Fuel and Marine Marketing, Inc. and
**Texaco**, Inc.

MEMORANDUM OPINION
CARPENTER, J.
*1 Defendants have filed a motion for summary
judgment pursuant to Superior Court Civil Rule
12(b)(6) for failure to state a claim upon which relief
could be granted. The core of this controversy centers
upon an alleged oral long term requirement contract
between **Texaco** Fuel and Marine Marketing, Inc.
(hereinafter "**Texaco**"), and **Christiana** Marine
Service Corporation (hereinafter "**Christiana**") a
bunker fuel provider.FN1 **Christiana** seeks
compensatory damages without limitation to its lost
profits; and consequential damages, consisting of
**Christiana's** economic losses. The Court has heard
oral argument on the motion and for the reasons set
forth below, **Texaco's** motion for summary judgment
is denied in part, and granted in part.

FN1. **Christiana** has sued **Texaco's** parent
company, **Texaco** Incorporated, in addition
to **Texaco**, pursuant to vicarious liability.

*FACTS*

**Christiana** Marine was incorporated in 1986, after
its successor corporation, Compass Marine
Corporation, ceased doing business. **Christiana** was
a barge contractor that transported marine bunker
fuel, a low grade black oil, in the Delaware River.
Usually, when ships are at sea and need fuel, they
will notify the oil providers in a particular port, such
as **Texaco** or its competitors. The oil provider, is
informed of the ship's arrival date, and the amount of
bunker fuel needed to which the oil companies reply
with their bids. Once awarded a contract, the oil
company hires a barge contractor to transport the oil
to the ships who requested the fuel.FN2

FN2. **Christiana** had two business
locations: one in Chester, Pennsylvania,
where delivery vessels were berthed during
non-use and repair, and one in Wilmington,
Delaware, where orders were received,
invoices were sent, and where payments
were received from **Texaco**.

In 1988 **Texaco** purchased a new supply facility, the
Delaware Terminal Corporation ("DTC") in
Wilmington, Delaware to increase **Texaco's** market
share in the Delaware River area. Because DTC was
in Wilmington, and not in, or as near to Philadelphia,
it was slightly alienated from (1) the highest business
activity where most other supply facilities were
located; and (2) where most of the ships that had to
be serviced were located.FN3 Bunker fuel deliveries
from a more distant area, such as Wilmington, were
assessed higher rates to transport bunker fuel, as
compared to the established rates in the Delaware
River zone. In addition, DTC was not equipped to
handle bunkers, and had experienced substantial
congestion problems because of this.FN4 To solve
these problems, **Texaco** needed a barge carrier who
would agree to provide below market prices for fuel
deliveries from DTC, and who would also agree to
exclude demurrage for loading delays at **Texaco's**
congested terminal.FN5 It was in this environment that
the business relationship between **Texaco** and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

**Christiana** began.

> FN3. Most supply facilities are located in Philadelphia, Pennsylvania.

> FN4. Bruce Bond Dep. at 51. Barge contractors like **Christiana**, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, **Texaco** would pay **Christiana**, **Christiana's** barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid **Texaco** for the fuel.

> FN5. Plaintiff's Response Brief at 2.

Before the alleged contract with **Texaco, Christiana** had a virtual monopoly on small to medium size bunker jobs in the Delaware River area,[FN6] and had sufficient equipment to conduct its usual business successfully. According to **Christiana, Texaco** proposed a long term agreement, which provided that **Texaco** would employ **Christiana** as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for **Christiana's** commitment to have ample equipment on hand to deliver **Texaco's** requirements upon demand.[FN7] In addition to these terms, **Christiana** and **Texaco** allegedly agreed that **Texaco** would receive discounted delivery charges, at below market rates, along with no additional penalties for loading delays at DTC.[FN8] In 1990, the parties apparently orally modified their business relationship and agreed that **Christiana** would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which **Texaco** may have encountered, in return for **Texaco's** commitment to put through an average 200,000 bbls. of oil per month.[FN9] **Christiana** considered the 200,000 quote a minimum average, with **Texaco** anticipating a 225,000 or 250,000 bbls a month throughput. In other words, **Christiana** presumed the 200,000 barrels was a floor, not a ceiling. Regardless, **Texaco** did not meet this alleged "guaranteed" minimum monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months **Christiana** and **Texaco** had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

> FN6. York's Report at 6 (citing the October 28, 1999 Bruce R. Bond deposition p. 238).

> FN7. **Texaco** even published a pamphlet, which stated "[**Christiana**], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [**Christiana**] operates several barge units ranging in capacity from 1700-3000 metric tons. DTC and [**Christiana**] offer **Texaco** flexibility second to none any supplier on the river."

> FN8. Because barge carriage is generally a small margin, fixed cost business, **Christiana** would have a unique opportunity to secure a steady, expanding stream of business, provided by **Texaco**, if it entered into this "agreement."

