## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

DELAWARE ART MUSEUM, INC., a   :
Delaware corporation,   :
  :
       Plaintiff,   :   C.A. No. 06-481 (GMS)
  :
    v.   :   Jury Demand
  :
ANN BEHA ARCHITECTS, INC., f/k/a   :
ANN BEHA ASSOCIATES, INC., a   :
Massachusetts corporation, and OVE ARUP   :
& PARTNERS MASSACHUSETTS, INC.,   :
a Massachusetts corporation,   :
  :
       Defendants.   :

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
MOTION OF DEFENDANT OVE ARUP & PARTNERS MASSACHUSETTS, INC.
TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)**

Thomas J. Allingham II (#476)
tallingh@probonolaw.com
Richard S. Horvath, Jr. (#4558)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000
Attorneys for Plaintiff Delaware Art
   Museum, Inc.

DATED: November 10, 2006

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

SUMMARY OF THE ARGUMENT .........................................................................................2

STATEMENT OF FACTS .........................................................................................................4

ARGUMENT..............................................................................................................................9

I.     THE MUSEUM'S CLAIM FOR NEGLIGENT MISREPRESENTATION
       AGAINST ARUP FALLS SQUARELY WITHIN SECTION 552 OF THE
       RESTATEMENT (SECOND) OF TORTS AS ADOPTED IN DELAWARE.................10

       A.     The Weight Of Persuasive And Authoritative Case Law Establishes That
              Arup, As A Design Engineer, Is In The Business Of Providing
              Information. .........................................................................................................11

       B.     Arup's Exclusive Reliance On The Unpublished Decision In *Millsboro* Is
              Procedurally And Substantively Misplaced...........................................................13

II.    THE MODERN TREND OF LEGAL AUTHORITY IS IN FAVOR OF THE
       APPLICATION OF SECTION 552 TO DESIGN PROFESSIONALS LIKE
       ARUP......................................................................................................................16

III.   PUBLIC POLICY ALSO FAVORS THE APPLICATION OF SECTION 552 TO
       DESIGN PROFESSIONALS LIKE ARUP.......................................................................18

IV.    THE DELAWARE SUPREME COURT WOULD NOT LIMIT NEGLIGENT
       MISREPRESENTATION CLAIMS TO ONLY AGAINST THOSE ENTITIES
       WHICH ARE "EXPRESSLY IN THE BUSINESS OF SUPPLYING
       INFORMATION".........................................................................................................20

V.     EVEN IF *MILLSBORO* WERE AN ACCURATE STATEMENT OF
       DELAWARE LAW, THE COMPLAINT HAS ESTABLISHED FACTS
       SUFFICIENT FOR A NEGLIGENT MISREPRESENTATION CLAIM
       AGAINST ARUP .........................................................................................................22

CONCLUSION.........................................................................................................................25

**TABLE OF CASES AND AUTHORITIES**

**CASES**                                                  **PAGE(S)**

*Bilt-Rite Contractors, Inc. v. Architectural Studio,*
866 A.2d 270 (Pa. 2005) .................................................................17, 18, 19, 20

*Blake v. Kline,*
612 F.2d 718 (3d Cir. 1979)..............................................................................16

*Carello v. PricewaterhouseCoopers LLP,*
C.A. No. 01C-10-219RRC, 2002 WL 1454111
(Del. Super. Ct. July 3, 2002) .................................................................. 17, 21-22

*Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg. Inc.,*
C.A. No. 98C-02-217WCC, 2002 WL 1335360
(Del. Super. Ct. June 13, 2002)..................................................................... passim

*Danforth v. Acorn Structures, Inc.,*
C.A. No. 90C-JN-30, 1991 WL 269956 (Del. Super. Ct. Nov. 22, 1991),
*aff'd and remanded by* 608 A.2d 1194 (Del. 1992) ...................................... passim

*Davidson & Jones, Inc. v. County of New Hanover,*
255 S.E.2d 580 (N.C. Ct. App. 1979).............................................................17, 21

*Delaware State Police Fraternal Order of Police Lodge No. 6 v. Dep't of Pub. Safety,*
C.A. No. 4341, 1974 WL 6342 (Del. Ch. Dec. 26, 1974) .....................................22

*Donnelly Constr. Co. v. Oberg/Hunt/Gilleland,*
677 P.2d 1292 (Ariz. 1984)..............................................................................17

*Drake v. St. Francis Hosp.,*
560 A.2d 1059 (Del. 1989) ..............................................................................14

*E. Steel Constructors, Inc. v. City of Salem,*
549 S.E.2d 266 (W.Va. 2001)..........................................................12, 13, 17, 21

*Fiat Motors of N. Am., Inc. v. Mayor & Council of Wilmington,*
619 F. Supp. 29 (D. Del. 1985).........................................................................9, 16

*Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,*
583 A.2d 1378 (Del. Super. Ct. 1990)........................................................... passim

i

*Jim's Excavating Serv., Inc. v. HKM Assocs.,*
    878 P.2d 248 (Mont. 1994) ............................................................................17, 21

*John Martin Co. v. Morse/Diesel, Inc.,*
    819 S.W.2d 428 (Tenn. 1991).................................................................12, 17, 21

*Millsboro Fire Co. v. Constr. Mgmt. Serv.,*
    C.A. No. 05C-06-137, 2006 WL 1867705
    (Del. Super. Ct. June 7, 2006)........................................................................ passim

*Moorman Mfg. Co. v. Nat'l Tank Co.,*
    435 N.E.2d 443 (Ill. 1982) .................................................................................21

*Nota Constr. Corp. v. Keyes Assocs., Inc.,*
    694 N.E.2d 401 (Mass. App. Ct. 1998) ...............................................................17

*Outdoor Techs. Inc. v. Allfirst Fin. Inc.,*
    C.A. No. 99C-09-151, 2000 WL 141275 (Del. Super. Ct. Jan. 24, 2000).............11

*RLI Ins. Co. v. Indian River Sch. Dist.,*
    C.A. No. 05-858, 2006 WL 1749069 (D. Del. June 20, 2006)...................... passim

*Synopsys, Inc. v. Magma Design Automation,*
    C.A. 05-701, 2006 WL 1452803 (D. Del. May 25, 2006)....................................23

*Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.,*
    463 S.E.2d 85 (S.C. 1995) ......................................................................12, 17, 20

*Williams v. Law Firm of Cooch & Taylor,*
    C.A. No. 92C-03-024, 1994 WL 234000 (Del. Super. Ct. May 11, 1994)............20

## AUTHORITIES

Del. Supr. Ct. R. 41(a) .......................................................................................................16

Restatement (Second) of Torts § 552 (1977)............................................................. passim

Plaintiff Delaware Art Museum, Inc. (the "Museum"), by and through its attorneys, respectfully submits this memorandum of law in opposition to the motion of Defendant Ove Arup & Partners Massachusetts, Inc. ("Arup") to dismiss the claim against it.

## NATURE AND STAGE OF THE PROCEEDINGS

In 1998 and 1999, the Museum's Board of Trustees developed a long-range Strategic Building and Site-Development Plan that included renovations and expansions to the Museum's existing facilities. This plan encapsulated the Museum's goals of increasing revenue, improving visitors' experiences at the Museum, and providing additional means for the Museum to further its goals of educating and adding to Delaware's cultural vibrancy.

In order to bring its plan to fruition, the Museum retained Ann Beha Architects, Inc. ("ABA") to design the Museum's new facility. ABA, in turn, retained Arup to act as a consultant to ABA and as ABA's project engineer. From the beginning, Arup's primary task was to provide information to ABA that would be subsequently communicated to the Museum. Arup was also obligated to provide engineering services to ABA to the same extent ABA was to provide those services to the Museum. When Arup transmitted the information it prepared to ABA, Arup knew that the information would be transmitted to the Museum. Arup also knew that the Museum would rely on the information provided by Arup to develop a construction budget and to provide plans and drawings to the Museum's construction manager, Barclay White Incorporated, and its successors in interest (collectively, "BWS").

However, after the Museum accepted bids from contractors and subcontractors and the construction commenced, the Museum learned that information that ABA and Arup gave the Museum was filled with errors and omissions. Identifying and correcting these errors and omissions repeatedly delayed the construction, and postponed the Museum's reopening by over a

year. The delays and changes to the construction caused by the errors and omissions of Arup and

ABA meant that the Museum had to spend more for raw materials, duplicative services and extra

labor. As a result of these costs, the Museum has had to raise $32,000,000 to cover the final

costs of its new facility and its related furnishings, fixtures and equipment – far above the

$19,649,176 the Museum originally budgeted for the construction.

A mediation held on November 3 and 4, 2005, in Wilmington, Delaware, failed to

resolve the dispute among the Museum, Arup and ABA. On August 4, 2006, the Museum filed a

complaint (D.I. 1) in this Court seeking damages, in part, for Arup's negligent

misrepresentations. On October 24, 2006, Arup filed a motion to dismiss the Museum's sole

claim against Arup and an opening brief in support of that motion. (D.I. 18) This is the

Museum's answering brief.

## SUMMARY OF THE ARGUMENT

1.      The Museum has stated a claim for negligent misrepresentation against

Arup. Although the Delaware Supreme Court has not yet ruled on the issue, it is clear that it

would hold design professionals like Arup liable for economic losses caused by their negligent

misrepresentations, under the exception to the "economic loss doctrine" established by Section

552 of the Restatement (Second) of Torts. This is true for at least four reasons:

(a)      The weight of persuasive and authoritative case law from

Delaware's lower courts favors a finding that design professionals like Arup are in the

business of supplying information.

(b)      The modern trend in state courts of highest authority outside of

Delaware would also support a finding that design professionals like Arup are in the

business of supplying information.

2

(c)     Public policy also favors a rule that the Section 552 exception should apply to design professionals like Arup.

(d)     Limiting Section 552 to those defendants who are expressly in the business of supplying information is unnecessary, vague and ambiguous.

2.     Regardless of how the Delaware Supreme Court might rule on the scope of Section 552 of the Restatement (Second) of Torts, dismissal is inappropriate here, because the Complaint's allegation that Arup is in the business of supplying information must be taken as true on this motion to dismiss.  Moreover, if, in preparing design documents, Arup was not in the business of supplying information, the complaint also alleges that Arup was responsible for investigating, supervising and reporting on the status of the construction project, and that it failed to do so -- facts that permit the Museum's claim against Arup to proceed.

## STATEMENT OF FACTS

The Museum is a Delaware nonprofit corporation with its principal place of business in Wilmington, Delaware. Compl. ¶ 4. In 1998 and 1999, the Museum's Board of Trustees developed a long-range Strategic Building and Site-Development Plan that included renovations and expansions to the Museum's existing facilities. Compl. ¶ 1. The Museum's chief concern was that any construction work would be completed on time and within budget. *Id*. Because the Museum's Board of Trustees was made up of community volunteers who had little, if any, experience in large-scale construction, the Museum sought qualified professionals to guide it through the construction. Compl. ¶ 2.

The Museum retained ABA to design the Museum's new facility. Compl. ¶ 22. ABA, in turn, retained Arup to act as a consultant to ABA and as ABA's project engineer. Compl. ¶ 30. From the beginning, Arup's primary task was to provide information to ABA, which would in turn communicate that information to the Museum. Compl. ¶¶ 30 and 31. Arup also provided structural, mechanical, electrical, plumbing and fire protection engineering services to ABA to the same extent ABA was to provide those services to the Museum. Compl. ¶ 30. Throughout the construction, Arup traveled to the construction site to perform on-site investigations and/or supervise the construction. Compl. ¶ 32. Arup was required to keep ABA (and thus the Museum) "informed about the progress and quality of the portion of the Work completed. . . ." Compl. ¶ 36.j. When Arup transmitted the information it prepared to ABA, Arup knew that the Museum would rely on that information in developing a construction budget and in providing plans and drawings to the BWS. Compl. ¶¶ 222 and 227.

On August 23, 2002, ABA released a set of design documents called the "GMP Set" that the Museum used to negotiate with BWS a guaranteed maximum price of $19,649,176.00 for the construction work. Compl. ¶¶ 68 and 69. However, due to the delays

4

caused by errors and omissions of Arup and ABA, the guaranteed maximum price eventually exceeded $22,500,000.00. Compl. ¶ 70.

ABA represented to the Museum that ABA would provide 100% completed design documents by September 23, 2002. Compl. ¶ 66. In reliance on its design professionals' representations, the Museum relocated its operations and instructed BWS to proceed with construction-related tasks. *Id*. In fact, ABA did not provide what it would claim to be 100% completed documents until May 30, 2003 -- a full eight months late. Compl. ¶ 79. Moreover, design documents that were released before May 30, 2003 contained errors and omissions that fell within Arup's responsibilities. For example, the structural documents needed an addendum, which was, in turn, revised at least five additional times. Compl. ¶ 90. It also became clear that the mechanical and electrical documents issued on February 21 and March 3, 2003 were grossly inadequate and not biddable. Compl. ¶ 91.

Meanwhile, Arup failed to obtain complete licensure to practice engineering in Delaware, and therefore needed third-party engineers to review and seal design documents. Compl. ¶ 145. These engineers cited errors and omissions in Arup's designs that needed to be corrected before Arup's drawings could be sealed. Compl. ¶¶ 146-147. Because Arup was not licensed, and negligently produced design documents that contained errors and omissions, the release of a "Permit Set" of documents had to be delayed from October 11, 2002 until December 10, 2002. Compl. ¶ 148. That delay meant that it took until January 30, 2003 before a foundation permit was issued -- delaying the commencement of foundation work. Compl. ¶ 149. Throughout the construction, Arup exacerbated the construction's delays by releasing drawings that contained vague and guarded comments that needed to be clarified before work on those drawings could proceed. Compl. ¶ 158. Arup also had full authority to review and approve all

coordination drawings when ABA was not present in the field -- a task it routinely failed to accomplish. Compl. ¶¶ 155, 159 and 161.

On May 30, 2003, ABA issued what it claimed were 100% completed design documents. Compl. ¶ 99. However, even these documents contained numerous errors and omissions. Compl. ¶¶ 100-107, 110-112 and 114-115. Just as with the documents released before May 30, 2003, Arup was responsible for some of these errors and omissions. For example, these new design documents contained mechanical, plumbing, fire protection and electrical drawings that did not agree with architectural drawings. Compl. ¶ 103. Also, Arup designed ductwork and drain pipes that fell below the ceiling thresholds that the Museum required for certain rooms. Compl. ¶ 104. As a consequence, Arup had to redesign these documents to reroute piping, ductwork, conduit and other mechanical systems (or the equipment would have been inaccessible to maintenance personnel). Compl. ¶¶ 106-107, 157, 163.d. and 172.

A September 29, 2003 email from ABA to Arup demonstrated Arup's negligence in providing the information that went into the set of design documents released on May 30, 2003, and the effect that that negligence had on the construction. Compl. ¶ 111. The email read: "The drawings provided by Arup were simply not complete in their coordination with the rest of the architectural details. . . . This has resulted in late corrections after being brought to our attention at the site, with consequent delays and increased costs!" *Id.*

Because of the errors in the May 30, 2003 set of documents, all of the design documents needed to be reissued as a "Conformed Set." Compl. ¶ 116. The Conformed Set addressed all changes to the construction that had occurred since May 30, 2003. *Id.* In effect, the term "Conformed Set" was doublespeak for the set of documents that should have been

released on May 30, 2003, as the 100% completed documents. Compl. ¶ 118. Although the Conformed Set was initially promised to be released around November 6, 2003, Compl. ¶ 116, in fact it was not released until April 15, 2004. Compl. ¶ 138.

When the Conformed Set was finally released, numerous sketches and details were missing and there were inconsistencies in at least two areas for which Arup was responsible: electrical and mechanical. Compl. ¶ 135. Implementing the Conformed Set required the re-coordination of mechanical, electrical and plumbing trades -- all areas within the scope of Arup's responsibility. Compl. ¶ 139. Arup also failed to identify changes made to sheet metal layouts in the Conformed Set -- and it took four months to resolve the complications resulting from that omission. Compl. ¶ 161. By October 13, 2004, the Conformed Set had generated an additional $2,000,000.00 in cost of work and other change orders. Compl. ¶ 141. Daily changes were also needed to correct Arup's errors and omissions in the Conformed Set. *Id.* In 2004, an Arup engineer admitted at a staff coordination meeting that Arup had failed to coordinate properly the design documents for the construction. Compl. ¶ 159.

As the complaint shows, the numerous errors made by ABA and Arup complicated and extended the time needed for the Museum to approve changes to the design documents. Compl. ¶¶ 163 and 165. Arup's negligence also delayed the construction, as a multiple-step process was needed to approve changes to the design documents before work could continue. Compl. ¶¶ 167, 169, 174-175, 178, 180 and 182. Arup's negligence also meant that changes to the design documents came at a premium cost because of the lack of competitive bid pricing for the changed work, the need to duplicate tasks, and the need for additional materials and extra work. Compl. ¶¶ 166, 172, 173, 181 and 183-184.

7

In the end, the Museum could not have anticipated the magnitude of the cost impact resulting from the negligence of Arup and ABA. Compl. ¶¶ 134 and 168. In some instances, the Museum had to mitigate these unexpected costs by redesigning or changing the specifications for the construction. Compl. ¶ 168. The Museum lost income-generating opportunities when it was unable to obtain bond financing caused by the delay in the design documents' preparation. Compl. ¶ 185. The Museum also had to make interest payments even though the Museum generated less income because it was not fully operational. Compl. ¶¶ 187-188. Ultimately, the Museum has had to raise approximately $32,000,000 to cover the final costs of the construction and the new facility's furnishings, fixtures and equipment, far in excess of the $19,649,176 initially budgeted for the construction based on information provided by Arup and ABA. Compl. ¶ 199.

## ARGUMENT

The sole question raised by Arup's motion to dismiss is whether Arup, as a design

professional, is liable under Delaware law for the Museum's economic losses caused by Arup's

providing false and inaccurate information to the Museum, which the Museum then relied on to

help construct its new facility. Arup Br. at 9. In Arup's rush to claim that the economic loss

doctrine shields it from liability for its professional misconduct, Arup ignores not only the more

persuasive and authoritative Delaware lower court case law on the subject, but also the great

weight of modern authority outside of Delaware, and public policy considerations as well.

Exercising its diversity jurisdiction, this Court "must apply the substantive law of

the appropriate state jurisdiction as expressed in that state's statutes and the decisions of its . . .

highest court." *Fiat Motors of N. Am., Inc. v. Mayor & Council of Wilmington*, 619 F. Supp. 29,

32 (D. Del. 1985). However, the Delaware Supreme Court has not decided the issue that is at the

heart of Arup's motion -- when a design professional is in the business "of 'supplying

information' or whether that requirement is mandated." *Christiana Marine Serv. Corp. v. Texaco

Fuel & Marine Mktg. Inc.*, C.A. No. 98C-02-217WCC, 2002 WL 1335360, at *7 (Del. Super. Ct.

June 13, 2002) (Exhibit A). In attempting to forecast how the Delaware Supreme Court would

decide this issue, this Court may examine "lower state court precedents, related decisions and

considered dicta of [Delaware's] highest court, the policies that inform that court's application of

certain legal doctrines, the decisions of courts in another jurisdiction and even legal treatises and

articles." *Fiat Motors*, 619 F. Supp. at 32. The opinions of Delaware's trial courts are not to be

regarded as conclusive evidence of what the Delaware Supreme Court would hold. *Id.* In

particular, this Court may disregard a trial or intermediate appellate court's ruling when that

ruling bears "certain indicia of unreliability." *Id.* Arup ignored these considerations in its

motion when Arup exclusively relied on an unpublished opinion of the Delaware Superior Court,

9

while ignoring the established precedent of a published Superior Court opinion of which Arup

must have been aware.

I.    **THE MUSEUM'S CLAIM FOR NEGLIGENT MISREPRESENTATION AGAINST ARUP FALLS SQUARELY WITHIN SECTION 552 OF THE RESTATEMENT (SECOND) OF TORTS AS ADOPTED IN DELAWARE.**

The sole ground for Arup's motion to dismiss is the economic loss doctrine, "a

judicially created doctrine that prohibits recovery in tort where a product has damaged only itself

. . . and the only losses suffered are economic in nature." *RLI Ins. Co. v. Indian River Sch. Dist.*,

C.A. No. 05-858, 2006 WL 1749069, at *2 (D. Del. June 20, 2006) (Exhibit B) (citation

omitted).  The Museum does not dispute that the damages it seeks from Arup are economic in

nature.  However, the Museum's claim against Arup falls "within the negligent misrepresentation

exception to the economic loss [doctrine]." *Id.*  Indeed, in *Christiana*, a case cited by Arup, the

Delaware Superior Court made clear its view that these issues cried out for clarification by the

Delaware Supreme Court:

> The question of when does a business cross the line into the world of "supplying information" or whether that requirement is mandated, is anything but clear.  If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

*Christiana*, 2002 WL 1335360, at *7.

Arup concedes, as it must, that Delaware has recognized claims for negligent

misrepresentation by adopting the provisions of Section 552 of the Restatement (Second) of

Torts (1977).  *See Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386

(Del. Super. Ct. 1990).  To state a claim for negligent misrepresentation, it is necessary to allege

that a defendant:  (1) had a pecuniary duty to provide accurate information, (2) supplied false

information, (3) failed to exercise reasonable care in obtaining or communicating the

information, and (4) caused the plaintiff to suffer a pecuniary loss by justifiably relying upon the

10

false information. *Outdoor Techs. Inc. v. Allfirst Fin. Inc.*, C.A. No. 99C-09-151, 2000 WL

141275, at *4 (Del. Super. Ct. Jan. 24, 2000) (Exhibit C); *see also Guardian*, 583 A.2d at 1383

(adopting Section 552(1) of the Restatement (Second) of Torts (1977)).

   Arup does not argue in its brief that the Museum failed to plead any of the above

elements. Instead, Arup claims that the Museum failed to state a claim because: (1) Delaware

only authorizes negligent misrepresentation claims under Section 552 where the defendant is "in

the business of supplying information," Arup Br. At 8, and (2) "*as a matter of law*, Arup is not in

the business of supplying information as defined under Delaware law." Arup Br. at 9 (emphasis

added). Arup is wrong on both counts. The Delaware Supreme Court has not decided whether a

defendant must be in the business of supplying information for a negligent misrepresentation

claim to succeed, *Christiana*, 2002 WL 1335360, at *7, and there are powerful reasons to believe

that the Supreme Court would decline to adopt that severely "limiting" requirement. *See* Section

IV, below. But even assuming such a prerequisite for a negligent misrepresentation claim, the

Delaware Supreme Court would certainly rule that Arup is in the business of supplying

information. We turn to that argument next.

A.  THE WEIGHT OF PERSUASIVE AND AUTHORITATIVE CASE LAW ESTABLISHES
   THAT ARUP, AS A DESIGN ENGINEER, IS IN THE BUSINESS OF PROVIDING
   INFORMATION.

   Since the very first case adopting for Delaware Section 552 of the Restatement

(Second) of Torts, Delaware law has recognized claims for negligent misrepresentation against

design professionals. Thus, in *Guardian Constr. Co. v. Tetra Tech Richardson*, the Superior

Court held that Tetra Tech Richardson, Inc. ("TTR"), a design engineer, could be liable for

miscalculating "tidal heights and project benchmark[s] . . . used by TTR to develop the project

plans and specifications." *Guardian*, 583 A.2d at 1380. Those plans and specifications were, in

turn, used by contractors to submit bids for a construction project to make improvements to the

11

Augustine Beach breakwater structure. *Id.* As a result of TTR's miscalculations, the plaintiffs in *Guardian* (a contractor and subcontractor who submitted bids based on TTR's plans) incurred additional labor and equipment costs of $185,000 and lost profits totaling $18,500. *Id.* at 1381. Thus, the court in *Guardian* held that a negligent misrepresentation claim existed against a design professional that "negligently prepared project plans and specifications." *Id.* at 1387; *see also Danforth v. Acorn Structures, Inc.*, C.A. No. 90C-JN-30, 1991 WL 269956, at *3 (Del. Super. Ct. Nov. 22, 1991) (Exhibit D) ("the facts [in *Guardian*] clearly show the defendant was in the business of providing information. The defendant was a design engineer."), *aff'd and remanded by* 608 A.2d 1194 (Del. 1992). Just like TTR in *Guardian*, Arup negligently prepared project plans and specifications for the Museum's benefit, which the Museum, in turn, relied on -- to its detriment -- in seeking bids from contractors.