> FN9. Bates Dep. at 86.

**\*2** Based upon **Texaco's** alleged representations that it planned to put through 200,000 bbls. of oil per month, **Christiana** went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work **Texaco** and **Christiana** anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a "favorable reference from Mr. Bruce Bond of **Texaco**," that **Texaco** referred to Mr. Bates as a "no-nonsense businessman who always gets the job done," that on a "monthly basis, **Christiana** moves roughly 150,000 barrels of bunkers, and [**Texaco**] wants to increase this to 200,000," and that "**Texaco** is looking for a long term relationship with **Christiana**."[FN10]

> FN10. June 20, 1989 loan document.

The alleged oral contract between **Christiana** and **Texaco** ensued until **Christiana** wrote **Texaco** a letter in August of 1995, informing them that **Christiana** could not continue to provide bunker transportation because of the lack of **Texaco's** business and the cost of providing the service.[FN11]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 3
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN11. "It is with regret that [**Christiana**] had to inform **Texaco** last week that we could no longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high...." August 16, 1995 letter from William Bates to C. Michael Bandy of **Texaco**.

*PROCEDURAL POSTURE*

On February 20, 1998, **Christiana** filed a complaint against **Texaco** and alleged six separate counts: (1) breach of contract-volume of business; (2) breach of contract-duration; (3) breach of contract-notice of termination; (4) breach of contract-duty of good faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. **Texaco** has filed a summary judgment motion requesting the dismissal of all claims.

*STANDARD OF REVIEW*

A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[FN12] If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate.[FN13] Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied.[FN14] The Court is required to examine all pleadings, affidavits and discovery material provided to the Court,[FN15] accept all non-disputed facts as true, and must accept the non-movant's version of any disputed facts.[FN16]

FN12. *See Schueler v. Martin,* 674 A.2d 883, 885 (Del.Super.1996); *Pierce v. International Ins. Co. of Ill.,* 671 A.2d 1361, 1363 (Del.1996); *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

FN13. *Kysor Industrial Corp. v. Margaux,* 674 A.2d 889, 894 (Del.Super.1996).

FN14. *Vanaman v. Milford Memorial Hospital, Inc.,* 272 A.2d 718, 720 (Del.1970).

FN15. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322 (Del.Super.1973).

FN16. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96 (Del.1992).

*DISCUSSION*

*A. Doctrine of Laches / Statute of Limitations*

**Texaco** asserts that **Christiana's** breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because **Christiana's** time to bring suit started in July 1993, when it became clear the terms of the contract as alleged by **Christiana** were not being met.[FN17] Additionally, **Texaco** claims that **Christiana** consulted counsel in 1995, when it went out of business, to consider bringing a claim against **Texaco**; that **Christiana** intentionally misled **Texaco** "by writing **Texaco** a soothing, non-accusatory" 1995 letter saying nothing about a claim; that **Christiana** and its former attorney deliberately chose not tell **Texaco** about the alleged claim to inhibit **Texaco** from taking steps to defend itself. **Texaco** alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by **Christiana's** delay because: (1) out of the 48 months **Christiana** transported **Texaco's** bunker oil, **Texaco** only reached the alleged 200,000 barrels a month for 8 months, so if **Christiana** considered this "lower throughput" a breach of contract, they had an obligation to notify **Texaco** so it could have limited its damages by terminating the alleged contract at that point in time, and (2) **Texaco** is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. **Texaco** stated that its computer files only date back until 1994, which makes locating precise and complete data for the relevant time period impossible.

FN17. **Texaco's** Brief at 20.

**\*3 Christiana** contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated. **Christiana** claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to **Texaco** notifying it that **Christiana** would be unable to participate in further business. **Christiana** also asserts that a laches

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 4

agreement is unavailable to **Texaco** because **Texaco** "effectively" caused the termination of the agreement in its continuously low throughput, which caused **Christiana** to be prejudiced and to go out of business. And lastly, **Christiana** claims that **Texaco** is responsible for the lost computer files and documents, as **Texaco** took their mainframe computer out of service at the end of 1993. **Christiana** also points out that **Texaco** has been on notice of this lawsuit since May 1, 1996, and thus, could've kept records and documents for its defense as of that date.[FN18]

FN18. Plaintiff's Brief in Opposition to Defendant's Motion at 20.

"The test of laches is both unreasonable delay and consequent significant prejudice."[FN19] In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations.[FN20] Delaware's statute of limitations for contract and negligence actions is found in 10 Del. C. § 8106. The 3 year limitation on cause of actions for an alleged breach of contract accrues at the time of the breach,[FN21] whereas a tort claim accrues at the time of the injury. [FN22]

FN19. Wilkes v. H.M. Wrangell & Co., 293 F.Supp. 522, 524 (D.Del.1968)(citing Gutierrez v. Waterman S.A. Corp., 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Claussen v. Mene Grande Oil Co., 275 F.2d 108, 113 (3d Cir.1960)).