    *Guardian* and *Danforth* are not the only cases that recognize that Delaware law permits a claim under Section 552 against design professionals for negligently preparing documents for a construction project. For example, this Court recently recognized *Guardian's* holding that a design engineer who prepared contract documents and specifications -- just like Arup here -- could be liable under a claim for negligent misrepresentation. *RLI*, 2006 WL 1749069, at *3 n.2. The highest courts of other states have also identified the *Guardian* opinion as permitting negligent misrepresentation claims against design professionals in connection with the negligent preparation of design documents for a construction project. *See Eastern Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 273-74 (W.Va. 2001); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 87 n.1 (S.C. 1995); *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 434 n.1 (Tenn. 1991). These courts identified *Guardian* as part of the "modern legal authority support[ing] the proposition that if . . .

12

a [design professional] negligently obtained and communicated incorrect information . . . then the [design professional] should be liable for foreseeable economic losses sustained." *Eastern Steel*, 549 S.E.2d at 273 (quoting *Guardian*, 583 A.2d at 1386).

Thus, the lower state courts of Delaware, this Court and the highest courts of other states have all recognized that design professionals such as Arup can be liable under Delaware law for economic losses stemming from their negligent preparation of design documents. Given this wealth of authority, it is virtually certain that the Delaware Supreme Court would rule that the Museum has stated a claim for negligent misrepresentation against Arup.

### B.    ARUP'S EXCLUSIVE RELIANCE ON THE UNPUBLISHED DECISION IN *MILLSBORO* IS PROCEDURALLY AND SUBSTANTIVELY MISPLACED.

In its argument that *as a matter of law* Arup is not in the business of supplying information, Arup Br. at 9-11, Arup relies exclusively on the unpublished decision in *Millsboro Fire Co. v. Constr. Mgmt. Serv. Inc.*, C.A. No. 05C-06-137, 2006 WL 1867705, at *2-3 (Del. Super. Ct. June 7, 2006) (Exhibit E). That reliance is substantively and procedurally misplaced.

Substantively, *Millsboro* is at odds with the wealth of authority cited above, including the Superior Court's published *Guardian* opinion. That is not surprising, since *Millsboro* is premised on a faulty understanding of the facts in *Guardian*. While the Court in *Millsboro* recognized that *Guardian* adopted the negligent misrepresentation exception to the economic loss doctrine, *id.* at *2, it apparently (and incorrectly) identified the defendant in *Guardian* as a "land surveyor." *Compare id.* at *3, *with Guardian*, 583 A.2d at 1380. As a result of that error, the court in *Millsboro* apparently was unaware that the seminal *Guardian* opinion had already determined that claims against design professionals *could* be covered by Section 552, and thus did not address how a claim for negligent misrepresentation existed against

13

the design professionals in *Guardian*, while *Millsboro* exempted design professionals from a similar claim. Nor did the court in *Millsboro* give its reasoning for why "public policy considerations" (or even what those considerations were) did not compel it to reach a contrary result. *Id.* These omissions cast strong doubts on any claim that the Delaware Supreme Court would ignore the published opinion in *Guardian* in favor of the unpublished and cursory opinion in *Millsboro*. *Cf. Drake v. St. Francis Hosp.*, 560 A.2d 1059, 1062 n.4 (Del. 1989) (calling into doubt District Court opinion which ignored earlier Delaware Supreme Court precedent).

The Delaware Supreme Court would also rule that a court must conduct a case-specific inquiry to determine whether a defendant is in the business of supplying information with respect to the product in that case. Relying exclusively on *Millsboro*, Arup seeks to circumvent that case-specific inquiry by arguing for a rule of law that "only surveyors and *members of professions 'expressly in the business of supplying information'* fall within the exception to economic loss" doctrine. Arup Br. at 10 (emphasis added) (quoting *Millsboro*, 2006 WL 1867705, at *3). But, Delaware law is to the contrary; it requires a court to conduct a "case-specific inquiry, looking to the nature of the information and its relationship to the kind of business conducted," in determining "whether a defendant is in the business of supplying information." *RLI*, 2006 WL 1749069, at *3 (citing *Christiana*, 2002 WL 1335360, at *6). Under this factual inquiry,[1] a court must determine "what the product is in each of these cases" before determining whether the product is information. *Christiana*, 2002 WL 1335360, at *7. As such, Arup does not need to be expressly "in the business of supplying information" to be liable for a negligent misrepresentation claim. *See RLI*, 2006 WL 1749069, at *3 (defendant

---

[1]     As the question whether a defendant is in the business of supplying information is a factual inquiry, Arup's claim that paragraph 222 of the complaint "should be disregarded as it is not factual and merely attempts to usurp this Court's role in determining issues of law," Arup Br. at 9, lacks merit.

providing information regarding the progress of a subcontractor's work could be liable for a claim of negligent misrepresentation). Instead, because Arup supplied only information to the Museum, the Supreme Court would rule that, under Delaware law, Arup is liable for its negligent misrepresentations included in that information.

Arup and *Millsboro* do not recognize that which *Guardian* and *Danforth* implicitly did -- that design professionals provide information and not a tangible product like a building. *Danforth*, 1991 WL 269956, at *3; *see also Guardian*, 583 A.2d at 1387. Design professionals are not responsible for building structures -- that task is left to construction managers or general contractors such as BWS. Arup and other design professionals supply information in the form of plans and drawings so that other parties can turn that information into a final product. This is not an instance, like that in *Christiana*, where the defendant made a commitment to supply 200,000 barrels of oil per month. 2002 WL 1335360, at *1. In *Christiana*, that information -- the defendants' commitment -- was secondary to the defendants' undertaking to supply the product, oil. On the other hand, Arup did not supply ABA, the Museum or Skanska with the final product of the construction – the Museum's new facility. [2] Instead, Arup provided those parties with information on which they could then rely. The information that Arup supplied was the full extent of Arup's output, and Arup was and is in the business of supplying information.

Thus, the *Millsboro* opinion: (1) failed to distinguish *Guardian*, (2) ignored the *Guardian* Court's reasoning as to why public policy concerns do not weigh in favor of finding design professionals liable for their negligent conduct in connection with the preparation of

---

[2]    If anything, the only proposition that *Christiana* would support in this case would be that negligent misrepresentation claims could not be brought against BWS for representations that it might have made in connection with its construction of the Museum's new facility.

design documents and (3) identified the incorrect inquiry into whether a party is in the business of supplying information. For those reasons, this Court should disregard the *Millsboro* opinion and instead find that *Guardian* accurately states Delaware law.[3] *Cf. Blake v. Kline*, 612 F.2d 718, 723 (3d Cir. 1979) (vacating judgment of district court for improperly relying on state court opinion, where that opinion failed to consider "substantial differences" between two entities and other important factors).[4]

For the foregoing reasons, the published opinion in *Guardian* demonstrates that the Museum has properly raised a claim for negligent misrepresentation against Arup.

## II.    THE MODERN TREND OF LEGAL AUTHORITY IS IN FAVOR OF THE APPLICATION OF SECTION 552 TO DESIGN PROFESSIONALS LIKE ARUP.

The trend in modern legal authority strongly favors application of Section 552 of the Restatement (Second) of Torts to design professionals like Arup. Since *Guardian* adopted Section 552 in Delaware, many states have held design professionals liable for economic losses caused by their negligent misrepresentations. Thus, while the court in *Danforth* relied solely on Illinois case law in limiting Section 552 because those courts "had much litigation in this area and had adopted and used [Section] 552 for a period of time prior to Delaware's adoption in *Guardian*," *Danforth*, 1991 WL 269956, at *1, Delaware no longer needs to rely solely on Illinois for guidance on Section 552.

---

[3]    While this Court was aware of *Millsboro* in *RLI*, the parties in *RLI* each addressed the applicability of *Millsboro* in two, two-page letters they submitted to the Court after briefing on a related issue had been completed. *RLI*, No. C.A. 05-858, D.I. 19 (Exhibit F) and D.I. 20 (Exhibit G). At no point was the Court asked to consider *Millsboro*'s unreliability.

[4]    If this Court cannot determine whether *Guardian* or *Millsboro* applies to this action, this Court may also certify this question of law to the Delaware Supreme Court under Del. Supr. Ct. R. 41(a). *See Fiat Motors*, 619 F. Supp. at 32-39 (certifying questions of law to Delaware Supreme Court).

Since *Danforth*, the highest courts of five states, and one state's intermediate appellate court, have held that Section 552 applies to design professionals like Arup. *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270 (Pa. 2005); *see also E. Steel*, 549 S.E.2d 266; *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 694 N.E.2d 401 (Mass. App. Ct. 1998); *Tommy L. Griffin Plumbing*, 463 S.E.2d 85 (S.C. 1995); *Jim's Excavating Serv., Inc. v. HKM Assocs.*, 878 P.2d 248 (Mont. 1994); *John Martin Co.*, 819 S.W.2d 428 (1991). These courts joined those in Arizona and North Carolina, which reached the same conclusion before *Guardian* and *Danforth* were decided. *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland*, 677 P.2d 1292 (Ariz. 1984); *see also Davidson & Jones, Inc. v. County of New Hanover*, 255 S.E.2d 580 (N.C. Ct. App. 1979). Most recently, the Pennsylvania Supreme Court ruled that it could "see no reason why Section 552 should not apply to architects and other design professionals." *Bilt-Rite*, 866 A.2d at 286. These courts all recognize that "modern legal authority supports the proposition" that Section 552 applies to design professionals who prepare inaccurate design documents. *E. Steel*, 549 S.E.2d at 273 (quoting *Guardian*, 583 A.2d at 1386).

The Delaware Supreme Court would also look to illustration 9 of Section 552, which "sets forth a scenario that is closely analogous to the instant case and demonstrates how Section 552 should apply here." *Bilt-Rite*, 866 A.2d at 288; *see also Jim's Excavating*, 878 P.2d at 255 (finding that Illustration 9 is "particularly applicable" in holding that design professionals can be liable for negligently preparing designs).[5] It provides:

> The City of A is about to ask for bids for work on a sewer tunnel. It hires B Company, a firm of engineers, to make boring tests and provide a report showing the rock and soil conditions to be encountered. It notifies B Company that the

---

[5] The Delaware Superior Court has considered the illustrations found in the comments to Section 552 in order to determine the scope of that section. *See Carello v. PricewaterhouseCoopers LLP*, C.A. No. 01C-10-219RRC, 2002 WL 1454111, at *6 (Del. Super. Ct. July 3, 2002) (court considered an illustration found in comment h of Section 552 to determine accounting firm's liability) (Exhibit H).

> report will be made available to bidders as a basis for their bids and that it is
> expected to be used by the successful bidder in doing the work. Without knowing
> the identity of any of the contractors bidding on the work, B Company negligently
> prepares and delivers to the City an inaccurate report, containing false and
> misleading information. On the basis of the report C makes a successful bid, and
> also on the basis of the report D, a subcontractor, contracts with C to do a part of
> the work. By reason of the inaccuracy of the report, C and D suffer pecuniary
> loss in performing their contracts. B Company is subject to liability to C and to
> D.

*Bilt-Rite*, 866 A.2d at 276 (quoting Illustration 9, Section 552 of the Restatement (Second) of

Torts (1977)). Just as Arup did here, the design professionals in *Bilt-Rite* negligently produced

"plans, drawings and specifications with the intention of conveying those documents to

contractors for purposes of bidding." *Id.* at 275. Accepting the complaint's allegations as true,

Arup "provided plans and specifications for the . . . project . . . with full knowledge that those

plans and specifications would be included in a bid package supplied to prospective bidders." *Id.*

at 288. The Museum relied on Arup's negligently prepared design documents in preparing bid

packages and budgeting for the renovation -- and those negligently prepared documents caused

the Museum to incur additional delay costs. As Illustration 9 shows, Arup's conduct "falls

precisely within the framework of [Section] 552," *id.*, and the Museum has stated a claim against

Arup under Delaware law.

   The clear trend in modern legal authority outside of Delaware would further

support a ruling by the Delaware Supreme Court that Section 552 should apply to design

professionals like Arup for negligently preparing design documents that cause economic loss.

## III. PUBLIC POLICY ALSO FAVORS THE APPLICATION OF SECTION 552 TO DESIGN PROFESSIONALS LIKE ARUP.

   Serious public policy concerns also favor a rule that Section 552 applies to design

professionals like Arup.

First, Section 552 should be applied to design professionals like Arup because of the level of sophistication and specialization found in the modern business world. "[B]usiness persons have found themselves in a position of increasing reliance upon the guidance of those possessing special expertise." *Bilt-Rite*, 866 A.2d at 286. This is particularly true for institutions such as the Museum, whose "Board members had little, if any, experience in large-scale construction." Compl. ¶ 2. Because of that lack of experience, the Museum had to rely on Arup's expertise. Compl. ¶ 3. And as often happens, the Museum had no direct contractual relationship with Arup, the expert supplier of information, and thus no contractual recourse against Arup for its negligent misrepresentations. *See Bilt-Rite*, 866 A.2d at 286. Nonetheless, Arup knew that the Museum was going to rely on the information that Arup provided in the form of design documents. *Id.* The Delaware Supreme Court would likely agree with the Pennsylvania Supreme Court that it would not be radical or revolutionary to hold Arup or other design professionals to a traditional duty of care for foreseeable harm encapsulated in Section 552. *Id.*

Second, the public would benefit from application of Section 552 to design professionals because "design professional services play an important role in public and private planning." *Bilt-Rite*, 866 A.2d at 287. Private businesses, charitable institutions and federal, state and municipal governments all rely on design professionals to develop accurate design documents so that those institutions can budget correctly for construction costs. As the complaint demonstrates, design professionals' negligence imposes needless costs on public and private institutions. Given the costs that design professionals' negligence imposes on such institutions, "there is no reason to exempt such professionals from the tort consequences of a negligent failure to perform those services in a competent fashion." *Id.*

Finally, applying Section 552 to design professionals when they prepare design documents would hold those professionals "to the same sort of professional responsibility other professionals face." *Bilt-Rite*, 866 A.2d at 287; *see also Tommy L. Griffin Plumbing*, 463 S.E.2d at 89 ("Applying these concepts to professional liability, we have long held lawyers and accountants liable in tort for malpractice."). Under Delaware law, attorneys and other professionals are already responsible for their professional misconduct. *See, e.g., Williams v. Law Firm of Cooch & Taylor*, C.A. No. 92C-03-024, 1994 WL 234000 (Del. Super. Ct. May 11, 1994) (attorney malpractice) (Exhibit I). Therefore, the Delaware Supreme Court would rule that Section 552 simply requires design professionals to meet comparable standards of care required of other professionals.

Thus, public policy weighs heavily in favor of holding design professionals to the standard of care required by Section 552 for their preparation of design documents. If confronted with this issue, the Delaware Supreme Court would rule that design professionals such as Arup are liable for their negligent misrepresentations that cause economic loss.

## IV. THE DELAWARE SUPREME COURT WOULD NOT LIMIT NEGLIGENT MISREPRESENTATION CLAIMS TO ONLY AGAINST THOSE ENTITIES WHICH ARE "EXPRESSLY IN THE BUSINESS OF SUPPLYING INFORMATION".

As the above sections show, the more persuasive lower court authority in Delaware does not support Arup's proposition that Section 552 applies only to "members of professions 'expressly in the business of supplying information,'" Arup Br. at 10. But even if it did, the Delaware Supreme Court would likely decline to adopt such a requirement because it is unnecessary, and is also vague and ambiguous, since the point at which a "business cross[es] the line into the world of 'supplying information' . . . is anything but clear." *Christiana*, 2002 WL 1335360, at *7.

20

The original purpose of the restriction of Section 552 to claims against entities who provide only information as opposed to those who manufacture products was to prevent unlimited claims for economic loss from all users of those manufacturers' products. But that limitation is not necessary here to protect against that unwanted result, because those facts are not present here. No manufacturer; no oil supplier. It is not necessary to require a defendant to be in the business of supplying information for it to be liable under Section 552. Other states have held that design professionals are liable for negligent misrepresentations to a foreseeable class of third parties whom the design professionals knew would rely on those misrepresentations. *See Eastern Steel*, 549 S.E.2d at 275; *Jim's Excavating Serv.*, 878 P.2d at 255; *John Martin Co.*, 819 S.W.2d at 435; *Davidson & Jones*, 255 S.E.2d at 667. Accepting the facts in the complaint as true, Arup knew that the Museum would rely on the design documents that Arup negligently prepared. Therefore, concerns about unlimited claims for economic losses against manufacturers -- which were the basis for the rule that a defendant must be in the business of supplying information -- are not present here. *Compare John Martin Co.*, 819 S.W.2d at 435 (foreseeability was an adequate safeguard to prevent an unlimited action in tort based upon negligent misrepresentations), *with Danforth*, 2002 WL 1335360, at *6 (adopting *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 452 (Ill. 1982) (defendant must be in the business of supplying information or else manufacturers would be accountable for all negligent misrepresentations ).

Also, requiring a defendant to be in the business of supplying information would create a vague and ambiguous standard that could easily yield conflicting results. As the opinions in *Guardian* and *Millsboro* demonstrate, courts can consider the same set of circumstances and reach opposite conclusions under this standard. Further, in *Carello v.*

*PricewaterhouseCoopers LLP*, a case that Arup cites, the defendant negligently prepared

financial statements that were used in connection with the sale of the company Lason, Inc.

*Carello*, 2002 WL 1454111, at *1-3. Therefore, those financial statements aided the sale of a

product -- Lason, Inc. Under Arup's analysis, the defendant not have been liable for its financial

statements as they were "clearly incidental" to the sale of a product. Nonetheless, the court in

*Carello* found that PricewaterhouseCoopers was liable under Section 552 even though the object

of the transaction was a product. *Id.* at *7. Arup did not and cannot explain why negligently

prepared documents "incidental" to the sale of a product can impose liability under Section 552,

while design documents "incidental" to a construction project are immune from liability. These

examples illustrate why the Delaware Supreme Court would be reluctant to adopt a standard

requiring a defendant to be in the business of supplying information -- especially since that

limitation is unnecessary here to protect the interests the standard was originally formulated to

protect. *Cf. Delaware State Police Fraternal Order of Police Lodge No. 6 v. Dep't of Pub.*

*Safety*, C.A. No. 4341, 1974 WL 6342, at *2 (Del. Ch. Dec. 26, 1974) (contract term was too

vague to be enforced between contracting parties) (Exhibit J).

　　　　For the foregoing reasons, the Delaware Supreme Court would likely decline to

adopt any requirement that a defendant in a negligent misrepresentation claim be in the business

of supplying information.

**V.     EVEN IF *MILLSBORO* WERE AN ACCURATE STATEMENT OF DELAWARE
LAW, THE COMPLAINT HAS ESTABLISHED FACTS SUFFICIENT FOR A
NEGLIGENT MISREPRESENTATION CLAIM AGAINST ARUP.**

　　　　Even if *Millsboro* accurately states Delaware law -- and it does not -- dismissal is

not warranted. "First, the *Millsboro* decision was made on summary judgment, with a full record

before the court." *RLI*, 2006 WL 1749069, at *3; *see also Millsboro*, 2006 WL 1867705, at *1

(design professionals "filed a Joint Motion for Summary Judgment"). On this motion to dismiss,

22

the Court must accept all factual allegations in the Museum's complaint as true and draw all reasonable inferences from those allegations in favor of the plaintiff. *Synopsys, Inc. v. Magma Design Automation*, C.A. No. 05-701, 2006 WL 1452803, at *2 (D. Del. May 25, 2006) (Exhibit K). Also, whether Arup is in the business of supplying information is a "*case-specific inquiry.*" *Christiana*, 2002 WL 1335360, at *6; *see also RLI*, 2006 WL 1749069, at *3 ("To determine whether a defendant is in the business of supplying information, a court must conduct a case-specific inquiry, looking to the nature of the information and its relationship to the kind of business conducted."). Arup's motion should be denied, as the complaint shows that sufficient facts exist which entitle the Museum to the relief it seeks. Compl. ¶ 222; *Synopsis*, 2006 WL 1452803, at *2.

In any event, it is also clear from the complaint that Arup provided more than design documents; it "provided information regarding the progress of" the construction -- precisely the sort of information the Court in *RLI* held to support a claim for negligent misrepresentation. *RLI*, 2006 WL 1749069, at *3. Similar to what the design professional failed to do in *RLI*, the complaint shows that Arup failed to properly review and approve all coordination drawings. Compl. ¶¶ 155, 159 and 161; *RLI*, 2006 WL 1749069, at *1. Further, Arup misrepresented the design status to the Museum -- much like the information defendants failed to provide in *RLI*. Compl. ¶ 151; *RLI*, 2006 WL 1749069, at *3. These misrepresentations go beyond the negligent preparation of design documents and state a claim under Section 552 even if *Millsboro* applies. *Id.*

For the foregoing reasons, *Millsboro* -- even if it accurately states Delaware law -- does not justify dismissing the complaint without the benefit of a full record. Further, Arup negligently provided information to the Museum during the construction independently from the

23

preparation of design documents.  Therefore, the complaint contains sufficient allegations to survive Arup's motion to dismiss, and to enable the parties to develop a "full record" through discovery which will prove Arup's liability.  *RLI*, 2006 WL 1749069, at *3.

## CONCLUSION

The Delaware Supreme Court would rule that Arup's negligent misrepresentations are not protected by the economic loss doctrine, as Arup is in the business of supplying information. Further, if the Delaware Supreme Court were confronted with this issue, it would decline to adopt any requirement that a defendant must be in the business of supplying information to be liable for its negligent misrepresentations. Finally, even if a defendant must be in the business of supplying information, such an inquiry is case-specific and dismissal at this time would be inappropriate without the benefit of a full record.

DATED: November 10, 2006

Thomas J. Allingham /RSH
Thomas J. Allingham II (#476)
tallingh@probonolaw.com
Richard S. Horvath, Jr. (#4558)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000
Attorneys for Plaintiff Delaware Art
    Museum, Inc.

25

475165.05-Wilmington Server 1A - MSW

# EXHIBIT A

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

H

Christiana Marine Service Corp. v. Texaco Fuel and
Marine    MarketingDel.Super.,2002.Only    the
Westlaw citation is currently available.
UNPUBLISHED    OPINION.    CHECK    COURT
RULES BEFORE CITING.
Superior Court of Delaware.
CHRISTIANA MARINE SERVICE
CORPORATION, Plaintiff,
v.
TEXACO FUEL AND MARINE MARKETING
INC. and Texaco Inc., Defendants.
**No. Civ.A. 98C-02-217WCC.**

Submitted Jan. 2, 2002.
Decided June 13, 2002.

On Defendant Texaco Fuel and Marine Marketing
Inc., and Texaco Inc.'s Motion for Summary
Judgment. Granted in part; denied in part.

John D. Balaguer, White & Williams LLP,
Wilmington, Delaware, for Plaintiff, Christiana
Marine.
James J. Maron & John P. Daniello, Maron &
Marvel,    P.A.,    Wilmington,    Delaware,    for
Defendants, Texaco Inc.
Peter R. Kahana & Daniel M. Cohen, Berger &
Montague, P.C., Philadelphia, PA, for Defendant,
Texaco Fuel and Marine Marketing, Inc. and
Texaco, Inc.

MEMORANDUM OPINION
CARPENTER, J.
**\*1** Defendants have filed a motion for summary
judgment pursuant to Superior Court Civil Rule
12(b)(6) for failure to state a claim upon which
relief could be granted. The core of this controversy
centers upon an alleged oral long term requirement
contract between Texaco Fuel and Marine
Marketing, Inc. (hereinafter "Texaco"), and
Christiana Marine Service Corporation (hereinafter "
Christiana") a bunker fuel provider.[FN1] Christiana

seeks compensatory damages without limitation to
its lost profits; and consequential damages,
consisting of Christiana's economic losses. The
Court has heard oral argument on the motion and
for the reasons set forth below, Texaco's motion for
summary judgment is denied in part, and granted in
part.

> FN1. Christiana has sued Texaco's parent
> company, Texaco Incorporated, in addition
> to Texaco, pursuant to vicarious liability.

*FACTS*

Christiana Marine was incorporated in 1986, after
its    successor    corporation,    Compass    Marine
Corporation, ceased doing business. Christiana was
a barge contractor that transported marine bunker
fuel, a low grade black oil, in the Delaware River.
Usually, when ships are at sea and need fuel, they
will notify the oil providers in a particular port,
such as Texaco or its competitors. The oil provider,
is informed of the ship's arrival date, and the
amount of bunker fuel needed to which the oil
companies reply with their bids. Once awarded a
contract, the oil company hires a barge contractor to
transport the oil to the ships who requested the fuel.
[FN2]

> FN2.    Christiana    had    two    business
> locations: one in Chester, Pennsylvania,
> where delivery vessels were berthed during
> non-use    and    repair,    and    one    in
> Wilmington, Delaware, where orders were
> received, invoices were sent, and where
> payments were received from Texaco.