FN20. Wilkes, 293 F.Supp. at 524.

FN21. Fineberg v. Credit Int'l Bancshares, Ltd., 857 F.Supp. 338 (D.Del.1994); Nardo v. Guido DeAscanis & Sons, 254 A.2d 254 (Del.Super.1969).

FN22. Howmet Corp. v. City of Wilmington, 285 A.2d 423 (Del.Super.1971).

The Court finds that the statute of limitations, 10 Del. C. § 8106, did not begin to run until there was an affirmative termination by one of the parties. **Christiana** wrote the August 1995 letter to **Texaco**, which terminated the arrangement between these two parties. Until then, the two parties continuously conducted business with one another and **Christiana** operated as **Texaco's** bunker fuel contractor. As such, under the statute of limitations applicable to

contracts, **Christiana** had until August, 1998 to file its claims against **Texaco**. [FN23] Since **Christiana** filed the instant action on February 20, 1998, it appears that **Christiana** successfully brought its claims within its window of opportunity. The Court finds that **Christiana's** claims have not been unreasonably delayed.

FN23. An issue not addressed by the parties is whether the statute of limitations would prevent the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

Additionally, the Court is not convinced that **Texaco** has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue the passing of time has limited **Texaco's** access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that **Texaco**, during its business relationship with **Christiana**, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by **Christiana** to terminate the relationship so **Texaco** could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. **Texaco** is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and ones goodwill to perform an important business function. To argue that **Christiana** has tricked or mislead **Texaco** is simply an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds neither unreasonably delay or prejudice and thus the claims are not barred by the doctrine of laches.

### B. Breach of Contract Claims

*4 While it is the Court's province to define a contract, it is the jury's function to decide whether a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 5
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

contract exists.[FN24] In *Universal Products Co. v. Emerson,*[FN25] the Supreme Court of Delaware followed numerous other court's holdings that it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged.[FN26] The *Emerson* court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved." [FN27] Stated differently, when other facts and circumstances germane to the issue are to be considered in addition to any documentary evidence, a jury is to decide whether or not a contract was formed, not the Court.

> FN24. *Corletto v. Morgan,* 89 A. 738 (Del.Super.1914).
>
> FN25. *Universal Products Co. v. Emerson,* 179 A. 387 (Del.1935).
>
> FN26. *Id.* at 393.
>
> FN27. *Id.* at 394.

**Texaco** contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, **Texaco's** expert, Patrick J. Studdert, stated in his report that

[i]n all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between **Christiana** and **Texaco** and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry.[FN28]

> FN28. Studdert's Report at 3.

**Texaco** asserts that "it is undisputed in the bunker fuel barge delivery industry-that deliveries are made by barge carriers for oil companies on an "as available basis." [FN29] **Texaco** further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by **Christiana**-long term oral contracts with minimum guaranteed monthly delivery quotas. **Texaco** then asserts that because **Christiana** did not exclusively work for **Texaco**, and it continued to conduct

business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of **Texaco's** alleged "long term agreement" to put through the amount of oil it allegedly promised.

> FN29. **Texaco's** motion at 3.

**Christiana** contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. **Christiana** points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland ("FNBM")'s representative); and the mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. **Christiana's** expert, Robert B. York contends that **Christiana** and **Texaco's** relationship was contractual, and more specifically stated in his report that

"[a] contract existed between [**Christiana**] and [**Texaco**] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract.[FN30]

> FN30. York's Report at 20.

***5** The Court first finds that whether an oral contract, or a contract created by conduct was established between **Christiana** and **Texaco**, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, **Texaco** and **Christiana** had mutual, beneficial interests at stake in this business venture, and as such, an enforceable contract was created. The Restatement Second of Torts § 19 provides that "[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." [FN31] Subsection (3) further states that "[t]he conduct of a party may manifest assent even though he does not in fact assent." [FN32] The jury may find that **Texaco's** conduct manifested an assent to be bound, based upon Mr. Bates' testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. **Texaco's** arguments are simply ones

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 6
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between **Texaco** and **Christiana** is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

FN31. Restatement (Second) Torts § 19.

FN32. *Id.*

*C. Negligent Misrepresentation Claim*

Finally, **Texaco** asserts that **Christiana's** negligent misrepresentation claim is barred by the economic loss doctrine and must be dismissed as all of **Christiana's** alleged losses are purely economic in nature, *i.e.,* lost profits, lost investments, and acquired debt. **Texaco** also asserts that **Christiana** cannot employ the Restatement (Second) of Torts § 552, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine. [FN33]

> FN33. The Court need not decide whether federal maritime law governs this action as **Christiana's** negligent misrepresentation will be dismissed on other grounds.

**Christiana** admits its damages are purely economic in nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to **Christiana's** claims, Delaware has adopted the Restatement (Second) of Torts § 552, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. **Christiana** asserts it falls within this exception.