In 1988 Texaco purchased a new supply facility, the
Delaware    Terminal    Corporation    ("DTC")    in
Wilmington, Delaware to increase Texaco's market
share in the Delaware River area. Because DTC was
in    Wilmington,    and    not    in,    or    as    near    to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Philadelphia, it was slightly alienated from (1) the highest business activity where most other supply facilities were located; and (2) where most of the ships that had to be serviced were located.[FN3] Bunker fuel deliveries from a more distant area, such as Wilmington, were assessed higher rates to transport bunker fuel, as compared to the established rates in the Delaware River zone. In addition, DTC was not equipped to handle bunkers, and had experienced substantial congestion problems because of this.[FN4] To solve these problems, Texaco needed a barge carrier who would agree to provide below market prices for fuel deliveries from DTC, and who would also agree to exclude demurrage for loading delays at Texaco's congested terminal.[FN5] It was in this environment that the business relationship between Texaco and Christiana began.

> FN3. Most supply facilities are located in Philadelphia, Pennsylvania.

> FN4. Bruce Bond Dep. at 51. Barge contractors like Christiana, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, Texaco would pay Christiana, Christiana's barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid Texaco for the fuel.

> FN5. Plaintiff's Response Brief at 2.

Before the alleged contract with Texaco, Christiana had a virtual monopoly on small to medium size bunker jobs in the Delaware River area,[FN6] and had sufficient equipment to conduct its usual business successfully. According to Christiana, Texaco proposed a long term agreement, which provided that Texaco would employ Christiana as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for Christiana's commitment to have ample equipment on hand to deliver Texaco's requirements upon demand. [FN7] In addition to these terms, Christiana and Texaco allegedly agreed that Texaco would

receive discounted delivery charges, at below market rates, along with no additional penalties for loading delays at DTC.[FN8] In 1990, the parties apparently orally modified their business relationship and agreed that Christiana would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which Texaco may have encountered, in return for Texaco's commitment to put through an average 200,000 bbls. of oil per month.[FN9] Christiana considered the 200,000 quote a minimum average, with Texaco anticipating a 225,000 or 250,000 bbls a month throughput. In other words, Christiana presumed the 200,000 barrels was a floor, not a ceiling. Regardless, Texaco did not meet this alleged "guaranteed" minimum monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months Christiana and Texaco had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

> FN6. York's Report at 6 (citing the October 28, 1999 Bruce R. Bond deposition p. 238).

> FN7. Texaco even published a pamphlet, which stated "[Christiana], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [Christiana] operates several barge units ranging in capacity from 1700-3000 metric tons. DTC and [Christiana] offer Texaco flexibility second to none any supplier on the river."

> FN8. Because barge carriage is generally a small margin, fixed cost business, Christiana would have a unique opportunity to secure a steady, expanding stream of business, provided by Texaco, if it entered into this "agreement."

> FN9. Bates Dep. at 86.

**\*2** Based upon Texaco's alleged representations that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 3

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

it planned to put through 200,000 bbls. of oil per month, Christina went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work Texaco and Christina anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a " favorable reference from Mr. Bruce Bond of Texaco," that Texaco referred to Mr. Bates as a " no-nonsense businessman who always gets the job done," that on a "monthly basis, Christina moves roughly 150,000 barrels of bunkers, and [Texaco] wants to increase this to 200,000," and that "Texaco is looking for a long term relationship with Christina."[FN10]

FN10. June 20, 1989 loan document.

The alleged oral contract between Christina and Texaco ensued until Christina wrote Texaco a letter in August of 1995, informing them that Christina could not continue to provide bunker transportation because of the lack of Texaco's business and the cost of providing the service.[FN11]

FN11. "It is with regret that [Christina] had to inform Texaco last week that we could no longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high.... " August 16, 1995 letter from William Bates to C. Michael Bandy of Texaco.

*PROCEDURAL POSTURE*

On February 20, 1998, Christina filed a complaint against Texaco and alleged six separate counts: (1) breach of contract-volume of business; (2) breach of contract-duration; (3) breach of contract-notice of termination; (4) breach of contract-duty of good

faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. Texaco has filed a summary judgment motion requesting the dismissal of all claims.

*STANDARD OF REVIEW*

A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[FN12] If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate.[FN13] Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied.[FN14] The Court is required to examine all pleadings, affidavits and discovery material provided to the Court,[FN15] accept all non-disputed facts as true, and must accept the non-movant's version of any disputed facts.[FN16]

FN12. *See Schueler v. Martin,* 674 A.2d 883, 885 (Del.Super.1996); *Pierce v. International Ins. Co. of Ill.,* 671 A.2d 1361, 1363 (Del.1996); *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

FN13. *Kysor Industrial Corp. v. Margaux,* 674 A.2d 889, 894 (Del.Super.1996).

FN14. *Vanaman v. Milford Memorial Hospital, Inc.,* 272 A.2d 718, 720 (Del.1970).

FN15. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322 (Del.Super.1973).

FN16. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96 (Del.1992).

*DISCUSSION*

*A. Doctrine of Laches / Statute of Limitations*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Texaco asserts that Christiana's breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because Christiana's time to bring suit started in July 1993, when it became clear the terms of the contract as alleged by Christiana were not being met.[FN17] Additionally, Texaco claims that Christiana consulted counsel in 1995, when it went out of business, to consider bringing a claim against Texaco; that Christiana intentionally misled Texaco "by writing Texaco a soothing, non-accusatory" 1995 letter saying nothing about a claim; that Christiana and its former attorney deliberately chose not tell Texaco about the alleged claim to inhibit Texaco from taking steps to defend itself. Texaco alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by Christiana's delay because: (1) out of the 48 months Christiana transported Texaco's bunker oil, Texaco only reached the alleged 200,000 barrels a month for 8 months, so if Christiana considered this "lower throughput" a breach of contract, they had an obligation to notify Texaco so it could have limited its damages by terminating the alleged contract at that point in time, and (2) Texaco is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. Texaco stated that its computer files only date back until 1994, which makes locating precise and complete data for the relevant time period impossible.

FN17. Texaco's Brief at 20.

*3 Christiana contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated. Christiana claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to Texaco notifying it that Christiana would be unable to participate in further business. Christiana also asserts that a laches agreement is unavailable to Texaco because Texaco "effectively" caused the termination of the agreement in its continuously low throughput, which caused Christiana to be prejudiced and to go out of business. And lastly, Christiana claims that

Texaco is responsible for the lost computer files and documents, as Texaco took their mainframe computer out of service at the end of 1993. Christiana also points out that Texaco has been on notice of this lawsuit since May 1, 1996, and thus, could've kept records and documents for its defense as of that date.[FN18]

FN18. Plaintiff's Brief in Opposition to Defendant's Motion at 20.

"The test of laches is both unreasonable delay and consequent significant prejudice." [FN19] In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations.[FN20] Delaware's statute of limitations for contract and negligence actions is found in 10 *Del. C.* § 8106. The 3 year limitation on cause of actions for an alleged breach of contract accrues at the time of the breach,[FN21] whereas a tort claim accrues at the time of the injury. [FN22]

FN19. *Wilkes v. H.M. Wrangell & Co.,* 293 F.Supp. 522, 524 (D.Del.1968)(citing *Gutierrez v. Waterman S.A. Corp.,* 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Claussen v. Mene Grande Oil Co.,* 275 F.2d 108, 113 (3d Cir.1960)).

FN20. *Wilkes,* 293 F.Supp. at 524.

FN21. *Fineberg v. Credit Int'l Bancshares, Ltd.,* 857 F.Supp. 338 (D.Del.1994); *Nardo v. Guido DeAscanis & Sons,* 254 A.2d 254 (Del.Super.1969).

FN22. *Howmet Corp. v. City of Wilmington,* 285 A.2d 423 (Del.Super.1971).

The Court finds that the statute of limitations, 10 *Del. C.* § 8106, did not begin to run until there was an affirmative termination by one of the parties. Christiana wrote the August 1995 letter to Texaco, which terminated the arrangement between these two parties. Until then, the two parties continuously

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 5

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

conducted business with one another and Christiana operated as Texaco's bunker fuel contractor. As such, under the statute of limitations applicable to contracts, Christiana had until August, 1998 to file its claims against Texaco. [FN23] Since Christiana filed the instant action on February 20, 1998, it appears that Christiana successfully brought its claims within its window of opportunity. The Court finds that Christiana's claims have not been unreasonably delayed.

> FN23. An issue not addressed by the parties is whether the statute of limitations would prevent the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

Additionally, the Court is not convinced that Texaco has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue that the passing of time has limited Texaco's access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that Texaco, during its business relationship with Christiana, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by Christiana to terminate the relationship so Texaco could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. Texaco is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and ones goodwill to perform an important business function. To argue that Christiana has tricked or mislead Texaco is simply

an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds neither unreasonably delay or prejudice and thus the claims are not barred by the doctrine of laches.

### B. Breach of Contract Claims

**\*4** While it is the Court's province to define a contract, it is the jury's function to decide whether a contract exists.[FN24] In *Universal Products Co. v. Emerson*,[FN25] the Supreme Court of Delaware followed numerous other court's holdings that it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged.[FN26] The *Emerson* court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved." [FN27] Stated differently, when other facts and circumstances germane to the issue are to be considered in addition to any documentary evidence, a jury is to decide whether or not a contract was formed, not the Court.

> FN24. *Corletto v. Morgan*, 89 A. 738 (Del.Super.1914).

> FN25. *Universal Products Co. v. Emerson*, 179 A. 387 (Del.1935).

> FN26. *Id.* at 393.

> FN27. *Id.* at 394.

Texaco contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, Texaco's expert, Patrick J. Studdert, stated in his report that
[i]n all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between Christiana and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 6

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Texaco and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry.[FN28]

FN28. Studfert's Report at 3.

Texaco asserts that "it is undisputed in the bunker fuel barge delivery industry-that deliveries are made by barge carriers for oil companies on an "as available basis." [FN29] Texaco further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by Christiana-long term oral contracts with minimum guaranteed monthly delivery quotas. Texaco then asserts that because Christiana did not exclusively work for Texaco, and it continued to conduct business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of Texaco's alleged "long term agreement" to put through the amount of oil it allegedly promised.

FN29. Texaco's motion at 3.

Christiana contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. Christiana points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland (" FNBM")'s representative); and the mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. Christiana's expert, Robert B. York contends that Christiana and Texaco's relationship was contractual, and more specifically stated in his report that
"[a] contract existed between [Christiana] and [Texaco] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract.[FN30]

FN30. York's Report at 20.

**\*5** The Court first finds that whether an oral contract, or a contract created by conduct was established between Christiana and Texaco, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, Texaco and Christiana had mutual, beneficial interests at stake in this business venture, and as such, an enforceable contract was created. The Restatement Second of Torts § 19 provides that "[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." [FN31] Subsection (3) further states that "[t]he conduct of a party may manifest assent even though he does not in fact assent." [FN32] The jury may find that Texaco's conduct manifested an assent to be bound, based upon Mr. Bates' testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. Texaco's arguments are simply ones that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between Texaco and Christiana is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

FN31. Restatement (Second) Torts § 19.

FN32. *Id.*

*C. Negligent Misrepresentation Claim*

Finally, Texaco asserts that Christiana's negligent misrepresentation claim is barred by the economic loss doctrine and must be dismissed as all of Christiana's alleged losses are purely economic in nature, *i.e.,* lost profits, lost investments, and acquired debt. Texaco also asserts that Christiana

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

cannot employ the Restatement (Second) of Torts § 552, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine. [FN33]

> FN33. The Court need not decide whether federal maritime law governs this action as Christiana's negligent misrepresentation will be dismissed on other grounds.

Christiana admits its damages are purely economic in nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to Christiana's claims, Delaware has adopted the Restatement (Second) of Torts § 552, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. Christiana asserts it falls within this exception.

The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage." [FN34] The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. [FN35] Economic loss is "any monetary loss[ ], costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value ." [FN36] While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that Christiana's damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim

> FN34. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

> FN35. *Danforth v. Acorn Structures,Inc.,* 608 A.2d 1194,1195 (Del.1992)(citing *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 448 (Ill.Supr.1982).

> FN36. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. at 406. *See also Danforth,* 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 61 Ill.Dec. 746, 435 N.E.2d at 449)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits-without any claim of personal injury or damage to other property.").

*6 The Restatement (Second) of Torts § 552 provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson.* [FN37] The Restatement provides that

> FN37. 583 A.2d 1378 (Del.Super.1990).

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delaware's    narrow    application    and    strict

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 8

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

construction of § 552, has thus far held that for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, " the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties." [FN38] Christiana has satisfied this element. When viewed in a light most favorable to Christiana, there is sufficient evidence, which would indicate that Texaco allegedly informed Christiana, on several occasions, that it intended to put through 200,000 bbls. of oil per month. Christiana relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug boats, barges, and equipment to transport Texaco's bunker oil. Thus, it appears that Christiana shared the information Texaco supplied to it, to use in its business transactions, the loans, with FNBM. Christiana as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

> FN38. *Danforth v. Acorn Structures, Inc.,* Del.Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem.Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.,*[FN39] the Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that "the defendant is in the business of supplying information." [FN40] In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations. [FN41]

> FN39. The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely economic losses and were thus barred by the economic loss doctrine. *Danforth v. Acorn Structures Inc.,* C.A. No. 90C-JN-30, 1991 WL 215658 (Del.Super.Aug.27, 1991).

Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the Restatement (Second) of Torts § 552 exception to the economic loss doctrine, and thus his negligent misrepresentation claim against the defendant should survive. *Danforth v. Acorn Structures, Inc.,* C.A. No. 90C-JN-30, 1991 WL 269956 (Del.Super.Nov.22, 1991). The Court's expansive discussion concerning the Restatement (Second) of Torts § 552, and the two requirements a plaintiff must satisfy to lift the economic loss doctrine's bar are found in the November 22, 1991 opinion.

> FN40. *Danforth v. Acorn Structures, Inc.,* Del.Super. C.A. No. 90C-JN-30, 1991 WL 269956, (Del.Super.Nov.22, 1991). Since Danforth, Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan and Son, Inc. v. KLLM Architects, Inc.,* 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 296 (App.Ct.Ill.1999).

> FN41. *Danforth,* at *4 (citing *Rankow v. First Chicago Bank,* 870 F.2d 356, 360-366 (7th Cir.1989); *Gerdes v. John Hancock Mutual Life Insurance Co.,* 712 F.Supp. 692, 697-98(N.D.Ill.1989)).

In *Rankow v. First Chicago Corp.,*[FN42] the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that "[a] precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." [FN43] The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 9

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Rankow* court went further to hold that "[w]hether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted." [FN44] In its attempts to determine whether a bank was "in the business of supplying information" the *Rankow* court noted that while "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that " manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information." [FN45] The *Rankow* court then noted that

> FN42. 870 F.2d 356 (7th Cir.1989).
>
> FN43. *Rankow,* 870 F.2d at 360.
>
> FN44. *Rankow,* 870 F.2d at 361.
>
> FN45. Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.,* 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (Ill.App.Ct.1982)(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.,* 117 Ill.App.3d 304, 72 Ill.Dec. 703, 453 N.E.2d 8 (Ill.App.Ct.1983)(holding a roofing materials supplier was not in the business of supplying information); *Tan v. Boyke,* 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E.2d 390 (Ill.App .Ct.1987)(seller of an apartment building was not a supplier of information); *Vacuum Industrial Pollution,* 764 F.Supp. 507 (N.D.Ill.1991)(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information);.

*7 a great many businesses involve an exchange of information as well as of tangible products-manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental. [FN46]

> FN46. *Rankow,* 870 F.2d at 364.

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.,* [FN47] the Illinois court noted that "a great many businesses exchange information as well as products" and "[w]here the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." [FN48] The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services ... may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." [FN49]

> FN47. 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288 (Ill.App.3d 1999).
>
> FN48. *Tolan Sons Inc.,* 241 Ill.Dec. 427, 719 N.E.2d at 296.
>
> FN49. *Tolan,* 241 Ill.Dec. 427, 719 N.E.2d at 297.

The Court finds the above cited reasoning to be a fair interpretation of what it means to be "in the business of supplying information" for the purposes of a negligent misrepresentation claim. Based upon the above reasoning, and in heeding the prior precedent of *Guardian Construction,* and *Danforth,* the Court finds that Texaco was not "in the business of supplying information for the guidance of others." [FN50] The information Texaco supplied to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 10

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Christiana is more aptly categorized as information incidentally supplied to Christiana for the ultimate service-that of transporting bunker fuel oil. Clearly, Texaco is generally in the business of supplying oil, not information. [FN51] The information Texaco supplied, if any, is best classified as ancillary to the provided service.[FN52] As such, this litigation will move forward as a contract dispute only and the tort claim is dismissed.

> FN50. *See Tolan*, 241 Ill.Dec. 427, 719 N.E.2d at 296-96(delineating what business are pure information providers where the end product is an idea, what businesses are tangible product end manufacturers, and what businesses fall between the two.). *Tolan* notes that businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite inspectors and environmental assessors are "pure information providers, which would constitute "in the business of supplying information for the guidance of others. *Tolan* also notes certain professions that are tangible good providers, which is where this Court finds Texaco falls-that of manufacturers of computers and software or products of any type.

> FN51. *See Vacuum Industrial Pollution, Inc. v. Union Oil Co.*, 764 F.Supp. 507 (N.D.Ill.1991)(holding that a defendant oil company was not in the business of supplying information.).

> FN52. *See* the Restatement (Second) of Torts § 552 comment a explaining that "by limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests ."

While this Court has followed the earlier decisions of the Court that have addressed this issue, other jurisdictions have taken a more expansive view of § 552 [FN53] and clearly an argument can be made that the decisions from Illinois followed by Delaware are too limiting and fail to give full effect to the negligent misrepresentation exception. The question of when does a business cross the line into the world of "supplying information" or whether that requirement is mandated, is anything but clear. If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

> FN53. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582 (Md.2000)(holding that the negligent misrepresentation requires: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge hat the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence."); *Jacobson v. Environmental Risk Limited*, No. CV 950550991, 1996 WL 168086, at *3 (Conn.Super.Mar.4, 1996)(following the "governing principals" of the Restatement (Second) of Torts § 552 and holding that negligent misrepresentation requires a plaintiff to " allege and prove that the reliance on the misstatement was justified or reasonable," and "reasonableness is a question of fact for the trier to determine based on all of the circumstances.")

*CONCLUSION*

For the reasons set forth above, Texaco's motion for summary judgment as to the breach of contract claim is denied, but Texaco's motion for summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


judgment      as      to      Christiana's      negligent
misrepresentation claims is granted.

Del.Super.,2002.
Christiana Marine Service Corp. v. Texaco Fuel and
Marine Marketing
Not  Reported  in  A.2d,  2002  WL  1335360
(Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Slip Copy                                                                                    Page 1

Slip Copy, 2006 WL 1749069 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
RLI Ins. Co. v. Indian River School
Dist.D.Del.,2006.Only the Westlaw citation is
currently available.
      United States District Court,D. Delaware.
      RLI INSURANCE COMPANY, Plaintiff,
                          v.
   INDIAN RIVER SCHOOL DISTRICT, Edis
  Company, and Becker Morgan Group, Inc.,
                  Defendants.
            **No. Civ.A. 05-858-JJF.**

                   June 20, 2006.

Perry F. Goldlust, of Aber, Goldlust, Baker, &
Over, Wilmington, Delaware, Harry R. Blackburn,
Francine D. Wilensky, and John Hilser, of Harry R.
Blackburn & Associates, P.C., Philadelphia,
Pennsylvania, for Plaintiff, of counsel.
James S. Green, of Seitz, Van Ogtrop, & Green,
P.A., Wilmington, Delaware, Kevin Gerard Amadio
, of Venzie, Phillips, & Warshawer, Philadelphia,
Pennsylvania, for Defendant Indian River School
District, of counsel.
Donald L. Logan, of Tighe, Cottrell, & Logan, P.A.,
Wilmington, Delaware, for Defendant Edis
Company.
Paul Cottrell, of Tighe, Cottrell, & Logan, P.A.,
Wilmington, Delaware, for Defendant Becker
Morgan Group, Inc.

                *MEMORANDUM OPINION*
FARNAN, J.
**\*1** Pending before the Court is Defendants, Edis
Company And Becker Morgan Group, Inc.'s Joint
Motion To Dismiss The Complaint Of Plaintiff,
RLI Insurance Company (D.I.10). For the reasons
discussed, the Motion will be denied.

                I. BACKGROUND

The following facts are alleged in RLI Insurance
Company's ("RLI") Complaint. In August 2002,
Indian River School District ("Indian River")
contracted with Mc Daniel Plumbing & Heating,
Inc. ("McDaniel") for mechanical, plumbing, and
temperature control work at Sussex High School in
Georgetown, Delaware. The contract between
Indian River and McDaniel named Edis Company ("
Edis") as the construction manager and Becker
Morgan Group, Inc. ("Becker Morgan") as the
architect.[FN1] RLI, as the surety, issued a
performance bond to McDaniel for the project.

> FN1. Edis and Becker Morgan will be
> referred to collectively as "the Moving
> Defendants."

Pursuant to the contract between Indian River and
RLI, the Moving Defendants provided Indian River
with reports regarding McDaniel's progress, which
were used by RLI in making payments to McDaniel.
According to RLI, the Moving Defendants failed to
visit the site to evaluate McDaniel's work, reject
non-conforming work, and determine whether the
work was actually being performed in accordance
with the contracts. These failures caused RLI to
issue payments for more than $340,000 in excess of
the actual work performed by McDaniel. In October
2004, RLI alleges that Indian River terminated
McDaniel without the contractually-required notice
to McDaniel or RLI.

On December 12, 2005, RLI filed its Complaint,
alleging negligent misrepresentation against all
Defendants and breach of fiduciary duty against
Indian River. The Moving Defendants subsequently
filed the instant motion to dismiss.

              II. PARTIES' CONTENTIONS

By their Motion, the Moving Defendants contend
that the instant action should be dismissed pursuant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1749069 (D.Del.)
**(Cite as: Slip Copy)**

to Federal Rule of Civil Procedure 12(b)(6) or 56. The Moving Defendants contend that the economic loss rule bars RLI from bringing its negligent misrepresentation claim, because a plaintiff who has suffered only economic losses may not bring a claim in tort. The Moving Defendants further contend that their actions do not fall within the negligent misrepresentation exception to the economic loss rule because they are not in the business of supplying information and because RLI has failed to allege reliance.

In response, RLI contends that this case falls within the negligent misrepresentation exception to the economic loss rule, because the Moving Defendants are information providers who failed to exercise reasonable care when they gave RLI false information on which they knew RLI would rely.

### III. LEGAL STANDARD

When a court considers materials beyond a plaintiff's complaint in deciding a motion to dismiss pursuant to Rule 12(b)(6), with a few exceptions, the motion must be converted to one for summary judgment and decided pursuant to Rule 56. *Camo v. Brennan,* 219 F .3d 279 (3d Cir.2000). While the Moving Defendants filed an affidavit along with their Motion, the Court will not consider the affidavit. Accordingly, the Court will treat the Moving Defendants' Motion as a motion to dismiss.

**\*2** The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994). However, the Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost,* 1 F.3d at 183. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

### IV. DISCUSSION

"The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and the only losses suffered are economic in nature." *Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992). The parties do not dispute that RLI seeks to recover only economic losses. Accordingly, the Court will grant the Moving Defendants' Motion unless the claim falls within the negligent misrepresentation exception to the economic loss rule.

The Restatement of Torts provides an exception to the economic loss rule, which has been adopted by the Delaware state courts. *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378 (Del.Super.1990). The Restatement provides:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Restatement (Second) of Torts* § 552.

In order to sustain a claim under Section 552, a plaintiff must show: (1) the defendant gave false information to the plaintiff for use in business transactions with third parties; (2) the plaintiff justifiably relied upon the false information; (3) the defendant failed to exercise reasonable care in obtaining or relaying the information; and (4) the defendant intended that the plaintiff rely upon the information. *Rose Heart, Inc. v. Ramesh C. Batta Assocs., P.A.,* C.A. No. 92C-10-138, 1995 Del.Super. LEXIS 370, at \*9 (Del.Super.Aug. 15, 1995). Additionally, a plaintiff must show that "the defendant is in the business of supplying information." *Christiana Marine Serv. Corp. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1749069 (D.Del.)
**(Cite as: Slip Copy)**

*Texaco Fuel & Marine Mktg., Inc.,* C.A. No. 98C-02-217, 2002 Del.Super. LEXIS 305, at *23-25 (Del.Super. June 13, 2002) (citing *Danforth v. Acorn Structures, Inc.,* C.A. No. 90C-JV-30, 1991 Del.Super. LEXIS 454 (Del.Super.Nov. 22, 1991)).