The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage." [FN34] The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. [FN35] Economic loss is "any monetary loss[ ], costs of

repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value ." [FN36] While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that **Christiana's** damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim

> FN34. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

> FN35. *Danforth v. Acorn Structures,Inc.,* 608 A.2d 1194,1195 (Del.1992)(citing *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 448 (Ill.Supr.1982).

> FN36. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. at 406. *See also Danforth,* 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 61 Ill.Dec. 746, 435 N.E.2d at 449)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits-without any claim of personal injury or damage to other property.").

*6 The Restatement (Second) of Torts § 552 provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson.* [FN37] The Restatement provides that

> FN37. 583 A.2d 1378 (Del.Super.1990).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delaware's narrow application and strict construction of § 552, has thus far held that for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, "the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties." [FN38] **Christiana** has satisfied this element. When viewed in a light most favorable to **Christiana**, there is sufficient evidence, which would indicate that Texaco allegedly informed **Christiana**, on several occasions, that it intended to put through 200,000 bbls. of oil per month. **Christiana** relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug boats, barges, and equipment to transport **Texaco's** bunker oil. Thus, it appears that **Christiana** shared the information **Texaco** supplied to it, to use in its business transactions, the loans, with FNBM. **Christiana** as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

> FN38. *Danforth v. Acorn Structures, Inc.,* Del.Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem.Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.,*[FN39] the Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that "the defendant is in the business of supplying information." [FN40] In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations.[FN41]

> FN39. The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely economic losses and were thus barred by the economic loss

doctrine. *Danforth v. Acorn Structures Inc., C.A. No. 90C-JN-30, 1991 WL 215658 (Del.Super.Aug.27, 1991).* Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the Restatement (Second) of Torts § 552 exception to the economic loss doctrine, and thus his negligent misrepresentation claim against the defendant should survive. *Danforth v. Acorn Structures, Inc., C.A. No. 90C-JN-30, 1991 WL 269956 (Del.Super.Nov.22, 1991).* The Court's expansive discussion concerning the Restatement (Second) of Torts § 552, and the two requirements a plaintiff must satisfy to lift the economic loss doctrine's bar are found in the November 22, 1991 opinion.

> FN40. *Danforth v. Acorn Structures, Inc., Del.Super. C.A. No. 90C-JN-30, 1991 WL 269956, (Del.Super.Nov.22, 1991).* Since *Danforth*, Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan and Son, Inc. v. KLLM Architects, Inc., 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 296 (App.Ct.Ill.1999).*

> FN41. *Danforth*, at *4 (citing *Rankow v. First Chicago Bank, 870 F.2d 356, 360-366 (7th Cir.1989); Gerdes v. John Hancock Mutual Life Insurance Co., 712 F.Supp. 692, 697-98(N.D.Ill.1989)).

In *Rankow v. First Chicago Corp.,*[FN42] the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that "[a] precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." [FN43] The *Rankow* court went further to hold that "[w]hether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted." [FN44] In its attempts to determine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

whether a bank was "in the business of supplying information" the *Rankow* court noted that while "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that "manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information." [FN45] The *Rankow* court then noted that

> FN42. 870 F.2d 356 (7th Cir.1989).

> FN43. *Rankow,* 870 F.2d at 360.

> FN44. *Rankow,* 870 F.2d at 361.

> FN45. Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.,* 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (Ill.App.Ct.1982)(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.,* 117 Ill.App.3d 304, 72 Ill.Dec. 703, 453 N.E.2d 8 (Ill.App.Ct.1983)(holding a roofing materials supplier was not in the business of supplying information); *Tan v. Boyke,* 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E.2d 390 (Ill.App .Ct.1987)(seller of an apartment building was not a supplier of information); *Vacuum Industrial Pollution,* 764 F.Supp. 507 (N.D.Ill.1991)(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information);.

*7 a great many businesses involve an exchange of information as well as of tangible products-manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, pecipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.[FN46]

> FN46. *Rankow,* 870 F.2d at 364.

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.,* [FN47] the Illinois court noted that "a great many businesses exchange information as well as products" and "[w]here the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." [FN48] The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services ... may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." [FN49]

> FN47. 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288 (Ill.App.3d 1999).

> FN48. *Tolan Sons Inc.,* 241 Ill.Dec. 427, 719 N.E.2d at 296.

> FN49. *Tolan,* 241 Ill.Dec. 427, 719 N.E.2d at 297.

The Court finds the above cited reasoning to be a fair interpretation of what it means to be "in the business of supplying information" for the purposes of a negligent misrepresentation claim. Based upon the above reasoning, and in heeding the prior precedent of *Guardian Construction,* and *Danforth,* the Court finds that **Texaco** was not "in the business of supplying information for the guidance of others." [FN50] The information **Texaco** supplied to **Christiana** is more aptly categorized as information incidentally supplied to **Christiana** for the ultimate service-that of transporting bunker fuel oil. Clearly, **Texaco** is generally in the business of supplying oil, not information. [FN51] The information **Texaco** supplied, if any, is best classified as ancillary to the provided service.[FN52] As such, this litigation will move forward as a contract dispute only and the tort claim is dismissed.