**\*3** The Court concludes that RLI has sufficiently pleaded the first four elements. In its Complaint, RLI alleges that the Moving Defendants supplied false information regarding the quantity and quality of McDaniel's work. RLI further alleges that it relied upon the false statements to make payments to McDaniel, which were not due, and that the Moving Defendants knew that RLI would rely on those statements. Finally, RLI alleges that the Moving Defendants failed to exercise reasonable care in obtaining the information because they failed to visit the site to evaluate McDaniel's work, reject non-conforming work, and determine whether the work was actually being performed in accordance with the contracts. Because RLI has sufficiently pleaded the first four elements of a claim under Section 552, the Court must determine whether the Moving Defendants were in the business of supplying information.

To determine whether a defendant is in the business of supplying information, a court must conduct a case-specific inquiry, looking to the nature of the information and its relationship to the kind of business conducted. *Christiana Marine,* 2002 Del.Super. LEXIS 305, at *26-27 (citing *Rankow v. First Chicago Corp.,* 870 F.2d 356, 360 (7th Cir.1989)). "[W]here the information supplied is merely ancillary to the sale of a product or service in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." *Christiana Marine,* 2002 Del.Super. LEXIS 305, at *29 (quoting *Tolan & Son Inc. v. KLLM Architects, Inc.,* 308 Ill.App.3d 18 (Ill.App.1999)).

The Court concludes that RLI has sufficiently alleged that the Moving Defendants were in the business of supplying information. The Court recognizes that the Delaware courts have found potential liability under Section 552 only where the defendant is a pure information provider.[FN2]

However, in the cases where the Delaware courts have determined that a defendant is not in the business of supplying information, such a determination has been made on summary judgment. Because summary judgment is not appropriate at this juncture and because there has been very little discovery, the Court is not in a position to decide whether the Moving Defendants " were retained to provide information ... [or] were retained to build a structure." *Tolan,* 308 Ill.App.3d at 21.

> FN2. *See Guardian,* 583 A.2d 1378 (design engineer, who prepared contract documents and specifications); *Carello v. PricewaterhouseCoopers LLP,* C.A. No. 01C-10-219, 2002 Del.Super. LEXIS 180 (Del.Super. July 3, 2002) (financial accountants); *Ruger v. Funk,* C.A. No. 93C-04-210, 1996 Del.Super. LEXIS 34 (Del.Super.Jan. 22, 1996) (attorney issuing a title certificate); *Council of Dorset Condo. Apartments v. Dorset Apartments,* C.A. 90C-10-269, 1992 Del.Super. LEXIS 343 (Del.Super.Aug. 26, 1992) (engineers who prepared an engineering report; the court distinguished engineers, who " prepare information to be used as information," from architects, who produce a tangible product).

The Court acknowledges the Delaware Superior Court's recent decision in *Millsboro Fire Company v. Construction Management Services, Inc.,* C.A. 05C-06-137-MMJ (Del.Super. June 7, 2006), which held that the parties involved in the design and management of a construction project were not in the business of supplying information. The *Millsboro* court discussed Delaware's narrow application of the negligent misrepresentation exception, stating that it had only been applied to those strictly in the business of supplying information, such as "accountants, financial advisors, and title searchers." *Id.* at 7. However, the case does not change the Court's conclusion for two reasons. First, the *Millsboro* decision was made on summary judgment, with a full record before the court. Second, the *Millsboro* court found that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 4

Slip Copy, 2006 WL 1749069 (D.Del.)
**(Cite as: Slip Copy)**

designers and architects provided plans and design drawings to construct the project. From the pleadings in this case, the exact roles of the Moving Defendants are not clear, despite being named " architect" and "construction manager." What is clear from RLI's Complaint, however, is that RLI alleged that the Moving Defendants provided information regarding the progress of McDaniel's work. Accordingly, the Court concludes that RLI has sufficiently alleged for the purposes of a motion to dismiss that the Moving Defendants were in the business of supplying information.

### V. CONCLUSION

**\*4** For the reasons discussed, Defendants, Edis Company, and Becker Morgan Group, Inc.'s Joint Motion To Dismiss The Complaint Of Plaintiff, RLI Insurance Company (D.I.10) will be denied.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, the *20* day of June 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants, Edis Company, and Becker Morgan Group, Inc.'s Joint Motion To Dismiss The Complaint Of Plaintiff, RLI Insurance Company (D.I.10) is *DENIED.*

D.Del.,2006.
RLI Ins. Co. v. Indian River School Dist.
Slip Copy, 2006 WL 1749069 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1814032 (Trial Motion, Memorandum and Affidavit) Defendants Edis Company and Becker Morgan Group, Inc.'s Joint Reply Brief in Support of their Motion to Dismiss the Complaint of Plaintiff, RLI Insurance Company (May 11, 2006) Original Image of this Document (PDF)
• 2006 WL 1200000 (Trial Motion, Memorandum and Affidavit) Plaintiff Rli Insurance Company's

Memorandum of Law in Support of its Answer to Defendants Edis Company and Becker Morgan Group, Inc.'s Joint Motion to Dismiss the Complaint of Plaintiff (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809235 (Trial Pleading) Plaintiff/Counterclaim Defendant Rli Insurance Company's Answer and Affirmative Defenses to Defendant/Counterclaim Plaintiff Indian River School District's Counterclaim (Feb. 17, 2006) Original Image of this Document (PDF)
• 1:05cv00858 (Docket) (Dec. 12, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in A.2d

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

---

◪
Outdoor Technologies Inc. v. Allfirst Financial
Inc.Del.Super.,2000.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
OUTDOOR TECHNOLOGIES INC.
v.
ALLFIRST FINANCIAL INC. f/k/a First Maryland
Bancorp, Allfirst Bank f/k/a First National Bank of
Maryland, Allfirst Financial Center f/k/a First Omni
Bank
**No. 99C-09-151-WTQ.**

Jan. 24, 2000.

Letter Opinion and Order on:
(1) Allfirst Financial Center, N.A.'s ("Omni")
Motion to Dismiss-Motion Granted as to Count I
and Denied as to Counts II, III, and IV; and
(2) Allfirst Financial, Inc.("Bancorp") and Allfirst
Bank's ("FNB") Motion to Dismiss-Motion Granted
as to Count I and Denied as to Counts II, III, and IV.

Brett D. Fallon, Esquire, Smith Katzenstein &
Furlow, Wilmington.
Andrew C. Kassner, Esquire, Drinker Biddle &
Reath, Philadelphia, PA.
Neal J. Levitsky, Esquire, Agostini Levitsky Isaacs
& Kulesza, Wilmington.
James T. Heidelbach, Esquire, Gebhardt & Smith,
Baltimore, MD.
QUILLEN, J.
*1 Gentlemen:

This is the Court's Letter Opinion and Order on
Defendants Omni, FNB, and Bancorp's Motions to
Dismiss. For the reasons stated herein, Omni, FNB
and Bancorp's Motions to Dismiss are GRANTED
as to Count I of the Complaint (the contract claims).
The Motions to Dismiss are DENIED as to Count II
(fraud), Count III (negligent misrepresentation), and

Count IV (civil conspiracy). And, as to lack of
damages stemming from Hechinger's bankruptcy,
the Court adopts the reasoning of the New York
Supreme Court as set forth in *Met Frozen Food
Corp. v. National Bank of North America,*
N.Y.Supr., 393 N.Y.S.2d 643, 648 (1977).

FACTS

The facts of this case look like a payment systems
hypothetical written by a law school professor.
Because the current Motion before the Court arises
in the context of a Motion to Dismiss, all
allegations in the Complaint must be accepted as
true. *State Use of Certain-Teed Products Corp. v.
United Pacific Ins. Co.,* Del.Super., 389 A.2d 777,
778 (1978). Therefore, the Court must accept the
facts presented to it in the Complaint as set forth
below.

Plaintiff Outdoor Technologies, Inc. ("Outdoor") is
a manufacturer of garden accessories and related
goods. It is a Delaware corporation which maintains
its principal place of business in Mississippi.

During the first half of 1999, Outdoor sold
accessories to Hechinger, Inc. ("Hechinger"). It
appears that the two had an ongoing business
relationship. Hechinger would submit purchase
orders to Outdoor, and Outdoor would ship the
purchase orders under terms that provided that
payment of the invoices was to be made by
Hechinger. The invoices that are part of the subject
matter of this litigation were to be paid by May 15,
1999.

Outdoor did, in fact, receive a purported payment.
On June 4, 1999, Outdoor received a check from
Hechinger for $706,735.62. The check was made
payable to "Outdoor Technologies" as payee and it
was signed by Mark Adams. Hechinger was the
drawer. The check appears to have been drawn on "
First National Bank of MD, Baltimore, MD," ("FNB

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

") as payor/drawee.

Apparently, it was widely reported in the press and in the industry that Hechinger was having financial difficulties and was about to file for bankruptcy. Therefore, Outdoor determined that the check should be presented and negotiated for payment as expeditiously as possible. Outdoor determined that the fastest way to get payment on this check would be to present it directly to the bank upon which the check was drawn. In furtherance of that plan, on June 4, 1999, Outdoor's Controller, John Hurt, traveled from Mississippi to Baltimore to present the check for payment on Monday June 7, 1999. At 9 a.m. on June 7, 1999, Hurt presented the check for payment at the Airport Square branch of FNB in Baltimore. Hurt requested that the check be cashed or certified for payment by FNB. Before certifying or cashing the check, the branch manager of the bank called corporate headquarters and spoke to the corporate attorney, William Thomas. The branch manager then relayed to Hurt the information provided by Thomas, that is, that FNB could not certify or cash the check because the check was not drawn on an account maintained by FNB. Rather, it was drawn on an account maintained by Omni.[FN1]

> FN1. The check itself states that it was drawn on FNB, not Omni Bank. (Compl. at Exhibit A is a copy of the check in question). Nevertheless, the Complaint, p. 7, para. 22, seems to acknowledge Omni's status as the drawee bank. At oral argument, Defendants' counsel represented that confusion was caused by Hechinger, which printed its own checks and named the wrong drawee bank.

**\*2** Hurt then called Omni to determine how best to present the check for immediate payment. Omni representatives told Hurt that Omni was a subsidiary of Bancorp. Hurt then decided to speak to Bancorp about presenting the check for payment at Omni. Allegedly, he drove to the Bancorp office and spoke with the corporate attorney, Thomas, about how to have the check certified or cashed. [FN2] Hurt claims that he relayed to Thomas that Hechinger's financial difficulties and the possibility

of its impending bankruptcy was the impetus for him needing to present the check for immediate payment. Hurt asked Thomas why Omni could not cash or certify the check, especially considering that FNB (which Bancorp also owned) was the payor. Thomas apparently told Hurt that Bancorp was not required to negotiate the check, but that, if he presented the check to the Omni branch in Delaware with proper authorization, that the bank would make immediate payment on the check. Outdoor alleges that Thomas represented to Hurt that the check was good and there were sufficient funds in the account at Omni to cover the check.

> FN2. From the record, it appears that Thomas was the attorney that provided guidance to Bancorp, FNB, and Omni in this matter. Bancorp is alleged to be a Maryland holding company which controls the sister national bank subsidiaries, FNB and Omni.

Hurt then traveled from Baltimore to Omni's only branch, which is located in Millsboro, Delaware. He did not make it to the branch before its 3 p.m. closing time on June 7, 1999. Thus, Hurt had to wait until the June 8, 1999, to present the check for payment. While Hurt was biding his time until Omni opened, he received a faxed authorization letter from Outdoor's President, Peter Orebaugh. That letter authorized Hurt to present the check for payment on behalf of Outdoor and requested that Omni either certify the check or wire transfer the check proceeds to Outdoor.

Hurt was at the Omni branch at 9 a.m. on June 8th and presented the check and the authorization letter. An employee at the Omni branch faxed the check and authorization letter to, guess who, Thomas, for his review in his capacity as the "corporate attorney." At approximately 10:30 a.m. on June 8th, Thomas called Hurt at the Omni branch stating the authorization letter was insufficient and that Omni would require a resolution from the entire board of directors of Outdoor in order to negotiate the check for payment. Omni was unable to convene a special board of directors meeting in one day to allow Hurt to present the check for payment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Stonewalled at their attempts to get the check certified or to have the funds wire-transferred through FNB, Omni, and Bancorp, Outdoor decided to deposit the check through its own bank, Bank One f/k/a First Chicago National Bank of Detroit (" NBD") on an expedited basis. The check was sent by overnight mail on June 8 and the check "cleared" NBD the next morning, June 9, 1999. The check was allegedly cleared through the Federal Reserve System and presented to Omni Bank on June 10th.

Hurt claims that he called Omni on June 11 to see if the check was paid. Hurt alleges that an Omni employee, Ernie Dukes, stated to him that the check was paid on June 10, which turned out to be false.

*3 As luck would have it, Hechinger filed for bankruptcy in the District of Delaware on June 11, 1999, and the check was returned to Outdoor unpaid.

On September 17, 1999, Outdoor filed suit in this Court seeking damages. In Count I, Outdoor alleges damages as an intended third-party beneficiary, claiming that Omni and Hechinger had a contractual relationship where Omni would negotiate and transfer payment of funds for Hechinger, and that failure to negotiate, either by certifying or cashing the check upon presentment, constituted a breach of contract. Counts II, III, IV allege fraud, negligent misrepresentation and civil conspiracy respectively, stemming from Bancorp, Omni, and FNB's failure to pay the check, wire transfer the funds, or certify the check.

### STANDARD OF REVIEW

In evaluating a Motion to Dismiss under Superior Court Civil Rule 12(b)(6), the Court must assume all well pleaded facts in the Complaint to be true. *Nix v. Sawyer,* Del.Super., 466 A.2d 407, 410 (1983) (citing *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168 (1976)). For purposes of a Motion under Rule 12(b)(6), all allegations in the Complaint must be accepted as true. *State Use of Certain-Teed Products Corp.,* 389 A.2d at 778. A Complaint will not be dismissed unless the Plaintiff would not be

entitled to recover under any reasonably conceivable set of circumstances susceptible of proof. *Nix,* 466 A.2d at 410 (citing *Diamond State Tel. Co. v. University of Del.,* Del.Super., 269 A.2d 52 (1970)). A Complaint may not be dismissed unless it is clearly without merit, which may be a matter of law or fact. *Diamond State,* 269 A.2d at 58 .

### CHOICE OF LAW

Outdoor claims that Maryland law covers this action, while Defendants claim that Delaware law applies. At this time, it is premature for the Court to decide which law applies. For one thing, there are no documents before the Court relating to the bank account relationships between Omni, FNB, Bancorp and Hechinger. For the purposes of this Motion, the provisions of the UCC and the common law doctrines relied upon are virtually identical in both States. Thus, the Court will save the choice of law determination for a later date, if needed.

### OMNI'S MOTION TO DISMISS

#### A. Count I-Contractual Claims as a Third-Party Beneficiary

The Code states that "[a] check or other draft does not of itself operate as an assignment of funds in the hands of a drawee available for its payment, and the drawee is not liable on the instrument until the drawee accepts it." UCC § 3-408. The Court understands that the statute is intended to be a statement of public policy as a matter of law and that the legal statutory policy should not be undermined by the Courts.[FN3] In this case, it is clear that Omni never accepted the check, as the term "accepted" is defined under the Code. [FN4] Therefore, under the statute, the Court holds there can be no legal breach of the bank contract between Hechinger and Omni. It necessarily follows given the statute there cannot exist a third-party beneficiary claim by Outdoor. It is the intention, as well as the policy, of this Court to give full effect to this provision of the Uniform Commercial Code.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN3. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 16-6 (4th ed. 1995) ("Even if the drawee arbitrarily dishonors a check, the payee or holder has no cause of action against the drawee bank on the instrument.") *see also* Henry J Bailey & Richard B. Hagedorn, *Brady on Bank Checks* § 22.13 (7th ed. 1993) ("If a bank without just cause refuses to honor a check drawn by one of its depositors, the bank faces possible liability to the depositor in damages for its act. Normally, however, this liability runs only in favor of the depositor or customer and not in favor of the payee or holder. This arises from the rule that the payee has no cause of action against a drawee or payor bank on a check, unless the bank has accepted or certified the instrument, or has in some other manner agreed to pay it. But it would seem that, even in such a circumstance, the bank should be liable only on its promise or engagement relating to the instrument, and not liable in a tortious sense for wrongful dishonor ."). § 4-402 speaks in terms of liability for wrongful dishonor only to the customer. *Id.*

FN4. Neither did Bancorp or FNB.

**\*4** As a gut abstract issue, without considering the statute, the Court has difficulty on the face of the matter saying blanketly that the payee cannot be a third-party beneficiary between the bank and the customer. It seems to the Court that at least one purpose of a checking account is to benefit third parties. But, given the provisions and the policy of the UCC noted in UCC § 3-408, further supported by the provision (UCC § 4-402) that the bank is only liable "to its customer" for wrongful dishonor, the UCC provisions override any third-party beneficiary claim. Thus, the Court will not allow recovery here for a breach of contract. The provisions of the UCC not only defeat the breach of contract claims, but would defeat any other claims that would necessarily violate any policy of the Code. Therefore, Omni's Motion to Dismiss the claims for breach of contract in Count I is GRANTED.

### B. Fraud

Count II alleges fraud and misrepresentation in that Outdoor claims that all the Defendants willfully and intentionally defrauded it out of the proceeds of the check. To begin with, it appears that a payee of a check can bring a fraud claim against the bank. *See generally, C & K Petroleum Products Inc. v. Equibank,* 3d Cir., 839 F.2d 188, 191 (1988). The elements of fraud in Maryland are illustrative of the general law:

In order to recover damages in an action for fraud or deceit, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R Inc.,* Md.App., 639 A.2d 660, 669 (1994) (extensively citing Maryland precedent); *see also Stephenson v. Capano Development Inc.,* Del.Supr., 462 A.2d 1069 (1983).

Outdoor alleges that the Defendants engaged in a fraudulent scheme not to honor presentment of the check in light of Hechinger's financial condition. The facts alleged in the Complaint certainly show a pattern of what could be construed as fraudulent behavior under the fraud factors. At the very least, there is a possibility that Omni acted with the intention to defraud Outdoor. What Omni intended is a "question of fact for each particular case." *Comptroller of the Treasury, Income Tax Division et al. v. Haskin et al.,* Md.App. 472 A.2d 70, 75 (1984). As such, it cannot be decided on a Motion to Dismiss. Therefore, the Motion to Dismiss as to Count II of the Complaint, alleging fraud, is DENIED.

### C. Negligent Misrepresentation

Count III alleges negligent misrepresentation against all Defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

In order to sustain a claim for negligent misrepresentation under Delaware law, plaintiffs must prove (1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information. If plaintiffs fail to prove any of the four required elements, their claim for negligent misrepresentation must fail.

**\*5** *Darnell v. Myers,* Del. Ch., No. 14859-NC, Steele, V.C. (May 27, 1998) (citing *Ward v. Hildebrand,* Del. Ch., C.A. No. 13582, Chandler, V.C. (July 8, 1996) (citing *Wolf v. Magness Constr. Co.,* Del. Ch., C.A. No. 13004, Chandler, V.C. (Sept. 11, 1995) Mem .Op. at 3.))[FN5]

> FN5. In Maryland, the elements of negligent misrepresentation are:
> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably takes action in reliance on the statement; (5) the plaintiff suffers damage proximately caused by the defendant's negligence.
> *Biser v. Deibel,* Md. Spec.App., 739 A.2d 948, 954 (1999) (citing *Martens Chevrolet, Inc. v. Seney,* Md.App., 439 A.2d 534 (1982)).

Omni argues that absent contractual privity or the equivalent, it cannot be liable in negligence for economic loss. *Jacques v. First National Bank of Md.,* Md.App., 515 A.2d 756, 761 (1986). Citing Delaware law, Outdoor cites Restatement (Second) of Torts § 552 for the proposition that the privity requirement is abolished where the plaintiff is seeking purely economic damages for negligent misrepresentation. *See Guardian Construction Co. v. Tetra Tech Richardson,* Del.Super., 583 A.2d 1378 (1990).

Restatement (Second) of Torts § 552 provides recovery for:
[o]ne who, in the course of his business, profession or employment, or in any other transaction where he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for their pecuniary loss caused to them by their justifiable reliance upon the information.

Omni has cited Maryland authority that, where the failure to exercise due care creates a risk of loss only, Courts have generally required an "intimate nexus" between the parties as a condition to the imposition of tort liability. *Jacques,* 515 A.2d at 759. That nexus is satisfied by contractual privity or its equivalent. *Id.* at 760. But that does not end the story. Since the *Jacques* decision in 1985, it appears that Maryland Courts have at least applied, if not adopted, the language of the Restatement (Second) of Torts § 552. *See Shofer v. Stuart Hack Co.,* Md. Spec.App., 723 A.2d 481, 488 (1999), *cert. denied,* Md.App., 731 A.2d 440 (1999); *Village of Cross Keys Inc. v. United States Gypsum Co.,* Md.App., 556 A.2d 1126, 1133 (1989); *Giant Food, Inc. v. Ice King, Inc.,* Md. Spec.App., 536 A.2d 1182, 1185 (1986), *cert. denied,* Md.App., 542 A.2d 844 (1988).

Today, in Maryland, the tort of negligent misrepresentation will lie for the recovery of pecuniary losses, as well as for physical harm. *Village of Cross Keys Inc.,* 556 A.2d at 1133 (citing *Martens Chevrolet,* 439 A.2d at 534; *Brack v. Evans,* Md.App., 187 A.2d 880 (1963)). Outdoor has alleged that Omni has a pecuniary interest in not negotiating the check and that Omni and the other Defendants have supplied false and misleading information to Outdoor in advising Outdoor as to where and how to present the check. These allegations are sufficient to survive a Motion to Dismiss. At this time, the Court cannot determine as a matter of law that the allegations are clearly without merit. Therefore, the Motion to Dismiss as to the negligent misrepresentation claims is DENIED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

### D. Civil Conspiracy

Count IV of the Complaint alleges a cause of action for conspiracy. In Maryland, a civil conspiracy is defined as:
\*6 a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use an unlawful means to accomplish an act not in itself illegal with the further requirement that the act or the means employed must result in damages to the plaintiff .... No action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort.

*Robb v. Wancowicz,* Md. Spec.App., 705 A.2d 125, 132 (1998), *cert denied,* Md.App., 711 A.2d 869 (1998) (internal citations omitted).

"Delaware law imposing liability for civil conspiracy is well settled. Plaintiffs must prove: (1) A confederation or combination of two or more persons; (2) An unlawful act done in furtherance of the conspiracy; and (3) Actual damage." *Nicolet, Inc. v. Nutt,* Del.Supr., 525 A.2d 146, 149-50 (1987) (citing *McLaughlin v. Copeland,* D. Del., 455 F.Supp. 749, 752 (1978), *aff'd,* 3d Cir ., 595 F.2d 1213 (1979)).

In the current Motion to dismiss the civil conspiracy claims, Defendant Omni alleges that, as a matter of law, a subsidiary cannot conspire with its parent or sister corporation. *Copperweld Corp. v.. Independence Tube Corp.,* 467 U.S. 752, 771 (1984). Many authorities have noted that the U.S. Supreme Court's decision in *Copperweld Corp.* was limited to claims under the Sherman Antitrust Act. *See Borden Inc. v. Spoor Behrins Campbell & Young, Inc.,* D.N.Y., 828 F.Supp. 216, 223-24 (1993) (citing cases where the *Copperfield Corp.* reasoning was not applied to RICO conspiracies); *see also Shared Communications Services of 1800-80 JFK Boulevard, Inc. v. Bell Atlantic Properties Inc.,* Pa.Super., 692 A.2d 570, 573 (1997), *app. denied,* Pa.Supr., 723 A.2d 673 (1998) (holding that there is no per se rule ignoring the legal corporate form in the civil conspiracy context). This Court has not found, nor has Omni cited, any Maryland or Delaware specific case law

prohibiting civil conspiracy claims that arise from conduct that occurs between sister and parent corporations. Therefore, the Motion to Dismiss the Civil Conspiracy claims is DENIED.