> FN50. *See Tolan,* 241 Ill.Dec. 427, 719 N.E.2d at 296-96(delineating what business are pure information providers where the end product is an idea, what businesses are tangible product end manufacturers, and what businesses fall between the two.). *Tolan* notes that businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite

Not Reported in A.2d                                                                     Page 9
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

inspectors and environmental assessors are "pure information providers, which would constitute "in the business of supplying information for the guidance of others. *Tolan* also notes certain professions that are tangible good providers, which is where this Court finds **Texaco** falls-that of manufacturers of computers and software or products of any type.

FN51. *See Vacuum Industrial Pollution, Inc. v. Union Oil Co., 764 F.Supp. 507 (N.D.Ill.1991)*(holding that a defendant oil company was not in the business of supplying information.).

FN52. *See* the Restatement (Second) of Torts § 552 comment a explaining that "by limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests ."

While this Court has followed the earlier decisions of the Court that have addressed this issue, other jurisdictions have taken a more expansive view of § 552 FN53 and clearly an argument can be made that the decisions from Illinois followed by Delaware are too limiting and fail to give full effect to the negligent misrepresentation exception. The question of when does a business cross the line into the world of "supplying information" or whether that requirement is mandated, is anything but clear. If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

FN53. *See Walpert, Smullian & Blumenthal, P.A. v. Katz, 361 Md. 645, 762 A.2d 582 (Md.2000)*(holding that the negligent misrepresentation requires: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge hat the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in

reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence."); *Jacobson v. Environmental Risk Limited,* No. CV 950550991, 1996 WL 168086, at *3 (Conn.Super.Mar.4, 1996)*(following the "governing principals" of the Restatement (Second) of Torts § 552 and holding that negligent misrepresentation requires a plaintiff to "allege and prove that the reliance on the misstatement was justified or reasonable," and "reasonableness is a question of fact for the trier to determine based on all of the circumstances.")

*CONCLUSION*

For the reasons set forth above, **Texaco's** motion for summary judgment as to the breach of contract claim is denied, but **Texaco's** motion for summary judgment as to **Christiana's** negligent misrepresentation claims is granted.

Del.Super.,2002.
Christiana Marine Service Corp. v. Texaco Fuel and Marine Marketing
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 1

Millsboro Fire Co. v. Construction Management
Services, Inc.Del.Super.,2006.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware,New Castle County.
MILLSBORO FIRE COMPANY, a Delaware
corporation, Plaintiff,
v.
CONSTRUCTION MANAGEMENT SERVICE,
INC., a Delaware corporation, Defendant, Counter-
claimant, Third-Party Plaintiff,
v.
R. Calvin Clendaniel Associates, P.A., Mahaffy &
Associates, Inc., a Delaware corporation, Volair
Contractors, Inc., a Delaware corporation, B.D. Abel,
Inc., and Pierce Moretta & Co., d/b/a Shure-Line
Excavating, Third-Party Defendants.
**C.A. No. 05C-06-137 MMJ.**

Submitted: April 17, 2006.
Decided: June 7, 2006.

Upon Third-Party Defendants R. Calvin Clendaniel
Associates, P.A. and Mahaffy & Associates, Inc.'s
Joint Motion for Summary Judgment and B.D. Abel,
Inc.'s Motion for Summary Judgment. ***GRANTED***.

<u>Jeffrey M. Weiner</u>, Esquire, Wilmington, Delaware,
Attorney for Plaintiff.
<u>Paul G. Enterline</u>, Esquire, Georgetown, Delaware,
Attorney for Defendant/Third-Party Plaintiff.
James S. Green, Esquire, <u>Daniel B. Rath</u>, Esquire,
Landis, Rath & Cobb, LLP, Wilmington, Delaware,
Attorneys for Third-Party Defendant, B.D. Abel, Inc.
<u>Donald L. Logan</u>, Esquire, Tighe, Cottrell & Logan,
P.A., Wilmington, Delaware, Attorney for Third-
Party Defendant, Pierce Moretta & Co. D/b/a Shure-
Line Excavating.
<u>Paul Cottrell</u>, Esquire, Tighe, Cottrell & Logan, P.A.,
Wilmington, Delaware, Attorney for Third-Party
Defendant, Mahaffy & Associates, Inc.
<u>James W. Owen</u>, Esquire, Wilmington, Delaware,
Attorney for Third-Party Defendant, R. Calvin
Clendaniel Associates, P.A.