### E. Damages (or lack thereof)

Certainly the most interesting question in this Motion to Dismiss is whether or not Outdoor has suffered any damage as a result of Omni's refusal to cash this check. According to Outdoor, the check represented payment for goods that Outdoor previously delivered to Hechinger. If Omni would have paid the check, Outdoor would have received payment on an antecedent debt within 90 days of Hechinger's bankruptcy. Thus, Omni argues that as a preferential transfer, Outdoor would have been required to return this money to Hechinger's bankruptcy estate under 11 U.S.C. § 547.

Conversely, Outdoor responds in a two-sentence footnote that, if recovery is obtained by Outdoor from Defendants, the treatment of that recovery will be for the Bankruptcy Court to decide. *Met Frozen Food Corp. v. National Bank of North America,* N.Y.Supr., 393 N.Y.S.2d 643, 648 (1977). In that case, the New Your Supreme Court discussed a similar problem to the case at bar.
\*7 In a rather intriguing argument ... defendant contends that plaintiffs cannot establish that they have been damaged. It argues that due to the short period of time between dishonor and ... bankruptcy, plaintiffs would have been unable, assuming a timely return, to have obtained a judgment ... and ... plaintiffs would not have been able to retain the monies received since payment would represent a voidable preference ... against ... other creditors.
The issue of whether payment by defendant of the checks in question would result in plaintiffs' obtaining preference over ... other creditors is not properly before this Court. It has not been established that the defendant is a creditor ... nor are these actions the appropriate forum for making such a determination. That issue may become relevant if and when a recovery is obtained.

*Id.* (emphasis supplied).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 7

Not Reported in A.2d, 2000 WL 141275 (Del.Super.)
(Cite as: Not Reported in A.2d)

So, as to damages, the Court will adopt the above reasoning from the *Met Frozen Food Corp.* case and hold that this is not the appropriate forum to make such a determination at this time.

BANCORP AND FNB'S MOTION TO DISMISS

As to Count I, dealing with the breach of contract claims, this Court has already held that Omni does not have third-party beneficiary standing in this situation to assert a contract action. Because Omni, who was the account holder, cannot be held liable for breach of contract with Outdoor because of the UCC provisions, it is axiomatic that the same claims cannot be brought against the non-account holders, FNB and Bancorp. Therefore, the Motion to Dismiss dealing with the breach of contract claims against FNB and Bancorp is GRANTED.

Counts II and III allege a cause of action against FNB and Bancorp for fraud and negligent misrepresentation, respectively. FNB and Bancorp argue that the fact that Thomas served as in-house counsel for them and for Omni does not render them liable for his statements while making representations on behalf of Omni. This Court, however, agrees with Outdoor, that the Complaint alleges a significant fraudulent scheme by the Defendants not to honor the presentment of the check in light of Hechinger's financial condition. If proved, the alleged actions of all three of the entities (Omni, Bancorp and FNB) could play a part in delaying the payment of the check. Certainly there is behavior alleged that amounts to much more than a single misrepresentation by Thomas. Whether and to what extent fraud was committed or negligent misrepresentations were made will have to be fleshed out at a later date. For now, Outdoor has stated a cause of action against all three Defendants for fraud and negligent misrepresentation.

As to Count IV, which alleges civil conspiracy, FNB and Bancorp argue that the Complaint does not allege any agreement between the three entities to commit an unlawful act. Defendants further argue that separate corporate officers cannot conspire with each other through the same corporate officer. *See Windsor Theater Co. v. Wallbrook Amusement Co.,*

D. Md., 94 F.Supp. 388 (1950), *aff'd,* 189 F.2d 797 (1951). Contrary to FNB and Bancorp's assertions, the conduct alleged implicates far more that just the statements of the in-house counsel, Thomas. Outdoor alleges that several employees of various companies participated in this conspiracy. The allegations are certainly enough to survive a Motion to Dismiss. Therefore, the Motion to Dismiss on the claims of civil conspiracy is DENIED.

CONCLUSION

*8 For the foregoing reasons, Omni, FNB and Bancorp's Motions to Dismiss are GRANTED as to Count I of the Complaint (the contract claims). The Motions to Dismiss are DENIED as to Count II (fraud), Count III (negligent misrepresentation), and Count IV (civil conspiracy). And, as to lack of damages stemming from Hechinger's bankruptcy, the Court adopts the reasoning of the New York Supreme Court as set forth in *Met Frozen Food Corp. v. National Bank of North America,* N.Y.Supr., 393 N.Y.S.2d 643, 648 (1977). IT IS SO ORDERED.

Del.Super.,2000.
Outdoor Technologies Inc. v. Allfirst Financial Inc.
Not Reported in A.2d, 2000 WL 141275 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



**H**
Danforth      v.      Acorn      Structures,
Inc.Del.Super.,1991.Only the Westlaw citation is
currently available.
UNPUBLISHED   OPINION.   CHECK   COURT
RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
George DANFORTH, Plaintiff,
v.
ACORN STRUCTURES, INC., a Massachusetts
corporation, Defendant.
**Civ. A. No. 90C-JN-30.**

Submitted: Oct. 18, 1990.
Decided: Nov. 22, 1991.


Upon Motion of Plaintiff for Reargument.

John H. Newcomer, Jr., of Bayard, Handelman &
Murdoch, P.A., for plaintiff George Danforth.
Howard M. Berg, and Paul Cottrell, of Berg,
Bifferato, Tighe & Cottrell, P.A., for defendant
Acorn Structures, Inc.

*MEMORANDUM OPINION*
HERLIHY, Judge.
**\*1** Plaintiff George Danforth [Danforth] has moved
for reargument of this Court's decision of August
27, 1991. He argues that his claim falls within the
negligent misrepresentation exception to the
economic loss rule which was recognized in
*Guardian Construction Co. v. Tetra Tech
Richardson,* Del.Super., 583 A.2d 1378 (1990).
Specifically, Danforth contends that *Guardian*
allows his claim because he signed a "Custom
Design Agreement" [agreement] with Acorn
Structures, Inc. [Acorn] which agreement contained
defective plans which were used to build his house.
Danforth obtained a home building package from
Acorn after completion of the agreement. The
home building package is the material used to
construct the house.

*Guardian* adopted for Delaware *Restatement,
Second, Torts* § 552. [FN1] The cause of action
recognized in *Guardian* is known also as negligent
misrepresentation.       Danforth's       motion       for
reargument requires this Court to reexamine
*Guardian.* That reexamination further requires a
clarification of *Guardian* and its adoption of § 552
and its application to this case.

It has been noted that § 552 is unclear whether an
element of a claim for negligent misrepresentation
is that the information be supplied for a transaction
not involving the defendant. *Colorado Nat. Bank
of Denver v. Adventura Assoc.,* D.Colo., 757
F.Supp. 1167 (1991). The court in *Guardian* did
not specifically address this issue, however, an
examination of the facts in *Guardian* clearly shows
that the Court applied § 552 to just that kind of
situation.

The defendant in *Guardian* supplied information to
a state agency for the preparation of bid
specifications. The successful general contractor
bidder used those specifications not only to prepare
its bid but to eventually subcontract out the work.
Later it was found that the defendant's
specifications were faulty causing increased cost to
the subcontractor and, thus, to the state.

Without expressly so ruling, the *Guardian* court
found that the plaintiff general contractor had used
the defendant's information in dealings with third
parties, neither one of whom was the defendant.
There were two third parties. One was the state
agency to whom the general contractor offered a
bid, using the specifications to develop a price.
The other third party was the subcontractor who
used the information to prepare its work, including
the price to be charged to the general contractor.

As noted in this Court's original decision, *Guardian*
was presaged in *Hodges v. Smith,* Del.Super., 517
A.2d 299 (1986). In that case, too, the plaintiff
used the defendant's survey information in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1991 WL 269956 (Del.Super.)
(Cite as: Not Reported in A.2d)

transactions with third parties. *Hodges,* 517 A.2d at 301. While not expressly stated in *Hodges,* the factual setting clearly implicates, as did *Guardian,* the need for the plaintiff to use the defendant's information in transactions with third parties. The Court in *Hodges,* when using the negligent misrepresentation basis of liability, cited an Illinois case as authority. Illinois has had much litigation in this area and had adopted and used § 552 for a period of time prior to Delaware's adoption in *Guardian. See Penrod v. Merrill, Lynch, Pierce, Fenner and Smith,* Ill.App.Ct., 385 N.E.2d 376, 381 (1979).

**\*2** Illinois has now made it clear that in order to sustain a claim for negligent misrepresentation, the information must be supplied for the guidance of others in their business transactions. *Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.,* Ill.App.Ct., 440 N.E.2d 282, 284 (1982). This requirement has been further refined to mean that the information supplied must be "for the guidance of others in their business relations with *third* parties". *Id.* The Illinois Supreme Court has confirmed this as an element in a negligent misrepresentation cause of action. *Moorman Mfg. Co. v. National Tank Co.,* Ill.Supr., 435 N.E.2d 443, 452 (1982).

Subsequent litigation has made it clear that Illinois retains the element of third party involvement as a prerequisite to recover for negligent misrepresentation. *Rankow v. First Chicago Corp.,* 870 F.2d 356 (7th Cir.1989); *Gerdes v. John Hancock Mut. Life Ins. Co.,* D.C.N.D.Ill, 712 F.Supp. 692 (1989); *Vacuum Industrial Pollution, Inc. v. Union Oil Co. of California,* D.C.N.D.Ill., 764 F.Supp.. 507 (1991). Illinois is not alone in requiring that the information be used in transactions involving third parties. *See Meier v. Alfa-Laval, Inc.,* Ia.Supr., 454 N.W.2d 576, 581 (1990) where Iowa joined Illinois. Iowa, too, had previously adopted § 552. *Id.* at 581.

Colorado also has adopted § 552. *First National Bank in Lamar v. Collins,* Colo.Ct.App., 616 P.2d 154 (1980). In that case, the plaintiff had relied on information from a franchisor to mortgage property he owned. The plaintiff bank (mortgagee) filed

foreclosure and the plaintiff cross-claimed against the franchisor, including a claim for negligent misrepresentation. Colorado also would appear to require the involvement of third parties as an element of cause of action under negligent misrepresentation and § 552. *Jardel Enterprises, Inc. v. Triconsultants, Inc.,* Colo.Ct.App., 770 P.2d 1301, 1304-05 (1988); *Colorado Nat. Bank,* 757 F.Supp. at 1173.

In *Devore v. Hobart Manuf. Co.,* La.Supr., 367 So.2d 836 (1979), Louisiana recognized the existence of the tort of negligent misrepresentation under § 552. However, the facts of that case show an implicit acknowledgment of the need for involvement of third parties.

Thus, it is clear that in order for a plaintiff to invoke a cause of action under negligent misrepresentation involving § 552, the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties. In other words, the information must be used in a transaction not involving the defendant. Insomuch as this is a clarification of *Guardian's* adoption of § 552, the definite weight of authority, particularly recent decisions, justifies such a clarification.

Danforth's claim fails on this ground alone. He did not and does not claim that he took Acorn's information in the agreement and in *any way* used that with a third party. There is no claim that he selected any contractors or subcontractors based on that information. In addition, while Danforth may have contracted with a third party, a general contractor, to build his house from the package (materials) Acorn provided, Danforth used Acorn's "information" to sign a second contract with Acorn. That step hardly meets the test of a transaction involving a party other than the defendant. Accordingly, on this ground, Danforth's negligent misrepresentation claim must fail.

**\*3** There is an additional element to the cause of action under negligent misrepresentation. Again, while neither *Hodges* nor *Guardian expressly* made this second element a prerequisite to recovery under this type of tort, it can be fairly read into the opinions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3

Not Reported in A.2d, 1991 WL 269956 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

The second element is that the plaintiff must show that the defendant is in the business of supplying information. A surveyor such as the defendant in *Hodges* clearly meets that criteria. *Hodges* cited as support for its holding the Illinois case of *Rozny v. Marnul,* Ill.Supr., 250 N.E.2d 656 (1969) allowing a negligent misrepresentation cause of action against a surveyor. Again, it is constructive to examine Illinois case history in understanding the development of this cause of action. The Illinois Supreme Court clarified after *Rozny* that negligent misrepresentation requires the defendant to be in the business of supplying information. *Moorman Mfg. Co.,* 435 N.E.2d at 452. *See Rankow,* 870 F.2d at 362; *Black, Jackson and Simmons,* 440 N.E.2d at 284; *Gerdes,* 712 F.Supp. at 696.

In *Guardian,* while again not explicitly stated as an element of negligent misrepresentation under § 552, the facts clearly show the defendant was in the business of providing information. The defendant was a design engineer.

In light of the extensive litigation history in Illinois involving claims of negligent misrepresentation, this Court deems it appropriate to adopt explicitly that which was implicit in *Hodges* and *Guardian.* That is, a plaintiff must show as an element of this cause of action that the defendant is in the business of providing information.

"There has been no clear discussion in the [Illinois] cases to date as to what principle should be applied in determining whether a party is 'in the business of supplying information'." *Rankow,* 870 F.2d at 363. Various Illinois cases, *Hodges* and *Guardian* do provide guidance applicable to this case. *Black, Jackson and Simmons,* 440 N.E.2d at 284 (computer hardware and software supplier not in business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.,* Ill.App.Ct., 453 N.E.2d 8, 11 (1983) (roofing materials supplier not in information business); *Tan v. Boyke,* Ill.App.Ct., 508 N.E.2d 390, 396, *appeal denied,* Ill.Supr., 515 N.E.2d 127 (1987) (seller of an apartment building); *Vacuum Industrial Pollution,* 764 F.Supp. at 514 (oil company not in business of supplying information).

As the Court in *Rankow* stated:

Obviously, a great many businesses involve an exchange of information as well as of tangible products-manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.

*\*4 Rankow,* 870 F.2d at 364.

It is not necessary for this Court to presently delineate those types of businesses which are or are not in the business of providing information. Lists of those which clearly are in the information business are found in *Rankow,* 720 F.2d at 360-66 and *Gerdes,* F.Supp. at 697-98.

Suffice it to say that Acorn in this instance does not fall into the category of concerns which are in the business of supplying information. Danforth's complaint makes it clear that Acorn primarily sold a tangible product-materials with which to build homes. The design and "assembly instructions" were incidental.

Even if the design function approaches the level of an architect providing information and perhaps placing Acorn in the business of providing information, Danforth's claim still fails. It is the instructed use of a water proofing and/or insulating material which is the gravamen of Danforth's complaint. In the context of the construction of the house that was an assembly instruction relating to a tangible product. It was incidental to the home's construction and had nothing to do with design in the traditional architectural sense.

Accordingly, Danforth has not met his burden of showing that as an element of the claim of negligent misrepresentation, Acorn is in the business of providing information. On this ground alone, and/or in conjunction with his failure to meet the first element of involvement of third parties, Danforth's claim fails.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 4

Not Reported in A.2d, 1991 WL 269956 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


For the reasons stated herein, Danforth's motion for
reargument is DENIED.

IT IS SO ORDERED.


>          FN1. Information Negligently Supplied for
>          the Guidance of Others
>          (1) One who, in the course of his business,
>          profession or employment, or in any other
>          transaction in which he has a pecuniary
>          interest, supplies false information for the
>          guidance of others in their business
>          transactions is subject to liability for
>          pecuniary loss caused to them by their
>          justifiable reliance upon the information, if
>          he fails to exercise reasonable care or
>          competence in obtaining or communicating
>          the information.
>          (2) Except as stated in Subsection (3), the
>          liability stated in Subsection (1) is limited
>          to loss suffered
>          (a) by the person or one of a limited group
>          of persons for whose benefit and guidance
>          he intends to supply the information or
>          knows that the recipient intends to supply
>          it; and
>          (b) through reliance upon it in a
>          transaction that he intends the information
>          to influence or knows that the recipient so
>          intends or in a substantially similar
>          transaction.
>          (3) The liability of one who is under a
>          public duty to give the information extends
>          to loss suffered by any of the class of
>          persons for whose benefit the duty is
>          created, in any of the transactions in which
>          it is intended to protect them.
>          *Restatement, Second, Torts* § 552.

Del.Super.,1991.
Danforth v. Acorn Structures, Inc.
Not Reported in A.2d, 1991 WL 269956
(Del.Super.)

END OF DOCUMENT


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Not Reported in A.2d                                                                                                Page 1

Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Millsboro Fire Co. v. Construction Management Services, Inc.Del.Super.,2006.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware,New Castle County.
MILLSBORO FIRE COMPANY, a Delaware corporation, Plaintiff,
v.
CONSTRUCTION MANAGEMENT SERVICE, INC., a Delaware corporation, Defendant, Counter-claimant, Third-Party Plaintiff,
v.
R. Calvin Clendaniel Associates, P.A., Mahaffy & Associates, Inc., a Delaware corporation, Volair Contractors, Inc., a Delaware corporation, B.D. Abel, Inc., and Pierce Moretta & Co., d/b/a Shure-Line Excavating, Third-Party Defendants.
**C.A. No. 05C-06-137 MMJ.**

Submitted: April 17, 2006.
Decided: June 7, 2006.

Upon Third-Party Defendants R. Calvin Clendaniel Associates, P.A. and Mahaffy & Associates, Inc.'s Joint Motion for Summary Judgment and B.D. Abel, Inc.'s Motion for Summary Judgment. ***GRANTED.***

Jeffrey M. Weiner, Esquire, Wilmington, Delaware, Attorney for Plaintiff.
Paul G. Enterline, Esquire, Georgetown, Delaware, Attorney for Defendant/Third-Party Plaintiff.
James S. Green, Esquire, Daniel B. Rath, Esquire, Landis, Rath & Cobb, LLP, Wilmington, Delaware, Attorneys for Third-Party Defendant, B.D. Abel, Inc.
Donald L. Logan, Esquire, Tighe, Cottrell & Logan, P.A., Wilmington, Delaware, Attorney for Third-Party Defendant, Pierce Moretta & Co. D/b/a Shure-Line Excavating.
Paul Cottrell, Esquire, Tighe, Cottrell & Logan,

P.A., Wilmington, Delaware, Attorney for Third-Party Defendant, Mahaffy & Associates, Inc.
James W. Owen, Esquire, Wilmington, Delaware, Attorney for Third-Party Defendant, R. Calvin Clendaniel Associates, P.A.

*MEMORANDUM OPINION*
JOHNSTON, J.
**\*1** This case arises from the construction and renovation of improvements to the property of the Millsboro Fire Company ("MFC") in Millsboro, Delaware. MFC filed a complaint against the general contractor on the project, Construction Management Service, Inc. ("CMSI"), alleging numerous design and workmanship defects. CMSI filed an answer, counterclaim and a third-party complaint. The third-party complaint was asserted against two entities involved in the design and management of the project: R. Calvin Clendaniel Associates, P.A., ("Clendaniel") and Mahaffy & Associates, Inc. ("Mahaffy"). The third-party complaint also joined several subcontractors: Volair Contractors, Inc. ("Volair"), B.D. Abel, Inc. (" B.D.Abel") and Pearce & Moretto, Inc. ("Pearce").

Clendaniel and Mahaffy filed a Joint Motion for Summary Judgment on the third-party complaint. B.D. Abel also has moved for summary judgment.

*STATEMENT OF FACTS*

For purposes of evaluating the pending motions for summary judgment, the following facts are undisputed.

On May 19, 2001, MFC entered into a contract with CMSI for the construction of renovations and additions to the Fire Hall in Millsboro, Delaware (" Project"). The original contract sum was $1,847,541.00. CMSI is a construction management firm. Clendaniel was hired by MFC to provide architectural services, including design and administration of the construction contract. Mahaffy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2

Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

was hired by Clendaniel to assist Clendaniel in designing the heating, ventilation and air conditioning ("HVAC"), as well as the electrical and plumbing systems on the Project.

Construction began on August 17, 2001. Regular meetings were held on the Project site, attended by representatives of CMSI, its subcontractors, the design professionals, and the owners. At these meetings, the parties discussed the status of the Project, identified problems, and worked out solutions. From time to time, CMSI made applications to the owner for payment based upon the percentage of work performed. Clendaniel reviewed and approved such applications. CMSI paid its subcontractors for completed work.

A "punch list" was sent to CMSI by Clendaniel and Mahaffy in October 2002. The Project was substantially completed by October 31, 2002. MFC subsequently complained of defects in the design and workmanship on the Project. The alleged defects primarily concern two areas: HVAC and concrete paving.

The alleged HVAC defects are set forth in a report of Weldon Engineering, dated August 4, 2004. Based on that report, MFC claims damages, for repairs and changes in the design, in excess of $500,000. The HVAC systems was designed and specified by Clendaniel and Mahaffy. The HVAC contractor was third-party defendant Volair, Inc. The HVAC testing and balancing sub-contractor was third-party defendant B.D. Abel.

The alleged defects in concrete paving are set forth in the report of IOTT Architect Engineering Inc., dated October 14, 2004. MFC claims damages for repair of the concrete work, in an amount in excess of $388,000. The paving was designed and specified by Clendaniel. Interior paving was performed by CMSI. Exterior paving was performed by Pearce and its subcontractors.

**\*2** On June 10, 2005, MFC filed a complaint against CMSI seeking damages of $961,153, plus interest counsel fees and costs. On August 12, 2005, CMSI filed the following third-party claims: against Clendaniel for negligent misrepresentations or

non-disclosures to CMSI that the work was approved and acceptable, and for negligent design; against Mahaffy for negligent misrepresentations, non-disclosures and negligent design; against Volair for negligent performance of work and breach of its subcontract; against B.D. Abel for negligent misrepresentations, non-disclosure and breach of contract; and against Pearce for negligence performance of work and breach of contract.

*STANDARD OF REVIEW*

This Court will grant summary judgment only when no material issues of fact exist. The moving party bears the burden of establishing the non-existence of material issues of fact.[FN1] Once the moving party meets its burden, the burden shifts to the non-moving party to establish the existence of material issues of fact.[FN2] Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial.[FN3] If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of the case, then summary judgment must be granted.[FN4] A court deciding a summary judgment motion must identify disputed factual issues whose resolution is necessary to decide the case, but the court must not decide those issues.[FN5] In considering such a motion, the Court must evaluate the facts in the light most favorable to the non-moving party.[FN6] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. [FN7]

FN1. *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

FN2. *Id.* at 681.

FN3. Super. Ct. Civ. R. 56(e); *Celotex*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

FN4. *Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912 (1992); *Celotex Corp. v. Catrett, supra.*

FN5. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99 (Del.1992).

FN6. *Id.*

FN7. *Ebersole v. Lowergrub,* 180 A.2d 467, 468-69 (Del.1962).

### ANALYSIS

*Economic Loss Doctrine*

Under the Economic Loss Doctrine, a party may recover in tort only if losses are accompanied by bodily harm or property damage.[FN8] The Restatement (Second) of Torts § 552 provides an exception to the Economic Loss Doctrine's bright-line rule. This Court explicitly adopted this exception in *Guardian Construction Co. v. Tetra Tech Richardson.*[FN9]

FN8. *Christiana Marine Service Corp. v. Texaco Fuel and Marine Marketing, Inc.,* 2002 WL 1335360, at *22 (Del.Super).

FN9. 583 A.2d 1378 (Del. Super 1990).

A plaintiff seeking damages for negligent misrepresentation, where the losses are solely economic, must demonstrate two elements. First, " the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties." Second, the defendant must be in the business of supplying information."[FN10]

FN10. *Christiana Marine Services Corp.,* 2002 WL 1335360, at *8 (quoting *Danforth v. Acorn Structures, Inc.,* 1991

WL 269956 (Del.Super.)).

Initially, the Economic Loss Doctrine related to product liability actions. Courts later expanded me doctrine's application beyond its original scope. The doctrine generally must be considered in disputes arising from commercial transactions in which the alleged damages do no harm to a person or to property. Jurisdictions, including Maryland [FN11] and Connecticut, [FN12] have taken a more expansive view than Delaware.

FN11. *See Walpert, Smullian & Blumenthal, P.A. v. Katz,* 762 A.2d 582 (Md.2000).

FN12. *Jacobson v. Environmental Risk Limited,* 1996 WL 168086, at *3 (Conn.Super.)

*3 For litigants in Delaware, the questions of when a business crosses the line into "supplying information" and whether that requirement is mandated, have not been definitively resolved. In *Danforth v. Acorn Structures, Inc.,* [FN13] the Delaware Supreme court opined that where privity of contract exists, it is presumed that the parties to the transaction have allocated the risk of product nonperformance through the bargaining process. [FN14] Allegations of purely economic loss do not implicate tort law concerns with safety. Instead, the issues arise from commercial law and economic expectations. The *Danforth* Court held the existence of privity of contract is not an exception to the Economic Loss Doctrine's prohibition against recovery in tort in Delaware.[FN15]

FN13. 608 A.2d 1194 (Del.1992).