*MEMORANDUM OPINION*
<u>JOHNSTON</u>, J.
**\*1** This case arises from the construction and

renovation of improvements to the property of the
Millsboro Fire Company ("MFC") in Millsboro,
Delaware. MFC filed a complaint against the general
contractor on the project, Construction Management
Service, Inc. ("CMSI"), alleging numerous design
and workmanship defects. CMSI filed an answer,
counterclaim and a third-party complaint. The third-
party complaint was asserted against two entities
involved in the design and management of the
project: R. Calvin Clendaniel Associates, P.A.,
("Clendaniel") and Mahaffy & Associates, Inc.
("Mahaffy"). The third-party complaint also joined
several subcontractors: Volair Contractors, Inc.
("Volair"), B.D. Abel, Inc. ("B.D.Abel") and Pearce
& Moretto, Inc. ("Pearce").

Clendaniel and Mahaffy filed a Joint Motion for
Summary Judgment on the third-party complaint.
B.D. Abel also has moved for summary judgment.

*STATEMENT OF FACTS*

For purposes of evaluating the pending motions for
summary judgment, the following facts are
undisputed.

On May 19, 2001, MFC entered into a contract with
CMSI for the construction of renovations and
additions to the Fire Hall in Millsboro, Delaware
("Project"). The original contract sum was
$1,847,541.00. CMSI is a construction management
firm. Clendaniel was hired by MFC to provide
architectural services, including design and
administration of the construction contract. Mahaffy
was hired by Clendaniel to assist Clendaniel in
designing the heating, ventilation and air
conditioning ("HVAC"), as well as the electrical and
plumbing systems on the Project.

Construction began on August 17, 2001. Regular
meetings were held on the Project site, attended by
representatives of CMSI, its subcontractors, the
design professionals, and the owners. At these
meetings, the parties discussed the status of the
Project, identified problems, and worked out
solutions. From time to time, CMSI made
applications to the owner for payment based upon the
percentage of work performed. Clendaniel reviewed
and approved such applications. CMSI paid its
subcontractors for completed work.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
(Cite as: Not Reported in A.2d)

A "punch list" was sent to CMSI by Clendaniel and Mahaffy in October 2002. The Project was substantially completed by October 31, 2002. MFC subsequently complained of defects in the design and workmanship on the Project. The alleged defects primarily concern two areas: HVAC and concrete paving.

The alleged HVAC defects are set forth in a report of Weldon Engineering, dated August 4, 2004. Based on that report, MFC claims damages, for repairs and changes in the design, in excess of $500,000. The HVAC systems was designed and specified by Clendaniel and Mahaffy. The HVAC contractor was third-party defendant Volair, Inc. The HVAC testing and balancing sub-contractor was third-party defendant B.D. Abel.

The alleged defects in concrete paving are set forth in the report of IOTT Architect Engineering Inc., dated October 14, 2004. MFC claims damages for repair of the concrete work, in an amount in excess of $388,000. The paving was designed and specified by Clendaniel. Interior paving was performed by CMSI. Exterior paving was performed by Pearce and its subcontractors.

*2 On June 10, 2005, MFC filed a complaint against CMSI seeking damages of $961,153, plus interest counsel fees and costs. On August 12, 2005, CMSI filed the following third-party claims: against Clendaniel for negligent misrepresentations or non-disclosures to CMSI that the work was approved and acceptable, and for negligent design; against Mahaffy for negligent misrepresentations, non-disclosures and negligent design; against Volair for negligent performance of work and breach of its subcontract; against B.D. Abel for negligent misrepresentations, non-disclosure and breach of contract; and against Pearce for negligence performance of work and breach of contract.

### STANDARD OF REVIEW

This Court will grant summary judgment only when no material issues of fact exist. The moving party bears the burden of establishing the non-existence of material issues of fact.[FN1] Once the moving party meets its burden, the burden shifts to the non-moving party to establish the existence of material issues of fact.[FN2] Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial.[FN3] If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of the case, then summary judgment must be granted.[FN4] A court deciding a summary judgment motion must identify disputed factual issues whose resolution is necessary to decide the case, but the court must not decide those issues.[FN5] In considering such a motion, the Court must evaluate the facts in the light most favorable to the non-moving party.[FN6] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.[FN7]

FN1. _Moore v. Sizemore_, 405 A.2d 679, 680 (Del.1979).

FN2. _Id._ at 681.

FN3. Super. Ct. Civ. R. 56(e); _Celotex Corp. v. Catrett_, 477 U.S. 317, 322-23 (1986).

FN4. _Burkhart v. Davies_, 602 A.2d 56, 59 (Del.1991), _cert. denied_, 504 U.S. 912 (1992); _Celotex Corp. v. Catrett, supra._

FN5. _Merrill v. Crothall-American, Inc._, 606 A.2d 96, 99 (Del.1992).

FN6. _Id._

FN7. _Ebersole v. Lowergrub_, 180 A.2d 467, 468-69 (Del.1962).