FN14. *Id.* at 1200.

FN15. *Id.*

Public policy considerations do not compel this Court to expand the doctrine. In Delaware, only surveyors [FN16] and those expressly in the business of supplying information such as accountants,[FN17]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 4

Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

financial advisors, [FN18] and title searchers,[FN19] can be liable in tort for purely economic losses. By providing information to MFC for use in transactions with third parties, Clendaniel, Mahaffy, and B.D. Abel did not engage in conduct undertaken while in the business of supplying information. The information is more aptly categorized as information incidentally supplied to CMSI as part of the construction, renovation and addition to the Fire Hall. Viewing the facts in the light most favorable to the non-moving parties, the provision of plans and design drawings used to construct the project, do not constitute the business of supplying information. Clendaniel, Mahaffy and B.D. Abel are not businesses falling within Delaware's narrow application and strict construction the Economic Loss Doctrine.

> FN16. *Guardian,* 583 A.2d at 1385.

> FN17.        *Carello         v. PricewaterhouseCoopers, LLP,* 2002 WL 1454111, at *7 (Del.Super.)

> FN18. *Outdoor Technologies Inc. v. AllFirst Financial Inc.,* 2000 WL 141275, at *5 (Del.Super.).

> FN19. *Ruger v. Funk,* 1996 WL 110072, at *10 (Del.Super.).

With regard to E.D. Abel, CMSI claims that the defects in design were caused by Mahaffy and approved by the project architect Clendaniel. At the time B.D. Abel became involved in the Project, all the damage, and alleged detrimental reliance, already had occurred. B.D. Abel provided a deficiency report because it was prevented from properly testing, adjusting and balancing the HVAC system due to alleged defects in the system's design and/or installation. No party has alleged reliance on the deficiency report. B.D. Abel was hired to provide the service of testing, adjusting, and balancing an already installed HVAC system. B.D. Abel was not in the business of supplying information.

Third-Party Defendant Volair Contractors, Inc., a

business presumed to be insolvent, has not applied to the Court for relief. Therefore, the Court need not determine at this juncture any legal relationships among CMSI, B.D. Abel and Volair. In general, however, a sub-subcontractor stands in the shoes of a defunct subcontractor. A contractor may join a sub-subcontractor on the basis of the sub-sub's contract with the sub. In this case, B.D. Abel's liability is limited to the four corners of its contract with Volair. Pursuant to the Economic Loss Doctrine, there is not a basis for a cause of action in tort against B.D. Abel by CMSI.

### Detrimental Reliance

**\*4** To the extent latent defects were design defects, CMSI should not be found liable to MFC for breach of contract. CMSI would not have relied to its detriment on information provided by design professionals. CMSI would have a defense to MFC's breach of contract claims to the extent CMSI built the structure in accordance with the design plans. A contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if the contractor performs work without neglect and in a workmanlike manner. [FN20] Even if a contractor were obligated under the contract to produce a structure free from any defects, the owner's instructions to the contractor excuse the contractor from any further liability.[FN21] Here, the plans and specifications were provided by MFC or at MFC's request, and CMSI will not be held accountable for any defect that resulted from defective plans.

> FN20. *Id.*

> FN21. *Ridley Inv. Co. v. Croll,* 192 A.2d 925, 927 (Del.1963).

### Unjust Enrichment

CMSI's duties to MFC are those enumerated in the contract between CMSI and MFC. Any alleged failure on the part of the CMSI to conform to the contract will be measured by the terms of the contract, in accordance with the principles of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 5

Not Reported in A.2d, 2006 WL 1867705 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

contract law.

CMSI had no contractual relationship with either
Clendaniel or Mahaffy. Their duties to approve
payment requests were undertaken solely for the
benefit of MFC. Therefore, the claim that CMSI
was an intended third-party beneficiary of
Clendaniel's or Mahaffy's contract with MFC is
without merit.

Unjust enrichment is the unjust retention of a
benefit resulting in a loss to another. A plaintiff's
refusal to join a party to a breach of contract suit
does not constitute unjust enrichment to the
non-party. Further, CMSI retains the defense that it
built according to plans and specifications and,
therefore, CMSI is not liable for any alleged defects
in design.[FN22]

      FN22. *Id.*

        *CONCLUSION*

Allocation of liability among design professionals,
contractors and subcontractors, is a problem
inherent in complex litigation involving
construction. Generally, there is the risk of jury
confusion, and the risk of awards of damages
against parties which more appropriately should be
levied against absent parties. These risks can be
alleviated through use of special verdict forms and
interrogatories to the jury.

Clendaniel, Mahaffy and B.D. Abel did not supply
information to MFC while they were engaging in
the business of supplying information Any
information supplied was incidental to the services
provided by Clendaniel, Mahaffy and B.D. Abel as
part of the construction and renovation Project.

The contract at issue is between MFC and CMSI.
Clendaniel, Mahaffy and B.D. Abel have no
contractual relationship with CMSI. CMSI is not a
third-party beneficiary of any contract entered into
by Clendaniel, Mahaffy or B.D. Abel.

THEREFORE, the Economic Loss Doctrine
prohibits recovery in tort for losses unaccompanied

by bodily harm or property damage and Third-Party
Defendants have not been unjustly enriched to the
detriment of CMSI. Third-Party Defendants' R.
Calvin Clendaniel Associates, P.A., Mahaffy &
Associates, Inc. and B.D. Abel, Inc., Motions for
Summary Judgment are hereby GRANTED.
Third-Party Defendants are hereby DISMISSED,
WITH PREJUDICE.

**\*5** FURTHER, Defendant Chromalloy American
Corporation's unopposed request that it be
dismissed with prejudice is hereby GRANTED.

IT IS SO ORDERED.

Del.Super.,2006.
Millsboro Fire Co. v. Construction Management
Services, Inc.
Not Reported in A.2d, 2006 WL 1867705
(Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

# TIGHE, COTTRELL & LOGAN, P.A.

**Attorneys at Law**
704 KING STREET, SUITE 500
P.O. BOX 1031
WILMINGTON, DELAWARE 19899
Telephone Number: (302) 658-6400
Telecopier Number: (302) 658-9836
Toll Free: (800) 645-6401
WRITER'S EMAIL: p.mcgrory@lawtcl.com

BRANCH OFFICES:

19 WEST AVENUE
P.O. BOX 303
WOODSTOWN, NJ 08098

1220-C EAST JOPPA ROAD
SUITE 505
TOWSON, MD 21286

2017 SPRING GARDEN STREET
PHILADELPHIA, PA 19130-3804

June 12, 2006

The Honorable Joseph J. Farnan, Jr.
U.S. District Court for the
District of Delaware
844 N. King Street
Lockbox 18
Wilmington, DE 19801

RE:    **RLI Ins. Co. v. Indian River School Dist., et al.**
       **C.A. No.: 05-858-JJF**
       **Our File Nos.: 6981; 8760**

Dear Judge Farnan:

Pursuant to Local Rule 7.1.2 (c), please find enclosed a copy of a recent decision by the Delaware Superior Court which holds that the Restatement (Second) of Torts § 552 does not apply to architects and engineers who merely supply information ancillary to the ultimate production of a tangible object, such as a building.

In the case of *Millsboro Fire Company v. Construction Management Services, Inc.*, C.A. No. 05C-06-137 MMJ (Superior Court, DE; Memorandum Opinion of June 7, 2006), the Court expressly held that the Economic Loss doctrine applies to prevent suits based in tort against architects and engineers on the basis that both are not in the business of supplying information, a requirement of § 552. The Court specifically found that "the provision of plans and design drawings used to construct the project do not constitute the business of supplying information." *Id.* at pp. 7-8. The Superior Court held, therefore, that architects and engineers are not engaged in the type of "businesses falling within Delaware's narrow application and strict construction of the Economic Loss Doctrine." *Id.* at p. 8.

Co-defendants EDIS and Becker Morgan respectfully submit that the facts of *Millsboro* are analogous to the facts of the case *sub judice*. In *Millsboro*, the General Contractor ("GC")

-1-

The Honorable Joseph J. Farnan, Jr.
June 12, 2006
Page 2

attempted to recover in tort against the architect and design engineer for alleged deficiencies in
design and negligent approval of progress payments to the GC by the Owner. In the present case,
RLI is attempting to recover against the Construction Manager and the Architect claiming, *inter
alia*, that both negligently misrepresented that the GC was making adequate progress towards
completion of the project.

As there is no material difference between the case *sub judice* and the facts of *Millsboro*,
the Movants respectfully request that this Court follow the holding of the Delaware Superior
Court as indicative of the current trend in Delaware, and grant the present Joint Motion to
Dismiss the Complaint of RLI.

Respectfully Submitted,

TIGHE, COTTRELL & LOGAN, P.A.

   /s/ Paul Cottrell
Paul Cottrell DE I.D. # 2391
One Customs House, Suite 500
P.O. Box 1031
Wilmington, DE  19899
(302) 658-6400
p.cottrell@lawtcl.com
Attorney for Becker Morgan Group, Inc.

Enclosed

TIGHE, COTTRELL & LOGAN, P.A.

   /s/ Donald L. Logan
Donald L. Logan, Esquire DE I.D. # 2604
One Customs House, Suite 500
P.O. Box 1031
Wilmington, Delaware 19899
(302) 658-6400
d.logan@lawtcl.com
Attorney for EDiS Company

Cc:    Clerk of the Court
       Perry F. Goldlust, Esquire
       Harry R. Blackburn, Esquire
       Kevin Amadio, Esquire
       James S. Green, Esquire

-2-

# EXHIBIT G

# Harry R. Blackburn
## & Associates, P.C.    Attorneys at Law

*John E. Hilser\*‡*

*Of Counsel*
*Federico Calaf-LeGrand~*

*\*Also Admitted in NJ*
*‡Also Admitted in FL*
*~Admitted Only in PR*

*Direct Dial*
*Ext. 105*
*email: jhilser@hrblackburn.com*

June 21, 2006

Honorable Joseph J. Farnan, Jr.
United District Court for the
District of Delaware
Lockbox 18
844 N. King Street
Wilmington, DE 19801

> Re:    **RLI Insurance Company v. Indian River School District, et al.**
> **United District Court for the District of Delaware**
> **Civil Action No. 1:05-cv-00858-JJF**
> **Our File No. 729.004**

Dear Judge Farnan:

This firm represents Plaintiff RLI Insurance Company in connection with the above-referenced matter wherein Motions for Dismissal have bene filed by the Defendants and are currently pending before Your Honor. This office is in receipt of a June 12, 2006 letter from counsel for Defendants enclosing a recent case of *Millsboro Fire Company v. Construction Management Services, Inc.*, a copy of which I enclose for Your Honor's reference. While counsel for Defendants is correct in quoting the opinion of the Court as holding "the provision of plans and design drawings used to construct the project do not constitute the business of supplying information," that decision fails to address specifically the negligent inspection and approval of payment applications of the contractor. On this point it is of paramount significance that a design professional or a contract manager need not undertake inspection and approval responsibilities on behalf of an owner. Indeed, such services are more aptly characterized as consulting services and are separate and distinct from an architect's preparation of plans and specifications, and a construction manager's activities. Accordingly, these consulting activities are for the specific purpose of providing information, and are not incidental and/or necessary to the architect's traditional function. As set forth in RLI Insurance Company's Memorandum of Law, any party reviewing and approving payment applications in connection with a construction project understands that these applications are not only relied upon by the owner in relation to contract balances but also the Surety and any lending institution involved in a project. Such information is utilized by these parties for purposes of making decisions to act upon and/or protect security interests in the ongoing construction. Thus, the *Millsboro Fire Company* case

---

**1528 Walnut Street, 9th Floor, Philadelphia, Pennsylvania 19102 (215) 985-0123 Fax: (215) 985-0124**
208 Kings Highway South, Cherry Hill, New Jersey 08034 (856) 795-5758 Fax: (856) 428-1255
361 San Francisco Street, 4th Floor, San Juan, Puerto Rico 00901 (787) 725-1004
5160 N. Harbor City Blvd, Melbourne, Florida 32940 (321) 751-8100 Fax: (321) 751-8104

Harry R. Blackburn
    & Associates, P.C.
Honorable Joseph J. Farnan, Jr.
June 21, 2006
Page 2


does not squarely address the inspection and approval functions undertaken by the architect and the construction management company in the present case. To be clear, the Surety's complaint in the instant action is addressed to these separate and distinct consulting services and not on "the provision of plans and design drawings used to construction the project."

Your Honor's consideration of the above is greatly appreciated.


Respectfully submitted,


*/s/ John E. Hilser*
JOHN E. HILSER


JEH/erl
Enclosure

cc:    **Via First Class Mail, w/o encl:**
       Paul Cottrell, Esquire
       Donald L. Logan, Esquire
       Perry F. Goldlust, Esquire
       Kevin Amadio, Esquire
       James S. Green, Esquire

/s/ Perry F. Goldlust
Perry F. Goldlust (DSB #770)
Aber Goldlust Baker & Over
702 King Street, Suite 600
P. O. Box 1675
Wilmington, DE  19899-1675
pgoldlust@gablawde.com
(302) 472-4900

Q:\RLI Surety.729\McDaniel.004\Indian River\Ltr\Farnan, J 06-20-06.wpd

# EXHIBIT H

*Westlaw.*

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**
Carello      v.      PricewaterhouseCoopers
LLPDel.Super.,2002.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
Mark W. CARELLO and Karen Carello Nocket,
Plaintiffs,
v.
PRICEWATERHOUSECOOPERS LLP, Defendant.
**No. Civ.A. 01C-10-219RRC.**

Submitted May 23, 2002.
Decided July 3, 2002.

Upon Defendant's Motion for Summary Judgment.
Denied.

Kevin William Gibson, Gibson & Perkins, P.C.,
Media, Pennsylvania, for Plaintiffs.
Gregory V. Varallo, Richards, Layton & Finger,
P.A., Wilmington, Delaware, and Martin L.
Perschetz, Schulte Roth & Zabel LLP, New York,
New York (pro hac vice), for Defendant.

MEMORANDUM OPINION
COOCH, J.

INTRODUCTION

*1 Before the Court is a motion for summary
judgment ("the Motion") filed by defendant
PricewaterhouseCoopers LLP ("PwC") [FN1] against
plaintiffs Mark W. Carello and Karen Carello
Nocket ("Plaintiffs"). Plaintiffs' action sounds in
tort for negligent misrepresentation, specifically the
alleged negligence of a public accountant to a third
party with whom there was no privity of contract
and where the only harm suffered was economic in
nature. The issue here is whether PwC owed
Plaintiffs a duty, such duty potentially arising either
through 1) Plaintiffs' inclusion in a class of

similarly-situated business owners who relied to
their detriment on what Plaintiffs allege are the
negligently-audited financial statements of Lason,
Inc. ("Lason") and which were prepared by PwC, or
2) a showing that Plaintiffs alone relied to their
detriment on those allegedly negligently-audited
statements. In either scenario, at the time PwC was
auditing Lason's financial statements, in order for a
duty to arise, PwC would have had to have known
(or have had reason to have known) that Lason
would share its financial statements with the class or
with Plaintiffs as part of a potential business
transaction.

> FN1. PwC originally filed a motion to
> dismiss the complaint but both parties
> attached affidavits to their subsequent
> submissions in connection with that
> motion; the Court, with the agreement of
> the parties, will therefore treat the motion
> as one for summary judgment. *See* Super.
> Ct. Civ. R. 12(b) (providing that a motion
> to dismiss shall be treated as one for
> summary judgment if "matters outside the
> pleadings are presented to and not
> excluded by the Court").

In their proposed First Amended Complaint,[FN2]
Plaintiffs allege that PwC negligently audited the
financial statements of its client, Lason; Plaintiffs
aver that they relied upon those statements in
subsequently deciding to sell their business,
Delaware Processing Services, Inc. ("DPS") to
Lason. PwC advances two grounds for summary
judgment in its Motion: 1) that under Superior
Court Civil Rule 12(b)(6), Plaintiffs have failed to
state a claim upon which relief can be granted; [FN3]
and 2) that under Superior Court Civil Rule 9(b),
Plaintiffs have failed to plead negligence with
particularity.

> FN2. Plaintiffs originally filed a Complaint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

alleging negligence and fraud, and they sought an award of punitive damages. At oral argument on PwC's Motion, the Court granted Plaintiffs leave to submit a proposed amended complaint (as well as affidavits) in connection with Court-ordered supplemental memoranda. The proposed First Amended Complaint does not include a fraud count but avers only negligence.

FN3. Although originally filed as a motion to dismiss, PwC's submissions on the motion subsequent to the original motion's conversion did not re-characterize PwC's argument; PwC has maintained throughout this litigation that it is entitled to judgment as a matter of law because it did not owe Plaintiffs any duty at the time Plaintiffs decided to sell their business because they decided to sell after Lason made an SEC filing on March 31, 1999.

Because there are material facts in dispute and PwC is not entitled to judgment as a matter of law when those facts are viewed in a light most favorable to Plaintiffs, PwC's motion for summary judgment is DENIED.

FACTS

Plaintiffs were the sole shareholders of DPS, a company whose purpose was to service "financial institutions and similarly situated institutions in capturing and processing data"; [FN4] each plaintiff owned 50% of DPS's issued and outstanding stock prior to selling DPS to Lason.[FN5] Plaintiffs sold DPS to Lason through a transaction that closed on November 19, 1999 and which involved a complicated deferred "earn out" formula that was apparently engineered to partly compensate Plaintiffs *in futuro*. Plaintiffs allege that in deciding to sell their business to Lason, they in part relied " on [a] review ... of ... statements [relating to Lason's financial health] and [PwC's] assessment of the financial condition of Lason as represented by such audited financial statements...." [FN6] PwC had " audited Lason's annual financial statements." [FN7]

FN4. First Am. Compl. ¶ 6.

FN5. First Am. Compl. ¶ 5.

FN6. First Am. Compl. ¶ 68.

FN7. Def.'s Mot. ¶ 1.

A further chronology drawn from the First Amended Complaint follows: "In April, 1998, the Plaintiffs ... were contacted by ... representatives of Lason, soliciting DPS's data entry business for a Lason subsidiary ..."; [FN8] "In the third quarter of 1998 ... DPS began doing business with Lason through its subsidiary"; [FN9] "During the period 1996 through 1999, Lason completed the acquisition of 76 companies (55 of which were completed during the two year period 1998-1999)"; [FN10] "The Plaintiffs, as part of their investigation to enter into the sale ... reviewed and relied on Lason's Annual Report, 10-K and the audited financial statements accompanying such reports for the periods ending December 31, 1997, and December 31, 1998 ... together with Lason's ... 10-Q, and the unaudited financial statements accompanying such report, for the periods ending December 31, 1998, March 31, 1999, and June 30, 1999 ..."; [FN11] "The Plaintiffs subsequently learned [after DPS was acquired by Lason] that Lason's reported revenues on its audited financial statements, and its 10Ks, and 10Qs, for the reporting fiscal years 1997, 1998, and 1999, which were prepared by ... [PwC], were not based upon an accounting method which was in conformity with Generally Accepted Accounting Principles ('GAAP ')." [FN12]

FN8. First Am. Compl. ¶ 11.

FN9. First Am. Compl. ¶ 12.

FN10. First Am. Compl. ¶ 13.

FN11. First Am. Compl. ¶ 54.

FN12. First Am. Compl. ¶ 93.

*2 On December 5, 2001, Lason filed a voluntary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

petition under Chapter 11 of the United States Bankruptcy Code.[FN13] As a result of the accounting irregularities that Plaintiffs allege existed in Lason's audited financial statements and (presumably) because of Lason's subsequent filing for bankruptcy protection, and because Lason "cannot and will not be able to" pay the "earn out" Plaintiffs argue is now due them as part of the DPS acquisition. Plaintiffs assert that PwC is liable to them "in that had [PwC] not misstated the income of Lason contrary to [Generally Accepted Accounting Principles], Plaintiffs never would have agreed to sell DPS to Lason." [FN14]

> FN13. First Am. Compl. ¶ 106.

> FN14. First Am. Compl. ¶ 120.

Additionally, Plaintiffs claim that they relied on the alleged oral representations of Timothy Molnar, a PwC employee whom Plaintiffs apparently believed was a certified public accountant and who Plaintiffs state "specifically advised the Plaintiffs that the structure of the Lason [acquisition] was a 'fair one' and represented a 'good deal' for the Plaintiffs...." [FN15] The oral representations Plaintiffs purportedly relied upon included an alleged statement by Molnar to the effect that "if there was anything else the Plaintiffs should look at or needed to know about the financial condition of Lason [in consideration of whether to sell their business to Lason][,] ... what ... [PwC] reported to the SEC ... should be alright [sic]." In affidavits they have submitted in connection with this litigation, Plaintiffs state that after "meeting with Mr. Molnar .. . and after reviewing Lason's audited financial statements together with the 10Ks and the 10Qs prepared by ... [PwC] ... [we] decided to accept Lason's terms and proceed with the sale of our DPS stock to Lason." [FN16]

> FN15. First Am. Compl. ¶ 65.

> FN16. Carello Aff. ¶ 5 (Ex. A to Pls.' Sur Reply); Carello Nocket Aff. ¶ 5 (Ex. B to Pls.' Sur Reply)

PwC has attached two affidavits to its submissions opposing Plaintiffs' asserted cause of action. The first affidavit is from Timothy Molnar, the PwC employee whom Plaintiffs allege was the CPA who made certain representations concerning the financial health of Lason to Plaintiffs when they were contemplating the sale of their business; in his affidavit, Molnar denies he participated in PwC's audit of Lason's financial records, states that he was unfamiliar with Lason's financial condition (and denies that he made any representations to the contrary), and refutes that he ever represented to Plaintiffs that he was a CPA.[FN17] The second of PwC's attached affidavits is from Cheryl L. Dunn, the "engagement partner" for PwC's audits of the financial statements of Lason, Inc. Dunn's affidavit states "I am confident that, at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements, I did not know about a potential acquisition by Lason of DPS." [FN18]

> FN17. *See* Molnar Aff. ¶¶ 3, 4, 5 (Ex. A to Def.'s Supplemental Reply Mem.).

> FN18. Dunn Aff. ¶ 4 (Ex. B to Def.'s Supplemental Reply Mem.).

CONTENTIONS OF THE PARTIES

Plaintiffs concede (and PwC argues) that in Delaware the applicable standard of the tort of negligent misrepresentation lies in section 552 of the Restatement (Second) of Torts. That section, in pertinent part, provides that:
**\*3** (1) One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others ... is subject to liability for pecuniary loss caused to [those others] by their justifiable reliance ...
(2) ... the liability is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance [the information supplier] ... knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the information supplier] knows that the recipient ... intends [the information to influence].... [FN19]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN19. Restatement (Second) of Torts § 552 (1977).

The pertinent factual allegations Plaintiffs make in support of their argument that PwC should now be found liable under the Restatement formulation follow: "Upon information and belief, DPS, was targeted for acquisition by Lason as early as the third financial quarter of 1998, and no later than January of 1999, during or prior to the period ... [PwC] was performing [its] 1999 audit of Lason's financial statements"; [FN20] "Upon information and belief, the Defendant as an integral part of Lason's acquisition team had actual knowledge that the Plaintiffs were targeted for acquisition by Lason during or prior to the period the Defendant was performing its 1999 audit of Lason's financial statements"; [FN21] "It is believed and therefore averred, that ... [PwC] as an integral member of the Lason acquisition team was or should have been aware that companies considering an acquisition by Lason, such as DPS, would rely on the audited financial statements of Lason, and its 10Ks and 10Qs filed with the SEC, to determine if they should accept Lason's offer of purchase"; [FN22] that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies"; [FN23] and "As a result and direct proximate cause of ... [PwC's] negligence, the Plaintiffs have been and will be damaged, in that had ... [PwC] not misstated the income of Lason contrary to GAAP, Plaintiffs never would have agreed to sell DPS to Lason." [FN24]

FN20. First Am. Compl. ¶ 20.

FN21. First Am. Compl. ¶ 21.

FN22. First Am. Compl. ¶ 64.

FN23. Pls.' Answer to Def.'s Mot. at 4 n. 4.

FN24. First Am. Compl. ¶ 120.

Despite the attached Cheryl L. Dunn affidavit (the " engagement partner" for PwC's audits of the financial statements of Lason, Inc) to the effect that "at the time of the issuance of PwC's audit opinion

of the 1998 [Lason] financial statements" PwC did not know about a potential acquisition of DPS by Lason, Plaintiffs state that they "would suspect that . .. [PwC] has hundreds of employees that may have a different recollection" and that they "have the absolute right to take discovery on this potential issue." [FN25]

FN25. Pls.' Sur Reply at 2.