### ANALYSIS

_Economic Loss Doctrine_

Under the Economic Loss Doctrine, a party may recover in tort only if losses are accompanied by bodily harm or property damage.[FN8] The Restatement (Second) of Torts § 552 provides an exception to the Economic Loss Doctrine's bright-line rule. This Court explicitly adopted this exception in _Guardian Construction Co. v. Tetra Tech Richardson._[FN9]

FN8. _Christiana Marine Service Corp. v._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
(Cite as: Not Reported in A.2d)

*Texaco Fuel and Marine Marketing, Inc.,*
2002 WL 1335360, at *22 (Del.Super).

FN9. 583 A.2d 1378 (Del. Super 1990).

A plaintiff seeking damages for negligent misrepresentation, where the losses are solely economic, must demonstrate two elements. First, "the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties." Second, the defendant must be in the business of supplying information." [FN10]

FN10. *Christiana Marine Services Corp.,* 2002 WL 1335360, at *8 (quoting *Danforth v. Acorn Structures, Inc.,* 1991 WL 269956 (Del.Super.)).

Initially, the Economic Loss Doctrine related to product liability actions. Courts later expanded me doctrine's application beyond its original scope. The doctrine generally must be considered in disputes arising from commercial transactions in which the alleged damages do no harm to a person or to property. Jurisdictions, including Maryland [FN11] and Connecticut, [FN12] have taken a more expansive view than Delaware.

FN11. *See Walpert, Smullian & Blumenthal, P.A. v. Katz,* 762 A.2d 582 (Md.2000).

FN12. *Jacobson v. Environmental Risk Limited,* 1996 WL 168086, at *3 (Conn.Super.)

*3 For litigants in Delaware, the questions of when a business crosses the line into "supplying information" and whether that requirement is mandated, have not been definitively resolved. In *Danforth v. Acorn Structures, Inc.,* [FN13] the Delaware Supreme Court opined that where privity of contract exists, it is presumed that the parties to the transaction have allocated the risk of product nonperformance through the bargaining process.[FN14] Allegations of purely economic loss do not implicate tort law concerns with safety. Instead, the issues arise from commercial law and economic expectations. The *Danforth* Court held the existence of privity of contract is not an exception to the Economic Loss Doctrine's prohibition against recovery in tort in Delaware.[FN15]

FN13. 608 A.2d 1194 (Del.1992).

FN14. *Id.* at 1200.

FN15. *Id.*

Public policy considerations do not compel this Court to expand the doctrine. In Delaware, only surveyors [FN16] and those expressly in the business of supplying information such as accountants,[FN17] financial advisors, [FN18] and title searchers,[FN19] can be liable in tort for purely economic losses. By providing information to MFC for use in transactions with third parties, Clendaniel, Mahaffy, and B.D. Abel did not engage in conduct undertaken while in the business of supplying information. The information is more aptly categorized as information incidentally supplied to CMSI as part of the construction, renovation and addition to the Fire Hall. Viewing the facts in the light most favorable to the non-moving parties, the provision of plans and design drawings used to construct the project, do not constitute the business of supplying information. Clendaniel, Mahaffy and B.D. Abel are not businesses falling within Delaware's narrow application and strict construction the Economic Loss Doctrine.

FN16. *Guardian,* 583 A.2d at 1385.

FN17. *Carello v. PricewaterhouseCoopers, LLP,* 2002 WL 1454111, at *7 (Del.Super.)

FN18. *Outdoor Technologies Inc. v. AllFirst Financial Inc.,* 2000 WL 141275, at *5 (Del.Super.).

FN19. *Ruger v. Funk,* 1996 WL 110072, at *10 (Del.Super.).

With regard to E.D. Abel, CMSI claims that the defects in design were caused by Mahaffy and approved by the project architect Clendaniel. At the time B.D. Abel became involved in the Project, all the damage, and alleged detrimental reliance, already had occurred. B.D. Abel provided a deficiency report because it was prevented from properly testing, adjusting and balancing the HVAC system due to alleged defects in the system's design and/or installation. No party has alleged reliance on the deficiency report. B.D. Abel was hired to provide the service of testing, adjusting, and balancing an already installed HVAC system. B.D. Abel was not in the business of supplying information.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Third-Party Defendant Volair Contractors, Inc., a business presumed to be insolvent, has not applied to the Court for relief. Therefore, the Court need not determine at this juncture any legal relationships among CMSI, B.D. Abel and Volair. In general, however, a sub-subcontractor stands in the shoes of a defunct subcontractor. A contractor may join a sub-subcontractor on the basis of the sub-sub's contract with the sub. In this case, B.D. Abel's liability is limited to the four corners of its contract with Volair. Pursuant to the Economic Loss Doctrine, there is not a basis for a cause of action in tort against B.D. Abel by CMSI.