In response, PwC argues that under section 552 of the Restatement (Second) of Torts, Plaintiffs have failed to allege the requisite duty PwC would have had to have owed them for PwC now to be potentially liable to Plaintiffs. Specifically, PwC argues that Plaintiffs have failed to allege a " pecuniary loss caused by justifiable reliance upon ... false information" [FN26] because "the last audited financial statements issued before the sale of DPS was even contemplated were for the year ending December 31, 1998[and] ... [t]hus [P]laintiffs allege that Lason's failure to make a payment due after October 31, 2000 was caused by PwC's audit report on financial statements for a period that ended almost *two years earlier."* [FN27] PwC argues that Plaintiff's factual averments "contain[ ] no cognizable allegation that PwC's audit reports-rather than Lason's subsequent financial problems-caused [P]laintiffs' losses." [FN28] In support of its argument that PwC did not owe Plaintiffs a duty as alleged, PwC states that the pleadings "make[ ] clear that PwC could not possibly have known about a proposed sale of DPS to Lason, or [have] intended that its audit reports be used in connection with such a sale, since [P]laintiffs claim not even to have been approached about the sale until July 1, 1999" and "the audited financial statements on which [P]laintiffs claim to have relied ... were filed with the S.E.C. on March 31, 1998 and March 31, 1999, respectively." [FN29] PwC argues "to be liable for negligent misrepresentation under Restatement Section 552, a defendant must have owed to the plaintiff the requisite duty *at the time the alleged misrepresentations were made."* [FN30] Citing *Outdoor Techs., Inc. v. Allfirst Fin., Inc.,* [FN31] PwC further argues that Plaintiffs' averments, particularly those relative to their encounter with Timothy Molnar, the PwC employee whom

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Plaintiffs allege was the PwC CPA who made certain representations to them, fail to establish a business relationship with PwC such that PwC can now be held liable to Plaintiffs.

> FN26. Def.'s Mot. ¶ 2.

> FN27. *Id.* (emphasis in original).

> FN28. *Id.*

> FN29. Def.'s Mot. ¶ 3.

> FN30. Def.'s Supplemental Reply Mem. at 1 (emphasis in original); Def.'s Reply Mem. at 3.

> FN31. 2001 WL 541472 (Del.Super.) (granting defendant-banks' motion for summary judgment because those banks and their counsel did not owe a duty to non-customer attempting to cash a check drawn on them).

**\*4** Additionally, PwC argues that "a complaint alleging negligent misrepresentation ... must allege ' the specific manner in which the [statement] is misleading' (citation omitted)," and that although the pleadings "purport [ ] to set forth numerous Generally Accepted Accounting Principles, [they] fail to allege how any of these principles allegedly [were] violated." FN32 Accordingly, PwC argues that it is entitled to judgment as a matter of law because Plaintiffs have failed to plead negligence with particularity as required by Superior Court Civil Rule 9(b).

> FN32. Def.'s Mot. ¶ 5.

### STANDARD OF REVIEW

Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FN33 The court must view the facts in a light most favorable to the non-moving party.FN34 A court " reviews the summary judgment motion and

response papers and seeks to determine whether the record reveals a disputed factual issue material enough to require a trial and factfinder determination...." FN35 A "nontrivial factual dispute created by the nonmovant [such as by the attachment of an affidavit disputing the other side's allegations] will usually bar summary judgment so long as the contested facts are material even if the nonmovant's support is considered weak by the court." FN36

> FN33. Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56, 59 (Del.1991).

> FN34. *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99-100 (Del.1992).

> FN35. 11 James Wm. Moore et al., Moore's Federal Practice § 56.11[5] [a], at 56-108 (3d ed.2002).

> FN36. *Id.,* § 56.11[7][b], at 56-124.

### DISCUSSION

In order for PwC to be potentially held liable to Plaintiffs, Plaintiffs must show that PwC owed Plaintiffs a duty, either through Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason and which were prepared by PwC, or through a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, PwC would have had to have known (or have had reason to have known) that Lason would share those statements with the class or with Plaintiffs as part of a potential business transaction.

As noted by this Court in its 1990 decision in *Guardian Construction Co. v. Tetra Tech Richardson, Inc.*,FN37 "Delaware case law is divided on the issue of whether privity of contract is a prerequisite for the imposition of liability on a negligence theory where the damages sought to be recovered are purely economic." FN38 Finding,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 6

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

however, that a lack of contractual privity between the design engineer and the general contractor involved there was "not fatal," the *Guardian Construction* court held that section 552 of the Restatement (imposing liability on suppliers of information to third parties who are intended recipients of the information when that information contains negligent misrepresentations) was the proper standard for claims of negligent misrepresentation brought in the Delaware courts, and the Court then "specifically adopt[ed]" the Restatement's standard.[FN39]

> FN37. 583 A.2d 1378 (Del.Super.Ct.1990) (holding in part that claim of general contractor and subcontractor against design engineer for negligent misrepresentation as to tidal heights and project benchmarks in seaside construction project was cognizable despite lack of contractual privity between the parties).

> FN38. *Guardian Construction,* 583 A.2d at 1384.

> FN39. *Id.* at 1386.

**\*5** It has been said that "the Restatement rule ... appears to be a sensible and moderate approach to the potential consequences of imposing unlimited negligence liability ... [on third parties with whom there is no privity of contract and where the only harm alleged is economic in nature]." [FN40] This Court, in *Danforth v. Acorn Structures, Inc.*[FN41] stated that the Restatement view represented "the definite weight of authority." [FN42] Some courts have taken different approaches than that suggested by the Restatement, however, either on the one hand "by denying recovery to third parties for auditor negligence in the absence of a third party relationship to the auditor that is 'akin to privity[ ]', " or on the other hand by allowing recovery "based on auditor negligence to third parties whose reliance on the audit report was 'foreseeable[ ]'." [FN43] But "most jurisdictions, supported by the weight of commentary and the modern English common law ... have steered [the] middle course ... of § 552." [FN44]

> FN40. *Bily v. Arthur Young & Co.,* 834 P.2d 745, 769 (Cal.1992) (adopting the Restatement rule and rejecting the " foreseeability" approach that California courts had until that time followed in a case where investors in corporation brought a professional malpractice action against an independent auditor that had examined a corporation's books prior to the corporation's initial public offering).

> FN41. 1991 WL 269956 (Del.Super.), *aff'd on other grounds,* 608 A.2d 1194 (Del.1992).

> FN42. *Id.* at \*2.

> FN43. *Bily,* at 752.

> FN44. *Id.*

While "most jurisdictions" have analyzed negligent misrepresentation liability of accountants to third parties under the Restatement approach, interpretations of section 552 "vary ... [and][t]he more expansive cases [*i.e.,* those jurisdictions purporting to use section 552 in their analyses but not concentrating on limiting recovery to a person or group of persons that the accountant actually knew would rely on an audit report] have been criticized as effectively eliminating all of the restrictions the Restatement sought to impose." [FN45] One court has stated that the "better reasoned decisions interpret § 552 as limiting ... potential liability ... to actual knowledge of the limited although unnamed group ... as well as actual knowledge of the particular financial transaction that such information is designed to influence ... measured at the moment the audit report is published ...." [FN46] Such an interpretation is supported by comment h to section 552 itself, which provides:

> FN45. Elizabeth Williams, *Cause of Action Against Accountant for Negligent Performance of Professional Services,* 15 COA.2d 395 (2000); *cf. Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc.,* 2002 WL 1335360 (Del.Super.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 7

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

(finding that company whose primary business purpose was the transportation of fuel oil was not "in the business of supplying information" as required by section 552, and recognizing that those courts that have taken a more "expansive view" of that section may hold otherwise).

FN46. *Nycal Corp. v. KPMG Peat Marwick LLP,* 688 N.E.2d 1368, 1372 (Mass.1998) (applying the Restatement standard to an action brought by a buyer of the controlling interest in a corporation against the accountants who had audited the financial statements accompanying the company's annual report and holding that accountants were not liable to purchaser because they had no knowledge that the controlling interest was to be sold).

... it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied ... it is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it ... it is enough ... that the maker ... knows that his recipient intends to transmit the information to a similar person, persons or group. [FN47]

FN47. Restatement (Second) of Torts § 552 cmt. h (1977).

Thus a plaintiff invoking a cause of action under negligent misrepresentation involving section 552 must show that the defendant supplied the information to a party for use in that party's business transactions with the plaintiff or a class of which plaintiff was a member.[FN48]

FN48. *But cf. Danforth v. Acorn Structures,* 1991 WL 269956, at *2

(Del.Super.) (stating that under section 552 "the plaintiff must show that the defendant supplied the information to *the plaintiff* for use in business transactions with third parties) (emphasis added); *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc.,* 2002 WL 1335360, at *6 (Del.Super.) (quoting *Acorn Structures* ).

*6 The reasoning behind limiting the liability of an information-providing party (including accountants who audit financial statements) rests on the theory that "the misinformer actually knows [that the relying party] will receive inaccurate information ... because the misinformer knows that [its] client will channel the work product to that restricted group." [FN49] An illustration of these liability-limiting concepts can be found in an illustration to comment h to section 552 of the Restatement:

FN49. *First Nat'l Bank of Commerce v. Monco Agency Inc.,* 911 F.2d 1053, 1060 (5th Cir.1990) (holding that under Louisiana law circumstantial evidence offered by a bank of an accounting firm's knowledge that statements it had audited for its client would be relied on by the bank in making loans to the firm's client did not raise genuine issue of material fact so as to prevent summary judgment in favor of the accounting firm).

A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used un a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements ... to obtain a loan from X Bank ... [and] through reliance upon [the negligently prepared financial statements] ... X

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Bank suffers pecuniary loss. A is not liable to X Bank.[FN50]

> FN50. Restatement (Second) of Torts § 552 cmt. h, illus. 10 (1977).

Thus, under the Restatement, an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client.

In this case, Plaintiffs have alleged their reliance on certain financial statements of Lason that were audited by PwC at a time when a class of persons similar to and including Plaintiffs were allegedly contemplating the sale of their businesses to Lason; Plaintiffs also allege that they would not have sold their business to Lason had the statements PwC audited not been "misstated" and "contrary to Generally Accepted Accounting Principles." Plaintiffs apparently have not been able to collect that part of the purchase price that was to accumulate after the close of the sale of DPS to Lason, given that Lason subsequently filed for bankruptcy. Plaintiffs have therefore potentially shown the cause and effect of their claimed loss, contrary to PwC's assertion that Plaintiffs have failed to show "that PwC's audit reports-rather than Lason's subsequent financial problems-caused [P]laintiffs' losses." [FN51]

> FN51. Def.'s Mot. ¶ 2.

Plaintiffs may also possibly be able to show that they were within a "limited group of persons" for whose benefit and guidance PwC knew Lason intended to supply their audited statements and to whom PwC knew that Lason intended to influence with those same statements.[FN52] Plaintiffs attempt to provide this crucial link when they allege that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling

up companies." [FN53] Given that Plaintiffs allege that from 1996 through 1999 Lason "completed the acquisition of 76 companies," [FN54] and that PwC presumably was the accounting firm that Lason retained during this time period, Plaintiffs' assertion that PwC played some part in Lason's competitive acquisitioning might be established.

> FN52. *See* Restatement (Second) of Torts § 552 (1977).
>
> FN53. Pls.' Answer to Def.'s Mot. at 4 n. 4.
>
> FN54. First Am. Compl. ¶ 13.

*7 If in fact Lason was "actively gobbling up companies," and PwC was in fact Lason's accounting firm during this time period, it is possible that PwC knew or should have known that third parties might be relying on the PwC work product Plaintiffs claim was negligently prepared, because "in many cases, the accountant preparing a financial statement for his client, although he does not know the identity of the particular party or parties to whom his client intends to exhibit his report, is aware of the use to which his client intends to put the report, and thus is aware of the class of parties to whom the report will be exhibited." [FN55] Under the facts as Plaintiffs present them (that Lason completed the acquisition of 76 companies during the period 1996 through 1999, all the while using PwC's services), such a class could possibly consist of those entities or persons who utilized the PwC reports as part of their pre-sale considerations in those years Lason was actively acquiring other businesses, *i.e.,* those parties who would reasonably rely on the statement PwC audited for Lason with knowledge that Lason would then show the statements to third parties with an interest similar to that of Plaintiffs. Such a class, if so determined, would comport with the Restatement's contemplated limitation on liability, and in so doing, should allay the concerns of an accountant's liability to an unknown class for unknown amounts in an unknowable time frame. Thus, PwC's argument that it is not liable for Lason's failure to make "earn out" payments to Plaintiffs in late 2000 based on the fact that PwC's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 9

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

alleged negligently-prepared work product covered a period ending at least two years prior is not persuasive at this summary judgment stage; to the extent that Lason's last public filing prior to the sale of Plaintiffs' business occurred in March 1999, given that Plaintiffs may have been members of a class of companies Lason "gobbled up" between 1996 and 1999, and to whom PwC potentially knew its work product was to be distributed, the March 1999 date is not critical. Additionally, should Plaintiffs eventually be able to show that they were in fact a member of such a class, PwC's argument that Plaintiffs cannot show "something more than a casual business encounter" [FN56] with PwC would be meritless, as a business relationship between the class members and PwC via Lason and its utilization of PwC's auditing services for the purpose of acquiring members of the class might well impliedly establish the requisite business relationship.

> FN55. Jack W. Shaw, Jr., Annotation, *Liability of Public Accountant to Third Parties*, 46 A.L.R.3d 979, 1003 (1972).

> FN56. *Outdoor Technologies*, 2001 WL 541472, at *5.

PwC's claim that liability may be improperly imposed on a party such as PwC (as enunciated by illustration to comment 10 of the Restatement) is unfounded. That illustration applies only to audited statements where the auditor neither knows nor has reason to know of the intended use to which the audited statements will be put. In the illustration, the financial statements were audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential lender. The facts of this case, if developed as Plaintiffs allege, tend to show otherwise. This Court cannot be sure from the present state of the record what knowledge PwC had at the time it audited the relevant Lason statements, and for whose benefit the services were performed. Where " reasonable minds could conclude from the allegations [in the pleadings] that ... annual audits ... were prepared for another purpose [other than being prepared solely to file with the SEC], that being the

influencing of the transactions in question," a motion to dismiss can be denied under § 552.[FN57] In the context (as here) of a motion for summary judgment and at the outset of litigation, "the record is necessarily thin ... [and][a]s litigation continues with ensuing disclosure and discovery, the record becomes far richer factually." [FN58]

> FN57. *In re Smartalk Teleservices, Inc. Securities Litigation*, 124 F.Supp.2d 505, 525 (S.D.Ohio 2000) (denying motion to dismiss and holding that auditors owed a third party a duty of care where there were aware during preparation of documents that their client was interested in acquiring another company, which company was one of only four on national participants in the market).

> FN58. Moore's, *supra* note 35, § 56.11[3], at 56-98.

*8 Having found that on the present record PwC is not entitled to judgment as a matter of law, the Court could deny PwC's motion for summary judgment on that prong alone. However, the competing affidavits submitted by the parties additionally show that there are some material facts in dispute-namely, what PwC knew about Lason's potential use for the statements PwC was auditing, and when PwC knew it. Summary judgment is not warranted on that prong either. As an oft-cited treatise states, in the context of a summary judgment motion, a court is constrained to deny the motion even if the "nonmovant's support is considered weak by the court." [FN59] Summary judgment will further not be granted if "upon examination of all the facts, it seems desirable to inquire [more] thoroughly into them in order to clarify the application of the law to the circumstances." [FN60] Here, the Court cannot presently know what facts Plaintiffs may ultimately be able to establish, but at this juncture the Court will allow further discovery based on Plaintiffs' somewhat meager but legally sufficient showing of material facts in dispute.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 10

Not Reported in A.2d, 2002 WL 1454111 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN59. Moore's, *supra* note 36.

FN60. *Ebersole v. Lowengrub,* 180 A.2d
467, 470 (Del.1962) (reversing grant of
summary judgment where the record failed
to explain why a driver of a motor vehicle
suddenly stopped his vehicle thereby
causing a multiple-vehicle collision).

PwC's second argument that the pleadings fail to
plead negligence with particularity is also not
persuasive. In *Snyder v. Butcher & Co.,*[FN61] the
defendants filed a motion to dismiss predicated on
plaintiffs' alleged failure to plead fraud and
negligence with particularity, even though the
plaintiffs had identified the promotional materials
they relied upon in deciding to invest in
privately-owned radio stations, had identified the
alleged misrepresentations contained in those
promotional materials, and had identified the parties
who prepared and distributed the promotional
materials. This Court there permitted the fraud and
negligence claims to withstand the motion to
dismiss as "Defendants [we]re informed of the act
Plaintiff complain [ed] of and ... [could] adequately
prepare for response and defense[;] the Amended
Complaint d[id] not seem to be a pretext for a
fishing expedition, but contain[ed] allegations of a
substantial suit[;] ... [and] Defendants [we]re being
exposed to a suit which, while it may not [have]
ultimately be[en] successful ... [could not] correctly
be characterized as unfounded." [FN62] Additionally,
the rule requiring particularity in the pleading of
negligence "must be applied in light of the
particular situation presented in any case," [FN63]
and less particularity is required "when the facts lie
more in the knowledge of the opposite party, than of
the party pleading." [FN64] The Court finds those
statements and the holding of *Snyder* applicable to
this case, requiring denial of PwC's motion for
summary judgment on this ground.

FN61. 1992 WL 240344 (Del.Super.)
(denying motion to dismiss and holding in
part that claims of fraud and negligence
were sufficiently pleaded to satisfy
Superior Court Civil Rule 9(b)).

FN62. *Snyder,* 1992 WL 240344, at *10.

FN63. *Phillips v. Delaware Power & Light
Co.,* 194 A.2d 690, 697
(Del.Super.Ct.1963)

FN64. *Id.*

CONCLUSION

For the reasons stated above, PwC's motion for
summary judgment is DENIED. The Court will
deem the Plaintiffs' First Amended Complaint filed
today; PwC shall file an answer to that amended
complaint by July 15, 2002.

IT IS SO ORDERED.

Del.Super.,2002.
Carello v. PricewaterhouseCoopers LLP
Not Reported in A.2d, 2002 WL 1454111
(Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

Not Reported in A.2d                                                                Page 1

Not Reported in A.2d, 1994 WL 234000 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**c**
Williams v. Law Firm of Cooch and Taylor,
Attorneys at LawDel.Super.,1994.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
    Superior Court of Delaware, Sussex County.
        Dolores R. **WILLIAMS**, Plaintiff,
                        v.
    The **LAW FIRM** OF **COOCH** AND **TAYLOR**,
    Attorneys at Law, and H. Alfred Tarrant, Jr.,
                Esquire, Defendants.
            **Civ. A. No. 92C-03-024.**

            Submitted Feb. 22, 1994.
            Decided May 11, 1994.

Dolores R. Williams, plaintiff, pro se.
John A. Elzufon and William D. Sullivan, Elzufon,
Austin & Drexler, P.A., Wilmington, for defendants.

            MEMORANDUM OPINION
GRAVES, Judge.
*1 Dolores R. Williams ("plaintiff") has filed a
malpractice action against the law firm of Cooch &
Taylor, and H. Alfred Tarrant, Jr., Esquire ("
defendants"). This is defendants' motion for
summary judgment.

                    FACTS

Plaintiff entered into an agreement with defendants
on July 25, 1985 for legal representation in her
divorce action. Defendants' representation of
plaintiff ceased sometime between February and
August of 1988. By that time, plaintiff's divorce
had become final, and three orders had been issued
by the Family Court concerning plaintiff's award of
marital property. Property distribution was ordered
on November 30, 1987, with supplemental orders
entered on January 25, 1988, February 10, 1988,
and October 23, 1991.[FN1] *Wheatley v. Wheatley,*

FN2 Del.Fam., File No. 1278-85, Horgan, J.
(November 30, 1987); *Wheatley v. Wheatley,*
Del.Fam., File No. 1278-85, Horgan, J. (January
25, 1988); *Wheatley v. Wheatley,* Del.Fam., File
No. 1278-85, Horgan, J. (February 10, 1988);
*Wheatley v. Wheatley,* Del.Fam., File No. 1278-85,
Horgan, J. (October 23, 1991).

> FN1. Plaintiff appeared *pro se* at the 1991
> proceeding.

> FN2. Fictitious names were used to protect
> the privacy of the parties.

On August 21, 1988, plaintiff wrote a letter in
response to defendants' efforts to collect
outstanding attorney fees. In the letter, plaintiff
complained about various aspects of defendants'
representation. Plaintiff stated that her legal rights
had been "abused" by defendants. Plaintiff
concluded, "I do not feel that [my attorney's] efforts
were in my best interest ... I am not attempting to
hold [my attorney] responsible for [the Judge], but I
do hold him responsible for the lack of
representation in my case."

Plaintiff did not file the present action until March
20, 1992. Plaintiff maintains that defendants
committed malpractice by misrepresenting the value
(and consequently her marital interest) in her
husband's life insurance policies, investment club,
law practice and real estate. Plaintiff also contends
that she was deprived of alimony and attorney's fees
due to counsel error. Finally, plaintiff asserts that
defendants failed to finalize the parties' agreement
to split husband's Keough and pension plans 50-50
by failing to prepare a Qualified Domestic Relations
Order ("QDRO").

The majority of plaintiff's complaint is barred by a
three year statute of limitations. With the
exception of plaintiff's claim regarding the Keough
and pension plans, summary judgment is entered in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2

Not Reported in A.2d, 1994 WL 234000 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

favor of defendants.

## DISCUSSION

### I. *Summary Judgment.*

On a motion for summary judgment, the Court's function is to examine the record and determine whether there are any genuine issues of material fact. *Battista v. Chrysler Corp.,* Del.Super., 454 A.2d 286 (1982). In ruling upon defendant's motion for summary judgment, the facts are to be construed in the light most favorable to the plaintiff. *Fields v. Synthetic Ropes, Inc.,* Del.Super., 219 A.2d 374 (1966). If there is a reasonable indication that a material fact is in dispute, or if is seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law, summary judgment will not be granted. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646 (1985).

### II. *Statute of Limitations and the "Time of Discovery " Rule.*

**\*2** Defendants correctly cite 10 *Del.C.* § 8106 [FN3] for the proposition that actions for legal malpractice are governed by a three year statute of limitations. *See, e.g., Began v. Dixon,* Del.Super., 547 A.2d 620 (1988). Generally, the cause of action accrues with the occurrence of the wrongful act. *Isaacson, Stolper & Co. v. Artisan's Savings Bank,* Del.Super., 330 A.2d 130 (1974). Ignorance of the facts constituting a cause of action does not usually act as an obstacle to the operation of the statute of limitations, except in the case of infancy, incapacity and certain types of fraud. *Mastellone v. Argo Oil Corp.,* Del.Supr., 82 A.2d 379 (1951).

> FN3. 10 *Del.C.* § 8106 states in pertinent part:
> [N]o action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of defendant shall be brought after the

expiration of 3 years from the accruing of the cause of such action ...

Plaintiff argues that her action is governed by the " time of discovery" rule. Under the "time of discovery rule" an exception to the statute of limitations occurs where there are no observable or objective factors during the occurrence of the wrongful act which would put laymen on notice of a problem. *Pioneer v. National Title Insurance Co. v. Child,* Del.Supr., 401 A.2d 68 (1979); *Layton v. Allen,* Del.Supr., 246 A.2d 794 (1968). The rule is narrowly confined to instances where the injury is: (1) inherently unknowable; and (2) sustained by a " blamelessly ignorant" plaintiff. *Isaacson, supra* at 133; *Layton, supra* at 797. The Delaware Supreme Court has stated:
... in malpractice and fraud cases where a discovery rule is applied it is not the actual discovery of the reason for the injury which is the criteria ... [D]iscovery means discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.
*Becker v. Hamada, Inc.,* Del.Supr., 455 A.2d 353 (1982) quoting *Omaha Paper Stock Co., Inc. v. Martin K. Eby Constr. Co.,* Neb.Supr., 230 N.W.2d 87 (1975).