### Detrimental Reliance

**\*4** To the extent latent defects were design defects, CMSI should not be found liable to MFC for breach of contract. CMSI would not have relied to its detriment on information provided by design professionals. CMSI would have a defense to MFC's breach of contract claims to the extent CMSI built the structure in accordance with the design plans. A contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if the contractor performs work without neglect and in a workmanlike manner.[FN20] Even if a contractor were obligated under the contract to produce a structure free from any defects, the owner's instructions to the contractor excuse the contractor from any further liability.[FN21] Here, the plans and specifications were provided by MFC or at MFC's request, and CMSI will not be held accountable for any defect that resulted from defective plans.

FN20. *Id.*

FN21. *Ridley Inv. Co. v. Croll,* 192 A.2d 925, 927 (Del.1963).

### Unjust Enrichment

CMSI's duties to MFC are those enumerated in the contract between CMSI and MFC. Any alleged failure on the part of the CMSI to conform to the contract will be measured by the terms of the contract, in accordance with the principles of contract law.

CMSI had no contractual relationship with either Clendaniel or Mahaffy. Their duties to approve payment requests were undertaken solely for the benefit of MFC. Therefore, the claim that CMSI was an intended third-party beneficiary of Clendaniel's or Mahaffy's contract with MFC is without merit.

Unjust enrichment is the unjust retention of a benefit resulting in a loss to another. A plaintiff's refusal to join a party to a breach of contract suit does not constitute unjust enrichment to the non-party. Further, CMSI retains the defense that it built according to plans and specifications and, therefore, CMSI is not liable for any alleged defects in design.[FN22]

FN22. *Id.*

### CONCLUSION

Allocation of liability among design professionals, contractors and subcontractors, is a problem inherent in complex litigation involving construction. Generally, there is the risk of jury confusion, and the risk of awards of damages against parties which more appropriately should be levied against absent parties. These risks can be alleviated through use of special verdict forms and interrogatories to the jury.

Clendaniel, Mahaffy and B.D. Abel did not supply information to MFC while they were engaging in the business of supplying information Any information supplied was incidental to the services provided by Clendaniel, Mahaffy and B.D. Abel as part of the construction and renovation Project.

The contract at issue is between MFC and CMSI. Clendaniel, Mahaffy and B.D. Abel have no contractual relationship with CMSI. CMSI is not a third-party beneficiary of any contract entered into by Clendaniel, Mahaffy or B.D. Abel.

THEREFORE, the Economic Loss Doctrine prohibits recovery in tort for losses unaccompanied by bodily harm or property damage and Third-Party Defendants have not been unjustly enriched to the detriment of CMSI. Third-Party Defendants' R. Calvin Clendaniel Associates, P.A., Mahaffy & Associates, Inc. and B.D. Abel, Inc., Motions for Summary Judgment are hereby GRANTED. Third-Party Defendants are hereby DISMISSED, WITH PREJUDICE.

**\*5** FURTHER, Defendant Chromalloy American Corporation's unopposed request that it be dismissed with prejudice is hereby GRANTED.

IT IS SO ORDERED.

Not Reported in A.2d                                                                              Page 5
Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


Del.Super.,2006.
Millsboro Fire Co. v. Construction Management
Services, Inc.
Not Reported in A.2d, 2006 WL 1867705
(Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE ART MUSEUM, | § | |
| A Delaware corporation, | § | |
| | § | |
| Plaintiff, | § | C.A. No.: 06-481 |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| ANN BEHA ARCHITECTS INC., f/k/a | § | |
| ANN BEHA ASSOCIATES, INC., a | § | |
| Massachusetts corporation, and OVE ARUP & | § | |
| PARTNERS MASSACHUSETTS, INC., | § | |
| A Massachusetts corporation, | § | |
| | § | |
| Defendants. | § | |

**<u>NOTICE OF SERVICE</u>**

I, James F. Bailey, Jr., Esquire, do hereby certify that on this 24th day of October 2006 one copy of the foregoing ***MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION PURSUANT TO FED. R. CIV. P. 12(b) TO DISMISS THE COMPLAINT AGAINST ARUP*** was served on the on the following counsel of record ***Via Electronic Service***:

| | |
|---|---|
| Thomas Allingham, Esquire | Paul Cottrell, Esquire |
| Richard S. Horvath, Esquire | Tighe Cottrell & Logan |
| Skadden Arps | 704 N. King Street, Suite 500 |
| One Rodney Square | P.O. Box 1031 |
| P.O. Box 636 | Wilmington, DE 19899-1031 |
| Wilmington, DE 19899-636 | |

BAILEY & ASSOCIATES, P.A.

/s/ James F. Bailey, Jr.
JAMES F. BAILEY, JR.
Delaware Bar I.D. #336
Three Mill Road, Suite 306A
Wilmington, DE 19806
(302) 658-5686
*Attorney for Defendant*
*Ove Arup & Partners Massachusetts, Inc.*