While plaintiff argues that her action is not time-barred under the "time of discovery" rule, this Court finds that the rule is inapplicable to all but one of plaintiff's claims. The three year statute began to run no later than August 21, 1988, after the alleged wrongful acts had been committed by defendants and plaintiff had expressed her belief that defendants were responsible for the lack of representation in her case. By that time, three Family Court orders had been entered as to plaintiff's divorce litigation, and plaintiff was fully aware of defendants' performance and the outcome of that performance. In sum, plaintiff's complaints about defendants' trial preparation and trial performance were ascertainable by plaintiff, who revealed as much in her letter criticizing defendants' role in the divorce litigation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3

Not Reported in A.2d, 1994 WL 234000 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Taking the facts most favorable to plaintiff, this Court finds that plaintiff is not time-barred with respect to the Keough and pension claims. Defendants argue that plaintiff may not avail herself of the "time of discovery" rule and cite *Kumpfer v. Shiley, Inc.,* 741 F.Supp. 738 (N.D.Ill.1990) and *Poffenberger v. Risser,* Md.App., 431 A.2d 677 (1981) for the proposition that once plaintiff became aware of the alleged malpractice, she had a duty to fully investigate and "further determine whether an actionable wrong had been committed." Defendants thus maintain that plaintiff's entire malpractice claim dates back to her original dissatisfaction with defendants' representation. I have determined, however, that *Kumpfer,* is applicable to plaintiff's claims arising from the allegations contained in her August 21, 1988 letter, where plaintiff had an obligation to determine if defendants' conduct constituted an actionable wrong. I do not find that *Kumpfer* holds that plaintiff must search for and find all unknown claims.

*3 The Court finds plaintiff's claim with respect to the pension issue to be distinguishable from the other claims. The majority of plaintiff's malpractice allegations were expressed in her August 21, 1988 letter, and based on her subjective perceptions of her attorney's representation in the Family Court trial and subsequent proceedings. The QDRO agreement, however, was not part of the trial. Prior to the Family Court trial, the parties agreed to remove certain assets from the property division order. These assets included husband's pension and Keough plans, both of which were to be divided 50-50 between the parties. The parties informed the Family Court of these agreements at the outset of the property division proceedings. It was agreed that a QDRO would be filed. Plaintiff's charge of malpractice with regard to her husband's pension plans differs from the rest of her complaint in that it is based on her separate and objective discovery in the spring of 1991 that the pension funds had been depleted in violation of the parties' agreement. FN4

> FN4. When the aforementioned was brought to the attention of the Family

Court by way of plaintiff's contempt action, the Court found that there could be no contempt because the agreement was not covered by any Family Court order. The Court did note that an action could possibly be initiated based on breach of agreement. There has been no subsequent filing in Family Court of which this Court is aware.

The case of *Aykan v. Goldzweig,* N.J.Super., 569 A.2d 905 (1989) presents a situation that is analogous to the one at bar. Plaintiff in *Aykan* brought a malpractice action against her former divorce attorney. Plaintiff charged the attorney with: (1) use of an incorrect date for equitable distribution; and (2) failure to institute a separate battery action against her husband. The Superior Court determined that the first malpractice claim accrued and the statute of limitations began to run during the attorney's handling of the case, when plaintiff first learned that the attorney could have selected another date of separation for purposes of valuing the marital property. With regard to the second claim, the Superior Court found that the statute of limitations did not begin to run until much later, when plaintiff was first advised as to the possibility of such a claim by substitute counsel.

In the present case, the complaints contained in plaintiff's August 21, 1988 letter are unrelated to her QDRO claim. Plaintiff's claim with regard to her husband's pensions was not discovered until plaintiff received an income tax statement in the spring of 1991 stating that the account had been depleted. Plaintiff's pleadings generally allege malpractice, however the malpractice consists of different causes of action. Being aware of potential problems arising in the trial phase of defendants' representation did not place plaintiff on notice that the QDRO had not been drafted or filed.

The Court also disagrees with defendants' contention that summary judgment must be granted because plaintiff failed to produce an expert witness to rebut defendants' affidavit stating that defendants met their professional standard of care. While expert testimony is usually required to prove the standard of care against which an attorney's actions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 4

Not Reported in A.2d, 1994 WL 234000 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

are measured, expert testimony is not required when an ordinary person is equipped by common skill and knowledge to judge the issue. *Ruthenberg et al. v. Kimmel & Spiller, P.A.,* Del.Super., C.A. No. 79C-DE-17, Bifferato, J. (March 17, 1981). In the instant case, an expert witness' testimony would be necessary for most of plaintiff's claims. However, the Court has already disposed of those claims under the statute of limitations.[FN5] However, expert testimony is not required where an ordinary and reasonable person would recognize error upon discovering that there was no preparation or filing of a QDRO. Plaintiff's QDRO malpractice claim is within the common knowledge of laymen. Accordingly, plaintiff is not required to produce expert testimony.

> FN5. Plaintiff's other malpractice claims were dismissed under the statute of limitations. Had these claims survived, the Court would have had to dismiss them for plaintiff's failure to come forward with expert testimony, as they were exactly the sort of claims which require expert testimony. Plaintiff did not rebut defendants' expert on the issues of professional standard of care.

**\*4** The Court finds that summary judgment is inappropriate on the QDRO issue. Both parties agree that the husband's pension plan, which was valued at $100,000 at the time of divorce, was excluded from the Family Court distribution proceedings in lieu of a QDRO agreement which was to be filed with the Family Court. Both parties also agree that the QDRO was never filed. Plaintiff maintains that she relied on defendants' professional expertise in securing an agreement for her share of her husband's pension plans. Plaintiff further asserts that she did not learn until she received an income tax statement in the spring of 1991 that her husband had liquidated the Keough in February of 1987, approximately five months before the property division hearings began. Had the QDRO been prepared and filed, this conduct would have been discovered.

CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is denied as to the QDRO issue. Summary judgment in favor of defendants is granted as to all other counts of plaintiff's complaint.

IT IS SO ORDERED.

Del.Super.,1994.
Williams v. Law Firm of Cooch and Taylor, Attorneys at Law
Not Reported in A.2d, 1994 WL 234000 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J



Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 1974 WL 6342 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Delaware State Police Fraternal order of Police
Lodge No. 6 v. State, Dept. of Public
SafetyDel.Ch.,1974.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
DELAWARE STATE POLICE FRATERNAL
ORDER OF POLICE LODGE NO. 6
v.
STATE of Delaware, DEPARTMENT OF PUBLIC
SAFETY
**Civ. A. No. 4341.**

Submitted: Oct. 29, 1974.
Decided: Dec. 26, 1974.

Victor F. Battaglia, Wilmington.
Lester J. Taufen, Deputy Attorney General,
Wilmington.
QUILLEN, Chancellor.
*1 The defendant has moved to dismiss the
complaint. The case involves the alleged failure of
the defendant to use its "best efforts" to achieve
legislative approval for a $1,500 annual pay raise
for the State Police as it bound itself by contract to
do. A pay raise of $1,500 was enacted in June of
1974 effective July 1, 1974. But the plaintiff
pursues this litigation due to the fact that the
contract was made in February of 1973 and
therefore there was, according to the plaintiff, a
harmful time lag for which a cause of action exists.

The defendant relies on three independent grounds
to support the motion. The Court will not dwell on
the first two because the third is clearly dispositive.
The first ground argued is that the suit is precluded
because the plaintiff failed to seek arbitration, a
contention that gives rise to some uncertainty under
Delaware law. Compare *Nelson v. Allstate
Insurance Company,* Del.Super., 298 A.2d 337
(1972) with *Pullman Incorporated v. Phoenix Steel*

*Corporation,* Del.Super., 304 A.2d 334 (1973); see
10 *Del.C.,* § 5725. The second ground claims an
adequate legal remedy which is without merit due to
the number of persons affected and some probable
complex accounting problems if the suit were
successful.

The third ground is not an attack on jurisdiction but
a contention that the plaintiff has failed to state a
claim on which relief can be granted. The
defendant argues that the contract provision in issue
is too vague to be enforced. It reads as follows:

*"ACROSS THE BOARD WAGE INCREASE*

"The employer will use its best efforts to obtain the
necessary legislative approval for a $1500 per year
salary increase for each employee in the bargaining
unit to be effective at the very earliest date which
the General Assembly authorizes."

In considering this contention, the Court will not go
beyond the face of the complaint insofar as the facts
are concerned.

It is, however, necessary to put the complaint in its
proper legal context. The Department is headed by
the Secretary of Public Safety who signed the
contract. The Secretary is appointed by the
Governor with the advice and consent of the Senate
and he serves at the Governor's pleasure. 29 *Del.C.,*
§ 8202. He is therefore an executive officer who
serves under the chief executive officer.
Constitution of 1897, Art. 3, § 1, § 14. As chief
executive officer, the Governor has executive
responsibility for the entire budget and the duty to
present the annual budget report to the General
Assembly. 29 *Del.C.,* § 6335. Indeed, the
Secretary's power to contract is expressly limited to
"funds ... available". 29 *Del.C.,* § 8203(5). It is
the General Assembly, the holder of legislative
power, which has the exclusive and final authority
to authorize the expenditure of money, subject only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 2

Not Reported in A.2d, 1974 WL 6342 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

to the limited Constitutional power of the Governor as to legislation passed. Constitution of 1897, Art. 2, § 1 and Art. 3, § 18; 29 *Del.C.,* § 6337, § 6339. While the power of purse in the legislature is basic Constitutional doctrine, such legislative power is also expressly recognized in the statute creating the right of public employees to organize. 19 *Del.C.,* § 1310.

**\*2** The concept of using one's "best efforts" is probably too vague for enforcement under standard contract law. *Most Worshipful P.H.G. Lodge v. Hiram Grand Lodge,* 32 Del.Ch. 35, 80 A.2d 294 (Ch.1951). But, given the Constitutional and statutory limitations on the Department and the Secretary and given the legislative power of the purse, the standard created by the contract language is clearly in this context too vague for enforcement. For example, is the Secretary, an executive officer serving under and at the pleasure of the Governor, expected to use his "best efforts" to lobby for enactment of a pay raise which might be directly contrary to the Governor's budgetary policy? Indeed, the contract leaves completely vague the effort that is to be made and the Court has no meaningful standard to apply. In my judgment, the complaint fails to state a claim upon which relief can be granted.

I also feel, although I do not rest the decision herein on this point, that public policy and Constitutional responsibility would bar any executive department from obligating public money for employee raises without legislative action. It is the General Assembly which does control, and which should control, the expenditure of public money. Thus, it is difficult to see how the State or the Department could be liable in any event.

The motion of the defendant to dismiss the complaint is granted. IT IS SO ORDERED.

Del.Ch.,1974.
Delaware State Police Fraternal order of Police Lodge No. 6 v. State, Dept. of Public Safety
Not Reported in A.2d, 1974 WL 6342 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K



Slip Copy                                                                                    Page 1

Slip Copy, 2006 WL 1452803 (D.Del.), 2006-1 Trade Cases P 75,320, 64 Fed.R.Serv.3d 847
**(Cite as: Slip Copy)**

**C**
Briefs and Other Related Documents
Synopsys,    Inc.    v.    Magma    Design
AutomationD.Del.,2006.
United States District Court,D. Delaware.
SYNOPSYS, INC., Plaintiff,
v.
MAGMA DESIGN AUTOMATION, Defendant.
MAGMA DESIGN AUTOMATION, Counter
Claimant,
v.
SYNOPSYS, INC., Counter Defendant.
**No. CIVA 05-701(GMS).**

May 25, 2006.

Karen Jacobs Louden, Leslie A. Polizoti, Morris,
Nichols, Arsht & Tunnell LLP, Wilmington, DE,
for Plaintiff.
William J. Marsden, Jr., Fish & Richardson, P.C.,
Wilmington, DE, for Defendant/Counter Claimant.
William J. Wade, Richards, Layton & Finger,
Wilmington, DE, for Counter Claimant.

*MEMORANDUM*
SLEET, J.

### I. INTRODUCTION

*1 In the above-captioned action, Plaintiff and
Counter Defendant Synopsys, Inc. ("Synopsys")
alleges three counts of patent infringement in
violation of 35 U.S.C.A. § 271 (2001 & Supp.2005)
against Defendant and Counter Claimant Magma
Design Automation ("Magma"). In its first amended
answer, Magma alleges against Synopsys one count
of monopolization (Count I) and one count of
attempted monopolization (Count II), both in
violation of Section 2 of the Sherman Act, 15
U.S.C.A. § 2 (Supp.2005), one count of product
disparagement and trade libel (Count III) in
violation of Section 43(a) of the Lanham Act, 15
U.S.C.A. § 1125(a) (1998 & Supp.2005), one count

of statutory unfair competition (Count IV) in
violation of the Delaware Deceptive Trade
Practices Act, Del.Code. Ann. tit. 6, §§ 2531, *et seq.*
(1999), one count of unfair competition (Count V)
and one count of tortious interference with business
relations (Count VI), both in violation of Delaware
common law, and one count of patent infringement
(Count VII). Presently before the court are
Synopsys' motion to dismiss Counts I-VI of
Magma's first amended answer (D.I.9), Synopsys'
motion to bifurcate and stay (D.I.31), and Magma's
motion for leave to file a second amended answer to
include four additional patent infringement
counterclaims (D.I.50).

### II. JURISDICTION

The court has subject matter jurisdiction pursuant to
28 U.S.C.A. §§ 1331, 1367 (1993).

### III. BACKGROUND

According to the first amended answer, the patents
at issue in this case relate to improvements in
computer software used to design extremely
complex integrated circuits. In general, such
software translates a user's high-level description of
the circuit he or she has designed and wishes to
implement into a low-level description of the
necessary components. This translation process is
known as logic synthesis. The software then
engages in a process known as physical design, in
which the actual circuit layout and interconnections
are determined. Eventually (after several steps
irrelevant to this discussion) the newly-designed
circuit is manufactured and ready for testing. The
testing process typically requires the insertion of "
scan chains" into the low-level description
produced during logic synthesis. These scan chains
consist of interconnected storage elements capable
of being read from and written to during testing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1452803 (D.Del.), 2006-1 Trade Cases P 75,320, 64 Fed.R.Serv.3d 847
**(Cite as: Slip Copy)**

Magma alleges that Synopsys has a 91% share in both the logic-synthesis market and the scan-chain insertion market, which are monopolies Synopsys procured and maintains through anti-competitive conduct. More specifically, Magma contends that two of the patents asserted by Synopsys in this case were obtained by fraudulent means, and that Synopsys has attempted to create exclusive-dealing contracts with Magma's customers. Magma further alleges that Synopsys has engaged in a public campaign of disparagement by falsely claiming that Magma sells infringing products, and that Magma cannot afford to both defend itself in court and remain solvent.

## IV. DISCUSSION

### A. Motion to Dismiss

**\*2** "When considering a Rule 12(b)(6) motion, [the court is] required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005). "A Rule 12(b)(6) motion should be granted 'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.' " *Id.* at 351 (quoting *D.P. Enter. Inc. v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir.1984)). "However, [the] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." *Evancho,* 423 F.3d at 351.

### 1. Sherman Act (Counts I & II)

Synopsys argues that Magma's monopolization and attempted monopolization claims under Section 2 of the Sherman Act should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because they are unsupported by adequate factual allegations. In particular, Synopsys contends that the first amended answer fails to allege "antitrust injury," which, according to Synopsys, requires "harm to competition in the marketplace," and a causal connection between that harm and the anti-competitive activities.

In *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* the Supreme Court explained:

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In this case, the clear import of Magma's allegations is that Synopsys, with a 91% share in both relevant markets, is acting anti-competitively by using the patent system and exclusive-dealing contracts to run a competitor, *i.e.,* Magma, out of business. If Synopsys is successful, Magma contends that there will be a decrease in competition because significant barriers to entry prevent would-be competitors from replacing the void left by Magma. These allegations are sufficient to state a claim under Section 2 of the Sherman Act. *Gill v. Del. Park, L.L.C.,* 294 F.Supp.2d 638, 644 (D.Del. Dec.2, 2003) (explaining that "the anti-trust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market").

### 2. Lanham Act (Count III)

Synopsys argues that Magma's Lanham Act claim is subject to the heightened pleading requirements of Rule 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). However, the "state of the law [is unsettled] as to whether Rule 9(b) was intended to incorporate claims brought under the Lanham Act." *H.H. Fluorescent Parts, Inc. v. DM Tech. & Energy, Inc.,* No. 04-1997, 2005 U.S. Dist. LEXIS 26699, at \*13 (E.D.Pa. Nov. 3, 2005). If Count III is not subject to the heightened pleading

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                  Page 3

Slip Copy, 2006 WL 1452803 (D.Del.), 2006-1 Trade Cases P 75,320, 64 Fed.R.Serv.3d 847
**(Cite as: Slip Copy)**

requirements of Rule 9(b), then Magma's allegations need only satisfy the notice pleading requirements of Rule 8(a).

**\*3** The purpose of "Rule 9(b) [is] to give defendants 'notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements." ' *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 270 (3d Cir.2006) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997)). Here, none of these purposes would be served by requiring Magma to satisfy the pleading requirements of Rule 9(b). The Lanham Act claim in this case is one of seven claims Magma brought in response to a suit originally filed by Synopsys. Thus, this is not a case in which the court must protect Synopsys against a "frivolous suit brought *solely* to extract a settlement." Moreover, the need to provide increased protection for Synopsys' reputation is not as crucial in this case because Count III was brought as a means of protecting Magma's reputation. Finally, even if Magma's pleadings do not specify the "who, when, and where" of Synopsys' allegedly damaging statements, that problem is easily cured in discovery. Therefore, the court holds that the heightened pleading requirements of Rule 9(b) are not applicable in this context.

"Under the Lanham Act a plaintiff must allege that: (1) defendant made false or misleading statements as to its product, or those of the plaintiff; (2) there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Enzo Life Scis., Inc. v. Digene Corp.,* 295 F.Supp.2d 424, 427 (D.Del. Mar.31, 2003). However, the required level of specificity with which each element must be pleaded is not high because Rule 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The first two elements are adequately pleaded by the

allegation that Synopsys, knowing its patents were obtained by fraudulent means, engaged in a public campaign of disparagement by falsely claiming that Magma sells infringing products, and that Magma cannot afford to both defend itself in court and remaining solvent. The third element (materiality) and the fifth element (injury) are adequately pleaded by the allegation that Synopsys' campaign of disparagement has damaged Magma. And the fourth element (interstate commerce) is explicitly pleaded in paragraph 156 of the first amended answer. Thus, Magma has met the requirements of Rule 8 with regard to its Lanham Act claim.

### 3. State Law Claims (Counts IV, V & VI)

Synopsys argues that the court has no subject matter jurisdiction pursuant to 28 U.S.C.A. § 1367 over Magma's state law claims if Counts I-III are dismissed. However, because those counts will not be dismissed at this time, the court retains jurisdiction over Counts IV-VI.

### B. Motion to Bifurcate and Stay

**\*4** "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim...." Fed.R.Civ.P. 42(b). "[T]he decision to bifurcate *vel non* is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Lis v. Robert Packer Hosp.,* 579 F.2d 819, 824 (3d Cir.1978).

Synopsys argues that the court should bifurcate the antitrust claims from the infringement claims because other courts routinely do so. This argument runs contrary to the guiding principle enunciated in *Lis.* There, the district court had simply followed its customary practice of separating the liability and damages phases in negligence cases without considering the unique circumstances of the negligence case at bar. On appeal, the Third Circuit held that this methodology ran afoul of Rule 42(b): " A general policy of a district judge bifurcating all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4

Slip Copy, 2006 WL 1452803 (D.Del.), 2006-1 Trade Cases P 75,320, 64 Fed.R.Serv.3d 847
**(Cite as: Slip Copy)**

negligence cases offends the philosophy that the decision must be made by a trial judge only as a result of an informed exercise of discretion *on the merits of each case." Lis,* 579 F.2d at 824 (emphasis added). Therefore, although the routine practice of other courts may indicate that " experience has demonstrated [the] worth" of bifurcation in these circumstances, Fed.R.Civ.P. 42 advisory committee's note, the court's decision in this case will be guided first and foremost by the merits of this case.

With that principle in mind, the court is not convinced that bifurcation of the antitrust claims from the infringement claims is necessary to prevent jury confusion. In this court's experience, jurors are quite adept at comprehending and adhering to the instructions they are given, even in the most complex factual and legal scenarios. Therefore, the court will not pre-judge the yet-unnamed jurors by assuming they are unable to digest the facts and law in this case. Moreover, the court is confident that the experienced attorneys handling this case will craft cogent presentations to aid the jury in this process. The court is further unpersuaded by Synopsys' contention that bifurcation would serve the interest efficiency. Magma's antitrust claims are based in part on the allegation that Synopsys fraudulently-obtained two of its patents and asserted them against Magma in violation of Section 2 of the Sherman Act. Synopsys' alleged fraud is also a centerpiece of Magma's invalidity claims. Thus, were the court to bifurcate, the evidentiary presentation in one case would likely be substantially duplicative of the evidentiary presentation in the other. In addition, bifurcation would likely create further duplication of evidence because both juries would need to be educated in the same relevant technology. Accordingly, the court concludes that neither jury confusion nor efficiency weigh in favor of bifurcating the antitrust claims from the infringement claims.

*\*5 Synopsys also argues that the antitrust claims should be stayed until the infringement claims are resolved mainly because resolution of the infringement claims could streamline subsequent adjudication of the antitrust claims. Assuming *arguendo* that the litigation could be streamlined in

this way, it is telling that Synopsys does not propose to shorten the number of days allocated for trial in the event that a stay is granted. Thus, even if the court stays the antitrust claims, the minimum amount of time allocated to try this case does not decrease. Consequently, it appears that a stay only has the potential to consume *more* of this court's valuable time. Therefore, the court will not stay the antitrust portion of this action.

For similar reasons, the court also declines to stay Synopsys' infringement claims pending re-examination by the PTO. The validity of the asserted patents will be litigated regardless of whether a stay is granted because that issue is relevant to Magma's Sherman Act claims. The most efficient course of action, then, is to also litigate infringement in order to capitalize on the jury's understanding of the relevant technology. Thus, the court will deny Synopsys' motion in its entirety.

### C. Motion to Amend

Pursuant to the court's scheduling order of December 28, 2005, the deadline for amended pleadings is March 24, 2006. On that date-March 24-Magma timely filed a motion for leave to amend its first amended answer to include four additional counterclaims for patent infringement. "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given. " ' *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Synopsys' primary basis for opposing Magma's motion is that fact discovery is scheduled to close on September 26, 2006, thus giving the parties less than six months to both conclude discovery on the claims already in the case, and to conduct full

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 5

Slip Copy, 2006 WL 1452803 (D.Del.), 2006-1 Trade Cases P 75,320, 64 Fed.R.Serv.3d 847
**(Cite as: Slip Copy)**

discovery on the four additional patent infringement claims. However, trial in this case is not scheduled to begin until June 11, 2007, which should give the parties ample time to conduct additional discovery beyond September 26 without disturbing the trial date. Thus, the court will grant the motion and order the parties to meet and confer regarding an amendment to the court's scheduling order.[FN1]

> FN1. Synopsys claims that Magma's four additional patents are not sufficiently similar to the technology at issue in this case to justify their inclusion. However, Synopsys merely proposes that "a review of the patents quickly reveals that there is little similarity" among the patents. (D.I. 63 at 8.) In this lay court's opinion, a review of the patents quickly reveals enough similarity among the patents to justify including them in this lawsuit.

## V. CONCLUSION

For the reasons stated, the court will deny the motion to dismiss, deny the motion to bifurcate and stay, and grant the motion to amend. The court will further order the parties to meet and confer to regarding an amendment to the court's scheduling order.

## *ORDER*

*6 IT IS HEREBY ORDERED THAT:

1. The motion to dismiss (D.I.9) be DENIED;

2. The motion to bifurcate and stay (D.I.31) be DENIED;

3. The motion to amend (D.I.50) be GRANTED; and

4. The parties MEET and CONFER regarding the scheduling order.

D.Del.,2006.
Synopsys, Inc. v. Magma Design Automation

Slip Copy, 2006 WL 1452803 (D.Del.), 2006-1 Trade Cases P 75,320, 64 Fed.R.Serv.3d 847

Briefs and Other Related Documents (Back to top)

• 2006 WL 809212 (Trial Motion, Memorandum and Affidavit) Plaintiff Synopsys, Inc.'s Reply in Support of its Motion to Bifurcate and Stay Antitrust Claims, and to Bifurcate and Stay all Claims Affected by Likely PTO Reexaminations (Feb. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 809211 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Synopsys's Motion to Bifuracate and Stay (Feb. 6, 2006) Original Image of this Document (PDF)
• 2005 WL 3242197 (Trial Pleading) Defendant Magma Design Automation, Inc.'s Amended Answer to Complaint and Counterclaims (Oct. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 3242196 (Trial Pleading) Defendant Magma Design Automation, Inc.'s Answer to Complaint and Counterclaims (Oct. 19, 2005) Original Image of this Document (PDF)
• 1:05cv00701 (Docket) (Sep. 26, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.